UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.   CASE NO. 8:20-cr-206-T-60AEP

MUHAMMED MOMTAZ AL-AZHARI

### GOVERNMENT'S RESPONSE TO
### DEFENDANT'S OBJECTION TO PROBABLE CAUSE FINDING

The United States of America files this response in opposition to the objection of the Defendant, Muhammed Momtaz Al-Azhari, to the Court's probable cause finding at the preliminary hearing and his incorporated motion to dismiss the criminal complaint (Doc. 29).

### MEMORANDUM OF LAW

The Defendant's motion is both moot and without merit. The Court should deny his motion on both grounds.

On May 26, 2020, and the Defendant was federally arrested and his criminal complaint was filed. On June 23, 2020—within the 30-day period required by 18 U.S.C. § 3161—a grand jury returned an indictment charging the Defendant with violations of 18 U.S.C. § 2339B (the single charge alleged in the criminal complaint) and 26 U.S.C. § 5861(b) and (d). This Court has been assigned both the indicted case and the current motion.

## I. The Defendant's motion is moot.

The filing of the indictment renders the Defendant's motion moot. *See Denton v. United States*, 465 F.2d 1394, 1395 (5th Cir. 1972) (citing *Tanner v. United States*, 296 F.2d 218, 218 (10th Cir. 1961)); *see also Conlan v. United States*, No. A-11-CR-451(1) LY, 2015 WL 8362905, at *2 (W.D. Tex. Dec. 7, 2015); *Cusamano v. Donelli*, No. 06 CIV. 6047 PAC THK, 2010 WL 2653653, at *3 (S.D.N.Y. July 1, 2010) ("The indictment by the grand jury rendered any deficiency in the criminal complaint moot."); *cf. United States v. Forde*, No. 93-1322, 30 F.3d 127, at *2 n.2 (1st Cir. 1994) ("No doubt the later-obtained indictment superseded the complaint and, in that sense, mooted the question whether to dismiss that complaint."); *Rivers v. United States*, No. 3:13-CR-3954-BEN-1, 2019 WL 1959583, at *2 (S.D. Cal. May 2, 2019) ("Even assuming the existence of a defect [in the complaint], however, such a[n] [ineffective assistance] challenge would have been mooted by a finding of probable cause following the grand jury's indictment."). An indictment that is fair upon its face and returned by a properly constituted grand jury conclusively determines the existence of probable cause. *See Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975).

## II. The complaint was supported by probable cause.

By his own admission, the Defendant is a member of ISIS and a fervent supporter of that designated foreign terrorist organization ("FTO"). As the complaint details, the Defendant is a United States citizen who was returned to

this country from Saudi Arabia in December 2018 after he was convicted of terrorism-related charges abroad. Within months of returning to the United States, the Defendant began consuming ISIS propaganda. Doc. 5 at 28. Regardless of what organization he may have supported in the Syrian civil war—which gave rise to his first terrorism charges—the Defendant revealed his affinity for ISIS not long after he came back to this country.

The Defendant was found to be consuming ISIS propaganda beginning in May 2019. Doc. 5 at 30. By September 2019, the Defendant was actively researching how to make improvised explosives devices and poisons, including a resource called "*Mujahid guide in forensic research* and *4 easy ways to make a suicide belt*." *Id.* at 32-33. In around February and March 2020, he began looking into acquiring guns. *Id.* at 33-35. The Defendant's interest in finding guns only intensified over the next two months, and he turned to the streets to obtain an Uzi submachinegun. *Id.* at 36-43. The Uzi was in addition to another handgun that the Defendant "literally got [] off the streets." *Id.* at 18. Spent shell casings found in the Defendant's car show that he fired the Uzi. *Id.* at 46. Around the same time, the Defendant engaged an undercover FBI agent to try to get a fully automatic AK-47 rifle, a Glock pistol, a silencer, a threaded barrel, and extended magazines. *Id.* at 9-23. Those plans were only thwarted when the Defendant was arrested on state charges for unlicensed carrying of a concealed firearm—a third gun that he had somehow acquired. *Id.* at 22.

