UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 8:20-cr-206-T-60AEP

MUHAMMED MOMTAZ ALAZHARI
_____/

### MOTION TO DISMISS INDICTMENT AS BASED ON UNCONSTITUTIONAL STATUTES

**NOW COMES** Defendant, Muhammed Momtaz Alazhari, by and through undersigned

counsel, and moves this Court to dismiss the indictment because the statutes on which it is based

are unconstitutional, facially and as applied.  Mr. Alazhari requests a hearing on this motion.

### MEMORANDUM OF LAW

#### BACKGROUND

Count One of the indictment alleges that Mr. Alazhari attempted to provide "personnel

(including himself) and services" to a foreign terrorist organization ("FTO"), in violation of 18

U.S.C. § 2339B.  The complaint affidavit indicates the Government's theory that Mr. Alazhari, a

citizen of the United States and Florida, attempted to commit an unspecified attack on behalf of

the FTO in the United States.

Count Two and Count Three allege that Mr. Alazhari received and possessed a firearm

silencer in violation of the National Firearms Act (NFA).  Mr. Alazhari has no criminal history in

the United States (his foreign criminal history is discussed below).  A firearm silencer – more

accurately called a suppressor or moderator – is either a permanent part of the weapon's barrel or

an attachment that muffles the firearm's noise when fired.  It reduces noise, although it cannot

"silence" any firearm.  Silencers' primary purpose is hearing protection through the reduction of

noise at its source, eliminating or reducing reliance on ear protection.  They also aid in accuracy

by reducing recoil, the firer's natural instinct to flinch in anticipation of the noise, and the firer's disorientation after the first shot (from the recoil, noise, and muzzle flash).  Silencers increase a firearm's size and weight, and so reduce its concealability.  As such, silencers have important applications to self-defense, sport shooting, and hunting, and little application to violent crime, notwithstanding Hollywood representations to the contrary.

**ARGUMENT**

This Court should dismiss Count One for two reasons.  First, Congress lacks any enumerated power to enact § 2339B, facially and as applied to Mr. Alazhari.  Second, § 2339B is void for vagueness as applied.  This Court should dismiss Count Two and Count Three for two reasons.  First, Congress lacks any enumerated power to criminalize Mr. Alazhari's possession of a silencer.  That is, the NFA exceeds Congress's taxation power because it functions as a penalty, not a tax.  Second, Mr. Alazhari has a Second Amendment right to possess a silencer.

## I.  Congress lacks power to criminalize the conduct alleged in Count One.

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."  *United States v. Morrison*, 529 U.S. 598, 607 (2000).  In Count One, Mr. Alazhari is alleged to have attempted to provide himself (and perhaps someone else) as "personnel" for the FTO, under 18 U.S.C. § 2339B.  One district court has upheld a prosecution under § 2339B against a challenge to Congress's enumerated powers.  *United States v. Ahmed*, 94 F. Supp. 3d 394, 413-17 (E.D.N.Y. 2015).  The *Ahmed* court relied on three potential sources of congressional power:  the Necessary and Proper Clause, as an extension of the President's Article II treaty power; the Define and Punish Clause; and Congress's purported "national

2

security" power.  *Id*.[1]  However, none of these sources of Congressional power permit the criminalization of the conduct alleged in Count One.

First, Congress lacks the power under the Necessary and Proper and Treaty Clauses. When Congress relies on the Necessary and Proper Clause to pass legislation that advances the President's treaty power, it may only legislate in a way that advances the President's ability to *make* treaties.  For example, Congress may appropriate money for the hiring of treaty negotiators, empower the Department of State to appoint those negotiators, form a commission to study the benefits and risks of entering into the agreement, or pay for a bevy of spies to monitor the treaty-related deliberations of other potential signatories.  *United States v. Bond*, 572 U.S. 844, 876 (2014) (Scalia, J., concurring in the judgment).

> But a power to help the President *make* treaties is not a power to *implement* treaties already made.  Once a treaty has been made, Congress's power to do what is "necessary and proper" to assist the making of treaties drops out of the picture.  To legislate compliance with the United States' treaty obligations, Congress must rely upon its independent (though quite robust) Article I, § 8, powers.

*Id*. (citation omitted).  To rule otherwise would be to permit the President and two-thirds of the Senate to grant Congress additional constitutional powers to legislate not provided by the Constitution itself, thereby "plac[ing] Congress only one treaty away from acquiring a general police power."  *See id*. at 877-79.  Section 2339B's prohibition on material support obviously does not aid the President in making any treaty, and so cannot be sustained under the Necessary and Proper Clause or the Treaty Clause.

---

[1] Congress expressly relied on its necessary and proper treaty power and Law of Nations power in enacting § 2339B.  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 301(a), 110 Stat. 1214.

