# Federal Firearms Regulations

_____

## Options to Reduce or Modify Firearms Regulations



## White Paper
(Not for public distribution)

Ronald Turk
Associate Deputy Director (Chief Operating Officer)
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

20 Jan 2017

1

> *"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."*
>
> Second Amendment to the United States Constitution

## Executive Summary:

ATF is the only Federal law enforcement agency with a primary mission that directly involves an Amendment to the United States Constitution.  Thus, our actions and policies are appropriately subjected to intense review and scrutiny.  This paper serves to provide the new Administration and the Bureau multiple options to consider and discuss regarding firearms regulations specific to ATF.  These general thoughts provide potential ways to reduce or modify regulations, or suggest changes that promote commerce and defend the Second Amendment without significant negative impact on ATF's mission to fight violent firearms crime and regulate the firearms industry.  This white paper is intended to provide ideas and provoke conversation; it is not guidance or policy of any kind.

ATF's enforcement and regulatory efforts are focused on reducing violence and increasing public safety.  Positive steps to further reduce gun violence through enforcement or regulation are extremely important but are not the focus of this paper.

## Points for Discussion:

1. **New Federal Firearms Licensees (FFL) Dealing Exclusively at Gun Shows (or internet):**
   For over two years representatives within the firearms licensing community have asked for clarification and/or a decision from ATF regarding new FFL applicants requesting to conduct business solely at gun shows.  ATF has delayed a decision or guidance due to several concerns including what it means to be "engaged in the business" of selling firearms, and ATF's ability to have access to a dealer's records where they may not have routine business hours.  ATF has already recognized FFL activities via the internet without a classic "storefront" and is considering whether to include gun show only activities in a similar manner.  The marketplace has changed significantly in recent years, and ATF's guidance to FFLs on these issues has not kept pace with developments in commerce.  Classic "brick and mortar" storefronts with an on-hand inventory and set "front-door" business hours often no longer apply in today's modern marketplace.  A question remains as to whether ATF should consider simply changing past policy or initiate a lengthy regulation rule change process.  There is ample room for immediate action on this issue.  ATF can simply issue new guidance immediately and adjust past

2

policy to allow for a business to obtain a license with the primary intention of selling firearms with the transfer occurring at a location other than the business's physical premises (whether at guns shows, over the internet, or elsewhere).  This practice has in fact already been taking place, and ATF has provided guidance to FFLs allowing such activity with regards to internet only sales.  Provided the business is established at a location in full compliance with state and local laws/ordinances and the business is reasonably inspectable by ATF at an established business location, limited or no actual sales out the business's front door should not be an issue.

If a formal regulation rule change is needed for long-term clarification, ATF can start that process while immediately issuing a policy change to the above practice which would have no negative impact to public safety.  In fact, it would encourage more sales and business through a licensee, including background checks on sales at gun show events, and likely increase public safety.  Several national gun show promoters prefer to have licensees at their shows, which also somewhat reduces the so-called "gun show loophole" concerns some have expressed about such venues.

ATF recently issued guidance regarding what it means to be "engaged in the business" and indicated that:

> *"A person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted. For example, a person can be engaged in the business of dealing in firearms even if the person only conducts firearm transactions at gun shows or through the internet."*

Thus, by establishing that persons can be required to obtain a license to sell only at gun shows, ATF must provide reasonable means for businesses to obtain a license.  ATF can provide guidance to the public for gun show-only dealers similar that which was posted for internet-only firearms dealers.  There is no apparent downside to such a proposal, and in fact public safety is enhanced.

2. **Armor Piercing Ammunition:**  ATF has regulatory authority to classify what is and is not armor piercing (AP) ammunition.  Several major ammunition manufacturing companies have had requests pending for years to produce AP ammunition (AP ammo or ammo) which is not intended for use in a handgun and potentially lawful under Federal law.  In 2014, ATF proposed a framework that would have provided a transparent and fair review process for these applications, and would have resulted in the approval of many of the long-pending requests.  The framework, however, also would have withdrawn the 5.56 "green tip" AP ammo exemption that has existed since 1986.  The withdrawal of the exemption created controversy that ultimately stalled all AP ammo classification decisions.  Since that time, ATF has been asked to hold off on any AP ammo

determinations.  Continued inaction on these requests poses significant litigation and reputational risks to ATF.  ATF can readily mitigate these risks by using the criteria established in the framework to process and approve many of the applications, while leaving the 5.56 "green tip" AP ammunition exemption intact.  Moving forward with approval of these applications is consistent with the statutory goal of protecting the public and law enforcement because, consistent with the statutory exemption, the projectiles involved are not associated with criminal use, but instead are clearly designed and intended for hunting and sporting purposes (the projectiles/calibers at issue will generally penetrate body armor regardless of whether AP-classified metals are used in the manufacturing process).  If decisional restrictions were removed, ATF could readily apply drafted standards for reviewing AP ammo requests while leaving the 5.56 "green tip" AP ammo exemption intact.  Many of the industries' pending requests could be decided in a timely manner, meeting both statutory requirements and safety concerns within the law.

