UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                         CASE NO. 8:20-cr-206-T-60AEP

MUHAMMED MOMTAZ AL-AZHARI

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS BASED ON UNCONSTITUTIONAL STATUTES

The United States of America files this response in opposition to the motion of the Defendant, Muhammed Momtaz Al-Azhari, to dismiss the indictment "based on unconstitutional statutes" (Doc. 71).

## MEMORANDUM OF LAW

The violations alleged in each count of the indictment fall within Congress's enumerated or inherent powers. Furthermore, Count One is not unconstitutionally vague as applied, and Counts Two and Three do not offend the Second Amendment.

On May 26, 2020, and the Defendant was federally arrested pursuant to a criminal complaint. On June 23, 2020, a grand jury returned an indictment charging the Defendant with violations of 18 U.S.C. § 2339B(a) (Count One) and 26 U.S.C. § 5861(b) and (d) (Count Two and Count Three, respectively).

Count One alleges that the Defendant:

"knowingly attempted to provide material support and resources, namely personnel (including himself) and services, to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham ("ISIS"), which at all relevant times was designated by the Secretary of State as a foreign terrorist

organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that ISIS was a designated foreign terrorist organization and that ISIS has engaged and was engaging in terrorist activity and terrorism."

Doc. 33 at 2. Count Two alleges that the Defendant:

"knowingly received and possessed a firearm, namely, a SilencerCo Osprey silencer bearing serial number OSP9M-5489, transferred to him in contravention of Chapter 53 of Title 26."

*Id.* Count Three alleges that the Defendant:

"knowingly received and possessed a firearm, namely, a SilencerCo Osprey silencer bearing serial number OSP9M-5489, not registered to him in the National Firearms Registration and Transfer Record."

*Id.*

## I.   Count One falls within Congress's enumerated powers

Congress enacted 18 U.S.C. § 2339B based on one or more of its powers as enumerated in the Constitution or inherent to protecting sovereignty. *See United States v. Morrison*, 529 U.S. 598, 607 (2000).

"Section 2339B criminalizes the provision of material assistance to [Foreign Terrorist Organizations] ["FTOs"]—defined as organizations that, *inter alia*, 'threaten[ ] the security of United States nationals or the national security of the United States.'" *United States v. Ahmed*, 94 F. Supp. 3d 394, 414 (E.D.N.Y. 2015) (citing 8 U.S.C. § 1189(a)(1)(C)). "That Congress under the Constitution has power to safeguard our Nation's security is obvious and unarguable." *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964). "[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact. Similarly, Congress has broad power

under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

Congress passed prohibitions against terrorism in 1996, including providing material support for terrorism under 18 U.S.C. §§ 2339A and 2339B. Congress made specific findings emphasizing the importance of combating terrorism under multiple specific powers, interests, and concerns. Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, § 301, 110 Stat. 1247, note following 18 U.S.C. § 2339B ("Findings and Purpose"), and § 324, 110 Stat. 1255, note following 18 U.S.C. 2339A ("Findings") (Apr. 24, 1996); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 7, 29, 32 (2010) (citing provisions from Congress's findings in § 301). Congress made the following specific findings for AEDPA § 301:

"(a) Findings. The Congress finds that—

(1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States; (2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity; (3) the power of the United States over immigration and naturalization permits the exclusion from the United States of persons belonging to international terrorist organizations; (4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States; (5) international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts, including hostage taking, murder of an internationally protected person, and aircraft piracy and sabotage; (6) some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations; and (7) foreign

organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.

(b) Purpose. The purpose of this subtitle is to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities."

Congress further found, at AEDPA § 324, that:

"(1) international terrorism is among the most serious transnational threats faced by the United States and its allies, far eclipsing the dangers posed by population growth or pollution; (2) the President should continue to make efforts to counter international terrorism a national security priority; (3) ... the President should undertake immediate efforts to develop effective multilateral responses to international terrorism as a complement to national counter terrorist efforts; [and;] (4) the President should use all necessary means, including covert action and military force, to disrupt, dismantle, and destroy international infrastructure used by international terrorists, including overseas terrorist training facilities and safe havens...."

These findings demonstrate that when it enacted § 2339B, Congress was appropriately exercising its ability to safeguard the nation pursuant to its inherent power to regulate foreign affairs, as well as to protect its sovereignty and citizenry.

