## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 8:20-cr-206-TPB-AEP**

**MUHAMMED MOMTAZ ALAZHARI**

_____/

### MOTION TO SUPPRESS AERIAL SURVEILLANCE EVIDENCE AND EVIDENCE DERIVED THEREFROM

**NOW COMES** Defendant, by and through undersigned counsel, and moves this Court to suppress any evidence of the Government's aerial surveillance of Mr. Alazhari, and any evidence derived from such surveillance.

### MEMORANDUM OF LAW

### FACTS

The FBI operates a secret spy plane surveillance program.  The agency owns a fleet of planes, most of them small Cessnas.  The planes conduct surveillance with cameras and, at least sometimes, a cell-site simulator (a device that tricks cell phones in the area into connecting to it, instead of legitimate cell towers).  The planes are registered by six-digit alphanumeric tail number or "N number" with the Federal Aviation Administration (FAA) to often-fictitious front companies.  The planes circle their target at a high altitude in a counterclockwise motion, because the cameras are mounted on the planes' left side, where the pilot sits.  The cameras are likely "FLIR" systems or L-3 WESCAM systems, high-tech video cameras with a powerful zoom

function and infrared technology allowing them to see heat signatures, and see at night.  After the media exposed the program, including the fact that the FBI surveilled protestors during a civil disturbance in Baltimore, the FBI issued a press release stating that the aerial surveillance program is not itself classified, although the planes are registered "covertly."  The FBI asked the Associated Press to avoid exposing the planes' registration, but the AP declined.[1]

The FBI used at least nine of its spy planes to surveil Mr. Alazhari.  In discovery, the Government provided the Defense with over 900 videos showing aerial surveillance of Mr. Alazhari.  In at least one, the underside of the plane is visible before the



camera trains in on Mr. Alazhari's home.  (Ex. 1).  Each of the videos' file names includes a seemingly meaningless alphanumeric pattern at the beginning.  However,

---

[1] *See Buzzfeed Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396 (D.D.C. 2018); Jack Gillum, "FBI behind mysterious surveillance aircraft over US cities," *Associated Press* (Jun. 2, 2015), *available at* https://apnews.com/article/4b3f220e33b64123a3909c60845da045 (last visited May 26, 2021); Federal Bureau of Investigation, "FBI Aviation Program:  Purpose and Scope" (Jun. 4, 2015), *available at* https://www.fbi.gov/news/pressrel/press-releases/fbi-aviation-program-purpose-and-scope (last visited May 26, 2021); North Carolina Dep't of Public Safety, "New cameras on Civil Air Patrol aircraft improve state's search and rescue capability" (Dec. 12, 2019), *available at* https://www.ncdps.gov/news/press-releases/2019/12/12/new-cameras-civil-air-patrol-aircraft-improve-state%E2%80%99s-search-and (last visited May 26, 2021) (describing the use of FLIR systems on Cessnas); Sean Gallagher, "The FBI's secret air force watched the streets of Baltimore," *ArsTechnica* (May 6, 2015) (describing the FBI's purchase of WESCAM systems for mounting on aircraft), *available at* https://arstechnica.com/tech-policy/2015/05/the-fbis-secret-air-force-watched-the-streets-of-baltimore/ (last visited May 27, 2021).

those patterns correspond with registered FAA tail numbers.  Tail numbers N323LP, N859JA, N288JY, N404KR, N411CP, N539MY, N632TK, N907WK, and N959JT go to small Cessna aircraft registered to the



"companies" RKT Productions, KQM Aviation, NG Research, OBR Leasing, PSL Surveys, and National Aircraft Leasing.  (Exs. 2-10).  Most of these "companies" have been previously linked by the media to the FBI's spy plane program.  As the nearby photographs show, most of the planes have an orb affixed to the plane's left underside behind the landing gear, where the camera system is mounted.



On days that the FBI surveilled Mr. Alazhari with the planes, the planes circled counterclockwise above Mr. Alazhari's home in Tampa, Florida, often for hours on end.  When Mr. Alazhari left his home, the planes followed him, including when he drove in his car, and including when he traveled long distances.  For example, the



planes followed Mr. Alazhari when he drove to Honeymoon Island State Park, near

Dunedin, Florida, and when he drove to Orlando, Florida.  The planes followed Mr.

