UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                  Case No. 8:20-cr-206-TPB-AEP

MUHAMMED MOMTAZ ALAZHARI
_____/

**MOTION TO SUPPRESS EVIDENCE FROM THE GOVERNMENT'S SEARCH OF DEFENDANT'S HOME AND ANY EVIDENCE DERIVED THEREFROM**

**NOW COMES** Defendant, by and through undersigned counsel, and moves this Court to suppress any evidence seized or observed during the Government's search of Mr. Alazhari's home on May 1 and 2, 2020, and any evidence derived from that search.

**MEMORANDUM OF LAW**

**FACTS**

On May 1, 2020, Defendant Muhammed Alazhari ("Muhammed") was arrested by state authorities for carrying a concealed weapon, and booked into the county jail. While in jail, Muhammed called his sister, Muna Alazhari ("Muna"). The phone call was recorded by the jail, and the conversation was as follows (translations from Arabic to English in *italics*):

> Muhammed: *Peace upon you, Muna. I am in county jail right now.*
>
> Muna: *Peace upon you, Muhammed. I've been trying to speak to you all day today.*

Muhammed: Muna, Muna, I'm in County jail right now.

Muna: I know where you are, and I tried to bail you out, but they didn't let me.

Muhammed: They're not letting you?

Muna: They didn't let me because I don't have pay stubs from the job, but they told me that you could bail yourself out if you have some money on you.

Muhammed: Muna, call a bail bond or whatever they call these places.

Muna: I did call five or six of them, but they won't let me do it because I don't have a job in Florida. And Yahya is not here. I was going to have him come, but Yahya is travelling.

Muhammed: We will do that later. But for now, I want you to come over here, I gave you authorization to take my belongings, OK. So, come here, take my key, and then go to Home Depot and take my car. I'm afraid they're going to tow it.

Muna: Muhammed, how am I going *to take your car I don't have anyone that can drive with me.*

Muhammed: Just call Mohammed, call anyone!

Muna: *I don't have anyone here.* I may ask Abdallah if he can.

Muhammed: Yeah, yeah, Muna, ask Abdallah, that is urgent and necessary.

Muna: But I just wanted to let you know that I tried to bail you out, but they are not letting me.

Muhammed: Yeah, yeah, I understand.

2

Muna: But you can bail yourself out!

Muhammed: Yeah, but I might have to pay 2,000. My bail is 2,000.

Muna: No, it's 200.

Muhammed: OK, cool I can bail myself out for 200, God willing.

Muna: OK try to bail yourself out tonight, so I could go and get you.

Muhammed: Yes, I will do that, but first I need someone to take my car, *and then the second thing is to go to my place, you know where my house is, right?*

Muna: Yeah.

Muhammed: OK, *go to my house on 3003 East* Spillers Avenue. *Go to my place. Put all my stuff in your car and keep it, and if you have to throw away some things, go ahead and trash them. OK, except the Saudi release of judgement, keep that with you.*

Muna: OK, *take out all your stuff?*

Muhammed: Muna, *I have some toys…*

Muna: *But I'm afraid to go at night at this time.*

Muhammed: No Muna *it's fine. Everyone is driving, all is fine. I went out last night and the night before, they're not stopping anyone.*

Muna: OK, *but I can still take your stuff tomorrow, right?*

3

Muhammed: No Muna, *understand what I'm saying, I want you to go to my house tonight, I have some toys there that I want you to pick up, they are all legal and allowed, and keep them at your place temporarily. Do you understand*?

Muna: *So, you're talking about the toys or everything else*?

Muhammed: No Muna, *the toys, the judgment document, and all the notebooks. The notebooks, the judgement document, and the laptop, and…*

Muna: Yeah, *but why right now at night, is it OK tomorrow morning? Yahya is not going to let me go out at night*.

Muhammed: *Tell him it's very important, Muna! Did you understand what I mean by toys?*

Muna: *But why does it have to be at night? Is someone going to your house*?

