UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                              CASE NO. 8:20-cr-206-TPB-AEP

MUHAMMED MOMTAZ AL-AZHARI

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS**

       The United States of America hereby opposes the motion of the Defendant, Muhammed Momtaz Al-Azhari, to suppress evidence derived from the seizure and search of the Defendant on May 1, 2020 (Doc. 227).

**MEMORANDUM OF LAW**

       The seizure and search of the Defendant's person was valid pursuant to *Terry v. Ohio*, 392 U.S. 1, 21 (1968), and its progeny. The police officer had reasonable suspicion to stop the Defendant and detain him, and to thereafter search his person for weapons. Accordingly, no Fourth Amendment violation occurred in this case. Furthermore, even if the seizure and search was improper, the government, in this pleading, cannot address whether the subsequent arrest of the Defendant tainted any separate legal authorities that the government may have possessed and executed pursuant to the Foreign Intelligence Surveillance Act ("FISA"). The Defendant's motion should be denied.

I.    **Facts.**

   A.    **Home Depot's concerns about the Defendant and the intelligence bulletin.**

In April 2020, the Federal Bureau of Investigation ("FBI") was investigating the Defendant for providing material support to a foreign terrorist organization (namely, the Islamic State of Iraq and Syria ("ISIS")) and for his potentially unlawful possession of firearms, ammunition, and related paraphernalia. At the time, the Defendant was employed as a freight employee at a Home Depot store in Tampa.

On April 17, 2020, as the investigation progressed, an FBI task force officer reached out to the Defendant's store manager, R.R., to find out more information about the Defendant. *See* Doc. 227, Exh. 1. In relevant part, R.R. told the officer that the Defendant had claimed to have been tortured and imprisoned in another country.

On April 24, 2020, FBI agents interviewed K.H., who supervised the Defendant during the overnight shift at Home Depot. *See* Doc. 227, Exh. 2. At the time, the agents were concerned that the Defendant may have been acquiring firearms off the street as he advanced plans to carry out a terrorist attack. In relevant part, K.H. described the Defendant as being "passionately aggressive" about his Muslim faith, and he recounted that the Defendant had said that Americans "got what they deserved" in the September 11th attacks. K.H. told the agents that the Defendant had also said that an employee who had overdosed on drugs was "burning in hellfire." In addition, K.H. had overheard a coworker once ask the Defendant about "jihad," and the Defendant explained that it was about defending

Islam. According to K.H., the Defendant appeared to take a particularly "strong interest" in the prior military service of K.H., who had been deployed to Iraq and who had been stationed at Abu Ghraib prison—where abuses by United States military forces against Muslim detainees were documented and publicized.

K.H. said that the Defendant had a 9mm pistol that he always kept in the center console of his car. The Defendant, however, was not allowed to bring the pistol inside the store. K.H. had seen the Defendant with the gun two weeks earlier, while on a break. The Defendant told K.H. that he had bought the pistol off the street and that he was trying to get another gun. He also asked K.H. if K.H. or his girlfriend would sell him a gun. Furthermore, K.H. was aware that the Defendant had asked multiple other Home Depot employees to sell him a gun.

K.H. described the Defendant as paranoid. He stated that the Defendant's paranoia appeared to spike within the prior week. For example, the Defendant asked K.H. if the FBI had been to Home Depot and if K.H. had spoken to them. Moreover, the day prior, the Defendant had told K.H. that he was feeling disappointed, and he asked to take an earlier break (at 11:00 p.m., instead of at 1:00 a.m.). At the time, the Defendant was acting secretive and upset. The Defendant said that he was supposed to have a package delivered and that he needed to go home to get it, even though it was late at night. The Defendant ended up leaving work at around 11:00 p.m., and he returned at midnight. Then, at around 1:00 am, the Defendant saw police vehicles outside of the Home Depot. K.H. said that the Defendant became anxious, started acting concerned, and constantly looked out the

3

front windows and doors to observe the police. The Defendant then said that he needed to go home. Prior to leaving, the Defendant gave K.H. the names and numbers of two attorneys with the Council on American-Islamic Relations in Florida. The Defendant told K.H. to call the attorneys if he got arrested, and he left before his shift was over.

