UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                      Case No. 8:20-cr-206-TPB-AEP

MUHAMMED MOMTAZ ALAZHARI

_____/

### REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS THE FRUITS OF UNLAWFUL SEIZURE AND SEARCH

Mr. Alazhari moved to suppress evidence the Government gained as a result of his arrest outside his place of employment, a Home Depot. (Doc. 227). The Government responded, making a variety of arguments opposing suppression. (Doc. 235). This Court granted Mr. Alazhari leave to reply to certain of these arguments. (Doc. 237).

There is no dispute between the parties that the arresting officer, Officer Keith, initially detained Mr. Alazhari on the basis of an "intelligence bulletin" issued through Tampa Police Department (TPD) channels by TPD detectives who are task force officers on the FBI's terrorism task force. Further, the Government does not dispute that the task force officers who issued the bulletin were involved in the FBI's investigation of Mr. Alazhari. In his motion, Mr. Alazhari argues that the police lacked reasonable suspicion justifying the initial detention. In response, the Government writes that, given the intelligence bulletin, Officer Keith "could reasonably believe that the defendant was not permitted to enter the store and that he

might be carrying a weapon and/or intending to commit an act of violence." (Doc. 235, p. 15). Therefore, according to the Government, Officer Keith "stopped the Defendant so that he could confirm or dispel his suspicions that the Defendant was trying to trespass and/or carry out an act of violence." (*Id*. at 17). The Government points out that the intelligence bulletin stated that Mr. Alazhari had been "told not to come back" to "this specific Home Depot store," that he had been "exhibiting bizarre and erratic behavior" and "expressing unhappiness with some Home Depot employees," that "he was pending a mental health evaluation," and that he was suspected of being "armed and dangerous." (*Id*. at 15).

In connection with its argument that Officer Keith had probable cause that Mr. Alazhari was trespassing, the Government writes:

> It should be noted that, as relevant to the Fourth Amendment inquiry, it does not matter whether the Defendant had already been provided with a formal trespass notice when Officer Keith stopped him . . . . [T]he Court must look to Officer Keith's beliefs about the facts at the time that he effectuated the stop. An investigatory stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. Here, Officer Keith appears to have reasonably believed that Defendant would be trespassing at Home Depot if he entered the premises. Indeed, according to the TPD intelligence bulletin, which informed Officer Keith's beliefs, the Defendant "was told not to return to Home Depot until he [was] contacted by a Home Depot Supervisor." . . . Accordingly, Officer Keith could interpret the statements in the intelligence bulletin to mean that the

2

> Defendant was given a formal trespass notice, even if, in reality, a formal notice was not issued until after his arrest.

(*Id.* at 21-22) (citations omitted).

The problem for the Government is that it is the knowledge of the entire agency that issued the bulletin that matters for reasonable-suspicion purposes, not just the arresting officer. *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985). And here, the agencies that issued the bulletin – TPD and FBI – lacked reasonable suspicion of trespass or any other crime. Under *Hensley*, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a" *Terry* stop. *Id.* at 232. Conversely, "[i]f the flyer has been issued in the absence of reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id.* That is, "[a]ssuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department." *Id.* at 233.

Thus, under *Hensley*, the TPD and FBI must have possessed reasonable suspicion supporting a *Terry* stop at the time the bulletin issued. In Florida, for a

3

defendant to be guilty of trespassing in a store open to the public or its parking lot, the owner of the property must provide notice against entering, in almost all circumstances, through "actual communication." *Smith v. State*, 778 So.2d 329, 330-31 (2d Dist. Ct. App. Fla. 2000). So the Government is quite wrong when it says that "it does not matter whether the Defendant had already been provided with a formal trespass notice when Officer Keith stopped him." (Doc. 235, p. 21).

Further, TPD and FBI lacked reasonable suspicion that Mr. Alazhari would be trespassing if he arrived at Home Depot when the intelligence bulletin issued. The bulletin stated that Mr. Alazhari "was told not to return to Home Depot until he is contacted by a supervisor." This line is the product of a phone call Mr. Alazhari's Home Depot supervisor, Roberto Rojas, made to him. (*See* Doc. 235, p. 4). As the Government characterizes this call, Mr. Rojas offered to refer Mr. Alazhari into the company's Care Solutions program "on the condition that the Defendant not go into their Home Depot store . . . ." (*Id.*). The Government says, "[T]he intelligence bulletin itself contained a fair assessment of the facts and was based on the TPD's awareness of events before April 29, 2020 (when the bulletin was issued). *This included the April 24, 2020 phone call from [Robert Rojas] to the Defendant, in which [Rojas] told the Defendant not to go into the store and to 'stay home.'*" (*Id.* at 21-22) (emphasis added).

