## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                          **Case No. 8:20-cr-206-TPB-AEP**

**MUHAMMED MOMTAZ ALAZHARI**

_____/

### Motion for the Disclosure of Materials under the Foreign Intelligence Surveillance Act

**Now Comes** Defendant, Muhammed Alazhari, by and through undersigned counsel, and moves this Court to order the Government to provide to the Defense any application to the Foreign Intelligence Surveillance Court (FISC) for an order permitting a search or surveillance of Mr. Alazhari or his premises or facilities under the Foreign Intelligence Surveillance Act (FISA), any certifications or other materials that accompanied such an application, the FISC's order on any such application, and any returns filed in connection with such an order, under 50 U.S.C. §§ 1806(f) and 1825(g), and the Fourth and Fifth Amendments to the U.S. Constitution.

### Memorandum of Law

Muhammed Alazhari is a United States citizen. The Government has described him as a "lone wolf terrorist[]" and "homegrown violent extremist[]" who attempted to provide material support to the Islamic State of Iraq and Syria (ISIS) by committing an attack of some kind in his home state of Florida. (Doc. 5, pp. 52-53). Consistent with the Government's characterization of Mr. Alazhari as a "lone wolf,"

the Government to this day has never produced any evidence that Mr. Alazhari has ever attempted to contact ISIS, that ISIS made any effort to contact him, or that there is any other connection between Mr. Alazhari and ISIS beyond his alleged admiration for the group and consumption of some of its propaganda.

Nonetheless, the Government has provided notice that it intends to admit evidence obtained or derived from electronic surveillance and physical searches conducted under the authority of FISA.  (Doc. 26).  To obtain orders authorizing searches and surveillance under FISA, the Government had to prove to the FISC, among other things, that Mr. Alazhari was "a foreign power or an agent of a foreign power."  50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(1).  But even today, after the surveillance and searches have occurred, there is no evidence that Mr. Alazhari was any such thing.

Perhaps unsurprisingly, given these facts, Mr. Alazhari wishes to move to suppress any evidence obtained or derived from FISA surveillance or searches, under the statute and the Constitution.  But Mr. Alazhari does not have access to the secret FISC proceedings that authorized the surveillance of him, and so cannot know what arguments or evidence the Government presented to the FISC, what the FISC authorized, or what surveillance or searches the Government conducted.  Because under the unique circumstances of this case the Court could not possibly "make an accurate determination of the legality" of the surveillance or search without the

2

assistance of defense counsel for Mr. Alazhari, *see* 50 U.S.C. §§ 1806(f), 1825(g), this Court should order the Government to provide to the Defense its applications to the FISC related to Mr. Alazhari, any certifications or other materials that accompanied those applications or were otherwise provided to the FISC, the FISC's orders, and any returns filed in connection with such orders. *See United States v. Rosen*, 447 F. Supp. 2d 538, 545 n.9 (E.D. Va. 2006) (describing the record of the FISC reviewed by the district court).[1]

FACTS

In Count One of the indictment, Mr. Alazhari is charged with attempting to provide material support to a designated foreign terrorist organization. The indictment alleges that Mr. Alazhari "knowingly attempted to provide material

---

[1]     This motion does not necessarily address disclosure of information obtained or derived from surveillance conducted under Subchapter VI of Chapter 36 of Title 50, known as FISA Section 702. The Government's notice does not directly address Section 702, although cross-references within the statutes leave the notice ambiguous on the question of whether the Government believes it will offer evidence obtained or derived from Section 702 surveillance. Section 702 surveillance raises a host of issues distinct from those raised by so-called "traditional" FISA surveillance. *See, e.g., United States v. Muhtorov*, 20 F.4th 558, 590-91 (10th Cir. 2021). Mr. Alazhari will therefore address the possibility of Section 702 surveillance in a separate motion.

Additionally, as of the filing of this motion, proceedings under the Classified Information Procedures Act (CIPA) remain pending. (*See* Doc. 194). Because the Government's motion under CIPA's § 4 and the magistrate judge's classified order are unavailable to the Defense, the Defense cannot know whether the magistrate judge already addressed the disclosure of the materials requested in this motion. To the extent the magistrate judge has already denied the defense discovery of the materials requested by this motion, it is offered to supplement Mr. Alazhari's objections to the magistrate judge's order.

support and resources, namely personnel (including himself) and services, to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham ('ISIS') . . . knowing that ISIS was a designated foreign terrorist organization and that ISIS has engaged and was engaging in terrorist activity and terrorism."

