## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                        **Case No. 8:20-cr-206-TPB-AEP**

**MUHAMMED MOMTAZ ALAZHARI**

_____/

### MOTION FOR AN ORDER COMPELLING DISCLOSURES REGARDING SURVEILLANCE UNDER SECTION 702 OF THE FISA AMENDMENTS ACT OF 2008

NOW COMES Defendant, Muhammed Alazhari, by and through undersigned counsel, and moves this Court to order the Government to (1) affirm or deny whether it surveilled Mr. Alazhari under the authority of Section 702 of the FISA Amendments Act of 2008 and (2) provide specific notice of whether it intends to admit evidence obtained or derived from Section 702 surveillance.

### MEMORANDUM OF LAW

### BACKGROUND

The Government has charged Mr. Alazhari, a United States citizen, with providing material support to a foreign terrorist organization and firearms offenses. The Government has filed the following notice: "that, pursuant to 50 U.S.C. §§ 1806(c) and 1825(d), the United States intends to offer into evidence, or otherwise use or disclose in any proceedings in this matter, information obtained or derived from electronic surveillance and physical search conducted pursuant to the Foreign

Intelligence Surveillance Act of 1978, as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829." (Doc. 26).

The statutes referenced by the Government's notice provide the authority for searches and surveillance under so-called "traditional FISA," generally meaning an ad hoc search or surveillance of a particular target. The provisions mandating the Government's notice are triggered when the search or surveillance was conducted "pursuant to the authority of this subchapter . . . ." 50 U.S.C. §§ 1806(c), 1825(d). That is, a notice requirement is triggered by the Government's use of information obtained or derived from traditional FISA searches and surveillance. A separate subchapter governs the Government's bulk, ongoing surveillance program, known as Section 702 surveillance, so called because it was codified by Section 702 of the FISA Amendments Act of 2008. *See* 50 U.S.C. §§ 1881 *et seq.*

A provision within Section 702 "deems" surveillance under Section 702 to be surveillance under traditional FISA's notice provision: "Information acquired from an acquisition conducted under section 1881b of this title shall be deemed to be information acquired from an electronic surveillance pursuant to subchapter I for purposes of section 1806 of this title." 50 U.S.C. § 1881e(b). Section 1806(c), in turn, is the traditional FISA notice provision. Thus, the Government's use of information obtained or derived from Section 702 surveillance requires notice under § 1806. Because of the statutory cross-reference "deeming" Section 702 surveillance

2

to be traditional surveillance, the Government's notice in this case is ambiguous. That is, the notice does not tell the Court or counsel whether the Government intends to rely on traditional FISA evidence, Section 702 FISA evidence, or both.

ARGUMENT

This Court should order two forms of relief to allow Mr. Alazhari to move to suppress the Government's evidence or seek other relief.  First, this Court should order the Government to affirm or deny, under 18 U.S.C. § 3504, whether it surveilled Mr. Alazhari under the authority of Section 702.  Second, under FISA's disclosure provision, this Court should order the Government to provide notice of whether it will offer any evidence obtained or derived from Section 702 surveillance. These two forms of relief are related but distinct.  Under § 3504, the Government should be required to provide notice of whether it conducted Section 702 surveillance *at all*.  Under FISA, the Government should be required to provide notice of whether it will offer evidence obtained or derived from such surveillance.  Both disclosures are required because the Government historically takes a cramped view of whether its evidence was "derived" from FISA surveillance, and this Court should require the Government to provide notice of derivative evidence in accordance with existing law, not the Government's narrow view of what the law should be.

## I.  The Government should provide a detailed response under § 3504.

Mr. Alazhari hereby affirmatively asserts that the Government unlawfully

3

surveilled him under FISA Section 702.  Accordingly, the Government should be required to provide a detailed response affirming or denying such surveillance.  The reasons supporting this assertion are manifold.  Under Section 702, the Government collects at least "hundreds of millions" of communications annually.  Then, as a matter of standard operating procedure, the FBI always reviews relevant communications collected under Section 702 – a process called "querying" – when opening a new national security investigation, such as the investigation conducted in this case.  The reasons the Section 702 surveillance of Mr. Alazhari was unlawful are also numerous, including that it constituted the warrantless surveillance of a U.S. citizen, and that the annual, bulk, categorical approval of Section 702 surveillance by the Foreign Intelligence Surveillance Court (FISC) is an unlawful advisory opinion.

