UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                                                     CASE NO. 8:20-cr-206-TPB-AEP

MUHAMMED MOMTAZ AL-AZHARI

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO RECONSIDER

The United States of America hereby opposes the motion (Doc. 254) of the Defendant, Muhammed Momtaz Al-Azhari, to reconsider the Court's order (Doc. 109) denying the defense motion to dismiss as to Count Two and Count Three of the indictment.

## MEMORANDUM OF LAW

Firearm silencers are not "arms" within the meaning of the Second Amendment. Even if silencers are "arms," they are "dangerous or unusual weapons" under the reasoning of *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). Additionally, the National Firearms Act's ("NFA") registration and taxation requirements, which applied to the silencer that the Defendant possessed, do not "infringe" on the right to keep and bear arms. Even assuming that they do, however, the requirements are nevertheless analogous to historical laws regulating commerce in firearms. Therefore, they still pass constitutional muster after *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Accordingly, the Defendant's motion

should be denied.

I. **Silencers are not "arms" within the meaning of the Second Amendment.**

The Second Amendment "does not imperil every law regulating firearms." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality opinion). Indeed, *Heller* held that the Second Amendment applies to "bearable arms." 554 U.S. at 582. According to the Court, "the most natural reading of [the phrase] 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* Although that protection might extend to things necessary to use arms, such as certain magazines and ammunition, or even access to firing ranges—*see, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)—it does not automatically apply to anything that can be attached to a firearm, but which is not otherwise necessary to render the firearm operable. A firearm silencer is not necessary to make a firearm operable; rather, it is exclusively a means to reduce sound omitted from an already operable firearm. "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also United States v. Hasson*, 2019 WL 4573424, at *3-5 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder.").

2

Meanwhile, nothing in *Bruen* suggests that silencers fall within the meaning of "arms" under the Second Amendment. *Bruen* spoke of "firearm" regulations, not the regulation of firearm accessories. 142 S. Ct. at 2126, 2131. Discussing the historical application of the Second Amendment to "new circumstances," the Supreme Court reiterated that "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*, even those that were not in existence at the time of the founding." *Id.* at 2132 (citing *Heller*, 554 U.S. at 582) (emphasis added). As already discussed, a silencer is not such an arm. Indeed, the very right at issue in *Bruen* was an individual's ability to lawfully possess a *handgun* for self-defense outside of the home. *Id.* at 2122. *Bruen* did not directly address, or somehow constitutionally shield, an individual's right to possess accessories that merely quiet an otherwise bearable arm.

Therefore, the Second Amendment does not protect silencers from regulation and restriction.

**II.    Even if silencers are "arms," they are "dangerous or unusual weapons" under the reasoning of *Heller*.**

Even assuming that silencers are arms within the meaning of the Second Amendment, the NFA's restrictions on silencers are well in line with what the Supreme Court's decision in *Heller* recognized (and Justice Kavanaugh's concurrence in *Bruen* echoed) to be the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. For example, under English common law, "the offence of riding or going armed, with dangerous or

3

unusual weapons, [was] a crime." 4 William Blackstone Commentaries *148. In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). Accordingly, the Second Amendment encompasses only arms "of the kind in common use." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). The Supreme Court has explained that the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self- defense." *Heller*, 554 U.S. at 624. Thus, the common-use limitation—which supports the NFA restrictions at issue here—"is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627; *see also United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (rejecting defendant's Second Amendment-based challenge to constitutionality of NFA and finding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes" and therefore fall within "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." (quoting *Heller*, 554 U.S. at 627)); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (after *Heller*, defendant's possession of machinegun was not protected by Second Amendment because machineguns were "not in common use by law-abiding citizens for lawful purposes and therefore [fell] within the category of dangerous and unusual

weapons that the government can prohibit for individual use"), *cert. denied*, 555 U.S. 1174 (2009).

Moreover, the historical record indicates that silencers were perceived as dangerous almost immediately after their invention, and that they were quickly used to facilitate crimes. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp. Probs. 231, 246-49 (2020).[1] The silencer was invented in the early 1900s and patented in 1908. *Id.* at 246. "Objections to civilian use of silencers appeared almost immediately." *Id.* By 1909, the first state, Maine, had banned the sale or possession of silencers, and New Jersey followed two years later. *Id.* at 247. The primary concern about unregulated possession of silencers was crime, from both typical criminals and hunters/poachers. *Id.* "From 1909 and 1936, at least fifteen states enacted silencer restrictions," including Arizona, Louisiana, Michigan, North Carolina, Pennsylvania, and Wyoming. *Id.* at 248 n.123. Ultimately, the inventor of the silencer and his company "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id.* at 248 n.125 (*Maxim Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27).