But even the Defendant's state arrest did not deter him from his plans to

obtain firearms and provide material support to ISIS. In late May 2020, the Defendant began interacting with a confidential human source ("CHS-1"). *Id.* at 53-62. Over a period of days, he converted CHS-1 to Islam and asked for his help in carrying out attacks and robberies, to include killing police officers and members of the military. *Id.* The Defendant also asked CHS-1 to help him obtain a Glock pistol, an AK-47 rifle, and silencer, just as he had asked the undercover agent to do. *Id.* FBI agents arrested the Defendant when he took possession of the Glock pistol, a silencer, and an extended magazine. *Id.* at 62.

During these busy months, the Defendant prepared himself for a deadly attack in support of ISIS. He ordered gear for an attack, such as a tactical vest, a skull facemask, a backpack USB interface, a drone, and a long, hooded winter coat. *Id.* at 25. He also surveilled targets, to include Honeymoon Island State Park and other "busy" area beaches. *Id.* at 49, 51-53. Contemporaneously, the Defendant pledged allegiance to ISIS and rehearsed portions of his attack. *Id.* at 44-45, 49. In relevant part, he boasted:

- "Know America. Today is your emergency. Today we kill from you guys like you killed from us. I pledge allegiance to Sheik Abu Ibrahim al-Hashimi[1] when you consider what I'm about to do." *Id.* at 49.

- "Hey you, get on the floor. Get on the floor now. Don't you move, don't you move, I'm telling you, I will kill you. Get on the floor, God willing, the exalted." *Id.* at 44.

- "God willing, the exalted. This is revenge for my brothers Al Muwahideen *[the monotheists]* in Guantanamo in general, and for my brother [redacted] in particular. God willing, he may be praised and

---

[1] Al-Hashimi is the second and current "Caliph" of ISIS and is considered its leader.

4

> exalted.  God willing, this is a revenge for all my Muslim brothers in Iraq and al-Sham *[Syria]*[2] and everywhere."  *Id.* at 44-45.

- "In the name of God, Allah Akbar *[God is great]*…God willing, the exalted, the Islamic State is lasting."  *Id.* at 45.

If there was any doubt that the Defendant identified as a member of ISIS and endeavored to work under its direction or control, his interactions with CHS-1 erased that doubt.  The Defendant bluntly told CHS-1, "I am ISIS, okay?"  *Id.* at 57.  He further said that he wanted to go live with the "good brothers" in Syria and Iraq and explained, "I want to join ISIS.  They are the real followers.  I've lived there before.  I enjoyed that life."  *Id.*  The Defendant added, "We either go over there, to Syria and Iraq and live between Muslims, and fight with them against the Syrian Army and then the Iraqi army, or we stay here in America and we keep, we keep making their lives hell until Allah accepts us as martyrs."  *Id.*  He went on to explain the difference between al-Qaeda and ISIS, remarking that ISIS consists of all jihad groups together, and said, "We don't care about the name.  We care about the purpose.  America is afraid because we are united."  *Id.* at 58.  The Defendant repeatedly referred to ISIS by the collective words "we" or "our," including by saying that "our target" is to establish an Islamic state of Islam, and he claimed that he had been trying to do so for more than six years (which encompasses his time in Saudi Arabia).  *Id.*

The Defendant also continually expressed his admiration for Pulse

---

[2] ISIS is an acronym for the "Islamic State of Iraq and al-Sham."  Doc. 5 at 2, 4.

nightclub shooter, and fellow ISIS "soldier" (*Id.* at 36), Omar Mateen.  He searched for Mateen's grave in South Florida and visited the Pulse nightclub memorial on at least two occasions—including one time, ominously, in the dead of night and around the same time that Mateen's attack had occurred.  *Id.* at 35-37, 51-52.  As discussed below, the Defendant spoke glowingly about how Mateen had killed 49 people and injured 53 "in the gay club."  *Id.* at 60.  Even the weapons that the Defendant tried to acquire—the Glock pistol, in particular— were a dark homage to Mateen.[3]  In the Defendant's own words:

> "Me, I eventually, that's how I want to die, to be honest.  I want to die, you know, in a shootout with the kuffar *[disbelievers/non-Muslims]*…You know like, brother Omar Mateen in Orlando did.  He took 49 with him… He went in with his AR-15 and his 9mm, pow pow pow, and won't stop, just pulled the trigger – every kaffir *[infidel]* he sees in front of him.  That's what I want to do.  Inshallah *[God willing]*…[E]ver since that happened, they shut, they shut it down.  So, mashallah *[God has willed it]*, look what he did, he caused, he made a difference."