To be sure, the Court long ago stated, "If the treaty is valid there can be no dispute about the validity of the statute under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government." *Missouri v. Holland*, 252 U.S. 416, 432 (1920). Lower courts have construed this language to give Congress broad powers to pass legislation to implement a valid treaty. *See United States v. Belfast*, 611 F.3d 783, 805 (11th Cir. 2010) (citing *United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998)). Courts facing challenges to legislation implementing a treaty review for a "rational relationship" between the act and the treaty. *Belfast*, 611 F.3d at 805.[2] Here, there is no rational relationship with any treaty. The *Ahmed* court collected 12 treaties it supposed provides Congress with the power to criminalize the material support at issue in that case. *Ahmed*, 94 F. Supp. 3d at 414-15 & n.7. But even a cursory review of those treaties shows they are not addressed to an attempt to provide personnel to an FTO. A treaty relating to the *financing* of terrorism, which could at least be said to be vaguely related to this alleged offense, expressly does not apply "where the offence is committed within a single State, the alleged offender is a national of that State and is present in the territory of that State and no other state has a basis . . . to exercise jurisdiction . . . ." Convention for the Suppression of the Financing of Terrorism art. 3, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* Apr. 10, 2002. That is precisely the case here, and the Treaty Power therefore cannot be the basis for this prosecution.

Second, the Define and Punish Clause does not provide Congress with the necessary power. Congress's power to define offenses against the law of nations is limited by customary

---

[2] *But see Sabri v. United States*, 541 U.S. 600, 611-13 (2004) (Thomas, J., concurring in judgment) (stating that "one must seemingly show more than that a particular statute is a 'rational means'" to survive a challenge under the Necessary and Proper Clause).

4

international law.  *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1249 (11th Cir. 2012).

And, as the *Ahmed* court frankly conceded, customary international law does not recognize

material support to terrorism as an offense.  94 F. Supp. 3d at 415 n.8; *accord Hamdan v. United*

*States*, 696 F.3d 1238, 1249-53 (D.C. Cir. 2012), *overruled on other grounds*, *Al Bahlul v.*

*United States*, 767 F.3d 1, 11 (D.C. Cir. 2014).  While certain forms of material support to

terrorism may *coincidentally* constitute offenses against the law of nations, such as where the

material support also constitutes war crimes or crimes against humanity, *see Ahmed*, 94 F. Supp.

3d at 415 n.8, there is no allegation of such a coincidence here.

Last, Congress possesses no general "national security" power, as *Ahmed* suggests.  For

the proposition that the Constitution provides such a power, *Ahmed* cited *United States v.*

*Farhane*, 634 F.3d 127, 137 (2d Cir. 2011), and *Aptheker v. Secretary of State*, 378 U.S. 500,

509 (1964).  *Farhane* is a case in which a doctor asserted a constitutional right to practice

medicine, and contains no reference to such a power.  *Aptheker* is a case about the right of travel,

and its statement that "Congress has power to safeguard our Nation's security" refers to

Congress's *enumerated* powers in that regard, many of which relate to the national defense.  *See*

*Aptheker*, 378 U.S. at 509.  The case does not announce for the first time a penumbral and

general "national security" power that would render the specific national-security grants of

power in Article I, Section 8, superfluous.  Accordingly, Congress possesses no power to

prohibit the conduct alleged in Count One.[3]

---

[3] *Ahmed* does not rest on Congress's Commerce Clause power, although the case suggests the commerce power could provide a justification in cases in which jurisdiction is predicated on § 2339B(d)(1)(E).  Here, the Government will proceed under subsection (d)(1)(A) or (D) and, in any event, there is no suggestion that anything about the alleged offense is "commercial," or occurred in or affected commerce.

**II.  Section 2339B is void for vagueness.**

A statute is void for vagueness, and thus violates due process, if it (i) fails to provide fair notice of what is prohibited or (ii) gives "too much enforcement discretion" to the government. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-20 (2010).  In *Humanitarian Law Project*, the Supreme Court upheld § 2339B against an as-applied void-for-vagueness challenge, but left open two issues that are relevant here.  First, the Supreme Court did not decide whether § 2339B provides fair notice in all applications.  *Id.* at 14, 18-19, 21.   Second, the Supreme Court did not decide whether § 2339B "grants too much enforcement discretion to the Government."  *Id.* at 20. Both of these questions are implicated here.

Indeed, in upholding § 2339B against the void-for-vagueness challenge in *Humanitarian Law Project*, the Supreme Court pointed to Congress's "limiting definition" in § 2339B(h) to find that the term "personnel" was not vague.  *Id.* at 23.  In the instant case, however, the Government prosecutes Mr. Alazhari without even asserting this limiting provision.  The indictment contains no allegation that he attempted to provide a "person 'to work under th[e] terrorist organization's  direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization."  *See id*.

Similarly, the Supreme Court interpreted "service" to "refer[] to concerted activity, not independent advocacy."  *Id*.  The Court thus read "service" to carry the same requirement of concerted activity (and same exemption for independent activity) as "personnel."  *Id.* at 23-24. But the term "service" is left undefined and unlimited by the Government here, demonstrating that the term "service" provides too little notice to Mr. Alazhari and leaves too much discretion

to the Government.  Therefore, Count One of the indictment must be dismissed because the statute on which it is based is void for vagueness.[4]

### III.  Congress lacks Article I power to criminalize the conduct alleged in Count Two and Count Three.

Counts Two and Three charge Mr. Alazari with receiving and possessing a silencer transferred to him and not registered to him, citing 26 U.S.C. §§ 5812, 5861(b) & (d), and 5871.[5] The NFA provisions at issue here exceed Congress's power to "lay and collect Taxes," *see* U.S. Const. art. I, § 8, cl.1, and thus violate the Tenth Amendment, *see* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

Congress may use its tax power to influence conduct, but this power "is not without limits." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 567, 572 (2012) ("*NFIB*"). Consistent with the United States' federalist system of government, the Supreme Court has cautioned that Congress's enumerated powers "must be read carefully to avoid creating a general federal authority akin to the police power." *Id.* at 536.  As to its tax power, Congress's authority

---

[4] The Government's failure to plead the facts required by § 2339B(h) is addressed in Mr. Alazari's Motion to Dismiss for Failure to State an Offense and Multiplicity, and the Government's failure to allege the "services" at issue is addressed in Mr. Alazhari's Motion for a Bill of Particulars.