3. **Re-importation of Certain Department of Defense Surplus Firearms from Foreign Countries:**  The State Department and ATF have worked over the past several years with the Administration on requests for the importation of U.S. origin military firearms, ammunition, and parts that were once sent overseas to support allies.  There are surplus rifles, pistols, ammunition, and other importable U.S. origin Curio and Relic (C&R) defense articles (including M1 Garand and Carbine rifles) and pistols (M1911) overseas awaiting importation authority.  There is no clear public safety reason why taxpayer-funded US-origin C&R defense articles should be denied re-importation to the American public, while many non-U.S.- origin C&R items are approved.  Additionally, these items do not represent any discernable public safety concern, as demand lies with collectors of vintage military firearms.  Importation and sale through licensed dealers would effectively regulate the lawful transfer of these firearms through a licensee and a background check.  Joint effort from the Administration, State Department, and ATF could easily reverse past decisions and allow for the safe and legal importation and sale of these historical and collectible items.  Many M1 Garand rifles have been approved for importation in the past, setting precedence for this to occur.  The more recent denials were in part due to perceived potential that they may be used in crimes, for which there is little, if any, evidence for such a concern.

4. **Title 18, United States Code (U.S.C.), Section 922(o):**  Current law precludes FFLs who are registered Special Occupational Taxpayers (FFL/SOT) from transferring machineguns manufactured post-1986 unless they are for export or for law enforcement/government use; and there is no provision for the transfer from one FFL/SOT to another.  This is somewhat detrimental to FFL/SOTs operating within the small, but useful, Department of Defense-supported industry and theatrical armorer community.  One option, if supported by the Department of Justice (DOJ), would be to re-institute ATF's ability to

4

provide variances to licensees, as ATF has done in the past, that would adequately provide form transfers within defense industry FFLs and avoid a requirement to change the statute. Use of variances in a consistent and fair process within the limited DoD-supported FFL/SOT community would be viewed favorably by the industry and have no impact on public safety.

5. **Firearm Arm or Stabilizing Brace:** Manufacturers have produced an arm brace or stabilizing brace which is designed to strap a handgun to a forearm to allow a disabled shooter to fire the firearm. ATF determined that the brace was not a stock, and therefore its attachment to a handgun did not constitute the making of a short-barreled rifle or "any other firearm" under the National Firearms Act (NFA). (NFA classification subjects the product to a tax and registration requirement.) In the determination letter, however, ATF indicated that if the brace was held to the shoulder and used as a stock, such use would constitute a "redesign" that would result in classification of the brace/handgun combination as an NFA firearm (i.e., the "use" would be a "redesign" and making of a short-barreled rifle). ATF has not made another NFA determination where a shooter's use alone was deemed be a "redesign" of the product/firearm resulting in an NFA classification. This ruling has caused confusion and concern among firearm manufacturers, dealers, and consumers about the extent to which unintended use of a product may be a basis for NFA classification. To mitigate this confusion and concern, ATF could amend the determination letter to remove the language indicating that simple use of a product for a purpose other than intended by the manufacturer – without additional proof or redesign – may result in re-classification as an NFA weapon. While many at ATF are concerned about manufacturing processes continuing to push the boundaries between a Gun Control Act (GCA) and an NFA firearm, ATF has a relatively consistent history of what crosses the line between GCA and NFA firearms with which to draw from, and still maintains the ability to exercise good judgement with future requests based upon the firearm's individual characteristics.