*See Aptheker*, 378 U.S. at 509; *see also United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318 (1936) (with regard to foreign affairs legislation, "investment of the federal Government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution"; Congress's authority to regulate foreign affairs "exist[s] as inherently inseparable from the conception of nationality"); *United States v. Hamidullin*, 114 F. Supp. 3d 365, 384 (E.D. Va. 2015), *aff'd*, 888 F.3d 62 (4th Cir. 2018), (noting that charged terrorism offenses had "a severe and adverse impact on the security of the United States and its citizens"); *United States v.*

*Rodriguez,* 182 F.Supp. 479, 491 (S.D. Cal.1960), *aff'd in part, rev'd in part sub nom Rocha v. United States,* 288 F.2d 545 (9th Cir.), *cert. denied,* 366 U.S. 948 (1961) ("[T]he concept of essential sovereignty of a free nation clearly requires the existence and recognition of an inherent power in the state to protect itself from destruction. This power exists in the United States government absent express provision in the Constitution….").

Congress's finding with respect to the AEDPA also show that it was appropriately exercising its powers pursuant to the Necessary and Proper Clause, the Define and Punish Clause, and the Treaty Clause. "[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, 560 U.S. 126, 133 (2010). The Clause "makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are convenient, or useful or conducive to the authority's beneficial exercise." *Id.* at 133-34 (quotation marks omitted). "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134. Article I, section 8 reserves to Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."

Chapter 113B of Title 18 sets out many of the federal criminal terrorism statutes. Within that chapter, 18 U.S.C. § 2332b, titled "Acts of terrorism

transcending national boundaries," defines a violation of § 2339B as a "federal crime of terrorism." 18 U.S.C. § 2332b(g)(5). The Defendant tries to claim that "customary international law" does not recognize the specific term "material support to terrorism" as an offense. Doc. 71 at 5. However, that narrow label ignores the fact that international law certainly does recognize acts of terrorism as offenses against the law of nations. Even *United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015)—which the Defendant alleges supports his argument—says that § 2339B is an offense that involves a violation of customary international law. "Congress may criminalize providing material assistance to designated FTOs without drawing on its commerce or territorial authority because there are several other sources of authority pursuant to which Congress may regulate conduct that threatens U.S. interests, violates treaties, and is against the law of nations." *Id.* at 415. "Although there is no universal norm against terrorism—unlike piracy, war crimes, and crimes against humanity—Congress may nevertheless reach certain terrorist conduct under the 'law of nations' clause, when the terrorist conduct also violates the law of nations, such as planning and commission of suicide bombings and other murderous attacks using explosives, incendiary weapons, and lethal devices in public places, to attack innocent civilians." *Id.* at 415 n.8. This is precisely what the Defendant is accused of attempting to do here. His conduct involved an attempt to carry out a mass shooting and other violent acts against innocent civilians so as to support a terrorist organization that seeks to establish an Islamic state throughout the globe (Doc. 5). A

nation's right to protect against such acts is recognized by the international community. *See id.*

Article I, section 8 also gives Congress the power to "define" offenses against the law of nations. *See United States v. Bin Laden*, 92 F. Supp. 2d 189, 220 (S.D.N.Y. 2000). "[P]rovided that the acts in question are recognized by at least some members of the international community as being offenses against the law of nations, Congress arguably has the power to criminalize these acts pursuant to its power *to define* offenses against the law of nations." *Id.* (S.D.N.Y. 2000) (emphasis in original). "Congress may define and punish offenses in international law, notwithstanding a lack of consensus as to the nature of the crime in the United States or in the world community." Patrick L. Donnelly, *Extraterritorial Jurisdiction over Acts of Terrorism Committed Abroad: Omnibus Diplomatic Security and Antiterrorism Act of 1986*, 72 Cornell L. Rev. 599, 611 (1987). Congress, at 18 U.S.C. § 2332b, has labeled the offense in Count One as an act of terrorism transcending national boundaries, which is consistent with it being an offense against the law of nations. *See Bin Laden*, 92 F. Supp. 2d at 220; *see also United States v. Marino-Garcia*, 679 F.2d 1373, 1381 (11th Cir. 1982) ("the protective principle [of international law] allows nations to assert jurisdiction over foreign vessels on the high seas that threaten their security or governmental functions"); Anthony J. Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law*, 48 Harv. Int'l L.J. 121 (2007) ("What Supreme Court jurisprudence there is on the Clause strongly indicates that such crimes [as acts of terrorism] are indeed

offenses against the law of nations subject to congressional action."); *cf. United States v. Yunis*, 681 F. Supp. 896, 903 (D.D.C. 1988).