Alazhari as he went about his life, for example,

watching him pick up his mail from his

mailbox, watching him drive to visit his sister at

her apartment, watching him visit an Urgent



Care facility, and watching him check himself in for

inpatient mental health treatment.  The planes

generally flew at about 10,000 feet, sometimes

above cloud cover.  Small, quiet, and high in the

sky, the planes were barely noticeable to those on



the ground.  The FBI sometimes used multiple planes on the same day, with a new

plane picking up the surveillance another had left off.

     The planes that surveilled Mr. Alazhari were equipped with high-tech

cameras.  The camera produced a high-quality, color video image.  The camera had

a powerful zoom function that allowed it to focus in close enough to identify people.

The zoom function allowed the camera to reveal

the subject's age, race, sex, and identifying

features.  Mr. Alazhari was recognizable as

himself, and his car was recognizable as his.  The

camera was able to switch between various modes



4

to produce the most revealing video image.  For example, the camera's operator could switch between a standard color view, and a black-and-white view that provided heat signatures (likely using infrared technology), revealing people who



would otherwise be obstructed by an object.  The camera produced high-quality video imagery at night, and the camera's operator could pan the camera.  The nearby snapshot from one day of surveillance demonstrates some of the camera's capabilities.  The image was taken at an altitude of 10,878 feet and from a distance of 2.3 nautical miles, and depicts Mr. Alazhari returning home after being discharged from inpatient mental health treatment.

The cameras created digital recordings of the surveillance.  The FBI created 935 separate surveillance videos with the planes.  The FBI surveilled Mr. Alazhari with the planes on at least 43 days between 2018 and 2020.  Between April 18, 2020, and May 24, 2020, the FBI surveilled Mr. Alazhari on 36 days, skipping only May 7, when on-the-ground surveillance knew that Mr. Alazhari was undergoing in-patient mental health treatment.  *See* Exs. 11-12.  The chart below, based on the discovery

5

materials provided to Mr. Alazhari thus far, provides the dates the aerial surveillance videos were taken and the length of the surveillance for each day.

| Date | Total Time (h:mm:ss) |
|---|---|
| 6/13/2018 | 0:04:56 |
| 2/19/2019 | 0:05:44 |
| 6/3/2019 | 0:33:33 |
| 11/7/2019 | 1:27:35 |
| 12/16/2019 | 3:30:18 |
| 2/3/2020 | 1:57:46 |
| 2/4/2020 | 1:58:10 |
| 2/20/2020 | 0:12:13 |
| 4/18/2020 | 1:59:31 |
| 4/19/2020 | 1:53:20 |
| 4/21/2020 | 3:54:25 |
| 4/22/2020 | 3:52:06 |
| 4/23/2020 | 3:48:23 |
| 4/24/2020 | 1:41:16 |
| 4/25/2020 | 3:14:42 |
| 4/26/2020 | 8:07:43 |
| 4/27/2020 | 7:49:51 |
| 4/28/2020 | 7:04:53 |
| 4/29/2020 | 8:35:47 |
| 4/30/2020 | 10:27:22 |
| 5/1/2020 | 18:54:58 |
| 5/2/2020 | 14:06:07 |
| 5/3/2020 | 20:27:11 |
| 5/4/2020 | 18:52:51 |
| 5/5/2020 | 19:12:00 |
| 5/6/2020 | 5:28:14 |
| 5/8/2020 | 8:45:04 |
| 5/9/2020 | 16:22:01 |
| 5/10/2020 | 0:26:48 |
| 5/11/2020 | 15:23:41 |
| 5/12/2020 | 19:43:34 |

| 5/13/2020 | 20:12:52 |
|---|---|
| 5/14/2020 | 21:59:41 |
| 5/15/2020 | 18:14:51 |
| 5/16/2020 | 13:00:46 |
| 5/17/2020 | 18:37:41 |
| 5/18/2020 | 12:56:37 |
| 5/19/2020 | 16:42:37 |
| 5/20/2020 | 18:39:20 |
| 5/21/2020 | 12:16:32 |
| 5/22/2020 | 15:33:51 |
| 5/23/2020 | 19:54:41 |
| 5/24/2020 | 10:48:10 |
| **Grand Total** | **428:59:42** |