Muhammed: Muna, *I'm afraid that they will come to my house. So, I want you to get there before them. Another thing is that the landlord was going to book a room in a hotel for me because he was going to spray all four apartments.*

Muna: *Why, you have a lot of insects*?

Muhammed: *Yes, and that's why he wanted us to take all our stuff and valuables out before Sunday*.

Muna: Oh my God! *So, how can I do all this? I can't do it by myself.*

Muhammed: Muna, *at least my toys, so the landlord won't go inside and see them*!

Muna: OK, *is he supposed to do that on Sunday*?

4

Muhammed: *Actually, I was supposed to give him a copy of my home keys today. But as I was going to get a copy, the S.O.B.s approached me by Home Depot and said*: "Mr. Muhammed…"

….

Muna: *So, can I come and pick up the key to the car right now?*

Muhammed: *One moment let me ask. Yes, you can do it right now.*

Muna: *Till what time tonight? Because I have a little girl to take care of!*

Muhammed: *You can come at any time, but I need that done tonight.*

Muna: *OK, I will come in the morning.*

Muhammed: No, *because at Home Depot they said, it can stay tonight only and then they will* tow it *in the morning.*

Muna: *OK, but this is the first night!*

Muhammed: *Just tonight it means like right now, I'm actually afraid they may have already towed it!*

Muna: *They are not going to tow it in the morning, they will give you more time tomorrow.*

Muhammed: *This is a personal thing. The store manager doesn't want the car there!*

Muna: What? *The store manager? But my bro, I don't have anyone that could drive the car with me! And your dad will not allow Abdalla to come with me tonight. Maybe he will let him during the day but not at night*, I have to find someone to help me!

5

Muhammed: *Do you have a car now*?

Muna: *Yes, I do, but how can I drive two cars*?

Muhammed: *Just go there with your car, park it there, and then take my car to your home.*

Muna: *That's nice! Then, they will tow my car*!

Muhammed: *Then in the morning, you could go with Yahya, and get your car back.*

Muna: *Yahya is not here for the next 10 days*!

Muhammed: *What about his brother, isn't he here*?

Muna: *He is not here either*, this is what I'm trying to tell you.

Muhammed: So, tell your dad.

Muna: *I'm not going to tell him because he has enough problems of his own!* My dad is not even talking to me right now, and it is Ramadan!

Muhammed: *But tell him this is an* emergency, *because I'm afraid if they tow the car they would also find a toy of mine inside. I have a toy at home, and a toy in the car.*

Muna: *By the way, you are a retard!*

Muhammed: *Just come now get the key and go get my car, leave your car there, get an Uber or something to return later, and get your car. Or get an Uber in the morning to go back and get your car, and I will compensate you for all those expenses.*

Muna: *How can I go with my little girl and an* Uber with this freaking virus out there? What are you talking about? *You*

6

*are not being sensitive to my situation at all. If Yahya were here, I would do it without any hesitation.*

Muhammed: *What? I was speaking to someone here.*

Muna: Your dad will not let Abdallah drive at night, and I cannot ride in an Uber with my little girl. *In fact, it is not allowed to go out anywhere after 9:00 PM.*

Muhammed: *Muna, everybody is going out.*

Muna: (shouting) *It is illegal after 9:00 pm!*

Muhammed: *Last night, I was driving from 10 to 5 AM in the morning, all kinds of people were out there and the cops did not arrest anyone. OK, Muna, should we call Abou Mohammed to help. If they tow open the car and find the toy inside, that, in itself, is another problem!*

Muna: No, *but there is nothing they can do anyway.*

Muhammed: *Muna, they will take the toy to the police.*

Muna: *Yes, they should take it. You don't have the right to have anything like that in your possession. You jackass! You are getting yourself involved to become like your mother, Jessica! I am coming to take the key, and go to your car, and I am not doing anything else.  I am going to trash the guns!*

Muhammed: *Ok, throw them away. What about the car? Are you going to take or not?*

Muna: *Yeah, I am going to get your car so they will not tow it away! But I am not going to your apartment.*

Muhammed: *That's OK. Don't go to my apartment now. But, if you can in the morning*, that's good.