On April 24, 2020, at approximately 5:11 p.m., R.R., the Defendant's store manager, called him. The FBI lawfully intercepted that phone call, and a summary transcript of it was provided in discovery. *See* Doc. 227, Exh. 3. In relevant part, R.R. said that K.H. had told him that the Defendant was worried about some things, and R.R. asked if everything was "okay" with the Defendant. The Defendant began to say that he had been a political detainee in Saudi Arabia and that he had been imprisoned and tortured there. The Defendant said that the FBI had since been harassing his sister and brother-in-law. The Defendant said that he was afraid that the Saudi Arabian government had told the FBI something about him. R.R. then began to explain to the Defendant the "Home Depot Care Solutions" program— essentially, an employee assistance program—and he said that it could offer assistance for the Defendant's anxiety and the concerns that he was having. R.R. said that the Defendant would be able to take time off from work to attend the Care Solutions program and that he would be paid. R.R. asked what the Defendant would think about referring him to the program, on the condition that the Defendant not go into their Home Depot store and that he would be paid for his time off. The Defendant said that it sounded very good, but he expressed concerns about being

able to keep his job. R.R. offered assurances that the Defendant's job would not be in jeopardy due to him participating in the program.

R.R. went on to offer to help the Defendant with the initial intake phone call for Care Solutions. They discussed whether the Defendant was scheduled to come into work that day, and R.R. said that the Defendant should not come into work. The Defendant then segued into a discussion about a "Moroccan" "guy" who approached him and offered him work at a second job. The Defendant claimed that he later became suspicious of the man and suspected him of being an FBI agent or informant. The Defendant proceeded to discuss how the FBI allegedly interrogated him while he was imprisoned in Saudi Arabia. R.R. responded by saying, "Sorry man." R.R. then concluded the conversation by telling the Defendant that the Care Solutions program might help him. R.R. told the Defendant to stay home and he said that he would call the Defendant the following Monday.

Also, at some point on April 24, 2020, an FBI agent interviewed M.M., a senior director of corporate security for Home Depot, by phone. *See* Doc. 227, Exh. 4. In relevant part, M.M. relayed that the Defendant had been placed on a two-week paid administrative leave and enrolled in the Home Depot Care Solutions program due to his "erratic and suspicious behavior." Per M.M., Home Depot had instructed the Defendant not to travel to his store during the administrative leave period. Additionally, Home Depot had contacted the Tampa Police Department ("TPD") to request a police presence to prevent the Defendant from entering the premises.

On April 29, 2020, based on information that K.H. had provided to both the

TPD and FBI, as well as the statements from M.M. to the FBI, the TPD issued the

following intelligence bulletin:

> Muhammed M. Alazhari is a current employee at the Home Depot located at
> 8815 N. Florida Ave. He has recently been exhibiting bizarre and erratic
> behavior. Mr. Alazhari has been expressing unhappiness with some Home
> Depot employees. He showed a fellow coworker a firearm that was located
> inside his 2001 bronze Infiniti 4 door vehicle with a Florida tag of LZIL68. He
> was at work at the time of this incident. He made some concerning comments
> to this coworker. Mr. Alazhari has been forced to enter into the Employee
> Assistance Program pending a mental evaluation. He was told not to return to
> Home Depot until he is contacted by a Home Depot supervisor. There are no
> criminal charges at this time. This investigation is ongoing. If law enforcement
> comes in contact with Mr. Alazhari please use caution and consider him
> armed and dangerous. If contact is made at any Home Depot location, detain
> Mr. Alazhari and immediately contact CIB Detectives Campagnano, George,
> or Rego.
> […]
> Mr. Alazhari is known to possess multiple firearms. He has been exhibiting
> bizarre and erratic behavior. He is currently flagged in NCIC [National Crime
> Information Center]. Areas of Concern: 8815 North Florida Avenue (Home
> Depot) 11616 North 22nd Street (Auto Experts)….

The intelligence bulletin also included a photo of the Defendant.