However, reasonable suspicion is judged by "the totality of the

4

circumstances," and "the presence of additional facts might dispel reasonable suspicion." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020). Among the "additional facts" available to TPD and FBI was the *actual call itself*, intercepted and recorded, immune from the Government's characterization or distortion, and attached here as Exhibit 11. After Mr. Rojas and Mr. Alazhari discussed Mr. Alazhari's having been imprisoned and tortured in Saudi Arabia, here's what Mr. Rojas said:

> But we do offer assistance, man, um, you know we're, um, with any other trouble that you're, like, the anxiety that you're having, the concerns you're having, um, and that—that's the help that I want to be able to offer you, man, um. So like I said we have Care Solutions, right? Um, and here—here's the thing about this referral, because that's what it is—I'm referring you to Care Solutions so that you're able to get some assistance. Um, we pay you for the time that you're out, um, with Care Solutions until you able to speak to somebody—uh, a counselor—um, and to, you know, and—and until you're out of, um, not out of but I say that, until they say "all right, um, Muhammed is good to go, you know, we talked through the issues." Um, so we would pay you for the time off, um. So I want to make that clear…too. I want to make clear that, you know, your job is not in jeopardy at any, you know, uh, not in jeopardy at all, um…so. What do you think about us doing that, so that that we refer you—and again, you wouldn't go into the store, um, you know, we would refer you and you'd get paid for the time, um, that you're out of the store, um, and the time that you're, uh, with Care Solutions?

Later in the call, the following dialogue took place:

> Mr. Rojas:  Um, so you – were you scheduled today?
>
> Mr. Alazhari:  Yeah, I am scheduled today.

> Mr. Rojas: Okay, so, yeah, don't go in today, uh, and I'll – I'll make sure that we put in your hours for today – you were scheduled what? Today? Tomorrow? And Sunday? Or What?
>
> Mr. Alazhari: Um… let's see… So I'm – I'm off – I'm off Sundays and Mondays.
>
> Mr. Rojas: Okay. All right, so, I'll make sure that we put in your time for Friday and Saturday? Um, and then on Monday, at 11 AM, I'll put it on my calendar now so that I call you . . . .

Later still, after Mr. Alazhari further discussed his torture in Saudi Arabia, the following dialogue occurred:

> Mr. Rojas: Wow. Sorry, man. Uh, again, you know, I – I think that, absolutely the Care Solutions would, uh, you know, will help. Um, all right, so, stay home, us, it's raining anyways so. [Laughs]. Uh, and that, um, we'll make sure that I'd up – that I'd put the time for you for tomorrow, uh, Saturday? And then once we hook up on Monday, um, remember 11 AM, um, then, uh, then we – we'll go forward with there, okay?
>
> Mr. Alazhari: Okay.

Seen in context and free from characterization, no reasonable person would conclude that Mr. Rojas had just issued Mr. Alazhari "actual communication" of a trespass warning, barring him from physically entering the store as a customer. Instead, plainly, Mr. Rojas was explaining the terms of the paid-leave Care Solutions program. That is, Mr. Alazhari was told that he did not need to report to work, not

6

that he was forbidden from entering the premises.  Thus, under *Hensley*, the officers issuing the bulletin lacked reasonable suspicion that Mr. Alazhari's presence at Home Depot would constitute a trespass under Florida law.

Nor did the officers have reasonable suspicion of any other crime, a planned "act of violence" or otherwise.  The officers based the intelligence bulletin entirely on their interview of Kyle Hughes and Home Depot's decision to refer Mr. Alazhari to the Care program.  As recounted in Mr. Alazhari's initial motion, Mr. Hughes told the officers that Mr. Alazhari expressed some unorthodox religious and moral views; that he seemed interested in Mr. Hughes's military service at Abu Ghraib prison, and wished to include it in a book he planned to write; that Mr. Alazhari had a pistol that he kept in his car and never brought into the store; that Mr. Alazhari was "paranoid" about FBI surveillance; and that Mr. Alazhari had recently seemed upset about a problem with a package delivery.  These facts do not add up to articulable suspicion that Mr. Alazhari was going to commit a crime as he tried to enter the store on May 1, 2020, to buy blinds for his apartment.

In its response, the Government gratuitously recounts other facts, but none of these facts were known to the police at the time the intelligence bulletin issued, and so cannot provide reasonable suspicion. (Doc. 235, pp. 6-9).  Instead, there was no reasonable suspicion for the stop.  This Court should therefore suppress any evidence the Government obtained as a result of the stop.

DATED this 3rd day of March 2022.

        Respectfully submitted,

        A. FITZGERALD HALL, ESQ.
        FEDERAL DEFENDER

        */s **Samuel E. Landes***
        Samuel E. Landes, Esq.
        D.C. Bar No. 1552625
        Assistant Federal Defender
        400 North Tampa Street
        Suite 2700
        Tampa, Florida 33602
        Telephone:  (813) 228-2715
        Facsimile:  (813) 228-2562
        Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd of March 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Patrick Scruggs.

        */s **Samuel E. Landes***
        Samuel E. Landes, Esq.
        Assistant Federal Defender