A 62-page affidavit attached to the complaint filed in this case outlines the Government's theory of the case.  (Doc. 5).  In short, the Government will seek to show that Mr. Alazhari sympathized with jihadist causes; collected various weapons and equipment; traveled to sites including FBI headquarters in Tampa, the site of the Pulse nightclub shooting in Orlando, and Honeymoon Island Beach, outside Dunedin, Florida; and discussed jihadist beliefs with an FBI informant.  As the Government explains elsewhere, it will seek to show that Mr. Alazhari attempted to provide material support or resources to ISIS by providing:  "a) personnel in the form of himself; b) personnel through his recruitment of [an informant]; and c) services in the form of an attack on behalf of ISIS, which was meant to further its terroristic goals."  (Doc. 91, p. 7).  The Government's evidence includes Mr. Alazhari's purportedly private internet browser history, a "court-authorized physical search" of his phone, a "court-authorized physical search" of his Google email account, "court-authorized intercepted calls" from his phone, an FBI search of his vehicle "pursuant to court authorization," and "audio from court-authorized electronic surveillance" from Mr. Alazhari's apartment, where he lived alone.  (Doc. 5, pp. 29-53).

4

However, the Government appears to lack any evidence that Mr. Alazhari made any effort to contact ISIS, that ISIS made any effort to contact Mr. Alazhari, or that there is any other connection between Mr. Alazhari and ISIS beyond Mr. Alazhari's alleged admiration of the group and consumption of some of its propaganda.  Instead, the Government notes that ISIS has issued propaganda encouraging "followers who are unable to travel to the Middle East to instead conduct attacks in other countries." (Doc. 5, p. 7).  The Government points to an ISIS tweet on March 31, 2015 – about four years before the events of this case – exhorting "Lone Wolfs [sic]" to "Rise Up" by committing terrorist acts in countries outside of the main military conflict in Syria and Iraq.  (*Id.*).  The Government points to no direct evidence that Mr. Alazhari ever became aware of this propaganda. Nonetheless, the complaint affiant concludes that Mr. Alazhari "identif[ies] with extremist Islamic and jihadi ideology that condones and encourages carrying out lone-wolf terrorist attacks against individuals in the United States" and that his conduct "match[es] the type of escalation seen with prior lone-wolf or homegrown violent extremists who have carried out, or attempted to carry out, mass shootings and other acts of terrorism in the United States and elsewhere."  (Doc. 5, pp. 52-53).

At the preliminary hearing in this case, the Government's case agent testified as follows:

5

Q.   You describe Mr. Al-Azhari [sic][2] as a lone wolf terrorist, correct?

A.  Yes.

. . . .

Q.   All right.   And what you mean by that, at least for example, is he wasn't sent here by ISIS, correct?

A.  Correct.

Q.  And he wasn't trained by ISIS?

A.  No.

Q.  He wasn't under ISIS's control?

A.  No.

Q.  He wasn't taking direction from ISIS?

A.  No.

Q.  He didn't organize anything for ISIS?

A.  Well, he – it appears he recruited [the informant] to help him in his attack on behalf of ISIS.

Q.  Okay.  But he didn't do that at the direction of anyone from ISIS, correct?

A.  Correct.

Q.  All right.  He didn't supervise anything for ISIS?

---

[2] Contrary to the indictment's spelling, Mr. Alazhari does not hyphenate his last name.

6

A.  No.

Q.  He didn't direct operations for ISIS?

A.  No.

Q.  And certainly you think he – he sympathized with ISIS, correct?

A.  Yes.

Q.   And you think he wanted to advance those goals, correct?

A.  Yes.

. . . .

Q.  All right.  And as a lone – but as a lone wolf, he -- he acted independently of ISIS, correct?

A.  Yes.

Q.  All right.  And he was just seeking to achieve their -- their goals on his own?

A.  Yes.

(R. at 39-41).

The Government filed a notice "that, pursuant to 50 U.S.C. §§ 1806(c) and 1825(d), the United States intends to offer into evidence, or otherwise use or disclose in any proceedings in this matter, information obtained or derived from electronic surveillance and physical search conducted pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829."

7

(Doc. 26).  Mr. Alazhari has to this point filed three motions to suppress.  (Docs. 174, 199, 227).  Each motion alleges that the Government violated the Fourth Amendment through searches or seizures other than FISA surveillance, but each motion also argues that any FISA-authorized evidence collection derived from the more standard Fourth Amendment violations should be suppressed.  For example, the motions argue that (1) if any information was presented to the FISC that the Government learned through an illegal search or seizure, (2) if Government agents were motivated to apply for a FISA order by something they learned from an illegal search or seizure, or (3) if an illegal search or seizure gave the Government the opportunity to execute the FISA surveillance or search, any evidence obtained or derived from the resulting FISA activity should be suppressed.