The statute provides,

> In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United states . . . upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act . . . .

18 U.S.C. § 3504(a).  "As used in this section 'unlawful act' means any act the use of [sic] any electronic, mechanical, or other device (as defined in section 2510(5) of [Title 18]) in violation of the Constitution or laws of the United States or any

4

regulation or standard promulgated pursuant thereto." *Id.* § 3504(b).

When the defendant's claim is specific and supported, the Government must provide a detailed response. *See In re Grand Jury Proceedings*, 831 F.2d 228, 230 (11th Cir. 1987). For example, in *In re Grand Jury Proceedings (Hermann)*, 664 F.2d 423 (5th Cir. Unit B 1981), the appellant made an affirmative claim of unlawful surveillance, supported by an affidavit from his lawyer and him, a letter from the FBI admitting to references to the appellant within its surveillance indices, and documents showing an investigation of the Church of Scientology, the subject of the appellant's case. In response, the Government denied any unlawful surveillance, and explained that it had conducted an "all agency" search for any surveillance a year earlier that yielded no results, and provided the statement of an FBI agent that there had been no surveillance in the federal district in which the case arose, and no surveillance anywhere else, to his knowledge. *Id.* at 426-27. The court held that these two responses were sufficient in combination, though the FBI agent's response would have been insufficient standing alone. *Id.* at 427-28 & n.10.

Here, Mr. Alazhari makes an affirmative claim of unlawful surveillance, supported by the broad scope of the Government's Section 702 program and the FBI's standard operating procedure of querying the Section 702 database in every "national security" case, such as this one. Accordingly, this Court should require a detailed response from the Government, including but not limited to (1) whether the

Government made use of PRISM or upstream surveillance (described below) and (2) whether and under what circumstances the Government queried its Section 702 database for terms associated with Mr. Alazhari.

A.   The Government engages in mass surveillance under Section 702.[1]

Traditional FISA concerns targeted surveillance of a particular person or facility.  Traditional FISA surveillance must be authorized by the FISC based on an application from the Government to that court that describes the person to be surveilled, and that makes a showing of probable cause.

With the rise in the use of written electronic communications like email and text messaging, and following September 11, 2001, the Government concluded that traditional FISA's procedures unduly limited the speed with which it could conduct surveillance.  Section 702 of the FISA Amendments Act of 2008 was designed to remedy this perceived deficiency.  Under Section 702, the Attorney General (AG)

---

[1] This section, describing both the law and practical application of Section 702, is drawn almost entirely from *United States v. Hasbajrami*, 945 F.3d 641, 649-58 (2d Cir. 2019), except where otherwise noted.  The *Hasbajrami* court, in turn, relied primarily on a leading national security law treatise, *see* David S. Kris & J. Douglas Wilson, *National Security Investigations and Prosecutions* (3d ed. 2019), declassified materials from the intelligence community, and an official report by the Privacy and Civil Liberties Oversight Board (PCLOB), *see* Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act (Jul. 2, 2014), *available at* https://www.pclob.gov/library/702-Report.pdf ("PCLOB Report").   "The PCLOB is an independent agency within the executive branch, authorized by statute, *inter alia*, to 'analyze and review actions the executive branch takes" and "ensure that liberty concerns are appropriately considered' in the government's development and implementation of anti-terrorism programs." *Hasbajrami*, 945 F.3d at 649 n.4 (quoting 42 U.S.C. § 2000ee(c)).  For the reader's ease, repetitive and excessive citation to *Hasbajrami* is eliminated.

and the Director of National Intelligence (DNI) jointly develop "targeting procedures," that is, guidelines for determining who or what will be surveilled under Section 702. "Targeting" refers to the decision to surveil an individual or his or her channels of communication, such as an email address or text messaging account. The statute does not provide the mechanism by which targeting procedures are to be developed, but instead leaves that to the AG and DNI. The Government may not intentionally target anyone located in the United States or a "United States person" outside the United States, and may not target a non-United States person if the purpose of the surveillance is to surveil a particular, known person reasonably believed to be in the United States. *See* 50 U.S.C. § 1881a(b)(1)-(3).