*Bruen* did not undermine *Heller's* recognition of the historical tradition of regulating "dangerous or unusual weapons"—in fact, it reemphasized it. *See Bruen*, 142 S. Ct. at 2143-44. And, unlike handguns, which are "indisputably in 'common

---

[1] This article is attached as Exhibit 1.

use' for self-defense today," silencers (if they are even weapons) are uncommon and not necessary (or truly intended or used) for self-defense. *Id.* at 2143. Silencers remain both dangerous and unusual—especially for self-defense purposes—regardless of whether they existed at the time of the founding or are comparable to any weapon that did. Consequently, the NFA restrictions of silencers that are at issue in this case fit within the historical tradition of prohibitions recognized by *Heller*. *See* 554 U.S. at 627.

### III. The NFA's registration and taxation requirements do not "infringe" on the right to keep and bear arms.

The NFA's registration and taxation requirements, which applied to the silencer that the Defendant possessed, do not "infringe" on the right to keep and bear arms. Under *Bruen*, the government only needs to address historical analogs "[w]hen the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2129-30. The Amendment does not say that the right to keep and bear arms cannot be "burdened in any way," but that it shall not be "infringed." Administrative burdens that stop far short of disarming law-abiding citizens do not "infringe" the right to keep and bear arms. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). Here, individuals—including, in theory, even the Defendant himself—can lawfully own and transfer silencers, assuming that they follow the registration and taxation requirements. *See generally* 26 U.S.C. Ch. 53. *Heller* and *Bruen* make clear that the government cannot *prohibit* the in-home

6

possession and public carrying of firearms, at least for self-defense purposes. Yet, *Bruen* expressly did not disturb the "shall issues" licensing laws that exist in 43 states. 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." 142 S. Ct. at 2162. A registration scheme for silencers is no more burdensome than the kind of requirements that the Supreme Court has found not to be problematic. The statutes alleged in Counts Two and Three of the indictment do not ban silencer possession; rather, they require registration and documentation, as well as the payment of appropriate, reasonable taxes. *See* 26 U.S.C. Ch. 53. Thus, such a scheme is constitutional, even if there is no historical analog to it.

**IV.   The NFA's registration and taxation requirements are analogous to historical laws regulating commerce in firearms and, thus, they are part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.**

Based on the above, the Court need not consider whether the NFA's registration and taxation requirements are consistent with the nation's historical tradition of firearm regulation. *See Bruen*, 142 S. Ct. 2129-30. Nevertheless, the government submits that the relevant statutes are analogous to historical laws regulating commerce in firearms. As a result, they survive constitutional scrutiny even if *Bruen* is applied.

7

"[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017).[2] "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added). And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *Id.* at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.* Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

---

[2] This article is attached as Exhibit 2.

Like these early laws, the NFA's registration and taxation requirements for silencers do not prohibit possessing or even transferring them. Instead, the statutes at issue merely impose record-keeping and attendant payment requirements to document the items, to help ensure that they can be traced (e.g., when they are believed to have been used in a crime). Although the statutes are not identical to the above historical statutes, *Bruen* explained that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. In this case, the practice of the colonies and the United States of regulating commerce in firearms provides a sufficient historical analog.

### V.  Conclusion.

For all of the foregoing reasons, the Court should deny the Defendant's motion to reconsider the Court's previous ruling.

        Respectfully submitted,

        ROGER B. HANDBERG
        United States Attorney

By:   */s/ Patrick D. Scruggs*
      Patrick D. Scruggs
      Assistant United States Attorney
      United States Attorney No. 140
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      Telephone: (813) 274-6000
      Email: patrick.scruggs@usdoj.gov

U.S. v. Muhammed Al-Azhari			Case No. 8:20-cr-206-TPB-AEP

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Samuel Landes, Esq.

Adam Allen, Esq.

				*/s/ Patrick D. Scruggs*
				Patrick D. Scruggs
				Assistant United States Attorney
				United States Attorney No. 140
				400 North Tampa Street, Suite 3200
				Tampa, Florida 33602
				Telephone: (813) 274-6000
				Email: patrick.scruggs@usdoj.gov