*Id.* at 60.

Despite the facts set out above and in the complaint, the Defendant alleges that the government "presented no evidence in any form that [he] attempted to work under the direction or control of ISIS."  Doc. 29 at 8.  However, the facts are clear that the Defendant attempted to violate 18 U.S.C. § 2339B, and certainly under a probable cause standard.

---

[3] *See* Bart Jansen, "Weapons gunman used in Orlando shooting are high-capacity, common," *USA TODAY*, June 14, 2016, *available at* https://www.usatoday.com/story/news/2016/06/14/guns-used-kill-49-orlando-high-capacity-common-weapons/85887260/.

6

Probable cause is defined as "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Grider v. City of Auburn,* 618 F.3d 1240, 1257 (11th Cir. 2010) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).  The Defendant claims that, contrary to the findings of two magistrate judges, this low bar has not been met because he did not in some way endeavor to place himself or someone else under ISIS's direction and control.  Doc. 29 at 14.  However, that argument overlooks the Defendant's own words and actions, as well as the reality of ISIS's modus operandi.

ISIS has called for its supporters to carry out the type of attack that the Defendant attempted to conduct here.  As laid out in the complaint, ISIS has encouraged its followers who are unable to travel to the Middle East to commit jihad by fighting (also known as making "hijrah") to instead conduct attacks in their home countries.  Doc. 5 at 5-7.  The very title of one such exhortation was "Lone Wolfs Rise Up."  *Id.* at 7.  By optimizing the types of social media and internet platforms that the Defendant himself consumed and used, ISIS spreads that message inciting violence across the globe.  *Id.*  While ISIS may maintain a formal, centralized structure in parts of the Middle East, it allows any like-minded follower to join its cause by committing acts of violence in support of an Islamic state.  As far back as September 21, 2014, now-deceased ISIS spokesperson Abu Muhammad al-Adnani called for followers to take action and show their support for ISIS through acts of violence in their homelands.  *Id.* at 6; Samantha

7

Arrington Sliney, *Right to Act: United States Legal Basis Under the Law of Armed Conflict to Pursue the Islamic State in Syria*, 6 U. Miami Nat'l Sec. & Armed Conflict L. Rev. 1, 2 (2016).  Al-Adnani reiterated that called in May 2016, stating, "If the tyrants have closed in your faces the door of hijrah, then open in their face the door of jihad and make their act a source of pain for them…The smallest action you do in the heart of their land is dearer to us than the largest action by us, and more effective and more damaging to them."[4]  What's more, common sense and our experience tell us that this is how ISIS now carries out its mission to attack the United States and other Western countries.  Over the past several years, there have been numerous publicized "lone wolf"-type terrorist attacks carried out in Florida, California, Texas, New York, the United Kingdom, France, Belgium, Spain, Australia, and elsewhere, in which the attackers have claimed to support ISIS or for which ISIS has claimed responsibility.[5]  To ignore those attacks and ISIS's role in facilitating and benefiting from them is to close one's eyes to reality.

Nor does the available case law support the Defendant's argument.  The

---

[4] Griff Witte et al., "Flow of foreign fighters plummets as Islamic State loses its edge," WASHINGTON POST, Sept. 9, 2016, *available at* https://www.washingtonpost.com/world/europe/flow-of-foreign-fighters-plummets-as-isis-loses-its-edge/2016/09/09/ed3e0dda-751b-11e6-9781-49e591781754_story.html

[5] *See* "Global Terrorism Database," NATIONAL CONSORTIUM FOR THE STUDY OF TERRORISM AND RESPONSES TO TERRORISM, accessed on June 17, 2020, *available at* https://www.start.umd.edu/gtd/; Tim Lister et al., "ISIS goes global: 143 attacks in 29 countries have killed 2,043," *CNN*, Feb. 12, 2018, *available at* https://www.cnn.com/2015/12/17/world/mapping-isis-attacks-around-the-world/index.html; Camila Domonoske et al., "Suspect In New York City Truck Attack Accused Of Terrorism In Federal Complaint," *NPR*, Nov. 1, 2017, *available at* https://www.npr.org/sections/thetwo-way/2017/11/01/561304014/suspect-in-new-york-city-truck-attack-worked-as-commercial-truck-uber-driver.