[5] The Eleventh Circuit recently heard oral argument on whether the NFA, and particularly 28 U.S.C. § 5861(d), are unconstitutional.  *See United States v. Bolatete*, No. 18-14184 (11th Cir.) (argued June 12, 2020).  One question before the Eleventh Circuit in *Bolatete* is whether *United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009); *United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972); and *United States v. Matthews*, 438 F.2d 715 (5th Cir. 1971), foreclose the constitutional challenge.  In light of the pending argument in *Bolatete*, Mr. Alazhari maintains that his arguments are not foreclosed and respectfully reserves the right to address this issue further once the Eleventh Circuit issues its decision in *Bolatete*.  In addition, the NFA goes well beyond a regulation "in aid of a revenue purpose," given the breadth of the NFA and its prohibition on possession. Acknowledging *Ross*, 458 F.2d at 1145, Mr. Alazhari preserves this argument for purposes of further review.

"is limited to requiring an individual to pay money into the Federal Treasury, no more." *Id.* at 574.[6]

Not every exaction that Congress has labeled a "tax" constitutes a tax within Congress's power.  As the Supreme Court has recognized, "there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." *Id.* at 573 (citations and internal quotations omitted).  While Congress may enforce its taxation laws, "criminal prosecution" is one of the "means most suggestive of a punitive sanction." *Id*. at 566, 574 n.11.  To determine whether an exaction is a tax or a penalty, the Supreme Court applies a "functional approach," focusing on the "practical characteristics of the so-called tax." *Id.* at 565.  In *NFIB*, for example, the Supreme Court was guided by three factors — whether the "tax" is (i) burdensome; (ii) requires scienter; and (iii) is enforced by an agency responsible for punishing violations of the subject laws. *Id.* at 565-66 (discussing *Child Labor Tax Case (Bailey v. Drexel Furniture)*, 259 U.S. 20, 36-37 (1922)).

Applying the *NFIB* framework here, the NFA provisions at issue function as a penalty, not a tax.  First, the NFA "tax" was set to impose a heavy burden, and exacts criminal punishment on those not responsible for paying it.   In *Drexel Furniture*, the Supreme Court found that the "exceedingly heavy burden" of the "tax" — 10% of net income for any company that employed children — weighed against finding it to be a tax. *NFIB*, 567 U.S. at 565 (citing *Drexel Furniture*, 259 U.S. at 36-37).  In the NFA, Congress set a $200 "tax," selecting that

---

[6] Congress's authority under the tax power is narrower than its power under the Commerce Clause. *Id.* at 573-74.

amount to match (and thus double) the price of a machine gun in 1934.  *See* Stephen P. Halbrook, *Firearm Sound Moderators:  Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 50 (2015) ("*Firearm Sound Moderators*") (explaining that the tax rate on a machine gun was 100%).  The tax rate on a silencer, which sold in 1934 for about $5, was roughly 4,000%.  *See id.*

The person responsible for paying the tax is the person transferring the firearm, not the recipient.  26 U.S.C. § 5811(b) ("**By whom paid**.--The tax imposed by subsection (a) of this section shall be paid by the transferor.").  And, the person responsible for registering the firearm before transferring it is the transferor, not the recipient.  26 U.S.C. § 5841(b) ("**By whom registered**.--Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferor.").  Yet, the NFA subjects the *recipient*, who is not responsible for paying these taxes, to severe criminal penalties of up to 10 years in prison and $10,000 in fines.  26 U.S.C. § 5871; *see Staples v. United States*, 511 U.S. 600, 616 (1994) (recognizing 10-year penalty as "harsh").[7]  Indeed, Mr. Alazhari is being prosecuted for receiving or possessing a silencer transferred to him, not for failing to pay any tax.  *Cf. Sonzinksky v. United States*, 300 U.S. 506, 514 (1937) (upholding NFA's $200 annual license tax on firearms dealers, in a case where defendant was prosecuted for "dealing in firearms without payment of the tax," without reaching whether the tax on transfers was valid).  The driving force behind the NFA is thus a punitive

---

[7] This NFA criminal penalty is far more severe than other criminal penalties for failing to pay taxes.  For example, the maximum penalty for violations of the Internal Revenue Code is five years imprisonment (26 U.S.C. § 7201), with other violations carrying three-year (26 U.S.C. § 7206) or one-year (26 U.S.C. § 7203) terms.

9

criminal regulation of the possession of firearms, not the collection of the $200 tax on transferring or making firearms.  *See* Exhibit 1, p. 1.  This first consideration therefore weighs in favor of concluding that the NFA exceeds Congress's tax power.