6. **Reissue a New Sporting Purpose Study:** Since the sunset of the Assault Weapons ban in 2004, the use of AR-15s, AK-style, and similar rifles now commonly referred to as "modern sporting rifles" has increased exponentially in sport shooting. These firearm types are now standard for hunting activities. ATF could re-examine its almost 20-year-old study to bring it up to date with the sport shooting landscape of today, which is vastly different than what it was years ago. Action shooting sports and organizations such as 3 Gun and the United States Practical Shooting Association (USPSA) have also drastically expanded in recent years. Restriction on imports serves questionable public safety interests, as these rifles are already generally legally available for manufacture and ownership in the United States. Low cost foreign made firearms are also still imported and converted into "non-sporting" configurations. These restrictions have placed many limitations on importers, while at the same time imposing a heavy

workload on ATF's Firearms and Ammunition Technology Division.  ATF's Imports Branch also possesses a list of firearms approved for import but has not made this list public.  Lists such as this can be made available to the public so that the importing community does not have to guess as to what the standard for importation is. Many concerns from the firearms industry could be re-examined through the publication of a new Sporting Purpose Study along with an updated Imports Branch Guide.

7. **Creation of a Database of Agency Rulings:** ATF lacks a consistent internal database to maintain and readily access private letters and ruling.  The public also has no direct access to public rulings in a manageable format.  The inability to access these rulings can create inconsistent agency interpretations of agency guidance.  ATF can create a retrievable database for internal use that includes access by the public for open rulings.

8. **Silencers:** Current Federal law requires ATF to regulate silencers under the NFA.  This requires a Federal tax payment of $200 for transfers, ATF approval, and entry of the silencer into a national NFA database.  In the past several years, opinions about silencers have changed across the United States.  Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.  At present, 42 states generally allow silencers to be used for sporting purposes.  The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country.  This surge in demand has caused ATF to have a significant backlog on silencer applications.  ATF's processing time is now approximately 8 months.  ATF has devoted substantial resources in attempts to reduce processing times, spending over $1 million annually in overtime and temporary duty expenses, and dedicating over 33 additional full-time and contract positions since 2011 to support NFA processing.  Despite these efforts, NFA processing times are widely viewed by applicants and the industry as far too long, resulting in numerous complaints to Congress.  Since silencers account for the vast majority of NFA applications, the most direct way to reduce processing times is to reduce the number of silencer applications.  In light of the expanding demand and acceptance of silencers, however, that volume is unlikely to diminish unless they are removed from the NFA.  While DOJ and ATF have historically not supported removal of items from the NFA, the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the NFA is archaic and historical reluctance to removing them from the NFA should be reevaluated.  ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the NFA.  On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions.  Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings.  Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not

be viewed as a threat to public safety necessitating NFA classification, and should be considered for reclassification under the GCA.

If such a change were to be considered, a revision in the definition of a silencer would be important.  The current definition of a silencer extends to "any combination of [silencer] parts," as well as "any part intended only for use in" a silencer.  Compared to the definition of a firearm, which specifies the frame or receiver is the key regulated part, any individual silencer part is generally regulated just as if it were a completed silencer.  Revising the definition could eliminate many of the current issues encountered by silencer manufacturers and their parts suppliers.  Specifically, clarifying when a part or combination of parts meets a minimum threshold requiring serialization would be useful.

9. **Firearms Industry Proposals to Allow for Interstate Sale of Firearms at Gun Shows:**  18 U.S.C. 923(j) and supporting regulations prohibit FFLs from conducting firearms sales outside the state in which they are licensed and reside.  Many FFLs would like to be able to travel to other states to venues like a gun show and conduct business.  ATF currently allows an FFL to travel to another state, display firearms for sale and take orders, but not to transfer firearms on-site (this must take place back at the FFL's business location in their home state, and only to a resident of their home state).  Similarly, FFLs can transfer firearms out of state to another licensee under an "advance consignment" before the gun show to the out-of-state licensee in a somewhat convoluted process where the traveling/transferring FFL is no longer making the sale.  ATF and DOJ have historically opposed removal of the statutory restriction on direct interstate firearm sales by FFLs.  Further discussion would be beneficial.  A change that could allow FFLs to operate at out-of-state gun shows (where also allowed by individual state laws) would have no detrimental effect on public safety and still provide ATF a means to trace firearms.  It would also be viewed favorably by the broader firearms community.  Since an FFL has a license, maintains records, and conducts background checks for sales, provided they are in compliance with State and local laws, there is no apparent harm or risk to public safety in allowing them to do so, but not for the current statute and interpretation requiring in-state only sales.  Sales would be documented and traceable, and a background check would be completed.