Proscribing terrorist acts under § 2339B also falls within Congress's powers with respect to treaties (via Article II, section 2), pursuant to the Necessary and Proper clause. *See Ahmed*, 94 F. Supp. 3d at 414-15. "[T]he United States is party or signatory to numerous international conventions and treaties relating to terrorism, and Congress may draw authority from its power to pass laws 'necessary and proper' to carry out the nation's treaty obligations." *Id.* The *Ahmed* court, alone, counted more than 10 such conventions and treaties. *See id.* at 414 n.7. These agreements permit Congress to regulate criminal conduct involving acts of terrorism in the United States. *See Missouri v. Holland*, 252 U.S. 416, 432 (1920); *United States v. Belfast*, 611 F.3d 783, 805 (11th Cir. 2010); *United States v. Ferreira*, 275 F.3d 1020, 1027-28 (11th Cir. 2001). Indeed, Congress, when enacting AEDPA § 301, expressly found that "international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force." AEDPA, Pub. L. 104-132, § 301, 110 Stat. 1247, note following 18 U.S.C. § 2339B ("Findings and Purpose"). "Therefore, the United States must have the power to pass [a law] and enforce it themselves, or be unable to perform a duty which they may owe to another nation, and which the law of nations has imposed on them as part of their international obligations." *United States v. Arjona*, 120 U.S. 479, 487 (1887).

In summary, Congress validly enacted § 2339B as part of its inherent power to safeguard our nation's sovereignty and security, as well as pursuant to the Necessary and Proper Clause, the Define and Punish Clause, and the Treaty Clause. Any one of those bases is sufficient for the Court to uphold the statute's constitutionality.

## II.    Count One is not unconstitutionally vague as applied

The Defendant argues that Count One is also void for vagueness as applied to him. Doc. 71 at 6-7. This argument is not persuasive because Count One sufficiently alleges the theories of material support that the Defendant attempted to provide.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "There is a strong presumption that statutes passed by Congress are valid." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010). Where a vagueness challenge does not involve the First Amendment, the analysis must be as applied to the facts of the case. *Id.*

The Defendant's claim that Count One is unconstitutionally vague because the limiting provision of § 2339B(h) is not alleged in the indictment is more

thoroughly addressed in the United States's response to his motion to dismiss for failure to state an offense and multiplicity (Doc. 70). Because subsection (h) is a definition, and not an element, it need not be pled in the indictment when alleging the providing of "personnel." *See United States v. Shafi*, 252 F.Supp.3d 787, 795 (N.D. Cal. 2017); *see also United States v. Ludke*, No. 16-CR-175, 2018 WL 2059556, at *2 (E.D. Wis. May 2, 2018); *United States v. Pugh*, No. 15-CR-116 (NGG), 2015 WL 9450598, at *8 (E.D.N.Y. Dec. 21, 2015).

Meanwhile, *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), resolves the Defendant's claims as to the indictment's allegation that he provided "services" as material support. In that case, the plaintiffs challenged the constitutionality of the material support statute, claiming that they wished to provide support for the humanitarian and political activities of designated FTOs in the form of monetary contributions, other tangible aid, legal training, and political advocacy. *Id.* at 10. The Court determined that the statutory terms at issue were not so vague as to violate due process. *See id.* at 21. Most of the activities in which the plaintiffs sought to engage readily fell within the scope of the terms "training" and "expert advice or assistance" under the material support statutes. *Id.* As for the term "service" in § 2339A(b)(1), the Court held that it "refers to concerted activity, not independent advocacy," owing to the statute prohibiting providing service *to* an FTO. *See id.* at 23-24. "We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause." *Id.* at 24. Additionally, because Congress chose to apply

the limiting definition of subsection (h) only to the provision of "personnel," and not to "service," the latter term and other types of material support are simply "not forms of support that could be provided independently of a foreign terrorist organization." *See id.* "Congress would not have prohibited under 'service' what it specifically exempted from prohibition under 'personnel.'" *Id.* Thus, "service" implicitly requires a connection between the service provided and the FTO, meaning that term comports with due process. *See id.* Here, the inclusion of the terms "personnel" and "services" in the indictment show that the Defendant has been provided adequate notice of how his alleged conduct is criminal.