In total, the FBI surveilled Mr. Alazhari for over 428 hours with the planes.  The FBI created many video files that did not actually record any video content, suggesting additional surveillance.[2]

The FBI did not obtain a warrant to conduct the aerial surveillance.  Some of the surveillance footage is itself incriminating.  (*See* Doc. 5, pp. 50-51) (asserting that Mr. Alazhari's travel on certain days in May 2020 shows that he was "scouting targets for a potential mass shooting attack.").  Additionally, the Government very likely derived other evidence from the aerial surveillance.  Most directly, the Government may have used the aerial surveillance to conduct other forms of

---

[2] For consistency's sake, this table was prepared by calculating the time of the surveillance with a UTC time zone.  Use of the UTC time zone makes it appear as if there was no surveillance on April 20, 2020; in fact, the FBI surveilled Mr. Alazhari in the late evening on April 20.

7

surveillance.  For example, the FBI, knowing Mr. Alazhari's location or likely route because of the aerial surveillance, may have surveilled him in person, through agents on the ground, who could remain out of Mr. Alazhari's sight and allow Mr. Alazhari to go out of their sight, assisted by the plane above.[3]

Moreover, the information learned from the aerial surveillance may have given the Government investigative leads that produced incriminating evidence. Finally, the Government may have used information from the aerial surveillance to obtain search warrants, or authorizations to conduct surveillance under the Foreign Intelligence Surveillance Act (FISA).  (*See* Doc. 26) (providing notice that the Government intends to rely on information obtained or derived from FISA surveillance).  The Government has moved for a protective order under the Classified Information Procedures Act (CIPA) and has not completed its discovery productions, and so much of this information is presently unknown to the Defense.

## ARGUMENT

This Court should suppress the aerial footage and any evidence derived from the aerial surveillance because the surveillance was an unreasonable search under the Fourth Amendment.  The surveillance was a "search" under the Fourth Amendment

---

[3] *See* Gillum, *supra*, n.1.

because Mr. Alazhari has a reasonable expectation of privacy in the whole of his physical movements.  The search was unreasonable because it was conducted without a warrant.  Finally, the Government cannot show that any derivative evidence – whether in the form of in-person surveillance, new investigative leads, or FISA or traditional warrant searches – was not tainted by the illegal aerial surveillance.

## I.  The aerial surveillance was a "search" under the Fourth Amendment.

"A search occurs for the purposes of the Fourth Amendment 'when the government violates a subjective expectation of privacy that society recognizes as reasonable.'"  *United States v. Trader*, 981 F.3d 961, 967 (11th Cir. 2020) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).  The question of which expectations of privacy are entitled to protection is informed by a historical understanding of the Fourth Amendment, with two "basic guideposts":  "First, that the Amendment seeks to secure the 'privacies of life' against 'arbitrary power.'  Second, and relatedly, that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'"  *Carpenter v. United States*, 138 S. Ct. 2206, 2213-14 (2018) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886); *United States v. Di Re*, 332 U.S. 581, 595 (1948)).  In applying this historical understanding of the Fourth Amendment to "innovations in surveillance tools," the Supreme Court has "sought to 'assure preservation of that degree of privacy against government that existed

9

when the Fourth Amendment was adopted.'" *Carpenter*, 138 S. Ct. at 2213 (quoting

*Kyllo*, 533 U.S. at 34).

The Supreme Court has repeatedly held that modern surveillance that allows

police to observe the whole of a person's physical movements constitutes a "search"

under the Fourth Amendment.  *See United States v. Jones*, 565 U.S. 400 (2012);

*Carpenter*, 138 S. Ct. at 2223.  In *Jones*, the police installed a GPS device on the

defendant's car that tracked the car's movements.  The majority opinion held that the

emplacement of the GPS tracker was a search because it constituted a trespass, but

five justices determined that the defendant had a reasonable expectation of privacy in

"the whole of [his] physical movements."  *Carpenter*, 138 S. Ct. at 2215 (discussing

the impact of the separate opinions in *Jones*).