7

Muna: *Ok, Bye.*

Unbeknownst to Muhammed, the FBI had already recruited Muna as an informant against him, on the pretense that the agents were concerned for Muhammed's well-being. Having received this call from Muhammed, Muna contacted her FBI handler, Special Agent Melissa Fair. Muna told Fair what Muhammed had said, and that she understood "toys" to be code for guns. Muna asked for Fair's advice on how to dispose of the guns, and Fair responded that the FBI could assist her. Muna and Fair arranged to meet that evening at the jail to pick up Muhammed's keys, as he had instructed.

Fair and another agent met Muna at the jail, but Muhammed's keys were not with his personal property held in custody at the jail, as he had expected. The agents recommended that they travel to Muhammed's house to try to gain access without the keys, and Muna agreed. At the house, the agents tried the door, but it was locked. The agents located an unlocked rear window and pushed it open. The agents then drafted a consent-to-search form in the following terms, which Muna signed:

> 1. . . . I give my consent and authorization to enter and search 3003 Spiller Ave. Apt. B Tampa FL and to take possession and dispose of property inside as directed by my brother Muhammad [sic] Alazhari and I abandon any interest herein.
>
> 2. I have been advised of my right to refuse consent.

      3. I give this permission voluntarily.

      4. I authorize these agents to take any items which they determine may be related to their investigation.

One agent crawled through the window, and then unlocked the door to let Muna and the other agent inside. For the next hour or so, crossing into the early morning of May 2, 2020, the agents searched the entirety of Muhammed's apartment. They took photographs of the interior, and inspected and photographed an electrical box on the home's external wall. They seized a gun and some ammunition, but also seized knives, a crossbow, a stun gun, some miscellaneous paperwork, six notebooks, a hat, a card with Muhammed's wireless internet credentials, two cell phones, Muhammed's laptop computer, and other items. When Muna protested that they were taking her brother's personal things, the agents responded that they "just wanted to look." After the search, the FBI digitally extracted the contents of the electronic devices they had seized – the computer and at least one of the phones – and examined the data from the extraction.

## ARGUMENT

This Court should suppress any evidence from the search because Muna had neither actual nor apparent authority to consent to it. Further, this Court should suppress any evidence derived from the unlawful search, including any surveillance under the Foreign Intelligence Surveillance Act (FISA) that derived from the search.

9

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). One exception to the warrant requirement is for a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Police may search an area without a warrant with the consent of one with actual or apparent authority over the premises. *United States v. Matlock*, 415 U.S. 164, 170 (1974); *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). While the law of property is relevant to the question of whether a third-party had actual or apparent authority to consent to a search, the Fourth Amendment is not limited by the law of property. *Georgia v. Randolph*, 547 U.S. 103, 110 (2006). Instead, the question is determined by "widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." *Id*. at 111 (citation omitted). The burden of showing valid third-party consent is on the Government. *See Rodriguez*, 497 U.S. at 181.

**I. Muna lacked actual authority to consent to the search.**

"Widely shared social expectations" do not permit a person with limited access to a space for a limited purpose to invite in the police. *See United States v. Moran*, 944 F.3d 1, 5-6 (1st Cir. 2019). In *Moran*, the defendant stored opaque plastic

trash bags filled with personal property at his sister's storage unit. Then, he learned that her storage unit would soon need to be emptied. Arrested on an unrelated charge, he called his sister from jail to ask her to move the bags. However, there was no evidence that he told his sister that she could open the bags or gain access to what was inside. The court held that the mere fact that the sister had access to the bags and permission to move them did not give her authority to consent to the police searching within them. *Id*.; *see also United States v. James*, 353 F.3d 606, 614 (8th Cir. 2003) ("[O]ne does not cede dominion over an item to another just by putting him in possession.").