On April 30, 2020, one of the Defendant's coworkers, A.B., provided a written

"Associate Statement" to Home Depot. In the statement, A.B. said that, two weeks

prior, the Defendant had been trying to get A.B. to convert to his religion and to

commit crimes with him. The Defendant had also asked A.B. to steal guns and had

talked about how "his people wanted to kill the president for what they did to his

country." A.B. had told a Home Depot supervisor about his concerns.

That same day, another one of the Defendant's coworkers, A.A., provided a

written "Associate Statement" to Home Depot. In the statement, A.A. said that the

Defendant had continuously and openly encouraged his own religion to A.A., as

well as to other employees in the store. What's more, A.A. said that the Defendant had asked A.A. to buy guns for him, or to sell him one of A.A.'s own guns. When A.A. told the Defendant about background checks, registering firearms, and firearm serial numbers, the Defendant said he did not want registered guns and that he preferred to grind off the serial numbers on firearms. Furthermore, A.A. heard from another coworker that the Defendant had said that something may happen and that "it would get bloody." The Defendant had also discussed being imprisoned in his prior country for three years.

Also that same day, another one of the Defendant's coworkers, R.S., provided a written "Associate Statement" to Home Depot. In the statement, in relevant part, R.S. said that another employee had told her that, during the week of April 25, 2020, the Defendant had pointed a gun at the employee and another person. R.S. also said, "I have seen [the Defendant] very upset at certain people."

Certain Home Depot employees later told the FBI about concerns that they had had about the Defendant.[1]  For example, R.S. had worked with the Defendant for one year. She said that the Defendant had a weird presence at work and always seemed very aggressive like he "was going to beat you up" or "eat you." She felt that he was the kind of guy who "would bring a backpack to work and was going to blow people up." R.S. also saw the Defendant get into at least two arguments with other

---

[1] These employees were interviewed after the Defendant's arrest on May 1, 2020—and his subsequent termination from Home Depot. It seems reasonable to assume, however, that at least some of their statements and concerns about the Defendant were known to the Defendant's supervisors, which informed Home Depot's concerns about the Defendant.

coworkers. As she had already told Home Depot, R.S. recounted to the FBI that another employee told her that the Defendant had shown a gun to other employees and potentially pointed it at them. R.S. had further heard other coworkers say that Defendant had asked them for guns.

Another employee, D.J., said that, when he first met the Defendant, the Defendant had asked if D.J. knew how to fight and the Defendant said that he could teach him. The Defendant appeared to be religious and wanted D.J. to become Muslim. In addition, the Defendant often appeared to be angry. At one point, the Defendant said that he did not like the United States. Moreover, when the Defendant had seen police at Home Depot, he claimed that the FBI had a "trace" on him and was following him. The Defendant also said that he hated cops, and he mentioned that he had been kidnapped and tortured before. The Defendant asked D.J. about guns and how to get guns that could not be traced back to him. He further talked about buying a gun and accessories on the "black [Dark] web." According to D.J., the Defendant wanted "big guns." The Defendant even asked D.J. to buy a gun for him, for which he would repay D.J., so that the gun could not be traced back to him.

The FBI also interviewed another employee, D.L. D.L. said that, the first time that he met the Defendant, he had been wearing a suit. The Defendant had then approached D.L. and accused him of being an FBI agent. The Defendant looked at D.L.as if the Defendant wanted to fight him. Later, the Defendant started talking with D.L. and said that he had been arrested two or three times in other countries for terrorism. In relevant part, the Defendant had said, "I want to teach you about the

8

real Islam," and the Defendant indicated that he wanted to convert D.L. to Islam.
Other employees later told D.L. that the Defendant had been acting weird and
asking about guns. The Defendant had asked several employees about "assault
weapons," and he had repeatedly asked one other employee to get him weapons. Per
D.L., the Defendant had continually approached "lots of employees about guns."
Another coworker told D.L. that the Defendant had once said, "It's gonna be a
blood bath." D.L. said that employees at Home Depot thought the Defendant was
going to come to work with a gun.

The FBI also interviewed another employee, Y.L. According to Y.L., the
Defendant had told her, "My god is *the* God," and he said that the FBI was watching
him. Y.L. also believed that the Defendant had asked other employees about guns.