## ARGUMENT

This Court should order the Government to disclose to the Defense the materials before the FISC because the complex factual and legal issues in this case are such that this Court cannot be expected to correctly rule on a motion to suppress without the assistance of adversarial testing by Mr. Alazhari's defense counsel. Congress enacted FISA in 1978 to regulate perceived abuses in electronic surveillance committed by the Executive.  *See United States v. Hasbajrami*, 945 F.3d 641, 650 (2d Cir. 2019).  FISA created a specialized court of already sitting district court judges, the FISC, to entertain ex parte Government applications to conduct

8

surveillance.  *See* 50 U.S.C. § 1803.  While FISA was initially directed only at electronic surveillance, it was later amended to include physical searches.  *See* Intelligence Authorization Act for Fiscal Year 1995, Pub. L. No. 103-359, § 807, 108 Stat. 3423, 3443-53 (1994) (codified, as amended, at 50 U.S.C. §§ 1821-29).  The procedures for electronic surveillance and physical searches are generally identical.

To obtain an order authorizing electronic surveillance or a physical search, the Government must show probable cause in the FISC that "the target of the electronic surveillance [or search] is a foreign power or an agent of a foreign power" and that "each of the facilities or places at which the electronic surveillance [or search] is being directed is being used, or is about to be used, by a foreign power or an agent of a foreign power."  50 U.S.C. §§ 1805(a)(2), 1824(a)(2).  A "foreign power" is broadly defined as a foreign government or group not substantially made up of "United States persons."  18 U.S.C. § 1801(a).  The definition of "United States persons" includes U.S. citizens.  *Id*. § 1801(i).

The definition of "agent of a foreign power" is divided in two, with one set of criteria applicable only to non-United States persons, and the other applicable to anyone.  *Id*. § 1801(b).  For United States persons, along with other criteria not even arguably applicable here, an "agent of a foreign power" is any person who "knowingly engages in sabotage or *international terrorism*, or activities that are in

9

preparation therefor, *for or on behalf of a foreign power*." *Id*. at § 1801(b)(2)(C)

(emphasis added).  "International terrorism," in turn, means activities that:

> (1) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any state;
>
> (2) appear to be intended –
>
>> (A) to intimidate or coerce a civilian population;
>>
>> (B) to influence the policy of a government by intimidation or coercion; or
>>
>> (C) to affect the conduct of a government by assassination or kidnapping; *and*
>
> (3) *occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.*

*Id*. § 1801(c) (emphasis added).

Additionally, the FISC must determine that the application includes a

required certification.  *Id*. §§ 1805(a)(4), 1824(a)(4).  A high-level executive official,

typically the Director of the FBI, *see In re Sealed Case*, 310 F.3d 717, 723 (Foreign

Intel. Surv. Ct. Rev. 2002), must provide a certification:

> (A) that the certifying official deems the information sought to be foreign intelligence information;

10

(B) that *a significant purpose* of the surveillance [or search] is to obtain foreign intelligence information;

(C) that such information cannot reasonably be obtained by normal investigative techniques;

(D) that designates the type of foreign intelligence information being sought according to the categories described [elsewhere in FISA]; and

(E) includes a statement explaining the basis for the certifications required by subparagraphs (C) and (D).

50 U.S.C. §§ 1804(a)(6), 1823(a)(6) (emphasis added).  The FISC is directed to apply

a "clearly erroneous" standard to the certifying official's factual certification.  *Id.*

§§ 1805(a)(4), 1824(a)(4).

As used in FISA, "foreign intelligence information" means

(1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against –

(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

(B) sabotage, international terrorism, or the international proliferation of weapons of mass destruction by a foreign power or an agent of a foreign power;

(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

11

(2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to –

    (A) the national defense or the security of the United States; or

    (B) the conduct of the foreign affairs of the United States.

*Id*. § 1801(e).

Finally, in addition to a showing of probable cause that the target is a foreign power or agent thereof and the certification requirement, the Government must show that it will follow sufficient "minimization procedures." *Id*. §§ 1805(a)(3), 1824(a)(3). That is, the FISC must approve procedures designed to limit the acquisition, retention, and dissemination of the information the Government learns from the surveillance. *Id*. §§ 1801(h), 1821(4), *see United States v. Muhtorov*, 20 F.4th 558, 587 (10th Cir. 2021).

## I. FISA provides a statutory right to disclosure in complex cases.

FISA provides for a statutory motion to suppress by an "aggrieved party," such as a criminal defendant. 50 U.S.C. §§ 1806(e), 1825(f). By its own terms, the motion to suppress contemplated by FISA includes both a motion alleging a violation of the statute and a motion alleging a violation of the Constitution. *See Muhtorov*, 20 F.4th at 619 (citing *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 465 (D.C. Cir. 1991)). If a defendant files a motion to obtain FISA materials in aid of a

12

motion to suppress (such as this motion), and if the Attorney General files an affidavit under oath "that disclosure or an adversary hearing would harm the national security of the United States," the Court must review the materials in camera, and may disclose to the defendant, "under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance [or search]."  50 U.S.C. §§ 1806(f), 1825(g).

Under FISA, disclosure is not automatic, but rather

> is necessary only where the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors *such as* indications of possible misrepresentation of fact, vague identifications of persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.