With only these limitations, the AG and DNI annually present their proposed targeting procedures to the FISC for approval. The proposed procedures describe, in the abstract, factors that in isolation or combination are said to justify a reasonable belief that the target is abroad. The proposed procedures submitted to the FISC do not nominate any particular person, place, or thing to be surveilled. The FISC instead provides "a form of programmatic pre-clearance." *United States v. Hasbajrami*, 945 F.3d 641, 652 (2d Cir. 2019). Once the FISC provides that pre-clearance, it is the Government, through the National Security Agency (NSA), that decides who to surveil. And, in practice, the NSA has created "a presumption of non-U.S. person status," under which the agency simply assumes that its desired target is not a U.S.

7

person unless it knows that he is a U.S. person.  *See* Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J.L. & Pub. Pol'y 117, 158 (2015).  The CIA and FBI can nominate targets for the NSA's targeting decision.

Mechanically, the surveillance happens in two ways:  PRISM and upstream collection.  Essentially, the PRISM program commandeers private internet service providers (ISPs) to surveil their customers on behalf of the Government.  Under PRISM, the FBI, on behalf of the NSA, sends "selectors" to ISPs located in the United States.  A selector may be, for example, a target's email address or text messaging account.  Then, the ISP is compelled to provide all communications sent to or from that selector in real time, or roughly in real time, and those communications are reviewed by the NSA in roughly real time.

Upstream collection is broader.  As the PCLOB puts it, the NSA compels information from "the providers that control the telecommunications backbone over which communications transit."  PCLOB Report at 35.  Upstream collection allows for surveillance that cannot occur through PRISM.  For example, if an NSA target maintains his email account with a foreign ISP, the PRISM program could not surveil his communications, with no American ISP company available to commandeer.  Instead, with upstream collection, the NSA taps into the communications infrastructure to collect traffic as it "traverse[s] the backbone."

8

*Hasbajrami*, 945 F.3d at 644 (citing PCLOB Report at 35).

Upstream surveillance collects more information than PRISM in two ways. First, upstream collection acquires not just communications to or from an account, but information *about* a targeted account, such as a conversation between two parties not themselves targeted that happens to mention the targeted person.  Second, while PRISM collects individual, discrete communications, upstream collection acquires entire "multi-communication transactions" (sometimes called "packets"), which might contain multiple discrete communications, only one of which contains the targeted term.

Limited only by the categorical, FISC-approved guidelines for targeting, Government agents decide who to surveil.  Perhaps unsurprisingly, given the breadth of collection and the NSA's de facto presumption of non-U.S.-person status, the Government collects a large amount Americans' communications.  This happens when the Government collects communications between a non-targeted U.S. person and a targeted non-U.S. person (called "incidental" collection), or when the Government unintentionally targets a U.S. person, assuming him or her to be a non-U.S. person (called "inadvertent" collection).

In 2011, the PCLOB estimated that the Government collects 250 million emails annually, and that number has likely risen.  *See Hasbajrami*, 945 F.3d at 671 (citing PCLOB Report at 116).  This number is in addition to intercepted

telephone conversations.  PCLOB Report at 116.  The Government has studiously avoided revealing – or even counting – how many of these hundreds of millions of communications are Americans'.  *See In re DNI/AG 702(h) Certifications 2018*, 941 F.3d 547, 557 (Foreign Intel. Surv. Ct. Rev. 2019).  The PCLOB has described the number as "substantial":  "as of 2011, the NSA was acquiring approximately 250 million Internet communications annually, and even if only a small percentage of these total involved Americans the number would be large in absolute terms."  PCLOB Report at 152.