8

two Eleventh Circuit cases that are directly on point demonstrate as much. *See United States v. Suarez*, 893 F.3d 1330 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 845 (2019); *United States v. Augustin*, 661 F.3d 1105 (11th Cir. 2011). In *Suarez*, the defendant was convicted of violations of 18 U.S.C. §§ 2332a and 2339B after he plotted a bomb attack on a Key West beach in support of ISIS. 893 F.3d at 1333. The FBI learned of the defendant's posting of ISIS propaganda and thereafter introduced a confidential source and an undercover agent to the defendant to disrupt the plot. *Id.* at 1332-1333. Challenging the sufficiency of the evidence on appeal, the defendant claimed that he did not provide material support or resources. *Id.* at 1334. The Eleventh Circuit disagreed, holding that the government had offered "substantial evidence" showing that Suarez knowingly provided material support to ISIS. *Id.* at 1335. The court noted the following:

> "Through his Facebook account, Suarez posted ISIS propaganda, requested help in building bombs, attempted to recruit others to join him in attacks, and filmed a recruitment video to this end…He coordinated directly with individuals whom he believed to be members of ISIS in order to acquire a bomb. He provided the money and materials for the bomb, and he accepted the bomb while reiterating his plan to detonate it on a crowded beach. On this basis, a reasonable jury could conclude that Suarez attempted to direct his services to the benefit of a foreign terrorist organization."

*Id.* It went on:

> "Suarez argues that there was no coordination or direct contact with an actual foreign terrorist organization because he had contact only with the government informant and undercovers. **But it is irrelevant that he did not make contact with ISIS, because the law requires only that Suarez directed (or attempted to direct) his services to ISIS**…**Suarez had the requisite intent to coordinate with ISIS and direct his services to ISIS, and he took substantial steps to do so**. Accordingly, there was sufficient

9

> evidence to convict Suarez for attempting to provide material support to a foreign terrorist organization…."

*Id.* (emphasis added).

Likewise, in this case, the Defendant had the intent to coordinate with ISIS, directed his services to that foreign terrorist organization, and took substantial steps to do so. The Defendant self-identified as an ISIS member, pledged allegiance to ISIS, consumed ISIS propaganda, spoke about wanting to join ISIS fighters overseas, and said that his motive was to avenge offenses against Muslims and to help establish an Islamic state. He then acquired the items needed for an attack, including a handgun, silencer, and extended magazine. As a United States citizen living in this country after already having been imprisoned in, and removed from the, Middle East, the Defendant did everything that he conceivably could do to align himself ISIS. Furthermore, he claimed to CHS-1 that he had been trying to help establish an Islamic state for more than six years, which suggests that he was a member, or at least a supporter, of ISIS when he lived abroad in Saudi Arabia. He also referenced avenging a specific "brother" and member of the "muhawhideen" who had been imprisoned at Guantanamo Bay detention camp. Thus, it seems likely that the Defendant did have contact with ISIS members overseas.

*Augustin* also shows that there is probable cause to support the § 2339B charge here. In *Augustin*, the defendants were charged with violating § 2339B and other crimes. 661 F.3d at 1115. In relevant part, the defendants had jointly

taken an oath to support Al Qaeda, photographed and videotaped federal buildings, and discussed a plot to attack those buildings.  *Id.* at 1111-1114, 1119. But there was no evidence that they had communicated or worked directly with any Al Qaeda members or operatives.  *See id.*  The Eleventh Circuit rejected the defendants' claim that their conduct did not rise to the provision of personnel under § 2339B(h).  *See id.* at 1119.  It held that, under of the totality of the circumstances, "the jury was free to conclude that [the defendants], though immediately under [one defendant's] command, were ultimately volunteering themselves to serve under the direction and control of Al Qaeda."  *Id.*  The jury could decide "from the entirety of the oath ceremony, including the revelation of the plan to blow up FBI offices across the country, and the [defendants'] later actions in taking photographs and video footage of the Miami federal buildings and presenting them to [Defendant] Assaad, that [Defendants] Augustin, Phanor, and Augustine had volunteered to work under Al Qaeda's direction or control." *Id.*; *see also United States v. Elshinawy*, No. CR ELH-16-0009, 2017 WL 876484, at *10 (D. Md. Mar. 6, 2017) (favorably citing *Augustin*).