Second, the NFA requires a showing of scienter.  While the NFA does not expressly include a scienter requirement, the Supreme Court has held that, at a minimum, the Government must prove that the defendant knew the characteristics of the item that make it an NFA "firearm."  *Staples*, 511 U.S. at 605, 618-19.  And, at least as applied to silencers, the NFA requires the Government to show that the defendant knew the facts that make the transfer to him unlawful under the NFA – as Mr. Alazhari explains in detail in his separate motion to dismiss. This second consideration also favors treating the NFA as an unconstitutional penalty.

Last, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), a Department of Justice (DOJ) agency, administers and enforces the NFA.[8]  The NFA is therefore not a tax collected by the Treasury Department, but is instead enforced by an agency responsible for punishing violations of gun laws.  *Compare NFIB*, 567 U.S. at 563-54, 566 (upholding what Congress labeled a "penalty," in part because it was "collected solely by the IRS through the normal means of taxation" and the IRS "is *not* allowed to use those means most suggestive of a punitive sanction, such as criminal prosecution"), *with Drexel Furniture*, 259 U.S. at 36-37 (striking down  "tax" on the use of child labor, in part because the tax was collected by an agency, the Department of Labor, responsible for punishing violations of labor laws, not

_____

[8] ATF used to be an agency within the U.S. Department of the Treasury.  In fact, except for a brief period, ATF was part of the Treasury Department for more than 200 years until January 2003, when Congress split its functions in two.  Exhibit 2.  ATF was transferred to DOJ; the Alcohol and Tobacco Tax and Trade Bureau remained with the Treasury Department.  *Id.*

collecting revenue).  This factor therefore also weighs in favor of concluding that the NFA exceeds Congress's tax power.  Accordingly, this Court should dismiss Counts Two and Three as based on unconstitutional statutes.

## IV.  Mr. Alazhari has a Second Amendment right to engage in the conduct alleged in Count Two and Count Three.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment provides an individual right to keep and bear arms unrelated to service in the militia.  554 U.S. 570, 595 (2008).  The Court explained that, like other constitutional rights, the Second Amendment right is "not unlimited."  *Id*. at 626.  The Court explained that its opinion does not "clarify the entire field." *Id*. at 635.  However, the Court did explain, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at 626-27. This list of "presumptively lawful" gun controls is not exhaustive, but only illustrative.  *Id*. at 627 n.26.  The Court also noted another limitation on the Second Amendment right, the Government's ability to ban "dangerous and unusual" weapons, like machine guns.  *Id*. at 627 (citing *United States v. Miller*, 307 U.S. 174, 179 (1939)).

The Court rejected any use of the "rational basis" test, a lower standard used in other areas of the law, to judge gun controls.  *Id*. at 629 n.27.  Further, the Court rejected any use of an "interest balancing" test when the Second Amendment right's "core protection" is at issue.  *Id*. at 634.  That core right is "the right of law-abiding, responsible citizens to use arms in defense of

hearth and home." *Id*. at 635. The Court later explained that the Second Amendment right is "fundamental." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). Accordingly, the Second Amendment right is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id*. at 780. For this reason, lower courts applying *Heller* and *McDonald* have reasoned by analogy to other constitutional rights, most prominently the First Amendment. *See*, *e.g.*, *Duncan v. Beccera*, __ F.3d __, 2020 WL 4730668, at *18 & n.20 (9th Cir. 2020); *see also* David B. Kopel and Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U. L.J. 193, 275-76 (2017) ("*Second Amendment Doctrines*").

Like most other appellate courts to have applied *Heller*, the Eleventh Circuit applies a two-step test to Second Amendment challenges. *GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1261 n.34 (11th Cir. 2012) ("*GeorgiaCarry.Org I*") (collecting out-of-circuit cases). "[F]irst, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny." *Id*. (citations omitted).[9] Here, the NFA's application to silencers burdens Mr. Alazhari's Second Amendment right under Step One, because it restricts his choice of arms for self-defense. The silencer restriction is not "presumptively lawful," because it is neither similar to any item on *Heller*'s illustrative list, nor is it "longstanding." As a license tax on the exercise of constitutional rights, the NFA is

---

[9] This judicially created two-part test is inconsistent with *Heller* and *McDonald* in various ways. *See Rogers v. Grewal*, 140 S. Ct. 1865, 1867 (2020) (Thomas, J., dissenting from denial of certiorari) (stating that the two-step test "appears to be entirely made up" and "its application has yielded analyses that are entirely inconsistent with *Heller*."). Instead, courts should apply a "text, history, and tradition" test. *See Heller v. District of Columbia*, 670 F.3d 1244, 1285 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). However, *GeorgiaCarry.Org I* is presently binding precedent for this Court.

categorically unconstitutional.  If any level of scrutiny applies, it is strict scrutiny, because the burden on Second Amendment rights is severe, and the NFA cannot survive strict scrutiny. Finally, even if the less demanding "intermediate scrutiny" standard applies, the NFA's broad restrictions on silencers fail that test as well.

A.  The NFA's application to silencers burdens protected conduct.

A silencer is an "arm" protected by the Second Amendment.  The Step One analysis under *GeorgiaCarry.Org I* is primarily a historical analysis of the scope of the right and the regulated arm, person, or activity.  *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1324 (11th Cir. 2015) (citing *GeorgiaCarry.Org I*, 687 F.3d at 1261).  At Step One, the burden is on the Government:  "If the government cannot establish this – if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected – then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights."  *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011).