10. **Destructive Devices**: The current definitions for destructive devices under both the NFA (26 U.S.C., 5845(f)) and the GCA (18 U.S.C., 921(a)(4)), and applicable controls, do not differentiate between destructive device launchers and destructive device munitions. Applicable regulatory and statutory controls under the GCA and NFA are focused on multi-use objects, such as typical long guns or machine guns, not single-use, expendable munitions which are also subject to the Safe Explosives Act.  The customer base for destructive device munitions is very limited—the U.S. DoD, foreign governments as

approved by the Directorate of Defense Trade Controls (DDTC) under current export policy, and small numbers of other destructive device launcher and/or munitions manufacturers for use in research, testing, or assistance in United States Government /foreign contract fulfillment.  In addition, the cost of munitions production runs, safety, and contract fulfillment requirements such as applicable DoD marking requirements necessitate, at a minimum, different standards for marking munitions than are possible for launchers.  This includes marking by lot numbers and having multiple dispositions against a single lot number.  There are several different ways to revise applicable controls to help solve these issues, as being currently discussed by ATF and destructive device munitions industry members.  ATF should continue to discuss these issues with leadership and the industry to explore changes that would be useful to the defense munitions industry and have discernable impact on public safety or ATF's ability to regulate them.

11. **Demand Letter 2 (DL 2):** An ATF regulation currently provides that all FFLs that have had 10 or more guns with a time-to-crime of 3 years or less traced to them in the previous year must provide ATF with copies of limited information from used firearms they acquired in that previous year.  This equates to limited "used" or "gray market" gun information (no purchaser information is directly stored by ATF, only gun information) that can be used to expand the success rate of traces for secondary market firearms.  This information can be useful to further crime gun trace capabilities by creating a pointer to allow for a more current firearms trace to a secondary purchaser.  ATF originally set the threshold for DL2 reporting at 25 firearms, but later reduced that number to 10 firearms.  ATF is currently re-examining the program and anticipates a change to the number (somewhere in the vicinity of 15 or more) based on trend and data analysis.  Some have argued that DL 2 creates a burden on firearms dealers to provide ATF information on used firearms that may become, but are not necessarily, crime guns.  An increase in the firearms requirement above 10 would likely have a positive impact on the firearms industry and still meet program objectives.  ATF should continue to examine data to determine where the appropriate number of firearms lies to best manage this program.

12. **Demand Letter 3 (DL 3):** Via regulation ATF currently requires FFLs in several southwest border states to record and submit multiple sales records for certain semi-automatic rifles capable of shooting with a detached magazine (although not defined as such by law or regulation, this applies to the sale of more than one rifle commonly referred to as "modern sporting rifles," sold to the same person at the same time).  This requirement came into effect several years ago in an attempt to curb the flow of rifles from commerce to the criminal element via illegal firearms trafficking into Mexico and South America.  There are examples where this regulation has proven effective and may provide a deterrent effect.  Over the past 5 years, ATF has over 40,000 multiple sales

reports involving over 90,000 rifles; opened over 300 investigations, and recommended approximately 374 defendants for prosecution.  DL 3 places some burden on the firearms industry via reporting requirements.  The elimination of DL 3 could have a detrimental effect on ATF's criminal enforcement mission based on the numbers of investigations and defendants seen to date, but can be further discussed regarding utility and impact.

13. **Pending ATF Regulation Regarding FFL Records Retention (20 years):**  ATF has a regulation pending at DOJ to increase the requirements for FFLs to retain records indefinitely.  The current standard is 20 years, and records older than 20 years can be destroyed.  The intent of the change from 20 years to indefinite retention is to provide access to records for firearms traces over longer periods of time.  However, many argue that crime guns are not frequently recovered with times to crimes from purchases over 20 years old.  Also, older firearms possessed by criminals frequently transfer hands several times and a trace will often not lead to the criminal after so much time has passed.  ATF has averaged approximately 1,200 failed traces a year over the past 5 years due to records destruction, accounting for less than one half of one percent of traces conducted nationally each year.  While such an extension is arguably a viable law enforcement intelligence tool, much of the firearms industry is opposed to such a change and a closer review of this proposal could be beneficial.

14. **Expanding Permissive Use of NICS Checks by FFL Holders:**  Standard pre-employment background checks frequently do not reveal that a person is firearms-disabled.  Other than requiring potential new-hires to purchase a firearm, licensees, in particular large retailers, are frequently unable to determine that an employee cannot be involved in firearms operations.  Retailers would appreciate the ability to run a NICS check on current employees or potential new hires to ascertain whether they can legally fulfill their job requirements.  A key aspect of this proposal is that it would be entirely elective; if the Federal Bureau of Investigation (FBI), ATF and others all concurred with this slight expansion of the use of NICS, there would be no mandate that licensees perform a NICS check on all employees.  Keeping the expansion of the system limited to elective employee checks will prevent any significant increase in cost to the FBI or ATF (in terms of running background checks or expanding regulatory enforcement), while it will enable FFLs to increase their compliance with existing regulations and help ensure firearms-disabled personnel do not have easy access to firearms.  Businesses could also be required to certify that permissive NICS checks were only used on impacted employees or face sanctions for misuse of the system.