It also cannot be said that the statute affords too much enforcement discretion to the government. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 168 (1972). A statute must provide "'minimal guidelines' to law enforcement authorities" to pass constitutional muster under the Due Process Clause. *See Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (quoting *Kolender*, 461 U.S. at 358). This is to provide a standard for evaluating whether a suspect has violated the statute, in order to not leave "full discretion" in the hands of law enforcement. *See Kolender*, 461 U.S. at 358-59. But § 2339B—and its incorporation of the definition of material support at § 2339B(a)(1)—satisfies due process in this respect. "It provides an exhaustive list of federal crimes for which a person can be charged for providing 'material support'—a term which courts have consistently found to be clear and definite…Thus, an objective standard exists for evaluating whether a person's conduct falls within the prohibition of the material-support statute." *United States v. Abu Khatallah*, 151 F.

Supp. 3d 116, 141 (D.D.C. 2015). Even if the Defendant may have a successful

defense at trial to his alleged § 2339B violation, that does mean that the government

has unfettered discretion in applying the law. Rather, the Government is limited by

provisions such as §§ 2339B(a)(1) and 2339B(h), including the requirement that there

be a connection between the personnel and services provided and the FTO. *See*

*Humanitarian Law Project*, 561 U.S. at 24. Its discretion is not boundless.

## III.   Counts Two and Three fall within Congress's enumerated powers

Counts Two and Three allege violations of federal statutes that are entirely

constitutional. The National Firearms Act ("NFA") provisions at issue here do not

exceed Congress's taxing power.

As the Defendant notes, the case of *United States v. Bolatete*, No. 18-14184,

2020 WL 5784153 (11th Cir. Sept. 29, 2020), was recently heard by the Eleventh

Circuit. Since the Defendant filed his motion, the court has issued its opinion in that

case, which forecloses the Defendant's constitutional argument about Counts Two

and Three.

The defendant in *Bolatete* was convicted of violations of 26 U.S.C. §§ 5861(d)

and 5871 due to his possession of a silencer, and, like the Defendant here, he

contended that the NFA exceeded Congress's taxing power. *Id.* at *4. The Eleventh

Circuit disagreed. "The National Firearms Act, and the criminal penalty for violating

it, are grounded in Congress' power to tax." *Id.* at *5. The NFA creates a

comprehensive taxation and registration scheme for certain statutorily defined

"firearm[s]," which include silencers. *Id*

The *Bolatete* court considered *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519 (2012), in arriving at the conclusion that the NFA is constitutional. Per *NFIB*, the Eleventh Circuit took a practical approach that does not depend on how the law is labeled, to decide whether the NFA is a valid tax measure. *See Bolatete*, 2020 WL 5784153 at *6. Yet, despite the Supreme Court issuing its *NFIB* decision in recent years, the *Bolatete* court found that it was still bound by the precedent in *United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972), and *United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009). *See Bolatete*, 2020 WL 5784153 at *6-7. In *Ross*, which involved a violation of § 5861(d), the court had held that the statute "is part of the web of regulation aiding enforcement of the transfer tax provision in § 5811." 458 F.2d at 1145. "Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons. Such a penalty imposed on transferees ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax." *Id.* Likewise, in *Spoerke*, the court had held that "[t]he National Firearms Act is facially constitutional," based on the taxation power of Congress. 568 F.3d at 1245. Citing *Ross* and other cases, it stated that "Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons." *Spoerke*, 568 F.3d at 1245. Furthermore, the "unlawfulness of an activity does not prevent its taxation," and a "statute does not cease to be a valid tax measure because it deters the activity taxed, because the revenue obtained is negligible" *Id.* (citations omitted).

According to *Bolatete*, the Eleventh Circuit was still required to follow *Ross* and *Spoerke*. *See Bolatete*, at *6-8. This was so even though the defendant, like the Defendant here, was charged as the transferee with possessing the silencer, and it is the transferor's responsibility to pay the tax. *See id.* at *8. The court considered the claim that the § 5861(d) does not aid any revenue-raising purpose because it punishes the recipient of an unregistered firearm even though the recipient has no obligation or opportunity to pay the transfer tax. *Id.* This is the same argument that the Defendant makes (Doc. 71 at 9), but the Eleventh Circuit dismissed it as "a distinction without a difference." *Id.* "[Section] 5861(d) aids a revenue-raising purpose even though it punishes possessors and transferees who have no obligation or opportunity to pay the transfer tax themselves." *Id.*; *see also United States v. Hall*, 171 F.3d 1133, 1142 (8th Cir. 1999). Per *Bolatete*, the NFA is constitutional as an exercise of Congress's taxing power.[1]