In *Carpenter*, the Government requested seven days' worth of historical cell site

information from Sprint, which showed the location of the defendant's cell phone

virtually any time it was powered on during that period.  The Court first considered

whether the defendant had a reasonable expectation of privacy in his public

movements.  Relying on *Jones*, the Court noted that the cell phone surveillance was a

new technological advance that would not be anticipated by most people.  *Id*. at

2217.  Like in *Jones*, "'society's expectation has been that law enforcement agents

and others would not–and indeed, in the main, simply could not–secretly monitor

10

and catalogue every single movement of an individual's car for a very long period.'"

*Id.* (quoting *Jones*, 565 U.S. at 430 (opinion of Alito, J.)).

The Court explained that the Government's acquisition of the cellular location information contravened a similar reasonable expectation:

> As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." [*Jones*, 565 U.S. at 415 (opinion of SOTOMAYOR, J.]. These location records "hold for many Americans the 'privacies of life.'" [*Riley v. California*, 134 S. Ct. 2473, 2494-95 (2014) (quoting *Boyd*, 116 U.S. at 630)].

*Id.* at 2217-18.  *See also People v. Weaver*, 909 N.E.2d 1195, 1199 (N.Y. 2009) (quoted approvingly in *Jones*, 565 U.S. at 415 (opinion of Sotomayor, J.) ("Disclosed in [GPS] data . . . will be trips the indisputably private nature of which takes little imagination to conjure:  trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.").

The Court explained, "In light of the deeply revealing nature of [cell-site information], its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection, the fact that such information is gathered by a third party does not make it any less deserving of Fourth Amendment protection."

11

*Id.* at 2223.  The Court added that its decision is "narrow," does not express a view on matters not before the Court, and does not "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 2220.  *See also Kyllo*, 533 U.S. at 34 (holding that police use of a thermal-imaging device on a house was a Fourth Amendment search "as least where (as here) the technology in question is not in general public use.").

Following *Carpenter*, the en banc Fourth Circuit held that aerial surveillance of the whole of a person's public movements constitutes a Fourth Amendment "search." *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 333 (4th Cir. 2021) (en banc).  In *Leaders*, the court considered the Baltimore Police Department's "AIR" program under which multiple planes orbited Baltimore with a high-tech camera system trained on the city.  *Id.* at 334.  The cameras captured roughly 32 square miles per image per second, and were powerful enough to make people and cars individually visible.  *Id.*  Although not required by the technology, the police limited the resolution of the images so that people and cars were visible "only as blurred dots or blobs." *Id.*  Because of this blurring function, the cameras could not "'capture a suspect's bodily movements, observe facial expressions, record in real-time, [or] zoom-in on suspicious activities . . . .'" *Id.* at 345 (quoting the district court).  The planes flew at least 40 hours a week, obtained an estimated twelve hours of coverage of around 90% of the city each day, and maintained a

12

database of the images they captured for at least 45 days.  *Id.* at 334.  The planes

were limited to surveilling during daylight hours.  *Id.*

On these facts, the en banc Fourth Circuit held that "*Carpenter* applies squarely

to this case."  *Id.* at 341.  The court explained, "[B]ecause the AIR program enables

police to deduce from the whole of individuals' movements, we hold that accessing

its data is a search, and its warrantless application violates the Fourth Amendment."