Similarly, the purpose for which a third-party has been given access to a space limits his authority to consent to a search of that space. *See James*, 353 F.3d at 614. In *James*, the defendant gave his friend an envelope with computer discs for the purpose of storing the discs. When approached by police, the friend gave the police the discs and signed a form consenting to a search of them. Without a warrant, the police opened the discs and reviewed the material on them. Describing the friend as a "bailee," the court held that he lacked authority to consent to the search, noting *inter alia* that the defendant gave the discs to the friend "for the sole purpose of storing them . . . ." *Id*.; *see also United States v. Basinski*, 226 F.3d 829, 835 (7th Cir. 2000) (holding that a third party lacked apparent authority to consent to a search of a locked briefcase the defendant had given him with instructions to destroy it before

11

allowing anyone to see inside).  Relatedly, an occupant may have authority to grant access to some guests, but not the police.  *Cf. United States v. Burnett*, 890 F.2d 1233, 1238 (D.C. Cir. 1989) (citing *United States v. Most*, 876 F.2d 191, 198-99 (D.C. Cir. 1989)).

Here, "widely shared social expectations" dictate that Muna had no actual authority to invite the FBI into Muhammed's apartment.  Muhammed gave Muna permission to enter the apartment for a limited time for the express and limited purpose of removing the gun and other items.  This permission did not extend to her inviting inside anyone she might wish, to rummage through the home and take pictures as they saw fit.  And, given Muhammed's clear and express purpose in granting Muna access, she especially had no authority to grant access to the police.  While "widely shared social expectations" might include her bringing someone along to aid in Muhammed's purpose, like her husband, they would squarely exclude bringing along the police to frustrate that purpose.

Property law, which influences "widely shared social expectations," supports this conclusion.  *See Randolph*, 547 U.S. at 111.  Just as the friend in *James* was a bailee of personal property, Muna was an "licensee by invitation" in the apartment.  *See* Black's Law Dictionary 940 (8th ed. 2004) ("One who is expressly or impliedly permitted to enter another's premises to transact business with the owner or occupant or to perform an act benefitting the owner or occupant.").  Muna's

"license" to enter the apartment did not extend to her inviting friends to tea there, and especially did not license her to invite the FBI to search the entire premises.

None of this is to say that Muna had no recourse to seek the FBI's assistance. She could have retrieved the gun and handed it to the agents. She could have entered the apartment, searched every inch, and told the agents what she had seen, so that they might seek a search warrant with that information. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (describing the so-called "private search doctrine"). But she had no actual authority to consent to the agents searching the premises, and so the search cannot be justified on that ground.

## II. Muna lacked apparent authority to consent to the search.

Whether a third party had apparent authority to consent to a search "must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief"' that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). Often, apparent authority arises because the police are uninformed or misinformed about the facts. *See, e.g., United States v. Barber*, 777 F.3d 1303, 1305-06 (11th Cir. 2015) (upholding a search of a bag found on the passenger-side floorboard of a car because the driver consented to the search, although the bag in fact belonged to the passenger). In other cases, apparent authority is defeated because the police know *more* about the situation than the

13

ostensibly consenting third party. *See James*, 353 F.3d at 615 (holding that defendant's friend did not have apparent authority to consent to the search of defendant's discs, where the friend had been asked to store the discs, but the police had intercepted a letter instructing the friend to destroy the discs).

Here, there was no information disparity: the agents knew virtually all the facts relating to Muna's authority over the apartment. And, as discussed above, Muna lacked actual authority to consent to the search. What the agents knew of Muna's authority matched what authority she had. The agents knew that Muna did not live at the apartment and had no key. They knew what permission Muhammed had given Muna, and what his purpose was for doing so, because Muna told them what Muhammed had said during the phone call. They knew that Muna had permission to enter the apartment to remove and store or destroy the gun, and had no other permission. They knew that Muhammed's purpose was to prevent the police from finding the gun. ("Muna, I'm afraid that they will come to my house. So, I want you to get there before them."). Without any access or authority provided Muna, they were required to force open a back window to climb into the house. No reasonable officer would have believed that Muna had authority to consent to a detailed search of the apartment given these facts. Muna therefore lacked apparent authority to consent to the search. Accordingly, the warrantless search was unconstitutional.