### B.   The stop, search, and arrest of the Defendant.

On May 1, 2020, TPD Officer Hooley Keith was working an "off-duty"
security detail at the Defendant's Home Depot store in Tampa. At the time, Home
Depot had, of its own accord, hired the TPD to have a visible police presence at the
store due to their concerns about the Defendant's behavior.

According to Officer Keith, his understanding of the detail was that police
units had been hired to be at the store due to a "disgruntled" employee (namely, the
Defendant) who had recently been furloughed. *See* Doc. 227, Exh. 5. Officer Keith
also understood that the Defendant was "not to return to the business per
management." *See id.* Additionally, Officer Keith had reviewed the TPD intelligence
bulletin about the Defendant, which flagged him as "armed and dangerous" and "to

be detained upon sight." *See id.* The bulletin also included a photo of the Defendant and a description of him.

Within around 40 minutes of starting his detail, Officer Keith spotted the Defendant walking from his vehicle toward the front entrance of the Home Depot. Officer Keith confirmed that the Defendant matched the photo and information in the intelligence bulletin. He then exited his patrol car, which was parked in the yellow fire lane bordering the store, and confronted the Defendant as the Defendant was approximately 15 to 20 feet away from the entrance. Surveillance video shows that the Defendant was among a section of outdoor grills immediately in front of the main doors when Officer Keith stopped him.

According to Officer Keith, when Officer Keith asked the Defendant his name, he hesitated to answer. Surveillance video appears to show that Officer Keith proceeded to conduct a "quick" pat-down of just the Defendant's waistline (using what seem to be two brief brushes of his hand against the Defendant's back and sides), which revealed nothing of concern. Officer Keith then handcuffed the Defendant, advised him that he was being detained for questioning, and explained that he was not under arrest.

Officer Keith brought the Defendant by his patrol car. Once at the car (but, seemingly, with the Defendant standing outside of it), Officer Keith asked the Defendant why he was at the store and if a manager requested him to be there. The Defendant said that he was there to "buy some things." Officer Keith thereafter asked the Defendant if he had any weapons or objects that might hurt Officer Keith,

and the Defendant gave an "unintelligible" response. Officer Keith then saw a bulge in the Defendant's right front shorts pocket, so he conducted a pat-down of that area. Immediately upon touching the outside of the pocket, where the bulge was, he recognized a solid object with rounded edges that resembled a closed knife or small firearm. Officer Keith removed the object, which turned out to be a .22 caliber revolver.[2] The Defendant was then placed under arrest for unlawfully carrying a concealed firearm, a violation of Fla. Stat. § 790.01(2). He was later charged with that felony offense in state court in Hillsborough County.

The FBI never obtained the .22 caliber pistol from the TPD. Rather, the TPD seized and inventoried the weapon, and it has remained in TPD custody. It should also be noted that the FBI did not direct the TPD to stop, search, or arrest the Defendant on May 1, 2020. Instead, the TPD had prepared an intelligence bulletin based on K.H.'s and M.M's statements about the Defendant, and Home Depot had privately hired off-duty TPD officers to work security for the store and to prevent the Defendant from entering it without permission. In fact, although FBI investigators

---

[2] Although defense counsel repeatedly, and dismissively, refers to the Defendant's pistol as a "mouse gun," a .22 caliber handgun is perfectly capable of killing or seriously injuring a person. *See, e.g.,* Robert Scott, "One dead, one in custody following Thursday night shooting," CHICKASAW JOURNAL, Feb. 4, 2022, available at https://www.djournal.com/chickasaw/one-dead-one-in-custody-following-thursday-night-shooting/article_23822cd4-06b0-5737-aa35-771b7a3d89a4.html; Nick Poppy, "This serial killer left a trail of dead black men from Buffalo to New York City," NEW YORK POST, Dec. 19, 2017, available at https://nypost.com/2017/12/19/this-serial-killer-left-a-trail-of-dead-black-men-from-buffalo-to-new-york-city/) (discussing the so-called ".22 Caliber Killer"); Meghan Keneally et al., "Why Robert Durst Killed His Neighbor, In His Own Words," ABC NEWS, Mar. 17, 2015, available at https://abcnews.go.com/US/robert-durst-killed-neighbor-words/story?id=29689667.

were surely glad to see the Defendant relinquish a gun and be prevented from carrying out an act of violence at Home Depot, the arrest had the effect of disrupting ongoing discussions that the Defendant had been having with an undercover FBI employee to acquire multiple firearms, including an automatic weapon.