*Muhtorov*, 20 F.4th at 619 (quoting *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982)) (emphasis added); *see also id.* (collecting cases from the Second, Fourth, and Eighth Circuits that have applied *Belfield*).  By its own terms *Belfield* did not seek to create an exhaustive list of factors; indeed, it merely quoted examples offered in the Congressional Record.  *See Belfield*, 692 F.2d at 147.  Under the statute, the touchstone is whether disclosure is "necessary" to the Court making an "accurate"

13

ruling on the legality of the search or surveillance, *see* 50 U.S.C. §§ 1806(f), 1825(g), and *Belfield* explained that necessity exists in cases involving complexity or close issues of fact or law.

## II.  The Constitution provides a right to disclosure in certain circumstances.

In addition to the statutory right to an in camera review and disclosure in appropriate circumstances, several lines of constitutional authority may require disclosure of FISA materials in aid of a defendant's motion to suppress.[3]

A.  <u>Due process requires disclosure of material evidence favorable to the Defense.</u>

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), due process is violated when the Government suppresses material evidence favorable to the Defense.  Thus, if the Court's in camera review of the FISA matters reveals evidence material to Mr. Alazhari's suppression motion, the Court should disclose that evidence to the Defense.  *See United States v. Gamez-Orduno*, 235 F.3d 435, 461 (9th Cir. 2000) (holding that *Brady* applies to information that would support a defendant's motion to suppress under the Fourth Amendment); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992) (same); *see also Biles v. United*

---

[3] FISA's statutory text acknowledges that, even if the district court concludes that the surveillance was lawful during its ex parte and in camera review, due process may still require discovery or disclosure to the defense.  *See* 50 U.S.C. §§ 1806(g), 1825(f).

*States*, 101 A.3d 1012, 1018-20 & nn.3, 4, 6 (D.C. Ct. App. 2014) (holding the same

and collecting cases); *cf. Nuckols v. Gibson*, 233 F.3d 1261, 1266-67 (10th Cir. 2000)

(finding a *Brady* violation where the prosecution suppressed evidence material to a

claim under *Miranda v. Arizona*, 384 U.S. 436 (1966)).[4]

   B. <u>Due process and the Fourth Amendment require disclosure where the
      district court's in camera review provides a reasonable belief that the
      FISA application contained material false statements or omissions.</u>

   The possibility of false statements or omissions in the applications to the FISC

may require disclosure under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).  Under

*Franks*, the Fourth Amendment entitles the defendant to an evidentiary hearing if he

makes "a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included in the warrant

affidavit, and if the allegedly false statement is necessary to the finding of probable

cause."  *Id.*  *Franks* applies to omissions as well as affirmative false statements.

*United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980).  But "[w]ithout access to

the FISA application, it is doubtful that a defendant could ever make a preliminary

showing sufficient to trigger a *Franks* hearing."  *United States v. Daoud*, 755 F.3d 479,

---

[4] In addition to those courts that have held that *Brady* applies at the motion-to-suppress stage, some courts have assumed so without deciding the issue, and others still have gone only so far as to hold that the issue is not settled enough to meet the plain error standard.  *See Biles*, 101 A.3d at 1018-19 & nn.3, 5; *see also Muhtorov*, 20 F.4th at 624 (assuming without deciding that *Brady* applies to the district court's in camera review under FISA).

493 (7th Cir. 2014) (Rovner, J., concurring).  Due process cannot tolerate a situation

in which the Fourth Amendment provides a right, but FISA makes obtaining a

remedy impossible.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 161, 163 (1803)

("The very essence of civil liberty consists in the right of every individual to claim the

protection of the laws, whenever he receives an injury . . . . The government of the

United States has been emphatically termed a government of laws, and not of men.

It will certainly cease to deserve this high appellation, if the laws furnish no remedy

for the violation of a vested legal right.").

Courts have frequently acknowledged this conundrum, but have thrown up

their hands as to what to do about it.  *See, e.g., Daoud*, 755 F.3d at 486, 496 (Rovner,

J., concurring).  Courts have agreed that defendants enjoy no *automatic* right to

inspect FISA applications to make out a *Franks* claim., *see id*. at 483-84, but have

articulated no standard by which a court is to determine, on a case-by-case basis,

whether disclosure of the application to the defense is required by *Franks*.

Analogizing from the attorney-client privilege context, this Court should order the

Government to provide the FISC materials to the Defense under appropriate

protective orders if the Court's in camera review provides "a factual basis adequate

to support a good faith belief by a reasonable person" that the Government made

material false statements or omissions before the FISC.  *Cf. United States v. Zolin*, 491

U.S. 554, 571-72 (1989) (internal quotation omitted).