B.  <u>The FBI queries the Section 702 database for Americans' communications very frequently and in every national security investigation.</u>

Once the NSA acquires communications under Section 702 – including the communications of Americans "incidentally" or "inadvertently" acquired – it can share the communications with other agencies, like the FBI and CIA.  The FBI can then "query" the resulting databases in support of its criminal investigations – the equivalent of a Google search.  The FBI does so routinely and on a massive scale.  From December 2020 to November 2021, the FBI conducted some number less than 3,394,053 queries of its Section 702 databases for terms associated with U.S. persons.  Off. of the Director of Nat'l Intelligence, *Annual Statistical Transparency Report Regarding the Intelligence Community's Use of National Security Surveillance Authorities* 21, *available at*

10

https://www.odni.gov/files/CLPT/documents/2022_ASTR_for_CY2020_FINAL.pdf.  That is, the FBI read or listened to some number shy of 3,394,053 American conversations after the NSA, using a presumption of non-U.S.-person status, "incidentally" or "inadvertently" intercepted them.

Finally, as a matter of policy, the FBI *always* queries its Section 702 database for terms associated with the subjects of national security investigations like the one conducted in this case.  *United States v. Muhtorov*, 20 F.4th 558, 676 (10th Cir. 2021) (Lucero, J., dissenting) (citing PCLOB Report at 59; *FBI Domestic Investigations and Operations Guide*, paras. 5.10, 6.9, 7.9, and 9.7 (2008)).  By standard operating procedure, anytime the FBI opens a new terrorism investigation, agents will always search its Section 702 database for communications associated with the subject's name, phone number, email address, or other identifier.  *See id*.  So, to summarize, first the NSA captures a massive number of Americans' communications "accidentally" using a presumption of non-U.S.-person status, then the FBI searches a massive number of those communications to review their substance, including in every terrorism case.

C.  Surveillance and querying under Section 702 are unlawful.

The mass warrantless surveillance of Americans' communications under Section 702 is unlawful, for two reasons.  First, the Government's interception of Americans' communications is an unreasonable search under the Fourth

11

Amendment, even if it is "inadvertent" or "incidental."  Second, even if the initial interception of Americans' communications were lawful, the FBI's later querying of those communications is not.

(1) The interception of Americans' communications is unlawful.

Whether through "incidental" or "inadvertent" collection, the warrantless interception of Americans' communications is unlawful.  Because Americans like Mr. Alazhari have an expectation of privacy in their electronic communications, even with foreigners abroad, the Government's interception of those communications is a "search" implicating the Fourth Amendment.  *See Hasbajrami*, 945 F.3d at 666 (citing *United States v. Warshack*, 631 F.3d 266, 285-86 (6th Cir. 2010)); *Muhtorov*, 20 F.4th at 603 (citing *Hasbajrami*, 945 F.3d at 666).  Searches conducted without a warrant "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).  To be a "warrant" for Fourth Amendment purposes, a judicial order must (1) be issued by a neutral and disinterested magistrate, (2) be based on probable cause that the search will produce evidence of a crime, and (3) particularly describe the place to be searched and the things to be seized.  *See Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations omitted).  The FISC's "programmatic pre-clearance" of the seizure of hundreds of millions of communications quite obviously fails the probable cause and particularity

12

requirements, and so does not constitute a warrant.

Nor does any exception to the warrant requirement apply, including the "foreign intelligence" exception. *See United States v. U.S. Dist. Court for Eastern Dist. of Mich., South. Div. (Keith)*, 407 U.S. 297, 324 (1972). In *Keith*, the Court held that warrantless surveillance for domestic security purposes was unlawful. *Id*. at 323-24. However, the Court explained, "We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents." *Id*. at 321-22 (footnote omitted). Further, the Court cautioned, "[W]e do not hold that the same type of standards and procedures prescribed [for ordinary criminal surveillance] are necessarily applicable to this case." *Id*. at 322. That is because "domestic security surveillance may involve different policy and practical considerations from the surveillance of 'ordinary crime.'" *Id*. "Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the nature of the citizen rights deserving protection." *Id*. at 322-23.