Similarly, in *United States v. Hendricks*, 950 F.3d 348, 354 (6th Cir. 2020), the Sixth Circuit determined that there was sufficient circumstantial evidence to show that the defendant attempted and conspired to direct personnel or services to ISIS.  There, the defendant had approached a group of people and proposed waging jihad in the United States.  *Id.* at 350.  He had also expressed admiration for ISIS and asked the prospective group members to recruit other like-minded

11

individuals.  *Id.*  The court stated that, among other things, the defendant had expressed allegiance to the leader of ISIS, asked members of the group to distribute ISIS propaganda, had described himself as a "limb" or an "outpost" and ISIS as the "ultimate brain" or "headquarters," and identified himself as a recruiter.  *Id.* at 353-54.  It held that the government was not required to present "direct evidence of any conversation or meeting with specific ISIS members where Hendricks was directed or proposed to establish an ISIS cell."  *Id.* at 354.  Instead, "there was a mountain of circumstantial evidence from which a juror could find beyond a reasonable doubt that Hendricks attempted and conspired to direct services or personnel to the ISIS organization—not merely operate an 'entirely independent[ ]' venture."  *Id.* (citing 18 U.S.C. § 2339B(h)).

    *United States v. Jones*, 383 F. Supp. 3d 810, 813 (N.D. Ill. 2019), is also instructive.  In *Jones*, the defendants gave cell phones to a person who they thought was going to travel to Syria to fight on behalf of ISIS, so that the phones could be used to create IEDs.  *Id.* at 814.  They also advised the person about traveling to Syria and tried to facilitate his travel.  *Id.*  In reality, though, that individual was a confidential human source for the FBI.  *Id.*  The defendants argued to the district court that because they themselves were not members of ISIS, they could not be convicted under § 2339B(h).  *Id.* at 816.  The court, though, found that a "plain reading of the provision reveals no requirement that Defendants be under the direction or control of ISIS."  "Rather," it held, "the Government need only prove that Defendants attempted to provide '1 or more

12

individuals,' namely, the CHS, 'to work under [ISIS]'s direction or control.'"

Furthermore, in *United States v. Wright*, 285 F. Supp. 3d 443, 448 (D. Mass. 2018), *aff'd*, 937 F.3d 8 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 1283 (2020), the defendant was convicted at trial of violating § 2339B and other charges. The defendant had recruited at least two other people in an effort to organize a terrorist cell in Massachusetts. *Id.* at 449. The group initially planned to join ISIS in Syria, but then changed course and began plotting domestic attacks when ISIS issued a fatwa against an American journalist. *Id.* The trial judge gave the following instruction to the jury:

> "Now the coordination—and the reason that the government has to prove that is to prevent, um, the law from applying some random act, just a random act of violence and then ISIS latches onto that and says, 'Oh, yeah, those were our soldiers,' or something like that. They have to—the conspiracy has got to be, um, cognizant of and acting in coordination—it doesn't have to be direct orders, but in coordination with the strategy, the tactics of the foreign terrorist organization, in this case ISIS. Well, that's the first question."

*Id.* at 457. Upholding its own instruction, the court said that advocacy performed in coordination with, or at the direction of, a FTO is a form of "service" and a violation of section 2339B. *See id.* It also stated that "[I]n coordination with, or at the direction of" does not require a "direct link" to the FTO. *Id.* "Here, the government proved that Wright and his coconspirators pledged their allegiance to ISIS and were working under its direction and control to pursue its objectives." *Id.* at 458. The Defendant in this case has done the same.

13

Nor does the case of *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362 (D. Conn. 2009), support the Defendant's argument. In *Abu-Jihaad*, the government alleged that the defendant, while serving in the United States Navy, disclosed classified information regarding the movement of a fleet to individuals in London associated with Azzam Publications, an organization that the government alleged supported violent Islamic jihad and the Taliban. *Id.* at 364, 389. According to the Government, the defendant knew or intended that the information he disclosed would be used to kill United States nationals. *Id.* at 364. After having been convicted at trial, the defendant moved for a judgment of acquittal and a new trial. *Id.* In ruling on that motion, the district court held that "one who makes resources in the form of individuals (including himself) available, or furnishes individuals (including himself), for the purpose of actively preparing for or carrying out the crimes prohibited by the statute through some form of coordinated action is guilty of violating [18 U.S.C.] § 2339A." *Id.* at 400. The court rejected applying a more "narrow" or "limited" definition that confined the term "personnel" to "employees" or "quasi-employees." *See id.* (citing *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002).