"[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.  A "bearable arm" is any "[w]eapon of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] . . . for the purpose of offensive or defensive action."  *Id*. at 581 (internal quotation marks omitted).  When, as here, the law seeks to restrict a particular type of arm, the Government must show that the arm in question is "dangerous and unusual."  *See United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (citing *Heller*, 554 U.S. at 627).  The test is conjunctive:  "A weapon may not be banned unless it is *both* dangerous

*and* unusual." *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (Alito, J., concurring in the judgment).  Put in the negative, to prove that a weapon is "dangerous and unusual," the Government must prove that the weapon is "not typically possessed by law-abiding citizens for lawful purposes." *Tagg*, 572 F.3d at 1326 (citations omitted).

To determine whether an arm is unusual, courts look to an arm's "commonality," or whether it is typically possessed by law-abiding citizens for purposes of self-defense. *Duncan*, 2020 WL 4730668, at *7; *see also Ass'n of New Jersey Rifle and Pistol Clubs v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*") (citing *United States v. Marzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).  This inquiry is largely objective and statistical.  *Duncan*, 2020 WL 4730668, at *7.  However, "a pure statistical inquiry may hide as much as it reveals" because "protected arms may not be numerically common by virtue of an unchallenged, unconstitutional regulation."  *Id*. (citing *ANJRPC*, 910 F.3d at 116 n.15; *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)).  "Thus, '[w]hile common use is an objective and largely statistical inquiry, typical possession requires us to look into both broad patterns of use and the subjective motives of gun owners.'"  *Id*. (quoting *New York Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015)).

Silencers are typically possessed by law-abiding citizens for lawful purposes.  As of May 2019, there were 1,750,433 silencers registered in the United States and 118,097 in Florida.[10] Forty-two states make silencer use lawful. [11]  Silencers aid in self-defense by protecting against

---

[10] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States:  Annual Statistical Update* 15 (2019) (enclosed as Exhibit 3).

[11] Ronald Turk, Associate Deputy Director (Chief Operating Officer), Bureau of Alcohol, Tobacco, Firearms and Explosives, "Options to Reduce or Modify Firearms Regulations" 6

hearing damage and increasing accuracy.

> In the past several years, opinions about silencers have changed across the United States. Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized . . . . The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country.[12]

As cases like *Duncan* recognize, unchallenged firearms laws like the NFA act as obstacles to numerically broader silencer possession. Given the increasing demand for silencers, many more law-abiding citizens would likely possess them if not deterred by the need to comply with the NFA.

In addition to being widely possessed and accepted, silencers are almost never used in crimes or by criminals. "On average [between 2007 and 2017], ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions."[13] Of course, the vast majority of these referrals were likely for conduct that violates the NFA itself, like making, transferring, or possessing an unregistered silencer, the very law challenged as unconstitutional here. "[C]onsistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings."[14]

---

(2017) (enclosed as Exhibit 4). Eight states and the District of Columbia regulate or ban silencers. S*ee* Cal. Penal Code § 33410; Del. Code. Ann. Title 11, § 1444; D.C. Code § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1(a)(6); Mass. Gen. Law. ch. 269, § 10A; N.J. Stat. Ann. § 2C:39-3(c); N.Y. Penal Law §§ 265.02, 265.10; 11 R.I. Gen. Laws Ann. § 11-47-20.

[12] Turk, *supra*, note 11, at 6.

[13] *Id*.

[14] *Id*.; *accord* Paul A. Clark, *Criminal Use of Firearm Silencers*, WESTERN CRIMINOLOGY REVIEW 8(2) 52 (2007) ("In more than 92 percent of cases the silencer involved in the prosecution was not actively used in any way, but was simply found in the possession of the defendant.").

Accordingly, the Government cannot show that silencers are "unusual" under *Heller*.

*Cf. Caetano*, 136 S. Ct. at 1032-33 (Alito, J., concurring in judgment) (finding stun guns to be protected given that 200,000 have been sold and they may lawfully be possessed in 45 states).

Because *Heller*'s "dangerous and unusual" test is conjunctive, that silencers are not "unusual" ends the Step One analysis and requires the Government to satisfy heightened scrutiny under Step Two. *See Duncan*, 2020 WL 4730668, at *9. But neither can the Government show that silencers are "dangerous."

> *Heller* provides a useful baseline. All weapons are dangerous, and *Heller* tells us that handguns (which are very frequently used in crime, and disproportionately so, compared to their percentage of the gun stock) are protected by the Second Amendment. Ergo, a "dangerous" weapon must, at least, be more dangerous than handguns.

*Second Amendment Doctrines*, 61 St. Louis U. L.J. at 232 (citing *Heller*, 54 U.S. at 693-713 (Breyer, J., dissenting)). As described above, there is nothing inherently dangerous about silencers, which are designed for hearing protection and the promotion of accuracy, functions that serve self-defense well. *Cf. Tagg*, 572 F.3d at 1326-27 & n.5 (holding that pipe bombs are not protected because of their inherent dangerousness and lack of any legitimate purpose). Further, as described above, silencers are very rarely used to commit crimes or cause injuries. *See* Clark, *supra*, note 14, at 51 (finding that "ordinary firearms are far more likely to be actively employed, as well as used to injure a victim."); *cf. Duncan*, 2020 WL 4730668, at *9 n.8 (considering statistics showing that "criminal use of [the arms in question] is relatively low compared to their market saturation.").