15. **<u>Need for an ATF Confirmed Director:</u>**  Since moving from the Department of Treasury to the DOJ in 2003, ATF has had only one Senate-confirmed Director.  The agency needs a presidentially nominated, Senate-confirmed Director who has the support and backing

of the Administration to lead ATF. This will enable the agency to be fully in sync with leadership, and maximize the agency's potential regarding priorities, budgets, and support.

16. **Old Regulations Under Review for Possible Removal or Amendment:** Below is a list of the firearms and explosives regulations that are currently under review. They are likely no longer applicable (or portions of which are no longer applicable), and may be removed as part of a final rule to remove expired regulations. [1]

    a. 478.40 – Assault Weapons ban
    b. 478.40a – prohibition language for assault weapons
    c. 478.57(b) and (c) – assault weapons and large capacity magazines
    d. 478.92 (portions) – AP ammo and large capacity magazines
    e. 478.116 (portions) – importing large capacity magazines
    f. 478.119 – importing large capacity magazines and feeding devices (belts, drums, strips…)
    g. 478.132 – records keeping for large capacity feeding devices sold to law enforcement
    h. 478.153 – request for large capacity magazines and feeding devices for manufacturer testing
    i. 478.171 (portions) – exporting AP ammo and semi auto assault weapons
    j. 479.32(a) and (c) – reduced importer/manufacturer tax rate 1988; short taxable year standards
    k. 555.11 (portions) – obsolete dates; commerce in explosives
    l. 555.27 (portions) - obsolete dates; explosives background checks
    m. 555.33 (portions) - obsolete dates; licensees and permittees general explosives
    n. 555.41 (portions) - obsolete dates; licenses and permits general explosives
    o. 555.45 (portions) - obsolete dates;  licenses and permits general explosives
    p. 555.49 (portions) - obsolete dates; issuance of licenses and permits
    q. 555.51 (portions) - obsolete dates; duration of licenses and permits
    r. 555.57 (portions) - obsolete dates; change of control, RP's and employees
    s. 555.102 (portions) - obsolete dates; authorized operations by permittees
    t. 555.103 (portions) - obsolete dates; transactions between licensees and permittees
    u. 555.105 (portions) - obsolete dates; distribution to non licensees and non permittees
    v. 555.125 (portions) - obsolete dates; records maintained by permittees
    w. 555.126 (portions) - obsolete dates; transaction records
    x. 555.142 (portions) - obsolete dates; relief from disabilities
    y. 555.201 (portions) - obsolete dates; storage
    z. 555.224 (portions) - obsolete dates; table of distances

---

[1] This list was produced by ATF's Enforcement Programs and Services Directorate

**Conclusions:**

There are many regulatory changes or modifications that can be made by or through ATF that would have an immediate, positive impact on commerce and industry without significantly hindering ATFs mission or adversely affecting public safety.  There are also areas where adjustments to policy or processes could improve ATF operations.  Alleviating some of these concerns would continue to support ATF's relationships across the firearms and sporting industry, and allow ATF to further focus precious personnel and resources on the mission to combat gun violence.

In addition to these points of discussion, it is vital for ATF to find resources to refresh aging technology and systems that support law enforcement and the firearms industry.  Functionality at ATF's Martinsburg facility and other areas has been severely hampered by outdated technology and systems that negatively impact ATF's ability to provide services and information.

***Note:***   *The opinions expressed within this white paper are not those of the ATF; they are merely the ideas and opinions of this writer.  They are provided for internal use within ATF and DOJ and not intended to be public.  They are also general thoughts that cannot be taken as exacting language regarding policy or quotable specifics.  Additional specific details can be provided to further these general discussions.*

*The men and women of ATF are overwhelmingly a fantastic group of hard working civil servants who look to reduce violent crime and ensure public safety.  The focus on combating gun violence is key.  Fairly regulating the firearms and explosives industries is also important.  As the firearms conversations take place over the next few months and years, this paper is offered to provide informal insight on potential productive ways to limit regulation and continue to protect our Second Amendment freedoms, while focusing on ATF's mission to protect our nation.*

X _____
Ronald Turk