The Supreme Court's decision in *NFIB* does not change this conclusion. *NFIB* characterized the "penalty" in the Patient Protection and Affordable Care Act ("ACA") as a "tax" and, from that premise, reasoned that the ACA permissibly exercised Congress's taxing power. *See* 567 U.S. at 561–63. But, with respect to the NFA, Congress expressly created a taxing regime in aid of a revenue purpose and

---

[1] The United States notes that, as was true in *Bolatete*, there is no evidence in the instant case that the Defendant ever planned to register and lawfully possess a silencer. *See* 2020 WL 5784153 at *8. Instead, the evidence shows that the Defendant tried to create his own unlawful silencers out of solvent traps and that he knew that he was looking for silencers through illicit channels. *See* Doc. 5.

then delegated authority to the executive branch to carry it out. Moreover, *NFIB* emphasized that it was not making new law, but merely applying longstanding principles to decide whether a "penalty" was really a "tax." *See id.* at 565-66; *see also United States v. Stepp-Zafft*, 733 F. App'x 327, 330 (8th Cir.), *cert. denied*, 139 S. Ct. 279 (2018) ("*NFIB* upheld an Act of Congress based on the taxing power...and nothing in that decision obviously undermines our relevant precedent"); *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 2690 (2019). As the Defendant's own statistics indicate (Doc. 71 at 14), there are thousands of silencers that have been registered pursuant to the NFA, and there is no reason to believe that the tax and approval process here operated as a "penalty" that otherwise made it impossible for him to register and possess the silencer in question. *See Spoerke*, 568 F.3d at 1246; *see also United States v. Lim*, 444 F.3d 910, 914 (7th Cir. 2006); *United States v. Mise*, 240 F.3d 527, 530 (6th Cir. 2001); *United States v. Ridlehuber*, 11 F.3d 516, 526-27 (5th Cir. 1993).

Given that the NFA falls within Congress's enumerated powers, the Court should not dismiss Counts Two or Three.[2]

---

[2] In addition to constituting a legitimate taxing measure, some circuits have upheld the NFA on interstate commerce grounds. *See United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994) ("The NFA can be upheld on the preserved, but unused, power to tax or on the power to regulate interstate commerce"); *United States v. Jones*, 976 F.2d 176, 184 (4th Cir. 1992) ("there can be no serious contention that the[ ] application [of § 5861(d)] in this case to two machineguns which were transported between two states for sale exceeds Congress' power to regulate interstate commerce"); *see also United States v. Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006) (statute criminalizing possession of homemade machineguns manufactured intrastate was not unlawful extension of Congress' commerce powers, even if machineguns never traveled in interstate commerce).

### IV.   Counts Two and Three do not offend the Second Amendment

Counts Two and Three comport with the Second Amendment, even after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Courts employ a two-step inquiry when deciding a Second Amendment challenge. *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017). First, the court must ask if the restricted activity is within the scope of protection of the Second Amendment in the first place. *Id.* "If the challenged regulation does not burden conduct within the scope of the Second Amendment as historically understood, then the law comports with the Second Amendment." *Id.* If it does, then the court is to apply "an appropriate form of means-end scrutiny." *Id.*

The Second Amendment guarantees an individual right, but that right is not unlimited. *Heller*, 554 U.S. at 626. The Court in *Heller* detailed a non-exhaustive list of "presumptively lawful regulatory measures" that have historically constrained the scope of the right. *Id.* at 626-27 & n.26. These measures include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [ ] laws forbidding the carrying of firearms in sensitive places such as school and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures…."). These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms. *See Heller*, 554 U.S. at 631, 635. Moreover, the Court in *Heller*

recognized "another important limitation on the right to keep and carry arms" with regard to prohibiting the carrying of "dangerous and unusual weapons" that were not in common use at the time that the Second Amendment was enacted. *See id.* at 627.