*Id.* at 333.  The court reasoned, "Without technology, police can attempt to tail

suspects, but AIR data is more like 'attach[ing] an ankle monitor' to every person in

the city."  *Id.* at 341 (quoting *Carpenter*, 138 S. Ct. at 2218).  Although the

surveillance was not completely constant because it only occurred in 12-hour

increments, the court explained that the surveillance was sufficiently pervasive to be

a Fourth Amendment search.  The surveillance was

> enough to yield "a wealth of detail," greater than the sum
> of the individual [persons'] trips.  *See Jones* 565 U.S. at 415-
> 17 (Sotomayor, concurring) (suggesting people do not
> expect "that their movements will be recorded and
> aggregated in a manner that enables the government to
> ascertain" details of their private lives).   It enables
> deductions about "what a person does repeatedly, what he
> does not do, and what he does ensemble," which "reveal[s]
> more about a person than does any individual trip viewed
> in isolation."  *United States v. Maynard*, 615 F.3d 544, 562-
> 63 (D.C. Cir. 2010).  *Carpenter* held those deductions go to
> the privacies of life, the epitome of information expected to
> be beyond the warrantless reach of the government.  138 S.
> Ct. at 2214, 2218 . . . .

13

> Therefore, because the AIR program opens "an intimate window" into a person's associations and activities, it violates the reasonable expectation of privacy individuals have in the whole of their movements. *See id.* at 2218-19.

*Id.* at 342 (footnote omitted).

The court of appeals rejected the district court's finding that the surveillance was too short-term and anonymous to constitute a search, because "[t]he data sets in *Jones* and *Carpenter* had gaps in their coverage, too," and because people's habits and other information allowed the police to easily identify the people behind the dots and blurs. *Id.* at 342-45.  The court explained:

> For all these reasons, the AIR program's surveillance is not "short-term" and transcends mere augmentation of ordinary police capabilities.  People understand that they may be filmed by security cameras on the streets, or a police officer could stake out their house and tail them for a time. *See Maynard*, 615 F.3d at 560 ("It is one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work.").  But capturing everyone's movements outside during the daytime for 45 days goes beyond that ordinary capacity.  *See id.* ("It is another thing entirely for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine.").

*Id.* at 345.

Here, as in *Leaders*, "*Carpenter* applies squarely to this case." *Id.* at 341.  As in

14

*Jones* and *Carpenter*, Mr. Alazhari had a reasonable expectation of privacy in the whole of his physical movements.  The 43-days of aerial surveillance with high-tech cameras was therefore a search.  The surveillance here was more pervasive than in *Jones* or *Carpenter*, because it was longer lasting and was more unavoidable:  while Jones and Carpenter could have theoretically avoided using a car or a cell phone, the planes in this case followed Mr. Alazhari anywhere he went.  The surveillance was more pervasive than in *Leaders* because there was no self-imposed limit on the time of day or length of the surveillance, and no anonymous dots or blurs.  Like in *Jones* and *Carpenter*, the surveillance revealed the "privacies of life" by watching him visit his sister, watching him visit the health clinic, and watching him check himself in and out of mental health treatment.  Like in *Jones*, *Carpenter*, and *Leaders*, the surveillance made use of advanced technology, and most people would not expect to be constantly watched from above by high tech infrared cameras.  These cameras used "sense enabling" features "not in general public use" to observe and record from 10,000 feet in the sky, and to detect heat signatures in the dark or behind visual obstructions.  *See Kyllo*, 533 U.S. at 34.  The FBI's extended aerial surveillance of Mr. Alazhari was therefore a Fourth Amendment search.

To be sure, the Supreme Court has held that *other* forms of aerial surveillance did not constitute a Fourth Amendment search.  *See California v. Ciraolo*, 476 U.S. 207, 213-14 (1986) (holding no search occurred where police conducted a "flyover"

of a backyard curtilage with a plane at 1,000 feet, observed marijuana with the naked eye, and took still photographs of the yard with a standard 35mm camera, because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed."); *Florida v. Riley*, 488 U.S. 445, 451-52 (1989) (plurality opinion) (holding no search occurred where police circled twice over the defendant's greenhouse in a helicopter at 400 feet and saw marijuana with the naked eye, because any member of the public could have done the same and such flights are not sufficiently rare to make any expectation of privacy reasonable, while noting that not all aerial observation from lawful airspace will pass muster); *Dow Chemical Co. v. United States*, 476 U.S. 227, 238-339 (1986) (holding no search occurred where agents flew a plane over a 2,000 acre industrial complex and photographed it with a mapmaking camera, because the complex was more like an "open field" than a curtilage, while noting that "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant.").