14

### III. This Court should suppress any evidence from the search and any evidence derived from the search.

Because the search was illegal, any testimony about the agents' observations, the photographs, and the items seized, should be suppressed. *See Murray v. United States*, 487 U.S. 533, 536 (1988) (citations omitted) (explaining that the Fourth Amendment's exclusionary rule extends to "tangible materials seized during an unlawful search" and "testimony concerning knowledge acquired during an unlawful search."). Further, the results of the warrantless search of the computer and phone should be suppressed.

Beyond these materials, this Court should require the Government to prove that any other evidence it seeks to admit was *not* derived from the unlawful apartment search. The burden is on the Government to prove that evidence derived from an unlawful search is subject to some exception to the exclusionary rule. *See Brown v. Illinois*, 422 U.S. 590, 604 (1975). In this case, the Government intends to offer evidence derived from surveillance under FISA. (Doc. 26). Under FISA, the Government must apply to the specialized FISA Court for an order authorizing the desired surveillance, and in so doing, must include among other things "a description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance" and "a summary statement of the means by which the surveillance will be effected and a statement whether a physical entry is

15

required to effect the surveillance." 50 U.S.C. §§ 1804(a)(5), (7). *See also* 50 U.S.C. § 1823 (imposing nearly identical requirements for a FISA authorization to conduct a physical search).

  The Government has explained elsewhere that it conducted various forms of FISA surveillance on Mr. Alazhari, including after the illegal apartment search that is the subject of this motion. (*See, e.g.,* Doc. 198, p. 19). If the Government applied to the FISA Court for a surveillance order after conducting the illegal apartment search, any of the fruits of the resulting surveillance or evidence derived from the surveillance is inadmissible unless the Government makes a two-pronged showing that: (1) the information learned during the apartment search played no part in the issuance of the surveillance order, and (2) the information learned during the apartment search played no part in the decision to seek the surveillance order. *Cf. United States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012) (applying this test to a search warrant applied for after an illegal search). This Court has denied the Defense access to any of the classified material in this case under the Classified Information Procedures Act (CIPA), which presumably includes the FISA applications and orders, and much of the evidence of the surveillance itself. (Doc. 187). Because the Defense therefore cannot comment on that material, this Court should require the Government to prove that both *Noriega* prongs are satisfied as to *any* of its offered evidence at trial.

16

Although the Court's CIPA order renders the Defense ignorant as to the Government's FISA surveillance, a few matters are worthy of discussion. During the search, the agents paid particular attention to the electrical box on the exterior of the home, opening it and photographing it. If what they saw assisted the Government in planning surveillance, applying for a FISA order, or executing the surveillance authorized, the surveillance was unlawful under *Noriega*. If the search of the electrical box merely motivated the decision to apply for a FISA order, the resulting surveillance was unlawful under *Noriega*. Similarly, the agents seized a card with Mr. Alazhari's wireless internet credentials, and extracted data from his phone and computer. If any of this information aided or motivated FISA surveillance, the surveillance was illegal. In any event, the Defense being in no position to identify particular items of evidence that could have been derived from the apartment search because of the CIPA order, the burden should fall to the Government to prove under *Noriega* and *Brown* that any evidence was *not* so derived.

DATED this 30th day of September 2021.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER
MIDDLE DISTRICT OF FLORIDA

*/s* **Samuel E. Landes**
Samuel E. Landes, Esq.
D.C. Bar No. 1552625

>Assistant Federal Defender
>400 North Tampa Street
>Suite 2700
>Tampa, Florida 33602
>Telephone: (813) 228-2715
>Facsimile: (813) 228-2562
>Email: Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th of September 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Patrick Scruggs.

>/s *Samuel E. Landes*
>Samuel E. Landes, Esq.
>Assistant Federal Defender