### C.    Relevant subsequent events.

In this unclassified pleading, the United States can neither confirm nor deny whether the FBI conducted additional, classified searches or surveillance of the Defendant pursuant to FISA authorities.

The government also wishes to correct a statement made in the Defendant's motion about the timing of certain audio surveillance that was allegedly conducted on May 14, 2020. *See* Doc. 227 at 9. Relying on aerial surveillance records, the Defendant states that, on that date, at approximately 4:49 p.m., he appeared to be driving his car. Therefore, if the government captured an audio recording of the Defendant listening to a video about converting solvent filters into firearms at that time (as stated in the criminal complaint affidavit), then the FBI must have been conducting audio surveillance inside of the Defendant's car. Upon further review of that audio recording, though, the FBI has determined that, contrary to what was stated in the complaint affidavit, the recording was captured on May 15, 2020, between approximately 4:44 p.m. and 4:49 p.m.—and not on May 14, 2020. The date listed in the complaint affidavit was an error.

**II.    The seizure and search of the Defendant's person was part of a valid *Terry* stop, which then led to his arrest.**

*Terry* and the cases that have followed it make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119 (2000). In *Terry*, the Supreme Court adopted "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). Under this two-part inquiry, a court first examines "whether the officer's action was justified at its inception" (*Terry*, 392 U.S. at 20), which turns on whether the officer had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. *See United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000). In the second part of the inquiry, the court must determine whether the stop went too far and matured into an arrest before there was probable cause, considering "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" *See id.* (quoting *Terry*, 392 U.S. at 20).

To make a showing that an officer, in fact, had reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27). Although reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective

justification for making the stop. *Id.* at 123. That said, a reasonable suspicion of criminal activity may be formed by observing exclusively legal activity. *See id.* at 124-25; *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000).

During a *Terry* stop, if an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other instruments of assault. *Terry*, 392 U.S. at 27; *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. If, during a limited search of the suspect's outer clothing, an officer feels a concealed object that he reasonably believes may be a weapon, the officer may continue the search beyond the outer clothing by searching the suspect's pocket and removing the object. *See Johnson*, 921 F.3d at 997

Here, at the time that Officer Keith stopped the Defendant, he had reasonable suspicion to believe that the Defendant was about to engage in a crime—namely, by trespassing at the store and/or carrying out an act of violence there. Based on the information that he had received from Home Depot concerning the security detail, as well as the TPD intelligence bulletin,[3] Officer Keith had a minimal level of objective

---

[3] Contrary to the Defendant's characterization (Doc. 227 at 19), the intelligence bulletin had not been issued solely based on the fact that the Defendant reportedly kept a pistol in his car, but based on all of the Defendant's recent, concerning behavior at work—as K.H. had detailed to the FBI. *See* Doc. 227, Exh. 2.

justification to stop the Defendant before he could enter the store. *See Wardlow*, 528 U.S. at 123. Specifically, the Defendant had returned to this specific Home Depot store after being told not to come back, he appeared to be a disgruntled employee, he had been "exhibiting bizarre and erratic behavior" and expressing unhappiness with some Home Depot employees, he was pending a mental health evaluation, and he was suspected of being (and, it turns out, was) armed and dangerous. *See* Doc. 227, Exh. 6. Based on these facts, Officer Keith could reasonably believe that the Defendant was not permitted to enter the store and that he might be carrying a weapon and/or intending to commit an act of violence. *See* Fla. Stat. § 810.08 ("Trespass in structure of conveyance").[4] Moreover, the fact that the Defendant may have been engaged in wholly legal activity when he parked in the Home Depot lot and got out of his car does not mean that Officer Keith could not have formed reasonable suspicion as to what the Defendant was about to do. *Gordon*, 231 F.3d at 754. Indeed, Officer Keith waited to confront and seize the Defendant until he saw the Defendant walking toward the store's front entrance and was approximately 15 feet away from the doors (i.e., as he was about to commit, at a minimum, an apparent trespass).