C.  Procedural due process requires disclosure in certain circumstances.

As Congress recognized in the text of FISA, due process may require disclosure of the FISC's proceedings even when the district court concludes the surveillance or search was lawful during its in camera review.  *See* 50 U.S.C. §§ 1806(g), 1825(f).  The relevant test is that of *Mathews v. Eldridge*, 424 U.S. 319, (1976).[5]  Under *Mathews*, whether due process is satisfied by a given procedure is determined by considering three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335.

In the FISA context, the first and third factors are fairly static across cases, and the second factor is more fact sensitive.  As to the private interest affected, like

---

[5] Most courts have assumed the *Mathews* test applies.  *See, e.g., Muhtorov*, 20 F.4th at 624 (citing *United States v. El-Mezain*, 664 F.3d 476, 567 (5th Cir. 2011)).  The Sixth Circuit has stated broadly that *Mathews* does not apply because "FISA's requirement that the district court conduct an ex parte, in camera review of FISA materials does not deprive a defendant of due process."  *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005) (citing *United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987)).  But FISA's plain text acknowledges that due process may require disclosure in some cases.  *See* 50 U.S.C. §§ 1806(g), 1825(f).  It follows that some test of due process is needed to determine whether the in camera review satisfies due process without disclosure; *Mathews* simply provides that test.

17

all "aggrieved parties," Mr. Alazhari has a substantial interest in the accurate determination of whether the Government's foreign intelligence searches and surveillance of him violated his cherished constitutional rights.

As to the Government's interest in secrecy, it is legitimate but should not be overblown. Under FISA, if disclosure is ordered, it is to be with appropriate security procedures and protective orders. As detailed in Mr. Alazhari's sealed submission in the CIPA proceedings, lead defense counsel possesses a "top secret" Department of Defense security clearance, the background investigation for which can easily be used for a Department of Justice clearance. Defense counsel also has experience handling classified information in both litigation and non-litigation settings. Moreover, the Government has recently made a *public* disclosure of a lightly redacted copy of its FISC application for its surveillance of Mr. Carter Paige, in reaction to the political backlash attendant to that case. (Enclosure 1). The sky did not fall when the Government released an appropriately redacted FISA application to the entire world. The sky will not fall if the Government releases appropriately redacted FISA materials after clearing defense counsel, with appropriate security procedures and a protective order preventing him from disclosing the material to anyone, including Defendant.

## III. Disclosure is required by the specific facts of this case.

The second *Mathews* factor – the risk of error without the assistance of defense

18

counsel, and the probable value of defense counsel's assistance – is fact dependent. That is, in an easy case, the district court may have little trouble determining the lawfulness of the searches or surveillance without resort to defense counsel's help. But this is no easy case, and requires adversarial testing with an advocate for Mr. Alazhari's interests in the courtroom.

The Supreme Court has provided two useful guideposts for determining whether in camera review is a sufficient procedure for the legal task at hand.  In *Alderman v. United States*, 394 U.S. 165, 180-81 (1969), the Government illegally surveilled the defendants, and so the defendants were entitled to the suppression of any evidence tainted by the illegal surveillance.  The Government proposed that the district court should review the fruits of the surveillance in camera and ex parte, and only disclose to the defendants those records that were "arguably relevant" to a derivative evidence claim.  *Id*. at 181.  The Court rejected an in camera procedure:

> Although this may appear a modest proposal, especially since the standard for disclosure would be "arguable relevance," we conclude that the surveillance records as to which any petitioner has standing to object should be turned over to him without being screened in camera by the trial judge.  Admittedly, there may be much learned from an electronic surveillance which ultimately contributes nothing to probative evidence.  But winnowing this material from those items which might have made a substantial contribution to the case against a petitioner is a task which should not be entrusted wholly to the court in the first instance.  It might be otherwise if the trial judge had only to place the transcript or other record of the surveillance

19

alongside the record evidence and compare the two for textual or substantive similarities. Even that assignment would be difficult enough for the trial judge to perform unaided. But a good deal more is involved. An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court to identify those records which might have contributed to the Government's case.

*Id.* at 182 (footnote omitted). The Court emphasized that the district court could issue protective orders to safeguard the Government's interests, *id.* at 185, and remanded to the district court to hold an evidentiary hearing on whether the illegal surveillance tainted the defendants' convictions, *id.* at 186.

On the other hand, where the legal task is simple, an in camera procedure is permissible. *See Taglianetti v. United States*, 394 U.S. 316, 317 (1969). In *Taglianetti*, the Government turned over to the defendant all illegal audio surveillance involving him, and the district court conducted an in camera review to "doublecheck" the Government's voice identifications. *Id.* The defendant argued he should be able to review the remaining recordings to determine if he was a party to any other intercepted calls, but the Court held that the voice-identification task did not meet

20

*Alderman*'s "complexity" and "margin for error" standards, and affirmed the use of in camera review.  *Id*. at 317-18.

Here, for at least three reasons, "the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court." *See Alderman*, 394 U.S. at 182.