In apparent reliance on this language from *Keith*, Congress enacted FISA in 1978. As originally enacted, FISA contained only what we now call "traditional" FISA – court-authorized, targeted surveillance of a particular individual or facility,

13

with a modified probable cause standard geared toward foreign intelligence collection. *See* Kris & Wilson, *supra*, § 11:5. Thus, at least arguably, traditional FISA satisfies the modified prior-judicial-review requirement described by *Keith*. *See United States v. Ning Wen*, 477 F.3d 896, 898 (7th Cir. 2007).

But surveillance under Section 702 plainly does not. There is no probable cause standard met by the FISC's annual review, and indeed no particular person or facility identified for targeting. Instead, the FISC approves for an entire year a set of generalized criteria designed to guide the decision-making of NSA agents, who are the ones who actually decide whom to surveil and when. Even assuming traditional FISA's procedure meets the requirements of *Keith*, Section 702's "programmatic pre-clearance" is so far removed from a conventional warrant that it cannot provide the basis for a "foreign intelligence" exception to the Fourth Amendment warrant requirement.

What's more, the FISC's Section 702 pre-clearance is an unlawful advisory opinion. The Constitution limits the judicial power of federal courts to deciding "cases" or "controversies." *See* U.S. Const. art. III, § 2. The case-or-controversy requirement "limit[s] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Thus, a court may not pass judgment on "a difference or dispute of a hypothetical or abstract character,"

14

but instead is limited to disputes that are "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (quotations omitted). Advisory opinions are "advance expressions of legal judgment" lacking a "live dispute between adverse parties . . . ." *United States v. Fruehauf*, 365 U.S. 146, 157 (1961); *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

"The FISC's constitutional determinations, though, involve no adverse parties before the court and are thus unmoored from any case or controversy." *Muhtorov*, 20 F.4th at 682 (Lucero, J., dissenting). "Absent adverse parties litigating adverse legal interests, the FISC's annual assessments are the epitome of an impermissible advisory opinion." *Id.* The FISC does not "adjudge the legal rights of litigants in actual controversies." *See Baker v. Carr*, 369 U.S. 186, 204 (1962) (quotation omitted).

> Instead, the government submits certifications and targeting and minimization procedures to the FISC, without identifying non-U.S. persons who are to be targeted under § 702 or U.S. persons whose communications may be incidentally collected, and the FISC reviews the government's submission only as to whether the proposed procedures are "reasonably designed" to meet the statutory requirement.

*Muhtorov*, 20 F.4th at 682 (Lucero, J., dissenting). And, while the Tenth Circuit has upheld the FISC's "programmatic pre-clearance" under Article III by pointing to the

Government, the ISP companies affected, and the people who will be surveilled as entities for which the certification decision has "real meaning," that "ignores that at the time of the FISC approvals, no individuals to be surveilled are identified. Their interests are no more different or concrete than those of every other American whose communications might be collected." *Id.* at 683 n.34 (Lucero, J., dissenting). Thus, the FISC's annual pre-clearance is an unlawful advisory opinion under Article III and cannot form the basis for the prior judicial review required under *Keith* to excuse the traditional warrant requirement.

Courts of appeals have upheld Section 702 collection of Americans' communications under the "incidental overhear" doctrine developed from domestic wiretapping under Title III, but those courts misunderstand the relationship between that doctrine and Section 702. *See Hasbarjami*, 945 F.3d at 663-64; *Muhtorov*, 20 F.4th at 595; *United States v. Mohamud*, 843 F.3d 420, 439 (9th Cir. 2016); *see also In re Directives Pursuant to Section 105B of FISA*, 551 F.3d 1004, 1015 (FISA Ct. Rev. 2008). The argument goes like this: extraterritorial searches of foreigners with no substantial ties to the United States are lawful because such foreigners lack any Fourth Amendment rights. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990). Further, under the "incidental overhear" doctrine – a species of the "plain view" warrant exception, developed from Supreme Court dicta in Title III cases – the Fourth Amendment is not violated when, in the course of targeting a person through

16

a lawfully obtained wiretap order, agents overhear the conversations of one not intended for targeting.  *See Muhtorov*, 20 F.4th at 595-97.  In the Section 702 scenario, the argument continues, the foreign target lacks any Fourth Amendment rights under *Verdugo-Urquidez*, and so the incidental collection of Americans' communications during the surveillance of those foreign targets is permissible under the incidental overhear doctrine.