Contrary to the Defendant's claim, however, the court in *Abu-Jihaad* did not say that it was legally insufficient that the defendant offered to provide himself as personnel to the FTO without a more direct relationship. *See id.* at 401. Instead, the court said the following:

"The difficulty of applying that definition [of the term "personnel"] to the

14

> facts of this case arises from the Government's theory of guilt, which was that by disclosing national defense information to Azzam, Mr. Abu–Jihaad was, in effect, making himself available to terrorists for the purpose of killing U.S. nationals.  That is, by **providing information alone** to Azzam—an act that was not directly prohibited by § 2339A—Mr. Abu–Jihaad provided personnel—that is, Mr. Abu–Jihaad himself—to Azzam, knowing that he or his assistance would be used to prepare for, or carry out, the killing of U.S. nationals."

*Id.* (emphasis added).  The facts of that case did not involve the defendant offering *himself* as an attacker to further Azzam's goal of waging violent Islamic jihad—like the Defendant here did with ISIS.  Rather, the defendant in *Abu-Jihaad* merely passed on information hoping that it could be used to kill United State nationals.  *Id.*  The court emphasized this point only a few sentences later:

> "Of course, one can imagine situations where an individual makes both himself and others available to terrorist organizations and also provides the organizations with weapons, money, or other tangible resources.  But that is not invariably the case.  That is, merely providing an organization with a resource, even a prohibited resource, is not necessarily the same thing as providing personnel to prepare for or carry out the prohibited purposes of the statute through some form of coordinated or joint action."

*Id.*  Had there been more evidence that the FTO had specifically requested that its supporters provide the type of information that the defendant did, to aid an attack, then "the Court would have little difficulty concluding that [the defendant] had volunteered himself as personnel."  *See id.* at 401-02.  Here, the background set forth in the complaint and at the preliminary hearing regarding ISIS's modus operandi establishes that the Defendant answered that FTO's call to volunteer himself as a jihadi attacker in the United States.  Unlike an obscure publication that, on one occasion, asked its readership to "aid [] the Taliban by

15

requesting money, gas masks, or battlefield medical services," ISIS has relentlessly and effectively exhorted the type of violence that the Defendant tried to carry out and has supplied practical guidance for would-be attackers. *Id.* at 401. In response, the Defendant self-identified as an ISIS member and attempted to provide himself as deadly personnel for its cause.

The evidence set forth in the complaint and adduced at the preliminary hearing establishes that the Defendant attempted to work under ISIS's direction or control.[6] *See* 18 U.S.C. § 2339B(a)(1) and (h). The facts and circumstances are sufficient to warrant a prudent man in believing that the Defendant has committed a violation of § 2339B. *Grider,* 618 F.3d at 1257.[7]

---

[6] The evidence also shows that the Defendant attempted to recruit CHS-1 to work under ISIS's direction or control.

[7] The United States notes that nothing that the complaint affiant said at the preliminary hearing undermines this conclusion. Indeed, the Defendant's own citation to the hearing transcript confirms as much. Doc 29 at 6-7. Special Agent Hazel testified, in relevant part:
"Q.   And certainly you think he—he sympathized with ISIS, correct?
A.    Yes.
Q.    And you think he wanted to advance those goals, correct?
A.    Yes. […]
Q.    All right. And he was just seeking to achieve their—their goals on his own?
A.    Yes."
Doc. 29 at 6-7.

16

## III.  Conclusion

For all of the foregoing reasons, the Court should deny the Defendant's motion.

                Respectfully submitted,

                MARIA CHAPA LOPEZ
                United States Attorney

By:   */s/ Patrick D. Scruggs*
       Patrick D. Scruggs
       Assistant United States Attorney
       United States Attorney No. 140
       400 North Tampa Street, Suite 3200
       Tampa, Florida   33602
       Telephone:     (813) 274-6000
       E-mail: patrick.scruggs@usdoj.gov

| | |
|---|---|
| U.S. v. Muhammed Al-Azhari | Case No. 8:20-cr-206-T-60AEP |

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Samuel Landes, Esq.

*/s/ Patrick D. Scruggs*
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Ste. 3200
Tampa, Florida   33602
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6125
E-mail:   patrick.scruggs@usdoj.gov