One court has unconvincingly held that silencers receive no Second Amendment protection at all under Step One. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir.

2018), *cert. denied*, 139 S. Ct. 2690 (2019).  In *Cox*, the defendants presented evidence showing that silencers are "particularly valuable for 'the core lawful purpose of home defense.'"  *Id.* (quoting *Heller*, 554 U.S. at 630).  Without addressing silencers' usefulness for self-defense, the court held that silencers are not "bearable arms" because "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence').  Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."  *Id.*  One judge wrote separately "to caution against overreading our holding regarding silencers," noting that the court did not "consider whether items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition) are also protected."  *Id.* at 1196 (Hartz, J., concurring).

     *Cox* is contrary to *Heller*, the history of the Second Amendment, and other appellate court opinions on so-called firearm accessories.  A "bearable arm" is any "[w]eapon of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] . . . for the purpose of offensive or defensive action."  *Heller*, 554 U.S. at 581.  Thus, an artillery piece or tank is not a bearable arm.  But any other "thing" that a person "takes into his hands" or "carries" "for the purpose of offensive or defensive action" is a bearable arm.  The Tenth Circuit's "weapon in itself" test is contrary to this definition.  The Second Amendment's militia-based history confirms that the right is addressed to firearms themselves and the various accoutrements of militia service.[15]  A musket rest was a "firearm accessory" and "not a weapon in itself," but it

---

[15] *See Miller*, 307 U.S. at 180-81 ("The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former . . . . The law, as enacted in 1649 and thereafter, provided that each [pikeman] should be armed with a pike, corselet, head-piece, sword, and knapsack.  The musketeer should carry a good fixed musket, not less than three feet, nine inches, nor more than four feet three inches in length, a priming wire, scourer, and mould, a sword, rest, bandoleers, one pound of powder, twenty bullets, and two fathoms of match.") (internal quotations and citations omitted).

was required to be owned by anyone subject to militia service.

Further, Second Amendment caselaw protects the right to *effective* self-defense, as the individual sees fit, subject only to *Heller*'s limitations and the Government's ability to meet heightened scrutiny.  *Heller* considered a requirement that handguns be rendered inoperable, and found it to be categorically unconstitutional.  554 U.S. at 630-36..  But even beyond items *necessary* to armed self-defense, items that *enhance* armed self-defense are covered by the Second Amendment, even if they are not strictly necessary to a weapon's function, and even if they are not weapons themselves, such as "large capacity" magazines, s*ee Duncan*, 2020 WL 4730668, at *7; *ANJRPC*, 910 F.3d at 116, and hollow-point ammunition, *see Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014).

That is, in these lower-court cases, although gun owners were permitted to use firearms that do not require a magazine, or magazines with smaller capacities, or non-hollow-point ammunition, heightened scrutiny applied to their choice to use large-capacity magazines or hollow-point ammunition in self-defense.  As long as the "thing" can be "carried" and used "for the purpose of offensive or defensive action," the Second Amendment applies to it and "limits the state's ability to second-guess a citizen's choice of arms if it imposes a substantial burden on her right to self-defense."  *See Duncan*, 2020 WL 4730668, at *2.  One would never say that the First Amendment protects speech but not the use of printing presses or the internet to enhance speech's effectiveness, and the Second Amendment is not a second-class right.  *See Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring in judgment) (explaining that constitutional rights imply protection for "closely related" rights).

18

B.  The NFA's application to silencers is not "presumptively lawful." [16]

*Heller*'s illustrative list of three "longstanding" and "presumptively lawful" gun controls includes laws barring possession for felons and the mentally ill, laws prohibiting concealed carry, and laws imposing conditions and qualifications on the commercial sale of arms.  *Heller*, 554 U.S. at 626.  The NFA does not fit directly into any of these categories.  The third category, relating to the *commercial* sale of arms, is directed toward *sellers*; the NFA regulates all transfers, commercial or otherwise, and the present indictment seeks to punish an alleged transferee.  *See Second Amendment Doctrines*, 61 St. Louis U. L.J. at 216-17.  Nor is the NFA's comprehensive taxation, approval, and registration scheme analogous to any item on *Heller*'s list.  *Cf. United States v. White*, 593 F.3d 119, 1205-06 (11th Cir. 2010) (finding the federal ban on domestic-violence misdemeanants' possession to be analogous to a ban on felons' possession).  Nor is the regulation of silencers "longstanding."[17]  Silencers were first developed in the late 19th century and were widely available and unregulated until the passage of the NFA in 1934.  *Firearm Sound Moderators*, 46 Cumb. L. Rev. at 41-52 (2015).  Thus, the Government

---

[16]  Conceptually, *Heller*'s "presumptively lawful" analysis does not fit neatly into the *GeorgiaCarry.Org I* two-step analysis.  *See NRA v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012). The Eleventh Circuit appears to consider it part of Step Two.  *See United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) ("While felons do not forfeit their constitutional rights upon being convicted, their status as felons substantially affects the level of protection those rights are accorded.").