As an initial matter, a silencer does not fall within the definition of "arms" contemplated by *Heller* or the Second Amendment. Although 26 U.S.C. §§ 5861 and 5845 use the term of art "firearm" to describe a variety of items, including silencers as defined in 18 U.S.C. § 921, a silencer is not a "weapon of offen[s]e" or method of defense, nor is it an object used to "cast at or strike another." *See Heller*, 554 U.S. at 581. A silencer does not serve any intrinsic self-defense purpose, and it is not an instrument that constitutes a bearable weapon. *See id.* at 582. Unless one is to club another person with the silencer itself, a silencer has no offensive or defensive capability until it is attached to a gun. Silencers, therefore, are not "bearable arms" within the meaning of the Second Amendment. *See id.*

The Tenth Circuit agreed with this analysis in *Cox. See* 906 F.3d at 1186. Before even asking the question of whether silencers are commonly used by law-abiding citizens for lawful purposes, that court considered whether the Second Amendment protects silencers in the first place. *Id.* It held that it does not. *See id.* "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *Id.* "Thus, because silencers are not 'bearable arms,' they fall outside the Second Amendment's guarantee." *Id.* The Defendant tries to distinguish *Cox* and the common sense understanding that silencers are not themselves weapons by comparing them to magazines and ammunition, as well as by claiming that the

Second Amendment protects items that "enhance" self-defense. But the case law that he cites is distinguishable. Silencers are not like magazines or ammunition, because one can operate a gun in self-defense without a silencer. *See Heller,* 554 U.S. at 630 (holding that a regulation that "makes it impossible for citizens to use [their firearms] for the core lawful purpose of self defense" is unconstitutional); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) ("a regulation cannot permissibly ban a protected firearm's components critical to its operation"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended"). Magazines and ammunition are indispensable to using a gun for self-defense, but silencers certainly are not. *Cf. Bolatete*, 2020 WL 5784153, at *9 ("In fact, neither [this Court nor the Supreme Court] has ever decided the preliminary question of whether silencers are "Arms" for Second Amendment purposes."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1489 (2009) ("Bans on silencers...would also likely be constitutional because they don't materially burden self-defense.").

Alternatively, even if silencers are considered "arms," they are "dangerous and unusual weapons" under *Heller*. The firearm at issue in *Heller* was a handgun, not a silencer. In explaining the scope of the Second Amendment, the Supreme Court discussed both the nature of possession that is permissible and the sorts of weapons protected by the Second Amendment. The Court concluded that the

Second Amendment addresses only weapons "in common use," and, as an historical matter, the Amendment's scope was tied to the "lawful weapons" that militia members would bring from home "to militia duty." 554 U.S. at 627. The Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

Following *Heller*, the test is not, as the Court explained, whether the weapons are "most useful in military service"—an interpretation that would provide a right to keep "M-16 rifles and the like" at home. *Id.* at 627. Rather, the test is whether the weapons are "typically possessed" in the home and "in common use" by "law-abiding citizens for lawful purposes." *Id.* at 624-25. Conversely, the Court found that the Second Amendment has never been construed to protect "the carrying of 'dangerous and unusual weapons.'" *Id.* at 627.

This issue was more specifically identified in the Supreme Court's analysis of its prior decision in *United States v. Miller*, 307 U.S. 174 (1939). In *Miller*, the defendants had been indicted under the National Firearms Act of 1934 for transporting in interstate commerce an unregistered sawed-off shotgun. In *Heller*, the Supreme Court re-affirmed that the *Miller* decision turned on the fact that the type of weapon at issue there—a sawed-off shotgun—was not eligible for Second Amendment protection. *Heller*, 554 U.S. at 621-23. The *Heller* Court said, "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623. The Court then considered what types of weapons are protected under the Second Amendment,

writing:

> "We may as well consider at this point (for we will have to consider eventually) what types of weapons *Miller* permits. Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. *That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in Miller) might be unconstitutional, machineguns being useful in warfare in 1939.* We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.' The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense. 'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.' Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. *We therefore read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.* That accords with the historical understanding of the scope of the right…. "

*Id.* at 623-24 (emphases added) (internal citations omitted).