*Ciraolo*, *Riley*, and *Dow Chemical* do not control here because in none of these three "flyover" cases did police observe "the whole of [a person's] physical movements," as in *Jones* and *Carpenter*. None of the cases holds that all forms of aerial surveillance are outside the scope of the Fourth Amendment. Each case

16

considered a flyover of a fixed location, and not a person on the move. Each case

involved limited passes by the aircraft, and either naked-eye surveillance or the use of

a camera in common public use. Mr. Alazhari objects to the Government's aerial

surveillance of the whole of his public movements, not any one moment of

surveillance. As the Fourth Circuit explained in *Leaders*:

> Plaintiffs do not object to what any one AIR image reveals
> or claim a privacy invasion related solely to being
> photographed. *See Carpenter*, 138 S. Ct. at 2220 ("[T]his
> case is not about . . . a person's movement at a particular
> time."). Rather, they challenge the creation of a
> retrospective database of everyone's movements across the
> city. *See id.* ("It is about a detailed chronicle of a person's
> physical presence compiled every day, every
> moment, . . . [and] [s]uch a chronicle implicates privacy
> concerns.") . . . .
>
> Thus, the AIR program's "aerial" nature is only
> incidental to Plaintiff's claim, just as cell phone technology
> is ultimately incidental to the outcome in *Carpenter*. It is
> precedents concerning privacy in "physical location and
> movements" that control. *See id.* at 2215. And even though
> flyovers and pole cameras can sometimes reveal intimate
> information like the AIR program does, that does not mean
> the AIR program's citywide prolonged surveillance
> campaign must be permissible as well. *See Kyllo*, 533 U.S.
> at 35 n.2 ("The fact that equivalent information could
> sometimes be obtained by other means does not make
> lawful use of means that violate the Fourth Amendment.");
> *Maynard*, 615 F.3d at 565-66 ("[W]hen it comes to the
> Fourth Amendment, means do matter.").

*Leaders*, 2 F.4th at 345-46.

Here, the unmarked planes followed Mr. Alazhari everywhere he went for an

17

extended period with an advanced camera not in common public use, so that he could be seen in clear detail from 10,000 feet and two miles away, whether it was dark out or he was behind an obstacle.  This form of surveillance is more like the GPS satellites used in *Jones* or those hypothesized in *Dow Chemical* than they are like simple flyovers.  The surveillance here was even more invasive of Mr. Alazhari's privacy than the more limited surveillance found to be a search in *Leaders*.  Most people would not expect to be subject to this sort of technologically advanced and persistent surveillance.  The surveillance sounds like the ravings of a paranoid schizophrenic.  Society is therefore prepared to recognize as reasonable Mr. Alazhari's perfectly sane expectation that he was not being constantly watched from above by the FBI.  Simple flyovers are preserved as among the "conventional surveillance techniques and tools" discussed by *Carpenter*, but here the Government invaded Mr. Alazhari's reasonable expectation of privacy in the whole of his physical movements.  *See Carpenter*, 138 S. Ct. at 2219-20.  Accordingly, the aerial surveillance was a Fourth Amendment "search." [4]

---

[4] Additionally, the aerial surveillance was a search under a "positive law" model of the Fourth Amendment.  *See Carpenter*, 138 S. Ct. at 2268 (Gorsuch, J., dissenting).  Under Florida tort law, "a persistent course of . . . unreasonable surveillance, even if conducted in a public or semi-public place, may nevertheless rise to the level of [actionable] invasion of privacy based on intrusion upon seclusion."  *Wolfson v. Lewis*, 924 F. Supp. 1413, 1420 (E.D. Penn. 1996).  Under this formulation, the police conduct here, if engaged in by a private party, would violate the "positive law" of Florida, and so would be a search under the Fourth Amendment.  However, Justice Gorsuch's positive-law model has not been adopted by a majority of the Court.