---

[4] In relevant part, this statute provides that:

> Whoever, without being authorized, licensed, or invited, willfully enters or remains in any structure or conveyance, or, having been authorized, licensed, or invited, is warned by the owner or lessee of the premises, or by a person authorized by the owner or lessee, to depart and refuses to do so, commits the offense of trespass in a structure or conveyance.

Fla. Stat. § 810.08(1). Subsection (2)(c) renders the trespass a felony if the offender is armed with a firearm.

What's more, the fact that Officer Keith handcuffed the Defendant upon seizing him did not automatically transform the *Terry* stop into an arrest. *See, e.g., United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989). To assist in more objectively drawing the line between a *Terry* stop and an arrest in an individual case, courts apply four non-exclusive factors. *See United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004); *United States v. Hardy*, 855 F.2d 753 (11th Cir. 1988). These factors are: the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention. *See Acosta*, 363 F.3d at 1146 (cleaned up). In analyzing the first factor, the law enforcement purposes served by the detention, the Eleventh Circuit has stated that the most important consideration is whether the police detained the defendant to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference. *See id.* (cleaned up). Under the second factor, a reviewing court must ask "whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay." *Id.* Per the third factor, the court must look at "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Id.* "[O]fficers may take reasonable steps to ensure their safety so long as they possess 'an articulable and objectively reasonable belief that the suspect is potentially dangerous.'" *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)). An investigatory stop does not necessarily ripen into an arrest because, among other

things, an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car. *See id.* at 1147 (citations omitted). While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a *Terry* stop into a de facto arrest. *Hastamorir*, 881 F.2d at 1556-57; *see also United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (emphasis omitted) ("[A]n investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave."). The fourth and final factor is whether the duration of the detention was reasonable. There is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop. *See United States v. Place*, 462 U.S. 696, 709-10 (1983) (declining to adopt an "outside time limitation" for a permissible Terry stop).

Looking to the four factors as set forth in *Acosta*, Officer Keith's actions between when he stopped the Defendant and found the unlawful gun did not transform the stop into a full arrest. First, it is clear that Officer Keith detained the Defendant to pursue a method of investigation that was likely to confirm or dispel his suspicions quickly, and with a minimum of interference. Understanding that the Defendant was not to return to his Home Depot store, that he was apparently disgruntled, that he had been exhibiting bizarre and erratic behavior, and that he might be armed, Officer Keith did what was reasonable under the circumstances: he stopped the Defendant so that he could confirm or dispel his suspicions that the Defendant was trying to trespass and/or carry out an act of violence. Stopping the

Defendant to discern his intentions was Officer Keith's only course of action when Officer Keith saw him walking toward the store's entrance.

Second, the methods that Officer Keith used were carried out without unnecessary delay. Officer Keith immediately confronted the Defendant outside the entrance, did a very brief pat-down of the Defendant's waistline, handcuffed him, then brought him next to his patrol car (a few feet away) to continue his investigation. Surveillance video confirms that this occurred within mere seconds. The video also appears to show that less than two minutes elapsed between the time when Officer Keith first stopped the Defendant and when another TPD officer responded to the scene, apparently to assist with the Defendant's arrest after the gun had been found. This would suggest that the entire encounter lasted approximately three minutes, at most.

Meanwhile, under the third factor identified in *Acosta*, the scope and intrusiveness of the detention did not exceed the amount reasonably needed for Officer Keith to ensure his personal safety. Again, per the intelligence bulletin, Officer Keith was aware that the Defendant was likely to be armed and dangerous. *See Terry*, 392 U.S. at 27 ("[A] reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). This, alone, made it reasonable for Officer Keith to handcuff the Defendant. *See Hastamorir*, 881 F.2d at 1557. Furthermore, although Officer Keith performed a rapid, cursory pat-down of the Defendant's waistline before handcuffing him, that did not mean that Officer Keith could not conduct a more thorough search for

18

weapons afterward. *See Acosta*, 363 F.3d at 1147 ("During the stop the officers prevented Acosta from returning to his car at least one time, but that was a reasonable precaution because the car had not been fully searched for weapons at that point."). If, during a frisk, an officer feels a concealed object that he reasonably believes may be a weapon, he may continue the search beyond the suspect's outer clothing by searching the suspect's pocket and removing the concealed object. *See Johnson*, 921 F.3d at 997 (cleaned up). In this case, Officer Keith did not fully frisk the Defendant before he brought the Defendant next to the patrol car. Additionally, after the first rapid pat-down, when Officer Keith had asked the Defendant if he had any weapons or objects that might hurt Officer Keith, the Defendant gave an "unintelligible" response. Therefore, when Officer Keith spotted a bulge in the Defendant's shorts pocket—which he had not yet frisked—he did not have to ignore it. Rather, he was entitled to touch the outer clothing of the pocket to further investigate the bulge. *See United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) ("A Terry search may continue when an officer feels a concealed object that he reasonably believes may be a weapon."). Then, because Officer Keith immediately recognized a solid object with rounded edges that resembled a closed knife or small firearm, he was entitled to remove it. *See Terry*, 392 U.S. at 29 (frisk that is "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer" does not exceed its permissible scope).

Lastly, under the fourth factor, the duration of the detention was reasonable. As noted above, the entire encounter between the Defendant's stop and when the

gun was discovered (leading to probable cause to arrest him) appears to have lasted approximately three minutes. In evaluating the duration of a *Terry* stop, the Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). In *United States v. Street*, for example, the Eleventh Circuit found that the lapse of a full hour between a stop and when probable cause was established was not too long. *See* 472 F.3d 1298, 1306 (11th Cir. 2006). Likewise, in *United States v. Gil*, the court upheld a detention under *Terry* where the defendant was handcuffed in the back of a police car for 75 minutes. *See* 204 F.3d 1347, 1350-51 (11th Cir.2000). The Eleventh Circuit has also found that an intermediate period of 17 minutes of detention while awaiting a canine sniff was not unreasonable. *See United States v. Hernandez*, 418 F.3d 1206, 1210 (11th Cir. 2005); *but see Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (holding that *absent* reasonable suspicion to investigate for drugs, a canine sniff conducted *after* completion of traffic stop constitutes unreasonable seizure). Here, the approximately three minutes that the Defendant was detained before discovery of the unlawful gun was reasonable. The Defendant argues that the "the seizure was intended to be indefinite" (Doc. 226 at 13) because the intelligence bulletin had asked the responding officer to detain the Defendant until CIB detectives could question him. Had Officer Keith merely handcuffed the Defendant and placed him in the patrol car for a significant period of time while waiting for those detectives to respond, the government agrees that the situation would likely be analyzed differently under

20

*Terry*. But that is not what occurred. The relevant time period for the Court to examine is that which occurred between the initial stop and the discovery of the gun, which was definite and exceedingly brief.

It should also be noted that, as relevant to the Fourth Amendment inquiry, it does not matter whether the Defendant had already been provided with a formal trespass notice when Officer Keith stopped him. The Defendant points out that it was not until after his arrest and subsequent questioning that a TPD detective provided him with a trespass notice. Doc. 227 at 7. Additionally, it appears that Home Depot did not send the Defendant a formal trespass warning letter until about a week later. *Id.* Nevertheless, the Court must look to Officer Keith's beliefs about the facts at the time that he effectuated the stop. An investigatory stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. *See Saucier v. Katz*, 533 U.S. 194, 204-05 (2001); *United States v. Gonzalez*, 969 F.2d 999, 1006 (11th Cir. 1992) ("A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances"). Here, Officer Keith appears to have reasonably believed that the Defendant would be trespassing at Home Depot if he entered the premises. Indeed, according to the TPD intelligence bulletin, which informed Officer Keith's beliefs, the Defendant "was told not to return to Home Depot until he [was] contacted by a Home Depot Supervisor." Doc. 227, Exh. 6. In addition, the intelligence bulletin itself contained a fair assessment of the facts and was based on

21

the TPD's awareness of events before April 29, 2020 (when the bulletin was issued). This included the April 24, 2020 phone call from R.R. to the Defendant, in which R.R told the Defendant not to go into store and to "stay home" (*see* Doc. 227, Exh. 3), as well as interview of M.M. that same day, in which M.M. said that the Defendant had been instructed not to travel to the store during his administrative leave period (*see* Doc. 227, Exh. 4). Accordingly, Officer Keith could interpret the statements in the intelligence bulletin to mean that the Defendant was given a formal trespass notice, even if, in reality, a formal notice was not issued until after his arrest. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("Great deference is given to the judgment of trained law enforcement officers 'on the scene.'") (citation omitted). In other words, Officer Keith was reasonably relying on information provided in the intelligence bulletin when he approached and detained the Defendant. *See id.; cf. Heien v. North Carolina*, 574 U.S. 54, 66-67 (2014) (demands of Fourth Amendment can be satisfied when officer acts based on mistake regarding scope of substantive law); *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) (police may rely on third party's consent to enter property when facts at time of entry would lead reasonable police officer to believe that third party had authority over premises).

Ultimately, Officer Keith had reasonable suspicion to believe that the Defendant was about to engage in a crime by trespassing at the store and/or carrying out an act of violence there. Thus, Officer Keith had a minimal level of objective justification to stop the Defendant before he could enter the store. *See Wardlow*, 528 U.S. at 123. And, because he had reason to believe that the Defendant might

22

threaten his safety or the safety of others, he was permitted to search the Defendant and seize the concealed object in the bulge that he reasonably believed was a weapon. Furthermore, Officer Keith's actions between when he stopped the Defendant and found the unlawful gun did not transform the stop into a full arrest.

## III.    The Court need not yet analyze the impact on any FISA surveillance.

The United States submits that, because Officer Keith did not violate the Fourth Amendment when he conducted a *Terry* stop and search of the Defendant (and thereafter found the gun and arrested the Defendant), the Court need not conduct an analysis with respect to fruit of the poisonous tree. If, however, the Court were to find that a violation occurred, then the government asks that it be permitted to submit an additional ex parte, classified pleading for in camera review to address the scope of, and any effect on, FISA authorities that the government may have possessed and executed. Due to the classified nature of any such FISA authorities and potential searches, the government cannot directly address in this response what, if any, impact the stop and search of the Defendant may have had on those authorities and potential searches. For the same reason, moreover, the government cannot address whether independent legal authority under the Fourth Amendment existed to carry out additional searches, regardless of the seizure and search of the Defendant on May 1, 2020. *See Murray v. United States*, 487 U.S. 533, 537 (1988) (discussing application of "independent source" doctrine to evidence initially discovered as consequence of unlawful search, but later obtained independently from activities untainted by initial illegality). The government also disagrees with the

Defendant's contention that it is the government's responsibility to prove that any other evidence that it seeks to admit was *not* derived from the stop and search if it was, in fact, unconstitutional (Doc. 227 at 22).

Furthermore, the United States does not interpret the instant motion to be a motion to challenge the legality of FISA authorities pursuant to 50 U.S.C. § 1806(e) or 50 U.S.C. § 1825(f). In other words, the Defendant does not appear to be directly moving to suppress the FISA authorities, or for disclosure of FISA application(s), pursuant to statute. As previously noticed to the Defendant, such a motion would require a separate filing and the participation of the Department of Justice's National Security Division, as well as approximately 90 days for preparation of the government's response. To the extent the Defendant is alleging that his arrest on May 1, 2020, gave rise to unlawful acquisition of information, or that surveillance or searches were not made in conformity with an order of authorization or approval, then the Defendant must move to suppress the evidence obtained or derived from such electronic surveillance or physical search pursuant to 50 U.S.C. §§ 1806, 1825.

## IV.    Conclusion.

For all of the foregoing reasons, the Court should deny the Defendant's

motion to suppress evidence derived from the seizure and search of the Defendant on

May 1, 2020.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    */s/ Patrick D. Scruggs*
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone:   (813) 274-6000
E-mail: patrick.scruggs@usdoj.gov

**U.S. v. Muhammed Al-Azhari**          **Case No. 8:20-cr-206-TPB-AEP**

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2022, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

Samuel Landes, Esq.

Adam Allen, Esq.

*/s/ Patrick D. Scruggs*
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Ste. 3200
Tampa, Florida   33602
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6125
E-mail:    patrick.scruggs@usdoj.gov