A.  <u>The FISC's conclusion that there was probable cause that Mr. Alazhari was an "agent of a foreign power" is doubtful.</u>

The Eleventh Circuit's recent interpretation of the Anti-Terrorism Act (ATA) demonstrates that a "lone wolf" ISIS supporter is not an "agent of a foreign power" under FISA.  *See Colon v. Twitter, Inc.*, 14 F.4th 1213 (11th Cir. 2021).  In *Colon*, victims of Omar Mateen's Pulse nightclub shooting brought suit against social media companies for aiding and abetting terrorism.  The plaintiffs argued that the companies provided ISIS a platform for its propaganda, that Mateen consumed that propaganda and "self-radicalized," and that this contributed to Mateen's decision to commit the attack at Pulse.

At issue was whether the Pulse attack was "international terrorism," as defined by the ATA.  *Id*. at 1219.  The ATA specifically defines the term, and the statutory definition is identical to the definition used for the term in FISA, reproduced above.  *Compare* 18 U.S.C. § 2331(1) *with* 50 U.S.C. § 1801(c).  The Eleventh Circuit held that Mateen's acts did not constitute "international terrorism"

21

under the statute, because his acts did not "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they [were] accomplished, the persons they appear[ed] to be intended to intimidate or coerce, or the locale in which their perpetrators operate[d] or [sought] asylum." *Id*. at 1220 (quoting 18 U.S.C. § 2331(1)(C)).  The court explained that the attack occurred in Florida, where Mateen lived; that it was accomplished by means wholly within Florida, even though ISIS posted information on the internet that was distributed worldwide; that the persons intended to be intimidated or coerced were American citizens and residents; and that Mateen never operated or sought asylum outside of the United States.  *Id*. at 1220-21.  Thus, a self-radicalized domestic terrorist in Florida does not engage in "international terrorism" under the statute, even if he was inspired by ISIS propaganda on the internet.

The same goes for a FISA target.  To obtain a FISA order in this case, the Government had to show probable cause that Mr. Alazhari was "a foreign power or an agent of a foreign power."  50 U.S.C. §§ 1805(a)(2), 1824(a)(2).  As an individual U.S. citizen, he is quite obviously not a foreign power himself.  *See* 50 U.S.C. § 1801(a).  Nor was he an "agent of a foreign power."  An agent of a foreign power, as relevant here, is one who knowingly engages in "sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power."  50 U.S.C. § 1801(b)(2)(C).  "Sabotage" has no arguable application in this

case.  *See* 50 U.S.C. § 1801(d); 18 U.S.C. § 2151 *et seq.*  The question for the FISC was whether there was probable cause that Mr. Alazhari was engaged in "international terrorism," the same term considered in *Colon*.

As in *Colon*, no evidence establishes that Mr. Alazhari was at any time engaged in international terrorism, because even assuming the Government's worst theories about him are correct, nothing he was purportedly planning would have primarily occurred overseas or transcended national borders in any way.  The Government has been studiously vague about precisely what it thinks Mr. Alazhari was going to do, but it clearly thinks he was planning a shooting attack on people in Florida, perhaps at a beach or other public place.  The Government has even suggested that Mr. Alazhari was directly inspired by Mateen.  As in *Colon*, nothing about such an attack makes it "international terrorism."  And just as Mateen's consumption of ISIS propaganda online and motivation to commit the attack to support ISIS's goals was insufficient to make the Pulse attack "international terrorism" in *Colon*, the Government's similar evidence about Mr. Alazhari is likewise insufficient.

But the FISC necessarily concluded that Mr. Alazhari was an agent of a foreign power.  That decision is doubtful, or at the very least presented an extremely close case.  On a motion to suppress by Mr. Alazhari, this Court must decide whether the FISC erred.  The closeness of the question means that the risk of error is

23

high, as is the probable value of defense counsel's participation, under the second *Mathews* factor. This is not an easy case, and so is far more like *Alderman* than *Taglianetti*. Bare ex parte, in camera review is therefore inappropriate.[6]

Further, even putting aside whether the Government sought information about "international terrorism," the Government lacked any evidence that Mr. Alazhari was acting "for or on behalf of a foreign power." *See* 50 U.S.C. § 1801(b)(2)(C). To this day, even with the searches and surveillance completed, the Government has produced no evidence that Mr. Alazhari ever communicated with ISIS or tried to communicate with ISIS. He could not have possibly acted "for or on behalf of" a foreign power that had no knowledge whatsoever even of his mere existence. *See Sealed Case*, 310 F.3d at 739 ("FISA surveillance would not be authorized against a target engaged in purely domestic terrorism because the government would not be able to show that the target is acting for or on behalf of a foreign power.").

---

[6] The FISC's acceptance of the certifying official's designation of the type of "foreign intelligence information" sought is similarly dubious, and provides an additional reason for disclosure to defense counsel. Under FISA, the certifying official had to designate which statutory category of foreign intelligence information would be obtained by the search or surveillance. 50 U.S.C. §§ 1804(a)(6)(D), 1823(a)(6)(D). But the only arguable categories that could have applied in this case incorporate the same statutory terms at issue in *Colon*: "foreign power," "agent of a foreign power," and "international terrorism." *See* 50 U.S.C. § 1801(e). Just as the FISC's probable cause finding that Mr. Alazhari was an agent of a foreign power is doubtful, so too is the FISC's acceptance of the certifying official's assertion that the surveillance would yield foreign intelligence information.

24

Of course, defense counsel does not know what it is that the Government

actually presented to the FISC in its application(s).  But that is precisely the problem,

and this Court should order disclosure under appropriate security procedures to

remedy it.

B.  <u>This case involves complex factual and legal questions relating to the
Government's purpose for the surveillance and searches.</u>

Warrantless surveillance for *domestic* security purposes violates the Fourth

Amendment.  *United States v. U.S. Dist. Court for Eastern Dist. of Mich., South. Div.
(Keith)*, 407 U.S. 297, 324 (1972).  Warrantless surveillance for purely *foreign*

intelligence gathering purposes may be lawful.  *See United States v. Brown*, 484 F.2d

418, 426 (5th Cir. 1973).  Further, where prior judicial approval of surveillance is

required, the purpose of the Government's proposed action determines the nature of

the prior judicial approval required.  *See Keith*, 407 U.S. at 322-23 (citing *Camara v.
Municipal Court*, 387 U.S. 523, 534-35 (1967)).

These principles are simply enough stated, but determining whether the

Government's purpose is investigating "ordinary crime," conducting "domestic

security surveillance," or gathering "foreign intelligence" can prove to be highly

complicated.  The leading pre-FISA case is *United States v. Truong Dinh Hung*, 629

F.2d 908 (4th Cir. 1980).  There, following *Keith*, the court announced a "foreign

intelligence exception" to the Fourth Amendment warrant requirement.  *Id*. at 912-

13.  The court explained that the exception applies only when (1) "the object of the search or the surveillance is a foreign power, its agent or collaborators," and (2) "when the surveillance is conducted 'primarily' for foreign intelligence reasons."  *Id*. at 915.  In deciding on the "primary purpose" test, the court noted that often the Government will have mixed motives, involving both a desire to build a case for prosecution and a desire to gather foreign intelligence, and rejected a "sole purpose" test.  *Id*. at 915-16.  Applying this new test, the court undertook a fact-intensive inquiry to determine when the Government's primary purpose transitioned from foreign intelligence gathering to prosecution, and affirmed the district court's suppression of all evidence of surveillance occurring after a precise date.  *Id*. at 916.

In FISA, as originally enacted, Congress required an official to certify that "*the* purpose" of the surveillance was to collect foreign intelligence.  *See United States v. Abu-Jihaad*, 630 F.3d 102, 119 (2d Cir. 2010).  Courts of appeals interpreted this language to cement the *Truong Dinh Hung* "primary purpose" test into statute, and upheld FISA's constitutionality on that ground.  *See United States v. Duggan*, 743 F.2d 59, 72-75, 77 (2d Cir. 1984); *United States v. Johnson*, 952 F.2d 565, 572 (1st Cir. 1991).  Then, in 2001, Congress amended FISA in the Patriot Act to require a certification that foreign intelligence collection was only a "*significant* purpose" of the search or surveillance.  *Abu-Jihaad*, 630 F.3d at 119.  The FISC's superior court, the

Foreign Intelligence Surveillance Court of Review (FISCR), has interpreted this provision to require the Government to simply have "a measurable foreign intelligence purpose, other than just criminal prosecution of even foreign intelligence crimes." *Sealed Case*, 310 F.3d at 735.  That is, criminal prosecution may not be the Government's "sole objective."  *Id*.  Because *Sealed Case* was decided when Mr. Alazhari was a small child, presumably its holding bound the FISC in this case.  *See Abu-Jihaad*, 630 F.3d at 128 n.28.

Thus, the Patriot Act amendment, as construed by the FISCR, runs afoul of the Fourth Amendment, as construed by *Truong Dinh Hung*.  According to *Truong Dinh Hung*, for the foreign intelligence exception to the warrant requirement to apply, the Government's "primary purpose" must be foreign intelligence collection, not criminal prosecution.  But FISA as amended by the Patriot Act allows searches and surveillance on a showing of a mere "significant purpose" to collect foreign intelligence.  Courts have dealt with this conflict in a variety of ways.  *See Abu-Jihaad*, 630 F.3d at 120 (collecting cases).  For example, some courts have rejected *Truong Dinh Hung* and its progeny, and held that it is FISA's "programmatic purpose" to collect foreign intelligence information that controls.  *See, e.g., Sealed Case*, 310 F.3d at 746.  At least one district court has held FISA as amended by the Patriot Act to be unconstitutional, *Mayfield v. United States*, 504 F. Supp. 2d 1023 (D. Ore. 2007),

though that case was vacated on unrelated, jurisdictional grounds, *Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010).

There is no settled answer to these questions in the Eleventh Circuit, though the greater weight of circuit authority suggests a constitutional requirement that the Government show a "primary purpose" of foreign intelligence collection.  Binding, pre-FISA Fifth Circuit cases permit warrantless surveillance in the foreign intelligence context, but do not comment on the possibility of multiple Government purposes.  *See Brown*, 484 F.2d at 427; *United States v. Clay*, 430 F.2d 165, 171 (5th Cir. 1970), *rev'd on other grounds*, 403 U.S. 698 (1971).  In *United States v. Badia*, 827 F.2d 1458, 1462 (11th Cir. 1987), reviewing FISC proceedings on a motion to suppress, the court wrote, "Furthermore, the documents establish that the telephone surveillance of Arocena did not have as its purpose the primary objective of investigating a criminal act.  Rather, surveillance was sought for the valid purpose of acquiring foreign intelligence information . . . ."  This statement strongly suggests the court was applying some version of the *Truong Dinh Hung* test.

This Court need not *now* decide these issues.  This is all to say that the Court *will* be called upon to decide highly complex factual and legal issues, and that defense counsel's participation would greatly aid the Court.  The Court must first decide whether the "primary purpose" test, or some other test, applies.  Then, if the "primary purpose" test does apply, the Court must conduct the fact intensive inquiry

required by *Truong Dinh Hung* to determine when, if ever, the Government's primary purpose transitioned from a foreign-intelligence purpose to a criminal-prosecution purpose – assuming the Government ever had a foreign-intelligence purpose to begin with – and what evidence should be suppressed.  Or, the Court must adopt some other test and decide whether the Fourth Amendment is satisfied by FISA's procedures.  At a bare minimum, the Court must determine whether the official's certification was "clearly erroneous."  In any event, the Court's "task is too complex, and the margin for error too great," to rely on in camera review without the participation of defense counsel.

C.   Disclosure of the FISA materials is necessary for the litigation of Mr. Alazhari's other motions.

This Court cannot make an accurate determination of the legality of any FISA search or surveillance if it does not know whether the FISA search or surveillance was *itself* the product of some other Fourth Amendment violation.  That is, the Government may have used information gained through some other unlawful act to obtain or execute a FISA authorization, or may have decided to seek a FISA authorization because of information learned from a prior search or seizure.  To take just a few possible examples, the Government could have decided to request authorization from the FISC to intercept Mr. Alazhari's Google Maps queries based on illegal aerial surveillance of him; could have taken the opportunity of an illegal

arrest to surreptitiously execute a FISA authorization targeting his phone or car; or could have used its knowledge the location of certain electrical equipment at Mr. Alazhari's home, gained during an illegal search of the curtilage of the home, to supply the FISC with the required information about how proposed surveillance would be conducted. *See* 50 U.S.C. § 1804(a)(7) (requiring the Government to provide "a summary statement of the means by which the surveillance will be effected and a statement whether physical entry is required to effect the surveillance").

The possibilities for unlawfully derived evidence abound, and derivative evidence claims are particularly ill-suited to in camera review. *See Alderman*, 394 U.S. at 180-81. In *Alderman*, the issue was whether any of the evidence admitted against the defendants was derived from unlawful surveillance, although the recordings of the surveillance itself were not admitted against them. *Id*. at 180-81 & n.12. The Court held that an in camera review of the unlawful surveillance would be insufficient, ordered the disclosure of the surveillance records to the defendants, and remanded for an adversary hearing. *Id*. at 186-87. This Court take a similar course here. This Court cannot be expected to account for every possibility for derivative evidence without the assistance of both parties.

## CONCLUSION

Without access to the record before the FISC, the Defense motion would be

30

"punching at shadows." *See Belfield*, 692 F.2d at 147.  Given the difficulty of these issues, in camera review would be highly inappropriate – "the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court . . . ."  *Id*. at 182.  Accordingly, this Court should order the disclosure of the FISA materials under appropriate security procedures and protective orders to allow defense counsel to assist the Court in determining the legality of the searches and surveillance.

**WHEREFORE** Defendant, Mr. Alazhari, prays this Court will order the Government to disclose to him any application to the FISC for an order permitting a search or surveillance of him, his facilities, or his premises under FISA; any certifications or other materials that accompanied such an application; the FISC's order on any such application; and any returns filed in connection with such an order.

DATED this 23rd day of June 2022.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602

31

Telephone:   (813) 228-2715
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd of June 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to AUSA Patrick Scruggs.

/s ***Samuel E. Landes***
Samuel E. Landes, Esq.

32