This conclusion misunderstands both *Verdugo-Urquidez* and the plain view exception.  The defendant in *Verdugo-Urquidez* lacked Fourth Amendment rights *because the search occurred in a foreign country*.  The Court's holding was as follows:

> We think the text of the Fourth Amendment, its history, and our cases discussing the application of the Constitution to aliens and extraterritorially require rejection of respondent's claim.  At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, *and the place searched was located in Mexico*.  Under these circumstances, the Fourth Amendment has no application.

*Verdugo-Urquidez*, 494 U.S. at 274-75 (emphasis added).  The Court's reasoning leading to this holding almost entirely concerned the feasibility of Fourth Amendment litigation arising from searches in foreign countries or international waters.  *See, e.g., id.* at 274.

But Section 702 surveillance does not occur overseas, it occurs right here in the United States.  Under the PRISM program, the search occurs at the American

ISP company.  With upstream collection, the search occurs at the communications system's "backbone."  In either event, the search is not "extraterritorial" under *Verdugo-Urquidez*.  And, while the Fourth Amendment protects only reasonable expectations of privacy no matter the location of the search, *see Hasbarjami*, 945 F.3d at 665 (citing *Katz*, 389 U.S. 347), it is beyond dispute that Americans' possess a reasonable expectation of privacy in their electronic communications, even with foreigners, *see id*. at 666 (citation omitted); *Muhtorov*, 20 F.4th at 603 (citation omitted).  The interception of Americans' communications, occurring in America, is a Fourth Amendment search of those Americans' communications, requiring a warrant or other independent justification, even if the interception is ostensibly designed to capture the foreign end of the conversation.

Second, and more fundamentally, the plain-view principles from which the incidental overhear doctrine was drawn only apply when the initial intrusion is justified by a warrant or an exception to the warrant requirement.  In formulating the plain-view doctrine, the Supreme Court explained that an object can be seized in plain view following a search based on either a warrant or some exception to the warrant requirement.  *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).  The Court explained, "What the 'plain view' cases have in common is that the police officer in each of them had a prior *justification* for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.  The

18

doctrine serves to supplement the prior *justification* . . . ." *Id*. at 466 (emphases added).  For example, in the case of a warrant, "[t]he premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity."  *Id*. at 467 (citations omitted).

      With Section 702, there is no prior "justification" for intercepting the communication, like probable cause or exigent circumstances.  Rather, the target is presumed to be foreign in the absence of contrary evidence, and so presumed to be without any Fourth Amendment rights at all.  It is not that the initial intrusion is "justified" by circumstances that overcome the target's rights, it is that the target has no rights to begin with.  The Government needs no justification to intrude on the privacy of a foreigner in a foreign country.  The foreign target being powerless to complain, the Government may run roughshod over his expectation of privacy.

      Not so for the American conversant on the other end.  Under the incidental overhear doctrine, the Constitution accepts the intrusion on the privacy of Speaker A, because there has been a prior judicial determination of probable cause to intrude on the privacy of Speaker B.  The intrusion on Speaker B is affirmatively justified, and so the collateral intrusion on Speaker A is accepted.  So too in the case of a physical search of premises justified by a warrant or exigent circumstances, where the privacy of a co-tenant or spouse is violated in the course of a search directed at

19

the other co-tenant or spouse.

But under Section 702, there is no "justification" at all. Rather, Speaker A has no rights to overcome, the Government requires no justification to intrude on his privacy, and the Government is free to knowingly intrude on the privacy of Speaker B in the process. This intrusion is therefore quite unlike the intrusion that is accepted by the incidental-overhear or plain-view doctrines. This knowing, unjustified, and warrantless intrusion on the Fourth Amendment rights of Americans is therefore per se unreasonable.[2]

Further, even assuming incidental Section 702 surveillance of Americans requires no warrant or any exception to the warrant requirement, the scope and manner of execution of the surveillance must still meet the general Fourth Amendment standard of reasonableness. *See Hasbajrami*, 945 F.3d at 662 (quoting *Maryland v. King*, 569 U.S. 435, 448 (2013)); *Muhtorov*, 20 F.4th at 593 (quoting *King*, 569 U.S. at 448); *Mohamud*, 843 F.3d at 441 (quoting *King*, 569 U.S. at 448). It does not. To determine reasonableness, courts consider "the totality of the circumstances" and balance "'the promotion of legitimate governmental interests'

---

[2] Additionally, the Fourth Amendment calculus is entirely different in the case of "inadvertent" collection rather than "incidental" collection." *See Hasbajrami*, 945 F.3d at 668-69. With inadvertent collection, the person targeted was, in fact, a U.S. person with Fourth Amendment rights. The non-targeted end of the communication may also be a U.S. person. In these circumstances, neither *Verdugo-Urquidez* nor the incidental overhear doctrine apply.

against 'the degree to which [the search] intrudes upon an individual's privacy.'" *King*, 569 U.S. at 448 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

Here, the balance of the totality of the circumstances demonstrates that Section 702 surveillance is unreasonable.  To be sure, the Government's interest in protecting national security is legitimate and strong.  But Section 702 surveillance is not limited to national security matters, as it also includes "the conduct of [ ] foreign affairs."  *See* 50 U.S.C. §§ 1801(e)(2)(B), 1881(a).  Further, Mr. Alazhari's privacy interest in his electronic communications is strong.  While an individual's expectation of privacy is diminished once the communication is delivered, Section 702 surveillance intercepts the communication in transit, and "until electronic communications reach the recipient, they retain the same level of privacy interest as if they were still in the home."  *See Mohamud*, 843 F.3d at 442 (citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970)).

Some courts have upheld the reasonableness of incidental Section 702 collection in part because of the purported limitations provided by the targeting and minimization procedures – procedures that are themselves classified.  But the FISC's annual pre-approval of generalized procedures is an unlawful advisory opinion that cannot render the surveillance reasonable.  A violation of Article III cannot cure a violation of Amendment IV.  And the Government's internal oversight procedures provide little Fourth Amendment protection in a context where the prior review of a

21

neutral magistrate is the preferred method of protecting privacy.  *See id*. at 443-44.

Accordingly, even if a warrant is not required, the Government's broad incidental

collection of Americans' electronic communications is unreasonable.

(2) The Government's querying of the Section 702 databases is unlawful.

Even if the Government's initial incidental collection of Americans'

communications is lawful, its later searching of the resulting databases is not.

Querying of the Section 702 database is "a separate Fourth Amendment event that,

in itself, must be reasonable."  *Hasbajrami*, 945 F.3d at 670.  And to be reasonable, a

search of these databases must be authorized by a warrant.  *Cf. Riley v. California*, 573

U.S. 373 (2014).  In *Riley*, the Government asserted that the contents of a lawfully

seized cellphone could be searched without a warrant.  The Supreme Court rejected

this argument, relying on the vast amount of personal data available in a cell phone,

and required the Government to obtain a warrant prior to such a search.  *Id*. at 393-

403.

So too with queries of Section 702 databases.  Even assuming the initial

incidental acquisition of Americans' conversations is lawful, at the querying stage it

is no longer incidental or lawful.  "If anything, the Fourth Amendment questions

posed by § 702 are even greater than those addressed in *Riley* because § 702

communications may legally be seized without any showing of probable cause,

reasonable suspicion, or even any suspicion of criminal activity."  *Muhtorov*, 20 F.4th

at 680 (Lucero, J., dissenting).  Just as the initial warrantless seizure of the cell phone in *Riley* was lawful, but the later warrantless search of its contents was not, even if the initial interception of communications under Section 702 was lawful, the later warrantless search of the databases was not.  At the querying stage, the search occurs after the Government knows the communications are Americans', and no resort to *Verdugo-Urquidez* or the incidental overhear doctrine is possible.  "[Q]uerying is akin to fishing in enormous lakes of data to see what information one can catch using various search terms as 'bait.'"  *Id.* at 679 n.31 (Lucero, J., dissenting).  Without a warrant requirement, "law enforcement may routinely fish for Americans' data without first bothering to obtain a license."  *Id.*  Accordingly, querying is unlawful independent of whether the collection was lawful.[3]

*** 

Section 3504 compels a response from the Government whenever a defendant makes a "claim" of unlawful electronic surveillance, and caselaw provides that any denial must be detailed when the claim is well supported.  Mr. Alazhari's claim is

---

[3] In 2018, Congress required the Government to adopt procedures to control querying and required the FBI to seek a court order before querying in certain circumstances, but the latter requirement does not apply to national security cases such as this one.  *See* 50 U.S.C. § 1881a(f); *Muhtorov*, 20 F.4th at 587-88 & n.7.  Under a "positive law" model of the Fourth Amendment, this is strong additional evidence that querying is a separate Fourth Amendment event, i.e., a new "search."  *See Carpenter v. United States*, 138 S. Ct. 2206, 2268 (2018) (Gorsuch, J., dissenting).

substantial.  This Court should therefore order the Government to affirm or deny whether the Government surveilled Mr. Alazhari under Section 702 or queried its databases for his communications.  If the Government denies either, the Court should require a detailed explanation.

## II. The Government should provide notice of whether it will rely on evidence derived from Section 702 surveillance.

The Government's FISA notice does not distinguish between traditional FISA or Section 702 surveillance.  By statute, the Government must provide notice if it intends to admit evidence "obtained or derived from" Section 702 surveillance.  50 U.S.C. § 1881e(b) (cross-referencing 50 U.S.C. § 1806).  Given the vast differences between traditional FISA and Section 702 collection, the Government's notice does little good if it fails to distinguish between the two surveillance authorities.  Accordingly, this Court should order the Government to provide notice specifying whether it intends to rely on evidence obtained or derived from Section 702 surveillance.

Importantly, should the Government state that it surveilled Mr. Alazhari under Section 702 (through § 3504 or otherwise), but deny that it will rely on evidence obtained or derived from such surveillance, this Court should require a detailed explanation.  The Government's understanding of what "derived from" means in the Section 702 context has a checkered history.  *See* Patrick C. Toomey,

24

"Why Aren't Criminal Defendants Getting Notice of Section 702 Surveillance –

Again?" *Just Security* (Dec. 11, 2015), *available at*

https://justsecurity.org/28256/arent-criminal-defendants-notice-section-702-

surveillance-again (recounting a change in Department of Justice policy following

the Solicitor General's "misleading" the Supreme Court about the issue).

Apparently, the Government believes its evidence is "derived from" Section 702

evidence only if agents provided the results of the surveillance to the FISC in an

application for a traditional FISA order.  *See Muhtorov*, 20 F.4th at 678 (Lucero, J.,

dissenting) (describing the Government's litigation position on the issue).  But

evidence is derived from a Fourth Amendment violation unless its connection to the

violation is "so attenuated as to dissipate the taint." *Wong Sun v. United States*, 371

U.S. 471, 487 (1963) (internal quotation omitted).  That includes not only where

agents have used the fruits of an unlawful search in a later search warrant

application, but also where the agents were *motivated* to apply for the search warrant

by the earlier search.  *See Murray v. United States*, 487 U.S. 533, 542 (1988); *United

States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012); *see also Muhtorov*, 20 F.4th

at 678 (Lucero, J., dissenting) (stating that the Government's limited view of

derivative evidence "borders on disingenuous, given the breadth of the derivative

evidence inquiry.").

Given the Government's checkered history and cramped view of this issue, if

the Government denies that its evidence was derived from Section 702 surveillance, this Court should require the Government to explain its answer in detail.  *Cf. In re Grand Jury Proceedings*, 831 F.2d at 230.

DATED this 23rd day of June 2022.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:   (813) 228-2715
Email:   Samuel_Landes@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of June 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to AUSA Patrick Scruggs.

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.