[17]  The *White* court frankly admitted that the domestic-violence misdemeanant ban is not "longstanding," but found it to be "presumptively lawful" nonetheless.  593 F.3d at 1206.  Later courts have criticized this approach.  *See United States v. Chovan*, 735 F.3d 1127, 1134 (9th Cir. 2013) (collecting cases); *see also Teixeira v. City of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016) (stating that "a regulation that merely resembles something listed by the Court in *Heller* will not avoid heightened constitutional scrutiny.  Instead, the type of law in question must be both longstanding and closely match a listed prohibition.").  In any event, the NFA's application to silencers is neither analogous to an item on *Heller*'s list nor longstanding.

must meet heightened scrutiny under Step Two.

    C.  <u>The NFA's tax is categorically unconstitutional.</u>

As *Heller* demonstrates, some gun controls, such as the District of Columbia's handgun ban, are categorically unconstitutional without any need to resort to the various levels of scrutiny. *See Heller*, 554 U.S. at 628-29. In the First Amendment context, a flat tax on the exercise of constitutionally protected rights is categorically unconstitutional. *See Murdock v. Pennsylvania*, 319 U.S. 105 (1943). In *Murdock*, an ordinance provided for a flat license tax on canvassing, and was applied to a group of Jehovah's Witnesses attempting to spread their faith. *Id*. at 106. The Court explained, "It could hardly be denied that a tax laid specifically on the exercise of [First Amendment] freedoms would be unconstitutional. Yet the license tax imposed by this ordinance is in substance just that." *Id*. at 107. The Court focused on the nature of the tax:

> The tax imposed . . . is a flat license tax, the payment of which is a condition of the exercise of these constitutional privileges . . . . And the license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues. It is not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question. It is in no way apportioned.

*Id*. at 112-14.

As the Court later explained, "The tax at issue in *Murdock* was invalid because it was unrelated to any legitimate state interest, not because it was of a particular size." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 137 (1992). Courts have applied the Supreme Court's "fee jurisprudence" in the Second Amendment context. *See Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013); *see also Bauer v. Becerra*, 858 F.3d 1216, 1224-25 (9th Cir. 2017) (applying fee jurisprudence without deciding whether it should apply).

It is argued above that the NFA is not a taxation statute at all, but a punitive scheme masquerading as a taxation statute.  If that argument is rejected, then the NFA's application to silencers is categorically unconstitutional under the Second Amendment.  The NFA's $200 transfer and making tax was intended as a 100% tax on machineguns, and operated as a 4,000% tax on silencers.  *See Firearm Sound Moderators*, 46 Cumb. L. Rev. at 50.  Like the tax in *Murdock*, it is a flat licensure tax on the exercise of constitutional rights, without any relation to a legitimate state interest.  It is therefore categorically unconstitutional under the Second Amendment.

D.  <u>Strict scrutiny applies.</u>

If the NFA's application to silencers is not categorically unconstitutional, strict scrutiny applies.  The Eleventh Circuit has never proceeded to Step Two of its two-part test, and so has never delineated how to determine what level of scrutiny to apply at Step Two.  The cases on which the Eleventh Circuit has relied in creating the two-step test have generally looked to First Amendment doctrines to determine the level of scrutiny on a sliding scale.  *See Second Amendment Doctrines*, 51 St. Louis U. L.J. at 275-76.  The Seventh Circuit's formulation is typical:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end.  Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.  How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 651 F.3d at 708.  Here, strict scrutiny applies because the NFA and its implementing regulations completely eliminate Mr. Alazhari's ability to possess a silencer for self-defense in

21

the home.

First, as applied to Mr. Alazhari – a Floridian with foreign "convictions"[18] – the NFA's restriction is absolute.  The NFA requires an application to ATF for any transfer of a silencer.  26 U.S.C. § 5812.  ATF must disapprove the application if the transfer would put the transferee in violation of law.  *Id*.  ATF considers state and local law in addition to federal law, and will deny any application that would put the transferee in violation of state or local law.  *See* 81 Fed. R. 2658-01, 2661 (2016); ATF, *National Firearms Act Handbook* 24 (2009) (enclosed as Exhibit 5).  While federal law does not prohibit firearm possession by those with foreign convictions, *Small v. United States*, 544 U.S. 385 (2005), Florida law does, Fla. Stat. § 790.23(1)(e).  Thus, as to Mr. Alazhari and those similarly situated, the NFA amounts to a complete ban on silencer possession at any time, in any place (including the home), and for any purpose (including self-defense), and is therefore a severe burden on Second Amendment rights.  *See Duncan*, 2020 WL 4730668, at *12 (applying strict scrutiny in part because the challenged law banned large-capacity magazines "for nearly everyone, everywhere in California.").[19]

Second, silencers serve the core Second Amendment purpose of self-defense.  As the

---

[18] The Government asserts in its complaint affidavit that Mr. Alazhari has Saudi Arabian convictions for terrorism-related offenses.  Mr. Alazhari was arrested as a minor, was accused of supporting an organization that was supported by both the government of the United States and the government of Saudi Arabia, and his "convictions" were the result of prolonged pretrial detention and torture.

[19] Even without the absolute ban applicable in this case, the NFA's burden is severe enough to merit strict scrutiny.  The NFA requires citizens to ask their government's permission to exercise constitutional rights, prove themselves worthy, register their exercise of constitutional rights with the government, and pay a tax on the exercise of constitutional rights.  On average, the ATF takes seven months to process "perfected" applications.  Exhibit 7.  This sort of regulation would be unthinkable in the First Amendment context, and the Second Amendment is not a second-class right.  *See McDonald*, 561 U.S. at 780.

22

Defense expert has submitted in the enclosed declaration, silencers serve to protect against hearing loss or damage and increase accuracy.  Exhibit 6.  Firearm owners have good reason to be concerned with hearing loss, and no one can be expected to take the time to put on ear mufflers to sacrifice one of his senses as burglars come charging through the door.  It is no answer that people may choose to defend themselves with unsilenced firearms, as that is the very argument rejected by *Heller*.  *See Duncan*, 2020 WL 4730668, at *16 (citing *Heller*, 554 U.S. at 62).  Accordingly, strict scrutiny applies.

      E.  The NFA's application to silencers fails strict scrutiny.

      Strict scrutiny is the "most rigorous and exacting standard of constitutional review," and requires the Government to show that a law is "narrowly tailored to achieve a compelling interest."  *Miller v. Johnson*, 515 U.S. 900, 920 (1995).  However, even given a compelling governmental interest, the Government must prove that the law in fact advances that interest.  *See Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 226 (1989).  Further, "if there are other, reasonable ways to achieve [the compelling governmental interest] with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.  If it acts at all, it must choose 'less drastic means.'"  *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 909-10 (1986) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972)).  Here, the NFA's application to silencers may be assumed to be directed at a sufficiently compelling interest, such as protecting public safety.  *Cf. Duncan*, 2020 WL 4730668, at *22.  However, the NFA fails strict scrutiny nonetheless, for two reasons.

      First, the law does not actually advance public safety.  As explained above, there is nothing inherently dangerous about a silencer, and, despite more than 1.7 million in circulation,

they are very rarely used in crime.  Thus, regulation under the NFA does not advance the Government's goal of public safety.[20]

Second, the NFA is not the least restrictive means of preventing crimes committed with silencers.  This can be no more ably demonstrated than by pointing to an *existing* less restrictive means:  the Gun Control Act (GCA), as amended.  The GCA applies to silencers.  18 U.S.C. § 921(a)(3)(C).  As such, manufacturers and dealers must be licensed by ATF.  18 U.S.C. § 922(a)(1)(A)-(B).  Silencers must be marked with a serial number and dealers must keep records subject to inspection by ATF.  18 U.S.C. § 923(a), (g), (i).  Before transferring a silencer to a non-dealer, the dealer must obtain a national background check on the transferee.  18 U.S.C. § 922(t)(1)(A).  The GCA prevents the transfer or possession of silencers to felons, fugitives, drug addicts, the mentally ill, aliens, those who have renounced their citizenship, those dishonorably discharged from the armed forces, those subject to domestic violence restraining orders, and those convicted of misdemeanor crimes of domestic violence.  18 U.S.C. § 922(d), (g).  Using or possessing a firearm equipped with a silencer in furtherance of a drug-trafficking or violent crime is punishable by no less than 30 years' imprisonment for a first offense or no less than life imprisonment for a second conviction.  18 U.S.C. § 924(c)(1)(A)-(C).

Thus, the GCA regulates silencers in all the same ways the NFA does, with one exception:  the NFA *also* regulates law-abiding citizens.  While the GCA is directed at those considered untrustworthy and those who would violate the law with a silencer, the NFA captures everyone else.  Even assuming the GCA is the least-restrictive means of achieving its silencer-related goals, the NFA goes too far by restricting law-abiding citizens' choice of arms to be used

---

[20] *Accord* Turk, *supra*, note 11, at 6-7.

in self-defense.  The NFA is therefore unconstitutional as applied, and this Court should dismiss Count Two and Count Three.

F.  <u>The NFA's application to silencers fails intermediate scrutiny.</u>

To survive intermediate scrutiny, a statute "must be substantially related to an important governmental objective."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  "[T]he law must address 'harms' that 'are real' in a 'material' way."  *Duncan*, 2020 WL 4730668, at *23 (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)).  "While the precise contours of intermediate scrutiny may vary, this much is certain:  It has bite.  It is a demanding test.  While its application is neither fatal nor feeble, it still requires a reviewing court to scrutinize a challenged law with a healthy dose of skepticism."  *Id*.

Here, the NFA's application to silencers "fails intermediate scrutiny for many of the same reasons it fails strict scrutiny."  *Cf. id*. at *25.  Again, the Government's interest in fostering public safety may be assumed to be "important."  But, as with strict scrutiny, the lack of almost any nexus to silencers and crime means that the NFA does not advance that goal in any "material" way.  *Cf. id*. at *26 (citing *Edenfield*, 507 U.S. at 770-71).  And, as with strict scrutiny, the NFA's broad prohibition and regulatory scheme, overlapping with and exceeding the GCA's more targeted scheme, demonstrates that it is an overbroad restriction of the Second Amendment rights of law-abiding citizens.  Accordingly, whatever the level of scrutiny, the NFA is unconstitutional as applied.

**WHEREFORE** the Defendant, Mr. Alazhari, prays this Court will dismiss the indictment.

DATED this 31st day of August 2020.

Respectfully submitted,

JAMES T. SKUTHAN
ACTING FEDERAL DEFENDER

*/s Samuel E. Landes*
Samuel E. Landes
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street
Suite 2700
Tampa, Florida 33602
Telephone:     (813) 228-2715
Facsimile:     (813) 228-2562
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st of August 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Patrick Scruggs.

*/s Samuel E. Landes*
Samuel E. Landes
Assistant Federal Defender

26