*Heller's* references to the fact that weapons like short-barreled shotguns and machine guns do not fall within the scope of the Second Amendment right make clear that the indictment in this case does not infringe on any constitutional right of the defendant. The charges are based on the Defendant's possession of a silencer. Such a weapon is not akin to a handgun, the type of weapon that individuals have a right to maintain in their homes for self defense under *Heller*. Indeed, *Heller* and *Miller* make clear that a silencer is not covered by the Second Amendment. The obvious potential for substantial public safety risks presented by a silencer plainly supports that conclusion. For example, here, the Defendant repeatedly expressed interest in

obtaining a silencer not to protect his ears during target shooting, but to make his planned attack more effective and deadlier. *See* Doc. 5. The weapon at issue in this case is the sort of "dangerous and unusual" weapon that has historically stood outside of the right to bear arms. *See Heller*, 554 U.S. at 627 (citing 4 Blackstone 148-149 (1769)); *see also Bolatete*, 2020 WL 5784153, at *9 ("Neither this Court nor the Supreme Court has ever held that silencers are typically possessed by law-abiding citizens for lawful purposes") (quotation marks omitted); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers, grenades, and directional mines are not typically possessed by law-abiding citizens for lawful purposes") (quotation marks omitted); *United States v. Perkins*, No. 4:08CR3064, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) ("I have no doubt, however, that if confronted with the issue, the Eighth Circuit would apply the same rationale…That is, silencers/suppressors are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.") (quotation marks omitted); *United States v. Garnett*, No. 05-CR-20002-3, 2008 WL 2796098, at *4 (E.D. Mich. July 18, 2008) ("Nothing in the [*Heller*] decision casts doubt on the constitutionality of federal regulations over the machineguns and silencers at issue in this case.").

If the Court is to find that, as to the regulation of silencers, § 5861 burdens conduct within the scope of the Second Amendment, then the statute still clears the bar of constitutionality. As the Defendant notes, the Eleventh Circuit has never reached the second part of its inquiry for Second Amendment challenges, so the level

of scrutiny to be applied is unclear. And, although the Defendant suggests looking to First Amendment jurisprudence to apply strict scrutiny, the United States submits that, at most, the Court should apply intermediate scrutiny. *See Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017) (NFA taxing provisions at 26 U.S.C. §§ 5821 and 5822 "do not substantially burden a core Second Amendment right, so they trigger intermediate scrutiny"); *Heller v. D.C.*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("As between strict and intermediate scrutiny, we conclude the latter is the more appropriate standard for review of gun registration laws."); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(8)); *United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010) (rejecting strict scrutiny for all Second Amendment challenges and applying intermediate scrutiny to 18 U.S.C. § 922(k)); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (accepting intermediate scrutiny to analyze 18 U.S.C. § 922(g)(9)); *United States v. Gonzales*, No. 2:10-CR-00967 CW, 2011 WL 5288727, at *7 (D. Utah Nov. 2, 2011) ("Because the [NFA] only regulates, and does not ban, the firearms at issue, it does not substantially burden constitutional rights. Therefore, intermediate scrutiny, not strict scrutiny, is the appropriate standard of review.").

Under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that the objective is advanced by means substantially related to that objective. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724 (1982); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003). Applying intermediate scrutiny to § 5861, the Court should find that the

taxation and regulation of unusual weapons such as silencers serves an important government interest. Even if some people lawfully possess silencers to protect their hearing, silencers have significant potential to aid criminals who seek to commit crimes of violence. The Court should further find that the statute only minimally affects the ability to acquire a silencer. It does not operate to completely prohibit the Defendant, or anyone else, for that matter, from selling or buying firearms or silencers. *See Focia*, 869 F.3d at 1286. Instead, it merely "impos[es] conditions and qualifications" on transactions involving the transfer of silencers. *Id.* Hence, it is the type of "presumptively lawful regulatory measure" that *Heller* exempted. 554 U.S. at 627 n.26.

## V. Conclusion

For all of the foregoing reasons, the Court should deny the Defendant's motion. The United States further submits that no hearing is necessary given the claims raised and the ability of the pleadings to resolve the Court's questions. *See* Rule 3.01(j), Local Rules, United States District Court, Middle District of Florida.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:     */s/ Patrick D. Scruggs*
        Patrick D. Scruggs
        Assistant United States Attorney
        United States Attorney No. 140
        400 North Tampa Street, Suite 3200
        Tampa, Florida   33602
        Telephone:     (813) 274-6000
        E-mail: patrick.scruggs@usdoj.gov

**U.S. v. Muhammed Al-Azhari**          **Case No. 8:20-cr-206-T-60AEP**

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Samuel Landes, Esq.

/s/ Patrick D. Scruggs
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Ste. 3200
Tampa, Florida   33602
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6125
E-mail:   patrick.scruggs@usdoj.gov