## II.  The warrantless search was illegal.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).  Accordingly, the conclusion that extended aerial surveillance of the whole of a person's physical movements is a Fourth Amendment search does not mean that the police may never use this tactic, but only that the Constitution requires a magistrate to issue a warrant, to "'place[] [an] obstacle[] in the way of a too permeating police surveillance.'"  *Id.* at 2213-14 (quoting *Di Re*, 332 U.S. at 595).  If the FBI wishes to surveil someone for 43 days with its spy planes, "the Government's obligation is a familiar one – get a warrant."  *See id.* at 2221.  Because the Government did not do so in this case, the search was unreasonable under the Fourth Amendment.

## III.  The footage and any derivative evidence should be suppressed.

Evidence derived from a Fourth Amendment violation – the "fruit of the poisonous tree" – must be suppressed under the Fourth Amendment's exclusionary rule.  *See Nardone v. United States*, 308 U.S. 338, 341 (1939).  The burden is on the Government to prove that evidence derived from an unlawful search is subject to some exception to the exclusionary rule, such as on a "dissipated taint" or

"independent source" theory.  *See Brown v. Illinois*, 422 U.S. 590, 604 (1975).  Where police obtain a warrant after an unlawful search, the Government must prove both that information learned from the unlawful search played no part in the issuance of the warrant and that the decision to seek the warrant was not prompted by the unlawful search.  *United States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012).

Here, the "poisonous tree" is the aerial surveillance itself, and the video recordings it produced should be suppressed.  But this poisonous tree may have produced bountiful fruit.  In this sprawling, years-long terrorism investigation involving search warrants, subpoenas, FISA authorizations, and a multitude of informants, the Government may have derived countless decisions, leads, and items of evidence from having surveilled Mr. Alazhari's every movement over 43 days.  And, in part because much of the discovery in this case is undergoing the CIPA process or de-classification, much of the evidence is unavailable to the Defense, so it is impossible for the Defense to identify every item of evidence likely derived in some way from the aerial surveillance.  Instead, the burden is on the Government to show that any given item of evidence was *not* derived from the unlawful surveillance.  A few categories of evidence are worth discussion.

First, media reports suggest that one function of the spy planes is to supplement on-the-ground agents' surveillance.  That is, agents on the ground are able to hang back and lose sight of the subject of the surveillance while he is on the

20

move so as not to reveal themselves, aided by the plane in the sky keeping its camera trained on the subject.  There is some indication that this happened in this case, as at the Government engaged in on-the-ground surveillance in addition to the aerial surveillance.  If that is so, the agents' observations were derived directly from the unlawful aerial surveillance, and so should be suppressed.

Second, *any* lead, investigative decision, or other advantage generated from the unlawful aerial surveillance is the fruit of the poisonous tree.  If the Government enrolled Mr. Alazhari's sister as an informant because they saw him visit her home, her testimony would be derivative evidence.  If the Government knew to place recording devices in his home at a certain time because the planes showed that he was then away, what the devices recorded would be derivative evidence.  If the Government were prompted in any way to introduce Mr. Alazhari to the primary informant in this case (whom the Government calls a "confidential human source"), any evidence generated by that informant should be suppressed.

Third, the Government must show that any search warrant or FISA authorization was obtained entirely independently of the aerial surveillance, under *Noriega*.  That is, if the Government obtained a search warrant or FISA authorization after conducting the unlawful aerial surveillance, for the fruits of that warrant or authorization to be admissible, the Government must show that (1) the information gained from the unlawful surveillance was not used to obtain the warrant or

21

authorization, and (2) the decision to apply for the warrant or authorization was not prompted by the aerial surveillance.  *See Noriega*, 676 F.3d at 1260-61.  If the Government cannot make these showings, the evidence it obtained with the warrants or authorizations should be suppressed.

   **WHEREFORE** Defendant, Mr. Alazhari, prays this Court will suppress any evidence of the Government's aerial surveillance and any evidence derived therefrom.

   DATED this 30th day of August 2021.

Respectfully submitted,

A. FITZGERALD HALL, ESQUIRE
FEDERAL DEFENDER

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:   (813) 228-2715
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th of August 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Patrick Scruggs.

/s *Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender