# EXHIBIT 1

# GUN ACCESSORIES AND THE SECOND AMENDMENT: ASSAULT WEAPONS, MAGAZINES, AND SILENCERS

ROBERT J. SPITZER*

## I
## INTRODUCTION

Legal challenges to gun laws are nothing new, including laws restricting access to assault weapons. Such challenges have often included objections to restrictions regarding bullet magazines. In general, ammo magazine restrictions have been consistently upheld, with a couple of recent exceptions.[1]

In 2013, New York State enacted a tough new gun law, the New York SAFE Act.[2] This measure, enacted in the wake of the Sandy Hook school shooting in Connecticut, implemented a variety of new gun regulations, including new restrictions on assault weapons, and a reduction from ten to seven in the maximum number of bullets or rounds a legally owned magazine could hold.[3] The law also eliminated the grandfathering of older magazines, requiring that non-compliant magazines be disposed of regardless of their age.[4] The law's constitutionality was challenged in federal court, where a federal district judge upheld the law, but did strike down the lower limit, concluding that the number seven set in the new law was "a largely arbitrary number" as the state failed to explain why it settled on that number from the previous ten.[5] On appeal, the law was upheld, including the elimination of the lower magazine limit of seven.[6]

---

Copyright © 2020 by Robert J. Spitzer.

This Article is also available online at http://lcp.law.duke.edu/.

*Robert J. Spitzer (Ph.D. Cornell University, 1980) is Distinguished Service Professor of Political Science at the State University of New York Cortland. He is the author of fifteen books, including five on gun policy, most recently GUNS ACROSS AMERICA (2015) and THE POLITICS OF GUN CONTROL (8th ed., forthcoming 2021).

1. *See, e.g.*, Fred Barbash, *Gun Rights Groups Celebrate Win as Judge Rejects California's Ban on High-Capacity Magazines*, WASH. POST (Apr. 1, 2019), https://www.washingtonpost.com/world/national-security/gun-rights-groups-celebrate-win-as-judge-cuts-down-californias-ban-on-high-capacity-magazines/2019/04/01/0dc5830e-549d-11e9-9136-f8e636f1f6df_story.html?utm_term=.487f87caf9bf [https://perma.cc/YQ6G-7W39].

2. NY Secure Ammunition and Firearms Enforcement (SAFE) Act, Ch. 1, § 48(5) 2013 N.Y. Laws 1, 22 (2013) (codified as amended in scattered sections).

3. *See* ROBERT J. SPITZER, GUNS ACROSS AMERICA: RECONCILING GUN RULES AND RIGHTS 148 (2015)

4. *Id.* at 151.

5. N.Y. State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d 349, 372 (W.D.N.Y. 2013).

6. N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 269 (2d Cir. 2015).

A challenge to California's two-decade old magazine limit of ten resulted in a different outcome.[7] In the 2019 case of *Duncan v. Becerra*,[8] a federal district court judge struck down the ten bullet magazine limit, although the ruling was stayed pending a hearing by the Ninth Circuit. The decision is notable for three reasons. First, it struck down both the verdict of the state referendum that eliminated the legality of owning pre-2000 large capacity magazines (LCMs) and the ten round limit itself. Second, it concluded that there is a Second Amendment right to own magazines holding more than ten rounds, repeatedly calling it a "core" right of the Second Amendment.[9] Third, it was a departure from previous federal courts of appeals holdings which, as noted, up until this time had consistently upheld magazine restrictions.[10] Whether this ruling prevails or not,[11] it raises some key issues about the regulation of magazines and its relationship, if any, to the Second Amendment. In addition, arguments using *Duncan*'s logic have surfaced, claiming that the ownership of gun silencers might also be protected under the Second Amendment. These are not purely contemporary questions, as the history of gun laws reveals.

Recent analyses of the history of gun laws in America have excavated a surprisingly rich, diverse, and prolific number and variety of gun laws, extending back to the country's beginnings. It is commonplace to think of gun regulation as an artifact of the late twentieth century. Yet nothing could be further from the truth: gun ownership is as old as the country, and so are gun laws.

This Article examines the little-known roots of gun magazine regulation and its relationship to the regulation of semi-automatic and fully automatic weapons, dating to early in the previous century. It also examines the history and modern debate over gun silencers. Since their invention over a century ago, silencers have been subject to strict regulation. In recent years, however, both magazines and

---

7. California's statute was first enacted in 2000, and then was expanded by a state referendum in 2016. Whereas originally owners of magazines holding more than ten rounds could maintain ownership if they had obtained the magazines before the restriction's enactment, the 2016 expansion required owners to dispose of or destroy them.

8. 366 F. Supp. 1131 (S.D. Cal. 2019).

9. *Id.* at 14, 49, 114, 121.

10. *See, e.g.*, Worman v. Healey, 922 F.3d 26 (1st Cir. 2019); Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen., 910 F.3d 106 (3d Cir. 2018); Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017); Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011).

11. The *Duncan* ruling is extremely aggressive and expansive in its definition of Second Amendment rights. These traits appear from the outset of the decision, when Judge Roger Benitez begins his decision with the breathless retelling of three cases of self-defense which purport to show that actual instances of self-defense with a gun were or could have been effective only with the defender's possession of a LCM. Yet the veracity of the judge's claims that those were instances where the individuals could have defended themselves better or more effectively with LCMs was immediately challenged; in the first case referenced by Judge Benitez, the news article from the *Jacksonville Times-Union* he cited as the source of the story purporting to report on the incident could not be found. In the other two cases, "high capacity magazines were not an issue." Press Release, Americans Against Gun Violence, Americans Against Gun Violence Condemns District Court Judge's Ruling in Duncan v. Becerra Invalidating California High Capacity Magazine Ban (Apr. 2, 2019), https://aagunv.org/americans-against-gun-violence-condemns-district-court-judges-ruling-in-duncan-v-becerra-invalidating-california-high-capacity-magazine-ban/ [https://perma.cc/ME4C-6A52].

silencers have been a deregulatory pressure point for gun rights activists. For reasons of history, policy, and law, a fuller understanding of this regulatory history is essential to inform these modern debates.

Part II examines the history of bullet magazine[12] regulation and the functionality of magazines, as that history is inextricably tied to the regulation of semi-automatic and fully automatic weapons. Part III examines the history of and contemporary debate over the regulation of gun silencers. Part IV offers a short conclusion.

## II

### ASSAULT WEAPONS AND BULLET MAGAZINES

#### A. The Story of Assault Weapons

The modern civilian guns labeled as assault weapons and assault rifles are derived from military weapons designed for use on the battlefield. The firearm known today as the assault weapon first arose during World War II when the Germans developed the STG 44, also known as the *Sturmgewehr*.[13] That weapon was studied by the Soviets, who produced the well-known Soviet AK-47 in 1947, the most successful and prolific soldier-held battlefield weapon in modern times.[14] The AK-47 gave rise to the American AR-15, which then became the military M16. The AR-15 was eventually sold in the civilian market, which led in turn to many copycat variations.[15]

---

12.  The term "bullet magazine," strictly speaking, is incorrect, in that the term bullet refers to that portion of a cartridge that leaves the barrel of a gun when it is fired, whereas magazines hold an entire cartridge. But the term bullet is more clearly understood in general parlance as a synonym for round, so both terms will be used here.

13.  LARRY KAHANER, AK-47: THE WEAPON THAT CHANGED THE FACE OF WAR 16–19 (2007).

14.  *See id.* at 19–24.

15.  The AR-15 was first produced by the ArmaLite Company in the late 1950s. Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/ [https://perma.cc/EZS3-BUZ3]. According to one of its designers, Jim Sullivan, the weapon was "designed for full automatic military use. It wasn't really designed as a sporting rifle." *America's Gun: The Rise of the AR-15* (CNBC television broadcast Apr. 24, 2013). ArmaLite sold the rights to the gun to the Colt Company in 1959. A few years later, the weapon was adopted by the American military and re-produced as the M16, where it came in to use during the Vietnam War in the 1960s. Dickinson, *supra*. These military weapons came to have three firing capabilities: fully automatic, semi-automatic, and "selective fire," or three-round bursts. Civilian versions, both in the past and presently, can fire only in a semi-automatic fashion. PHILLIP PETERSON, GUN DIG., BUYER'S GUIDE TO ASSAULT WEAPONS 11 (2008). Colt received permission to market a semi-automatic version of the AR-15 to civilians, but these weapons did not catch on in the American market in a significant way until the late 1980s, when China flooded the market with cheap weapons, including its own semi-automatic version of the AK-47. *See* SPITZER, *supra* note 3, at 143; Jay Mathews, *AK47 Rifles Flood Into U.S. From Chinese Sales War*, WASH. POST (Feb. 2, 1989), https://www.washingtonpost.com/archive/politics/1989/02/02/ak47-rifles-flood-into-us-from-chinese-sales-war/6a509816-0602-45f6-a4db-d347c0cb7802/ [https://perma.cc/VPD3-HFM6]. Today, the AR-15-type weapon is manufactured and sold by over thirty companies, including Smith and Wesson, Bushmaster, and Sig Sauer.

The terms "assault weapon" and "assault rifle" are neither a "public relations stunt" nor ginned-up labels invented by gun control organizations.[16] In fact, these were the very terms used by the companies that first produced, marketed, and sold such weapons to the American public.[17] Industry use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s, before political efforts to regulate them emerged in the late 1980s.[18] The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[19]

By the early 1990s, both the gun industry and the National Rifle Association (NRA) abruptly changed course in their labeling of such weapons as pressure built on Congress and in some states to enact restrictions, which led to the rebranding of such weapons as being no different from typical, traditional hunting weapons that also fired in semi-automatic fashion. That effort has persisted to the present, where terms like "tactical rifles" and "modern sporting rifles" are typically offered by gun organizations including the NRA and the National Shooting Sports Foundation (NSSF) as preferred terms for such weapons.[20]

Persistent efforts at rebranding—and parallel denials of assault weapons' military past—accelerated through 2012 and 2013 as national concern about assault weapons escalated. For example, a widely-circulated NSSF "Modern Sporting Rifle Pocket Fact Card" says that such weapons are "widely misunderstood" because of their cosmetic resemblance to military weapons (an intentional design feature).[21] It urges gun owners to use the information on the card and website "to correct misconceptions about these rifles."[22] Among the "corrections" it offers: "AR-15-style rifles are NOT 'assault weapons' or 'assault rifles.' An assault rifle is fully automatic—a machine gun."[23] It adds "Please correct them" if they use the term "assault weapon" and further claims that the phrase "assault weapon" "is a political term" created in the 1980s.[24] (As noted above, this assertion is incorrect.) An article in *Outdoor Life* belies the claim that

---

16. Peter Ferrara, *'Assault Weapon' is Just a PR Stunt Meant to Fool the Gullible*, FORBES (Dec. 28, 2012), http://www.forbes.com/sites/peterferrara/2012/12/28/assault-weapon-is-just-a-pr-stunt-meant-to-fool-the-gullible [https://perma.cc/UJS6-29D6].

17. PETERSON, *supra* note 15, at 11.

18. VIOLENCE POL'Y CTR., THE MILITARIZATION OF THE U.S. CIVILIAN ARMS MARKET 30 (2011), http://www.vpc.org/studies/militarization.pdf [https://perma.cc/Q2FB-D8K3]; *see generally* VIOLENCE POL'Y CTR., ASSAULT WEAPONS AND ACCESSORIES IN AMERICA (1988), http://www.vpc. org/studies/awacont.htm [https://perma.cc/4GDD-KB8U].

19. *See* TOM DIAZ, THE LAST GUN 142–43 (2013) [hereinafter DIAZ, THE LAST GUN]; *see also* TOM DIAZ, MAKING A KILLING: THE BUSINESS OF GUNS IN AMERICA 124–28, 230–31 (2000) [hereinafter DIAZ, MAKING A KILLING].

20. DIAZ, THE LAST GUN, *supra* note 19, at 144.

21. *Modern Sporting Rifle Pocket Fact Card*, NAT'L SHOOTING SPORTS FOUND. (on file with author).

22. *Id.*

23. *Id.*

24. *Id.*

assault weapons are limited only to those that fire fully automatically: it, too, urges its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons."[25] The effort to rebrand the term "assault weapon" as something more benign and severed from its military origins is further seen in the publication struggles of Phillip Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*, is a well-known reference work on the subject.[26] As Peterson explained to the New York Times, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons, even though the origin of the term "assault weapon" was the industry itself.[27] He found that the NRA refused to sell his book until he changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[28]

## B. The Regulatory History of Semi-Automatic and Fully Automatic Firearms

Mass shootings in the late 1980s and early 1990s raised public concern about whether to regulate assault weapons. California became the first state to enact restrictions on assault weapons in 1989,[29] shortly after a mass shooting at an elementary school earlier that year where the shooter used an AK-47 semi-automatic assault rifle. Then, after several years of pressure, Congress enacted a limited national assault weapons ban in 1994.[30] Written into the bill was a sunset provision that called for the bill to lapse in 2004.[31] Congress did not renew the ban. Despite the law's limitations, at least three studies concluded that it reduced the rate of mass shootings and fatalities, which then climbed after the law lapsed.[32]

---

25. John Haughey, *Five Things You Need to Know About 'Assault Weapons'*, OUTDOOR LIFE (Mar. 19, 2013), http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons [https://perma.cc/UB3E-LSPN].

26. *See generally* PETERSON, *supra* note 15.

27. Erica Goode, *Even Defining 'Assault Weapons' is Complicated*, N.Y. TIMES (Jan. 17, 2013), https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html [https://perma.cc/W8KB-CHM9].

28. *See generally* PETERSON, *supra* note 15.

29. Jane Gross, *California Becomes the First State to Vote Curbs on Assault Rifles*, N.Y. TIMES (Mar. 4, 1989), https://timesmachine.nytimes.com/timesmachine/1989/03/14/667789.html?pageNumber =1 [https://perma.cc/S9CX-EW3J].

30. Violent Crime Control and Law Enforcement Act of 1994, Pub. L No. 103-322, 108 Stat. 1796 (codified as amended at 42 U.S.C. § 136).

31. *See* ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 195–201 (7th ed. 2018).

32. *See generally* Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, at 2–3 (U.S. Dep't of Justice Report No. 204431, 2004), https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf [https://perma.cc/GAX7-TDEN]; Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban*, 86 J. TRAUMA & ACUTE CARE SURGERY 11 (2019); John Donohue & Theodora Boulouta, *That Assault Weapons Ban Worked*, N.Y. TIMES (Sept. 5, 2019), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html [https://perma.cc/L75M-RFLM]. Christopher S. Koper cites five additional studies that found the 1994 law to have reduced public mass shooting deaths and injuries from assault weapons. *See* Christopher S. Koper, *Assessing the Potential to*

As of 2019, six states (California, Connecticut, Maryland, Massachusetts, New Jersey, and New York) plus the District of Columbia (D.C.) ban assault weapons.[33] A seventh state, Hawaii, bans assault pistols only.[34] Two more states, Minnesota and Virginia, regulate but do not ban assault weapons.[35] Relevant to this discussion, nine states (California, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Vermont) and D.C. ban high-capacity bullet magazines.[36] All of these states limit capacity to a ten round maximum except Colorado, which puts the limit at fifteen.[37] Yet the regulation of semi-automatic weapons and magazines dates not just to the 1980s, but to the 1920s.

At least twenty-eight states enacted laws to bar fully automatic weapons from the 1920s through 1934.[38] In 1934, Congress responded by enacting the first significant national gun law, the National Firearms Act.[39] It imposed restrictions on weapons like the Tommy gun and other fully automatic weapons, sawed-off shotguns, and silencers.

In addition to the regulation of fully automatic weapons, between 1927 and 1934 at least seven states enacted laws to restrict or bar all semi-automatic weapons.[40] Each of these states also barred fully automatic weapons, often lumping semi-automatic and fully automatic weapons (usually referred to as "machine guns" and "submachine guns") under the same regulatory rubric.[41]

For example, a Massachusetts law enacted in 1927 stated: "Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun . . . ."[42] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[43] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without

---

*Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIMINOLOGY & PUB. POL'Y 147, 157 (2020).

33.  *Assault Weapons: Summary of State Law*, GIFFORDS LAW CTR., https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/#state [https://perma.cc/QRY6-9X9J].

34.  *Id.*

35.  *Id.*

36.  *Large Capacity Magazines*, GIFFORDS LAW CTR., https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines [https://perma.cc/Z3H8-4XNY].

37.  *Id.*

38.  *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS., no. 2, 2017, at 55, 67. It is possible that other states enacted laws like the ones discussed here after 1934.

39.  Pub. L. No. 73-474, 48 Stat. 1236 (1934).

40.  SPITZER, *supra* note 3, at 50–51.

41.  *Id.*

42.  Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413, 413–14.

43.  Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, 256.

reloading.[44] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[45] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[46]

Ohio restricted to permit holders both fully automatic and semi-automatic weapons in a 1933 law, incorporating any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[47] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[48] Around the same the same time, South Dakota restricted access to machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device."[49] Similarly, in 1934 Virginia restricted weapons

> from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also . . . from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading.[50]

Aside from these seven states, statutes in another three—Illinois, Louisiana, and South Carolina—included language that may also have extended regulations to semi-automatic weapons and to fully automatic weapons.[51]

## C. Regulating Bullet Feeding Devices

As an examination of these laws shows, restrictions on fully automatic and semi-automatic firearms are closely tied to the regulation of bullet magazines or their equivalent, as both types of weapons are predicated on some kind of reloading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired. As is the case with contemporary state regulations restricting bullet magazine capacity, eight of the historic state laws discussed above imposed regulations based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to eighteen (Ohio).

Bullet magazine firing limits were imposed in three categories of state laws[52]: (1) those regulating semi-automatic and fully automatic firearms; (2) those regulating fully automatic weapons only, where the regulation was defined by the

---

44. Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.

45. Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.

46. *Id.*

47. Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.

48. *Id.*

49. Uniform Machine Gun Act, 1933 S.D. Sess. Laws ch. 206 § 1, at 245, 245.

50. Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.

51. *See* Act of July 2, 1931, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, 1932 La. Acts 336; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288.

52. *See infra* Table 1.

number of rounds that could be fired without reloading or by the ability to receive bullet feeding devices; and (3) those restricting all device fed guns that could receive any type of bullet feeding mechanism or round feeding device and fire them continuously in a fully automatic manner.

For example, a 1927 California law, falling into the third category, was titled this way:

> An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which Ammunition is Fed to such Guns from or by means of Clips, Disks, Drums, Belts or other Separable Mechanical Device. . . .[53]

The other three states in California's category utilized this same description.[54] In all, at least eighteen states enacted gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity.[55] Without question, one may reasonably conclude that regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s.

Table 1. **Ammunition Magazine Firing Limits in 18 State Laws, 1927–1934**[56]

| Semi-automatic and Fully Automatic Firearms | Fully Automatic Firearms | All Device Fed Firearms |
|---|---|---|
| Louisiana (8 round maximum) Massachusetts (more than one round) Michigan (16 round maximum) Minnesota (more than one round) Ohio (18 round maximum) Rhode Island (12 round maximum) South Carolina (8 round maximum) South Dakota (5 round maximum) Virginia (7 round maximum) | Illinois (8 round maximum) New Jersey (any removable device holding rounds) North Dakota (loadable bullet reservoir) Texas (5 round maximum) Vermont (6 rounds) | California Hawaii Missouri Washington State |

As this discussion demonstrates, the regulation of semi-automatic weapons and magazines predates the modern debate over these questions by 70 years. This fact is notable because it uncovers a hither-to unknown gun regulatory past, and because, as the Supreme Court noted in *District of Columbia v. Heller*, historical gun law provenance is relevant to determining the constitutionality of modern gun laws.[57]

History aside, the debate over contemporary gun regulations is also directly shaped by access to firearms like assault weapons, and accessories like LCMs and silencers. I consider each in turn.

---

53.  Act of May 16, 1927, ch. 552, 1927 Cal. Stat. 938.

54.  *See* Act of Apr. 27, 1933, no. 120, § 2, 1933 Haw. Sess. Laws 117, 117; Act of June 1, 1929, § 2, 1929 Mo. Laws 170, 170; Machine Guns, ch. 64, § 2, 1933 Wash. Sess. Laws 335, 335.

55.  *See infra* Table 1.

56.  The data in this Table are sourced from *Repository of Historical Gun Laws*, DUKE LAW CTR. FOR FIREARMS LAW, https://law.duke.edu/gunlaws/ [https://perma.cc/8RRH-MSEN]. The dataset ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934.

57.  District of Columbia v. Heller, 554 U.S. 570, 627 (2008).

## D. Contemporary Assault Weapons Concerns

No precise count of the number of assault weapons owned in America is maintained. In 1994, when Congress enacted the federal assault weapons ban, there were roughly 1.5 million such weapons in the country.[58] Several estimates in 2012 pegged the number at about four million.[59] A 2016 estimate put the number at about five million.[60] In 2018, the NSSF, a pro-gun industry group, suggested that between 15–20 million assault weapons were in circulation.[61] This estimate is likely unreliably high, however, because it included weapons produced for law enforcement, because the NSSF did not offer any explanation or methodology as to how it produced that number, and because of the NSSF's pro-industry orientation.[62] If, for the sake of argument, we take a number of ten million assault weapons in the country and divide by roughly the 300 million guns in civilian hands today, it equals about three percent of all guns in America. While there is general agreement that assault weapons, led by the AR-15, are the most frequently sold type of gun in recent years, this math confirms that they still represent a very small percentage of all guns in America. And assault weapons sales only began to rise dramatically in the United States after the expiration of the federal assault weapons ban in 2004.[63] This date also coincided with an increase in assault weapons' and LCMs' use in crime.[64]

Assault weapons' use in crime continues to be relatively small in relation to all gun crime in America. Most gun crime is committed with handguns. For example, roughly eighty percent of all annual gun murders and gun robberies are committed with handguns.[65] Yet as noted, assault weapons' use in crime has increased since 2004, as has the use of LCMs. According to a recent study, firearms capable of receiving LCMs (including, but not limited to, assault weapons, which constitute an estimated 2–12 percent of guns used in crimes, and also many handguns) account for 22–36 percent of guns used in crime, and over 40 percent of guns used in cases of "serious violence."[66] Beyond overall gun

---

58. Brad Plumer, *Everything You Need to Know About the Assault Weapons Ban, in One Post*, WASH. POST (Dec. 17, 2012), https://www.washingtonpost.com/news/wonk/wp/2012/12/17/everything-you-need-to-know-about-banning-assault-weapons-in-one-post/?utm_term=.6244243b2e1c [https://perma.cc/YT77-U5VM].

59. SPITZER, *supra* note 3, at 93.

60. John W. Schoen, *Owned by Five Million Americans, AR-15 Under Renewed Fire After Orlando Massacre*, CNBC.COM (June 13, 2016), https://www.cnbc.com/2016/06/13/owned-by-5-million-americans-ar-15-under-renewed-fire-after-orlando-massacre.html [https://perma.cc/8UNM-WRQ4].

61. Alex Yablon, *How Many Assault Weapons Do Americans Own?*, TRACE (Sept. 22, 2018), https://www.thetrace.org/2018/09/how-many-assault-weapons-in-the-us/ [https://perma.cc/4Q9S-EGYE].

62. *Id.*

63. David Heath et al., *How an 'Ugly,' Unwanted Weapon Became the Most Popular Rifle in America*, CNN.COM (Dec. 14, 2017), https://www.cnn.com/2017/12/14/health/ar15-rifle-history-trnd/index.html [https://perma.cc/2YF6-B37X].

64. Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313, 319 (2018). The 1994 assault weapons ban also restricted bullet magazines to those that could hold up to ten rounds.

65. SPITZER, *supra* note 3, at 80.

66. Koper et al., *supra* note 63, at 319.

crime, assault weapons play a disproportionately large role in three types of criminal activity: mass shootings, police killings, and gang activity.

1. Mass Shootings

Mass shootings are defined by the Federal Bureau of Investigation (FBI) as those where four or more people are killed, excluding the perpetrator.[67] Among mass shootings that have garnered significant national attention, such as the Columbine High School shooting in 1999, the Orlando night club shooting in 2016, the Las Vegas shooting in 2017, and the Parkland shooting in 2018, all involved the use of assault weapons. From 2009–2019, the five deadliest mass shootings in the United States involved assault weapons with LCMs.[68]

Studies illustrate the large role played by assault weapons in public mass shooting events in the United States. A study of 62 public mass shootings from 1982–2012 found that of the 143 firearms used in these events, 34 percent of them were assault weapons that could have been banned under a proposed federal law[69]; 50 percent of those were semi-automatic handguns, and another 14 percent were revolvers.[70] Similarly, a Congressional Research Service study of mass shootings from 1999–2013 concluded that assault rifles were used in 27 percent of public mass shootings; taking the data back to 1982, they were used in 24 percent of mass shootings.[71] A more recent study notes that from 2000–2017, semi-automatic assault rifles were used in 25 percent of active shooter events.[72] Handguns continued to be used in over half of such incidents, more frequently than any other type of firearm,[73] but assault rifles are over-represented in these

---

67. The FBI definition, set in the 1980s, is by no means universally accepted by researchers for several reasons, including the simple fact that expeditious police and medical intervention may succeed in reducing the number of deaths to below four, even if many people are injured. Surely such an event is no less a mass shooting than one where four or more are killed. *Mass Shootings: Definitions and Trends*, RAND CORP. (Mar. 2, 2018), https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html [https://perma.cc/ZA3D-CTMF].

68. *Assault Weapons and High-Capacity Magazines*, EVERYTOWN FOR GUN SAFETY (Mar. 22, 2019), https://everytownresearch.org/assault-weapons-high-capacity-magazines/ [https://perma.cc/B26S-2FN8].

69. A bill introduced in the U.S. Senate by Sen. Dianne Feinstein (D-Cal.) in 2013 laid out a definition of assault weapons that would have banned the 34 percent of assault weapons used in the crimes studied. That bill was defeated in a Senate vote.

70. Mark Follman et al., *A Guide to Mass Shootings in America*, MOTHER JONES, (Feb. 19, 2019), https://www.motherjones.com/politics/2012/07/mass-shootings-map/ [https://perma.cc/T4ZV-VJMF].

71. WILLIAM J. KROUSE & DANIEL J. RICHARDSON, CONG. RESEARCH SERV., MASS MURDER WITH FIREARMS 29 (2015), https://fas.org/sgp/crs/misc/R44126.pdf [https://perma.cc/BAW3-W7CP]; *see also* Michael S. Rosenwald, *Why Banning AR-15s and Other Assault Weapons Won't Stop Mass Shootings*, WASH. POST (June 16, 2016), https://www.washingtonpost.com/news/local/wp/2016/ 06/16/ why-banning-ar-15s-and-other-assault-weapons-wont-stop-massshootings/?utm_term=.7dffcadbb47b [https://perma.cc/G9BS-T44J].

72. Bloomberg, *Assault Rifles Are Linked to Only 25% of 'Active Shooter' Events*, FORTUNE (Sept. 11, 2018), https://fortune.com/2018/09/11/assault-rifles-active-shooter-study/ [https://perma.cc/3FG9-ACFT].

73. Alex Yablon, *Most Active Shooters Use Pistols, Not Rifles, According to FBI Data*, TRACE (Aug. 28, 2018), https://www.thetrace.org/rounds/mass-shooting-gun-type-data/ [https://perma.cc/68V7-K2B3].

incidents compared with all gun crime and the percentage of assault weapons in society.[74]

### 2. Police Killings

Assault weapons are more likely to be used in police murders than civilian murders. Using FBI data, the Violence Policy Center (VPC) reported that from 1998–2001, 41 of 211 police officers (20 percent) killed in the line of duty with firearms were shot with assault weapons (in all, 224 police officers during this period were killed in the line of duty from all causes).[75] An updated VPC study also found that 20 percent of police officers killed in the line of duty in 2016 and 2017 died from assault weapons fire.[76] Data from 2009 found that of 45 officers killed by firearms nationwide, eight (18 percent) were shot with assault weapons.[77] While this represents a minority of all police gun deaths, it is a far higher proportion than that of death via assault weapons in society. A 2018 study reported that assault weapons and LCMs were disproportionately more likely to be used in murders of police: 13–16 percent of police murders used assault weapons, and over 40 percent involved LCMs.[78]

### 3. Gang and Criminal Activity

Assault weapons are also preferred weapons for gang activity. A report by the International Association of Chiefs of Police recommended "[e]nacting an effective ban on military-style assault weapons . . . and other weapons that enable criminals to outgun law enforcement."[79] A report by the Police Executive Research Forum (PERF) noted "significant support for the proposition that the expiration of the law [the 1994 assault weapons ban] has caused problems for local police. Thirty-seven percent of the police agencies responding to PERF's survey reported that they had seen noticeable increases in criminals' use of

---

74. Polly Mosendz, *Assault Rifles Aren't the Weapon of Choice for 'Active Shooters'*, BLOOMBERG (Sept. 11, 2018), https://www.bloomberg.com/news/articles/2018-09-11/semi-autos-aren-t-the-weapon-of-choice-for-active-shooters [https://perma.cc/7LG7-XASF].

75. *See* VIOLENCE POL'Y CTR., OFFICER DOWN 5 (2003), http://vpc.org/studies/officer%20down.pdf [https://perma.cc/7784-DE4P].

76. *See New Data Shows One in Five Law Enforcement Officers Slain in the Line of Duty in 2016 and 2017 Were Felled by an Assault Weapon,* VIOLENCE POL'Y CTR. (Sept. 25, 2019), https://vpc.org/press/new-data-shows-one-in-five-law-enforcement-officers-slain-in-the-line-of-duty-in-2016-and-2017-were-felled-by-an-assault-weapon/ [https://perma.cc/9MPU-4D3Y]. Of 109 officers slain, 25 were killed by assault weapons fire. *Id.*

77. Lori Robertson, *Biden Wrong on Police Deaths*, FACTCHECK.ORG (Jan. 30, 2013), http://www.factcheck.org/2013/01/biden-wrong-on-police-deaths/ [https://perma.cc/N4P8-H8JG]. The FBI data categorizes gun shootings by types of guns (handguns, rifles, shotguns) but does not have a separate category for assault weapons, meaning that the data must be reanalyzed or obtained in some other way.

78. Koper et al., *supra* note 63, at 319.

79. INT'L ASS'N OF CHIEFS OF POLICE, TAKING A STAND: REDUCING GUN VIOLENCE IN OUR COMMUNITIES 6 (2007) https://www.theiacp.org/sites/default/files/all/a/ACF1875.pdf [https://perma.cc/AGL9-YCQG].

assault weapons."[80] The New York State Police were animated by similar concerns when their counsel filed a brief on behalf of the 2013 SAFE Act, defending in particular the strengthened assault weapons ban and magazine limit provisions.[81] The 2013 law included a provision (upheld by the courts) that pre-banned magazines capable of holding more than ten rounds be destroyed, turned in to police, or sold out of state.[82]

Widely noted prolific gun trafficking between the United States and Mexico has been motivated in large part by the appeal of assault weapons to Mexican drug gangs.[83] A National Gang Crime Research Center study of 1206 respondents in the American Midwest, including 505 gang members, found that over 43 percent reported owning an assault rifle, as compared with 15 percent of non-gang member criminals. Gang members were also much more likely to report having used an assault rifle in a crime (28 percent) than non-gang members (4 percent).[84] Other analyses note the appeal of assault weapons to American crime gangs and extremist paramilitary militias.[85]

### 4. Large Capacity Magazines

Prodigious evidence supports the concern that LCMs are widely used in criminal gun activity and that they increase gun mayhem. A study of sixty-two mass shootings found that LCMs were used in at least thirty-one of these instances.[86] The shooters' preference for magazines holding more rather than fewer rounds underscores the utility of less reloading for those seeking to kill

---

80. POLICE EXEC. RESEARCH FORUM, GUNS AND CRIME 2 (2010), http://www.policeforum.org/assets/docs/Critical_Issues_Series/guns%20and%20crime%20-%20breaking%20new%20ground%20by%20focusing%20on%20the%20local%20impact%202010.pdf [https://perma.cc/CL9V-ZM9P].

81. Declaration of Kevin Bruen at 16–17, N.Y. State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d 349 (2013) (1:13-cv-00291 (WMS)).

82. SPITZER, *supra* note 3, at 164. This law was upheld by the Second Circuit. *See* N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F. 3d 242, 264 (2d Cir. 2015).

83. *See Assault Weapons Ban of 2013: Hearing on S. 150 Before the S. Comm. on the Judiciary*, 113th Cong. 7–8 (2013) (statement of John F. Walsh, Att'y Gen. of Colorado); *see also* POLICE EXEC. RESEARCH FORUM, *supra* note 80; VIOLENCE POL'Y CTR., TARGET: LAW ENFORCEMENT (2010), http://vpc.org/studies/targetle.pdf [https://perma.cc/J2P8-EPXF]; Arindrajit Dube et al., *Cross-Border Spillover: U.S. Gun Laws and Violence in Mexico*, 107 AM. POL. SCI. REV. 397 (2013).

84. GEORGE W. KNOX ET AL., NAT'L GANG CRIME RESEARCH CTR., GANGS AND GUNS 36 (2001), https://ngcrc.com/ngcrc/ggunsp.pdf [https://perma.cc/V5PG-4PK3]. According to the Report: "Four social contexts were used for the survey: eight county jails from the farmland to the urban central area (891 inmates), matched pair design samples from a Chicago public high school and an inner-city program, and a sample of gang members in a private suburban probation program." *Id.* at i.

85. *See, e.g.*, PHILIP J. COOK & KRISTIN A. GOSS, THE GUN DEBATE 13 (2014) ("Handguns are also the weapon of choice for criminal use . . . . The exception may be for gang wars and militia activities, where military-style weapons are more the norm."); DIAZ, MAKING A KILLING, *supra* note 19, at 131 (quoting a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) spokesman as stating: "We've seen a proliferation because of the drug trade . . . . More and more people want to have increased firepower and the status of having the semiautomatic assault type weapon. It looks dangerous").

86. Mark Follman & Gavin Aronsen, *"A Killing Machine": Half of All Mass Shooters Used High-Capacity Magazines*, MOTHER JONES (Jan. 30, 2013), http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings [https://perma.cc/UR8U-7B6Z].

multiple people.[87] A study of mass shootings from 2009 to 2018 found that shooting incidents involving high-capacity magazines resulted in five times as many people shot, and more than twice as many deaths, than in instances where the perpetrators did not use such magazines.[88] Similarly, a study conducted in 2017 for the 2012–2016 period found that states with LCM bans in place had a 63 percent lower rate of mass shootings, controlling for other factors.[89] A 2018 study found that over 40 percent of guns used in murders of police were LCM compatible.[90] A 2019 study examined high-fatality mass shootings from 1990-2017, and concluded that attacks with LCMs resulted in a 62 percent higher death toll than when LCMs were not used.[91] It also found that states without LCM bans had gun death totals three times higher than states with such bans in place.

The shooting of then-Arizona Congresswoman Gabrielle Giffords in 2011 provides an example of LCMs' potential to cause more devastating impact than firearms without such capacity. Although Giffords was shot in the head by a deranged man at a public event, she survived the attack.[92] In 2013, Giffords' husband, Mark Kelly (a former Navy captain and astronaut), offered this account of his wife's shooting in congressional testimony, indicating how the shooter's LCMs resulted in more deaths and injuries:

> The shooter in Tucson showed up with two 33-round magazines, one of which was in his 9 millimeter. He unloaded the contents of that magazine in 15 seconds . . . . The first bullet went into Gabby's head. Bullet number 13 went into a nine-year old girl named Christina Taylor Green . . . . When he tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina Taylor Green would be alive today.[93]

Opponents of LCM limits often argue that a minimally skilled person can rapidly interchange an empty magazine for a full one, suggesting the futility of

---

87.   *See* ASHLEY CANNON, CITIZENS CRIME COMM'N OF N.Y.C., MAYHEM MULTIPLIED: MASS SHOOTERS AND LARGE-CAPACITY MAGAZINES (2014), http://www.nycrimecommission.org/pdfs/CCC-MayhemMultiplied-2014.pdf [https://perma.cc/9CDJ-FKST]; Follman & Aronsen, *supra* note 86; *see also* Alain Stephens, *The Gun Industry Is Betting on Bigger High-Capacity Magazines*, TRACE (June 19, 2019), https://www.thetrace.org/2019/06/gun-industry-high-capacity-magazine-size/ [https://perma.cc/8UKX-XC7M].

88.   EVERYTOWN FOR GUN SAFETY, ANALYSIS OF RECENT MASS SHOOTINGS 7 (2015), https://everytownresearch.org/documents/2015/09/analysis-mass-shootings.pdf [https://perma.cc/BG2P-34XW].

89.   Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN.COM (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-las-vegas/index.html [https://perma.cc/NE8F-Q2AA].

90.   Koper, et al., *supra* note 63, at 318.

91.   Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AM. J. PUB. HEALTH 1754, 1755. They defined high-fatality mass shootings as those that resulted in six or more deaths. *Id.*

92.   *What Should America do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. 68–69 (2013) (statement of Captain Mark E. Kelly, husband of Rep. Gabrielle Giffords).

93.   *Id*.

any magazine limits as an impediment to lethal criminality.[94] In a live shooting situation, however, shooters often succumb to the tension and confusion of the moment and take extra time, fumble or drop a magazine (as did the man who shot Giffords), or commit other errors that open the door to intervention. But even some gun rights supporters draw the line at LCMs. For example, one gun rights supporter, who is otherwise critical of the assault weapons ban, asked: "Can anyone think of a really good reason to have a magazine that holds more than ten rounds?"[95]

### 5. Assault Weapons and Self-Defense

In theory, any firearm can be used for self-defense, including assault weapons. Yet even if all assault weapons disappeared, Americans would still have thousands of models and hundreds of millions of guns to choose from for self-defense purposes. Handguns are the clear choice for those citizens seeking a gun for self-protection.[96]

For self-defense purposes, an assault weapon has some obvious limitations. Its length, compared with a handgun, makes it more unwieldy to deploy in the often tight confines of a home. It requires two hands to handle and operate. The higher velocity of the smaller caliber bullets assault weapons fire means that it is more likely that rounds fired may enter nearby buildings, automobiles, and the like, resulting in unintended damage, injury, and even death. And within the confines of a person's home, long guns contribute nothing to accuracy of fire, which is largely determined by the ability of the shooter to deal successfully with the stress and surprise of an actual confrontation with an intruder. A handgun is also preferable in such situations because only one hand is necessary to train the weapon on a target, whereas an assault weapon or other long gun requires two hands, a fact noted by Justice Scalia, writing for the majority in *Heller*.[97]

Further, actual civilian gun self-defense situations do not involve anything resembling a protracted firefight necessitating the ability to fire many rounds without reloading. A study of self-defense shootings based on data cumulated by the NRA's Institute for Legislative Action conducted by National Economic Research Associates (NERA) examined data from the NRA's "armed citizen" stories—accounts compiled in a database of private citizens who use guns for self-defense. Data compiled from 1997–2001 found that, during the this time period, defenders fired an average of 2.2 shots, and in 28 percent of these instances, defenders fired no shots (that is, mere display of a weapon stopped or thwarted

---

94. *See, e.g.*, Jacob Paulsen, *Why Magazine Capacity Limitations are a Bad Idea*, CONCEALEDCARRY.COM (Dec. 4, 2015), https://www.concealedcarry.com/law/magazine-capacity-limitations/ [https://perma.cc/HPK4-4GY5].

95. Jim Barrett, *Assault Weapons Bans: Are You Ready?*, THETRUTHABOUTGUNS.COM (June 8, 2012), http://www.thetruthaboutguns.com/2012/06/jim-barrett/assault-weapons-bans-are-you-ready/ [https://perma.cc/DEN3-VCJN].

96. They were identified specifically by the Supreme Court as the self-defense firearm of choice for use in the home. District of Columbia v. Heller, 554 U.S. 570, 629 (2008).

97. *Id.*

the incident).[98] For the period of 2011–2013, the average number of shots was 2.1, and no shots were fired in 16 percent of the instances.[99] For this later time period, there were no instances in which the defender fired as many as ten shots or more where the self-defense incident occurred in the home.[100] Given the NRA's well-known positions favoring gun ownership and use for self-defense, and the non-random, self-selecting nature of the data, one may assume that it likely represents the upper bound of gun self-defense uses.

Assault weapons offer, at best, no advantages for personal self-defense uses, and in certain respects, are less useful for personal self-defense than handguns.

## III

### GUN SILENCERS

In 2017, the Hearing Protection Act was introduced in Congress as part of a larger piece of legislation.[101] The purpose of the Act was to deregulate the process for obtaining gun silencers (also referred to as "suppressors").[102] Under the terms of the National Firearms Act of 1934, the process for obtaining a gun silencer was (and is) the same as for acquiring an automatic weapon: the applicant needs to pay a $200 fee, submit fingerprints and a photograph, and undergo a background check.[103] The government also keeps track of silencer ownership. As of early 2017, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) reported civilian ownership of 1.36 million silencers registered with the agency.[104] In 2010, Americans registered 285,000 silencers.[105] The 2017 bill would have eliminated these regulations, making silencer purchase legal as long as the prospective purchaser passed an instant background check—the same check applied to gun purchasers. Hearings on the bill were scheduled for 2017, but were eventually canceled in the face of public dismay over contemporaneous mass shootings. Thus, the bill died at the end of 2018. A similar bill was introduced in the U.S.

---

98. Declaration of Lucy P. Allen, Kolbe v. O'Malley, 42 F. Supp. 3d 768 (D. Md. 2014) (No. 1:13-cv-02841) ECF No. 44-9. The data reported in this declaration did not include the maximum number of rounds fired in incidents reported and compiled from 1997–2001. *Id.* at 3. It also did not report the number of incidents on which the 1997–2001 study was based, but did report that the 2011–2013 study was based on 279 incidents. *Id.* at 3–4.

99. *Id.*

100. *Id.* at 4.

101. Sportsmen's Heritage and Recreational Enhancement Act, H.R. 3668, 115th Cong. (2017).

102. I use the term "silencer" here rather than "suppressor," as silencer was the term used by the device's inventor, and it is the universally known term referencing devices added to the end of gun barrels to reduce the noise of firing. The devices have been also sometimes called "mufflers."

103. I.R.C. §§ 5811–12 (2018).

104. BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 15 (2017).

105. BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES 24 (2011).

Senate at the start of the new Congress in 2019. That bill, according to its sponsors, will not affect eight state laws that restrict silencer purchase.[106]

In 2018, the U.S. Court of Appeals for the Tenth Circuit ruled that possession of a silencer was not a protected Second Amendment right.[107] Yet, groups like Gun Owners of America argue that the right to own "bearable arms" under the Second Amendment includes the right to own gun accessories like silencers.[108] Eight state attorneys general agree, and argued as much in a 2019 brief before the Supreme Court appealing the Tenth Circuit ruling.[109]

Leaving aside constitutional arguments, why the recent effort to roll back a federal regulation that has been in effect for over eighty years, and that has, with the rarest exceptions, successfully kept silencers out of the hands of criminals? Before addressing this question, it is useful to begin with some history of silencers and early efforts at regulation.

## A. History

Engineer Hiram Maxim invented the gun silencer in the early 1900s and patented it in 1908.[110] Maxim immediately sought to sell his invention to the American military, as well as to those of European nations.[111] Objections to civilian use of silencers appeared almost immediately. In 1909, *Scientific American* reported on a direct demonstration of the device, discussing in detail its technological traits and value for military use. But the piece also noted "the menace" of silencers because they "greatly enlarged the opportunities for the

---

106. Press Release, Deb Fischer U.S. Senator for Neb., Senators Introduce Hearing Protection Act (Mar. 15, 2019), https://www.fischer.senate.gov/public/index.cfm/2019/3/senators-introduce-hearing-protection-act [https://perma.cc/DWV2-53GL].

107. United States v. Cox, 906 F.3d 1170 (10th Cir. 2018).

108. Press Release, Gun Owners of Am., Gun Owners of America Funds Challenge to National Firearms Act in U.S. Supreme Court (Jan. 14, 2019), https://gunowners.org/gun-owners-of-america-funds-challenge-to-national-firearms-act-in-u-s-supreme-court/ [https://perma.cc/Z9RU-37HW]. Given a now more conservative and potentially gun friendly Supreme Court majority, gun rights activists clearly see a new opportunity to expand the scope of gun rights. *See generally* Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 75 (2015).

109. Awr Hawkins, *Eight Attorneys General to SCOTUS: Second Amendment Protects Suppressors Too*, BREITBART (Feb. 21, 2019), https://www.breitbart.com/politics/2019/02/21/eight-attorneys-general-to-scotus-second-amendment-protects-suppressors-too/ [https://perma.cc/2SFY-3ZKA]. The basis for silencer regulations, the National Firearms Act of 1934, I.R.C. §§ 5801–22 (2018), was upheld by the Supreme Court in a 1939 Second Amendment challenge. *See generally* United States v. Miller, 307 U.S. 174 (1939). In June 2019, the Supreme Court refused to hear appeals from two cases that challenged the law. *See* United States v. Cox, 757 F. App'x 527 (9th Cir. 2018), *cert. denied*, 140 S. Ct. 634 (2019); Kettler v. United States, 906 F. 3d 1170 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 2691 (2019).

110. Michael Marinaro, *A Diversified Mind: Hiram Percy Maxim*, CONN. HIST., https://connecticuthistory.org/hiram-percy-maxim/ [https://perma.cc/PK9N-M22N]; *see also* Silent Firearm, U.S. Patent No. 916,885 (filed June 26, 1908) (issued Mar. 30, 1909).

111. Representatives of England, France, Russia, Germany, and Italy all purchased silencers and sent them back for testing to the militaries of their respective countries. *See To Try Maxim's Silencer*, N.Y. TIMES, Mar. 11, 1909, at 1. The American military also tested the silencer. *See Maxim Silencer Tests Successful*, N.Y. TIMES, July 4, 1909, at C2.

commission of undetected crime."[112] "It is well understood," the editorial continued, "that the fear of detection is one of the most powerful deterrents to the commission of crime."[113] Similarly, a 1909 newspaper article asked, "Who shall be authorized to carry and use firearms" equipped with silencers?[114] "No private person, surely. A true sportsman," opined the author, "would not use it . . . . The burglar, the highway robber, and the Black Hand assassin are the only other persons to whom it could be of advantage."[115]

The first state law outlawing silencers' sale or possession came within a year of their invention, when Maine enacted a ban in 1909.[116] Pittsburgh moved against silencers that same year: the city's superintendent of police warned that "[t]he risk of shooting is too great; the discharge of the weapon makes too much noise and attracts too many people. But with a silencer in use this would be different."[117] Two years later, New Jersey outlawed the use of "any silencer, when hunting for game or fowl, on any gun, rifle or firearm . . . ."[118]

These early restrictions underscored the two primary concerns about unregulated possession of silencers: that they would be used by criminals seeking to avoid detection, and that they would be used by hunters with a similar motivation. A news article from 1916 noted both of these concerns: "The Silencer is an incentive to crime" and "it is believed that [silencers] give[] too great an advantage to poachers and to those who are shooting out of season."[119] In 1913, the director of the New York Zoological Park, William T. Hornaday, published a book decrying the imminent extinction of many animal species throughout the country.[120] One of the chief causes, he argued, was the enhanced firepower of ever-more people engaged in indiscriminate hunting. Included in his list of weaponry technology that allowed for mass slaughter of animals was "silencers," which he dubbed "grossly unfair," and argued that they "should immediately be prohibited."[121] Chicago police discovered as early as 1922 that "the city's lawbreakers were ordering sales catalogs from the Maxim Silencer Company," and New York authorities reported similar criminal interest in silencers around the same time.[122]

---

112. *The Menace of the Noiseless Gun*, 100 SCI. AM. 218, 218 (1909).

113. *Id.* According to Stephen P. Halbrook's analysis of early silencer regulations, including congressional hearings held for what became the National Firearms Act of 1934, silencer restrictions were enacted "without evidence of criminal misuse." Halbrook, *supra* note 108, at 36. Yet as the *Scientific American* article makes clear, actual criminal silencer use and related concerns arose and persisted from the time of the device's invention up to enactment of the 1934 law.

114. *The 'Silencer' for Firearms*, N.Y. TIMES, Mar. 18, 1909, at 8.

115. *Id.*

116. Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141.

117. *Bars Maxim Silent Gun*, N.Y. TIMES, Mar. 8, 1909, at 1.

118. Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185.

119. *Would Suppress Silencers*, N.Y. TIMES, Feb. 3, 1916.

120. *See generally* WILLIAM T. HORNADAY, OUR VANISHING WILD LIFE (1913).

121. *Id.* at 146.

122. LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA 202 (1975).

From 1909 to 1936, at least fifteen states enacted silencer restrictions,[123] with eight of them specifically barring their use in hunting.[124] In 1930, Maxim and his company "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime" and turned his attention to the development of automobile mufflers and other sound-deadening technologies.[125]

No comprehensive statistics are available on early silencer ownership and use, but an examination of the *New York Times* archive during this period revealed a number of news stories where silencers were used in gun crimes in the New York City area. One early case in 1915 involved a triple murder and suicide in New York City.[126] Herman Auerbach, who had recently purchased a Winchester repeating rifle equipped with a silencer, killed his wife and two daughters before turning the gun on himself. (Auerbach was reportedly despondent over financial troubles.) The family lived in several adjacent rooms in a nine story apartment building bordering Central Park. The dead family members were discovered the morning after the shootings by the family's fourteen-year-old son, who found the bodies when he went to check on his family members. The boy slept through the shootings, according to the account, because "the Maxim silencer had prevented even the boy from hearing the shots that killed his sisters in the next room."[127] Within days of this killing, members of the State Legislature introduced a bill, enacted the following year, to bar the manufacture or sale of silencers in the state.[128]

Among other reports of silencer crimes, the *Times* reported that silencers were used in the suicide of a New Jersey man in 1917,[129] the murder-robbery of a city jewelry store in 1920,[130] a 1921 jewelry store robbery,[131] a bootlegger murder in a tenement house in 1921,[132] and a gangster murder in 1930 where the victim,

---

123.  *See* § 1543, 1936 Ariz. Sess. Laws 204; Act of Mar. 29, 1927, ch. 169, 35 Del. Laws 516 (1927); Act of July 1, 1933, no. 36, 1933 Haw. Sess. Laws 38, 38–39; Act of July 3, 1918, no. 88, § 3, 1918 La. Acts 131, 132; Act of Apr. 16, 1926, ch. 261, 1926 Mass. Acts 256; Act of Mar. 24, 1909, ch. 129, 1909 Me. Laws 141; Act of May 7, 1913, no. 250, 1913 Mich. Pub. Acts 472; Act of Mar. 13, 1913, ch. 64, 1913 Minn. Laws 55; Act of Mar. 7, 1925, ch. 460, § 4, 1925 N.C. Sess. Laws 529, 530; Act of Apr. 7, 1911, ch. 128, 1911 N.J. Laws 185; Act of Apr. 6, 1919, ch. 137, 1916 N.Y. Laws 338, 338–39; Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386; Act of Apr. 22, 1927, ch. 1052, § 8, 1927 R.I. Pub. Laws 256, 259; Act of Nov. 14, 1912, no. 237, 1912 Vt. Acts & Resolves 310; § 97, ch. 83, 1921 Wyo. Sess. Laws 112-13.

124.  *See* § 1543, 1936 Ariz. Sess. Laws 204; ch. 169, 35 Del. Laws, 516 (1927); no. 88, § 3, 1918 La. Acts at 132; ch. 460, § 4, 1925 N.C. Sess. Laws at 530 (applying to both hunting and general use); ch. 128, 1911 N.J. Laws at 185; no. 228, § 704, 1923 Pa. Laws at 386; no. 237, 1912 Vt. Acts & Resolves at 310; § 97, ch. 83, 1921 Wyo. Sess. Laws 112-13.

125.  *Maxim Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27.

126.  *Silent Gun Kills a Family of Four*, N.Y. TIMES, Feb. 1, 1915, at 1. The narrative in this paragraph also comes from this article.

127.  *Id.*

128.  Ch. 137, 1916 N.Y. Laws at 338–39.

129.  *See generally Trace Lewis's Movements*, N.Y. TIMES, Jan. 6, 1917, at 6.

130.  *See generally Slayers Escape Police Net*, N.Y. TIMES, Dec. 17, 1920, at 1.

131.  *See generally $80,000 Robbery Just Off 5th Av.*, N.Y. TIMES, Mar. 17, 1921, at 1.

132.  *See generally Murderer Decoys Victim By Phone*, N.Y. TIMES, Dec. 11, 1921, at 8.

known to carry a gun with a silencer, was killed with his own weapon.[133] The *Times* also reported the 1926 arrest of a man in Omaha charged with committing random killings in a dozen cities in the Midwest who used a silencer.[134]

Given the close association of the use of silencers with criminal acts, Congress moved to subject their purchase to a substantial fee and background check in the National Firearms Act of 1934.[135] Aside from passing mention of silencers as commodities to be subject to new regulation, along with fully automatic weapons and sawed-off shotguns, there was no discussion of the justification for including silencers in the bill's 166 pages of committee hearings and testimony in the House of Representatives.[136]

## B. Arguments For Repealing the Current Law

Those who seek to repeal the 1934 standards for silencer purchase have hung their hats primarily on the health benefits associated with the suppression of the noise that accompanies gunfire—ergo, the name of the proposed legislation, the Hearing Protection Act. Clearly, the noise generated when a weapon like an assault-style AR-15 is fired generates enough noise to harm hearing, especially when that firing is repetitive, such as at a firing range. It has been frequently reported that many guns produce noise levels of between 140–160 decibels, at which level hearing can be permanently impaired.[137] For example, the National Institute for Occupational Safety and Health (NIOSH) studied firearms instructors' exposure to firearms noise and found that they were subject to noise levels exceeding 150 decibels, whereas the NIOSH recommends exposure to no more than 140 decibels.[138] Those and similar reports typically focus on the noise of a small number of weapons, especially assault weapons.[139] Yet it is important to remember that firearms come in thousands of models, sizes, and styles, from derringers to elephant guns, which in turn generate a far wider range of noise than that in the 140–160 decibel range. Thus, many firearms do not pose the degree of threat to hearing that others do.

---

133. *See generally Slain With Own Gun, Say Veasey's Friends*, N.Y. TIMES, Jan. 12, 1930, at 20.

134. *Other Cities Want Omaha Sniper*, N.Y. TIMES, Feb. 24, 1926, at 3.

135. *See supra* note 103.

136. *See generally National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 173rd Cong. (1934). Franklin D. Roosevelt's Attorney General Homer S. Cummings reported that in the first three years of the law's enactment, it had resulted in the registration of 769 silencers. SELECTED PAPERS OF HOMER CUMMINGS 88 (Carl Brent Swisher ed., 1939).

137. Nick Wing & Jessica Carro, *What If Millions of People Get Gun Silencers?*, HUFFINGTON POST (Mar. 13, 2017), http://www.huffingtonpost.com/entry/gun-silencers-hearing-protection-act_us_58c6b59fe4b0ed71826e1be0 [https://perma.cc/4T3N-ZT5F].

138. *See* SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL HEALTH, MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR AND OUTDOOR FIRING RANGES DURING TACTICAL TRAINING EXERCISES 14 (2014).

139. *See, e.g.*, James K. Williamson, *How Easy Should It Be to Buy a Silencer for a Gun?*, TRACE (June 14, 2017), https://www.thetrace.org/2017/06/gun-silencer-deregulation-congress/ [https://perma.cc/V8VD-6ME2].

In this connection, as silencer advocates point out, silencers do not eliminate all or even most of the noise caused by gun firing, but do reduce the noise to roughly 135 decibels, below the 140 decibel threshold.[140] Hearing experts advise that shooters should wear proper hearing protection, even when using less noisy weapons and those with attached silencers. The chief reason, according to the National Hearing Conservation Association (NHCA), is that "[s]uppressors cannot reduce the noise caused by the supersonic flight of the projectile breaking the sound barrier once it leaves the barrel of the firearm."[141] Operators can use subsonic ammunition to address this problem, but even with that, the NHCA recommends that shooters "wear hearing protection whenever shooting firearms, including when employing a noise suppressor device."[142] The American Speech-Language-Hearing Association (ASHA) also recommends to "[a]lways use some type of hearing protection any time you fire a gun."[143] Both the NHCA and the ASHA note that, for hunters or others disturbed by the prospect of wearing ear plugs or earmuffs while in the field, some hearing protection devices are available that allow for the audibility of soft sounds while still blocking out the loud, sharp crack of firearm discharge.

The only instance where time constraints would not allow a gun user to employ hearing protection is in an emergency self-defense situation, such as a home intrusion, when an individual would not only deploy but also actually discharge a weapon in defense of person or property. Yet, as discussed above, such events are extremely rare, and involve few shots fired. In addition, one study based on data from the FBI and the National Crime Victimization Survey (NCVS) noted that from 2008–2012, there were a total of 1018 justifiable homicides by civilians (about 204 per year).[144] According to NCVS data, from 2007–2011, there were a total of 235,700 self-protection actions involving firearms.[145] This number (yielding a yearly average of 47,140) does not distinguish the type of firearm involved, and does not indicate whether it was actually fired or not.[146] Yet it is clear that the number of self-defense firing events is tiny relative to the gun-owning population, that the number of rounds fired is few, and that such events rarely, if ever, repeat themselves among those who do fire in self-defense.

140. Sean Davis, *Progressives Don't Understand How Gun 'Silencers' Work*, FEDERALIST (Jan. 9, 2017), http://thefederalist.com/2017/01/09/progressives-dont-understand-how-gun-silencers-work-here-are-some-facts-to-help-them/ [https://perma.cc/M86B-GL9V].

141. MICHAEL STEWART ET AL., NAT'L HEARING CONSERVATION ASS'N, NHCA POSITION STATEMENT: RECREATIONAL FIREARM NOISE 5 (2017), https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf [https://perma.cc/7QZW-W4ZN].

142. *Id.*

143. Michael Stewart, *Recreational Firearm Noise Exposure*, AM. SPEECH-LANGUAGE-HEARING ASS'N, http://www.asha.org/public/hearing/Recreational-Firearm-Noise-Exposure/ [https://perma.cc/72GM-UUT8].

144. VIOLENCE POL'Y CTR., FIREARM JUSTIFIABLE HOMICIDES AND NON-FATAL SELF-DEFENSE GUN USE 1–2 (2015), https://biotech.law.lsu.edu/blog/justifiable15.pdf [https://perma.cc/KZ7F-86QN].

145. *Id.* at 5.

146. *Id.*

In short, hearing experts always recommend the use of properly fitted ear protection devices, whether the shooter is using a silencer or not. What, then, would be the consequence of silencer use for those around a shooter? Might it not be beneficial if bystanders were exposed to less noise?

## C. The Safety Value of Noise

Proponents of silencers argue that, since silencers do not eliminate noise but merely reduce it, the residual noise can provide any warning to others that might be required. But this downplays the importance of gunshot noise as a critical safety component. In fact, the noise caused by gunfire is a key, even vital, de facto safety feature of firearms—not for the operator, but for those nearby.[147] Anything that reduces the alert value of gunfire sound is an impediment to bystanders taking effective defensive action. Almost without exception, bystanders who find themselves near a shooting—whether a mass shooting, a robbery, a gang shootout, or any other instance of pernicious gunfire—know instinctively that people's best warning of danger is the sound of shots being fired. Yet such critical notice is not limited to the commission of a gun crime. The same applies in a lawful hunting situation, especially when it occurs in places where line of sight is limited. Other hunters, sportspeople, recreationists, and residents are best warned of gunfire when it is loud. Given that rounds travel hundreds of yards in the blink of an eye, anything that inhibits gunshot sound decreases awareness and therefore increases the danger to bystanders. This by itself is a powerful argument on behalf of the protective value of gunshot noise.

The idea of sound as a protective warning is not limited to firearms. For example, in 2016, the federal government issued a new rule requiring hybrid and electric cars to "make noise when traveling at low speeds" so that pedestrians or those with poor eyesight can hear them coming.[148] The rule is set to be put fully into place by late 2020.[149]

## D. Silencers and Crime

Many have pointed out that silencers are rarely used in crimes, and thus suggest or imply that criminals are little interested in utilizing silencers, whether easy to obtain or not. A report by the ATF noted that "expanding demand and acceptance of silencers" by the public might warrant elimination of the current background check process for silencer applicants as an increase in applications

---

147. Robert J. Spitzer, *The NRA Wants to Suppress One of Guns' Most Important Safety Features*, WASH. POST (Jan. 22, 2017), https://www.washingtonpost.com/opinions/the-nra-wants-to-suppress-one-of-guns-most-important-safety-features/2017/01/22/5a7140fc-dcd7-11e6-ad42-f3375f271c9c_story. html?utm_term=.3f3e6a0dae3e [https://perma.cc/FP4S-DAU3]. I do not mean to suggest that guns are somehow deliberately manufactured to make more noise than they would otherwise as a safety feature.

148. *Quiet Hybrid and Electric Cars Must Make Noise under New U.S. Safety Rule*, PBS NEWSHOUR (Nov. 14, 2016), http://www.pbs.org/newshour/rundown/quiet-hybrid-electric-cars-must-make-noise-new-u-s-safety-rule/ [https://perma.cc/FJY7-L5AC].

149. 49 C.F.R. § 571.141 S9.

has produced a backlog,[150] even though the ATF and the Department of Justice have historically opposed altering federal requirements. The report also notes the relative rarity of silencer crime, saying that, in recent years, the ATF has averaged only about forty-four prosecutions per year for silencer violations.[151] In 2015, the ATF traced 125 registered silencers connected with crimes.[152]

But there are several problems with this argument. The first is that the backlog problem is a thin reed upon which to change existing law. The devotion of more staff to background investigations would resolve that problem. Second, and more importantly, the history of silencers tells us that they were utilized by criminals almost from the time that they were available, dating to the 1910s. The very fact that silencers were included in the National Firearms Act of 1934, along with other gangster weapons, demonstrates the clear sense that silencers had an undeniable appeal to those seeking to conceal gun-related crime. Given that criminals do pretty much the same things in the modern era as they did in the last century, why should there be less criminal interest now? As if to punctuate that point, the man who shot up a Virginia Beach municipal building on May 31, 2019 used a silencer attached to one of the two handguns he used to kill twelve people and injure four. According to one expert, "a suppressor will distort the sound in such a way that it would not immediately be recognizable as gunfire . . . ."[153] Consistent with this observation, Virginia Beach survivors reported that "they were caught off guard and initially puzzled by what was happening."[154]

Third, silencers have indeed been used in a small number of crimes in recent years. The VPC chronicled sixteen serious criminal cases since 2011 involving the use of silencers.[155] Does this small number mean that criminals would have no interest in silencers if they were more easily available and not subject to careful record-keeping? Or does it mean that the 1934 federal law has been successful in mostly keeping them out of the hands of criminals? The criminal record before 1934 suggests it is the latter, especially because the federal database of silencer owners provides a valuable source to trace and track criminal silencer use.

Fourth, the use of silencers in crime would surely escalate for one reason alone: more and more cities are installing ShotSpotter technology, designed to pinpoint the location of gunfire. Anything that modifies or muffles that sound could impede or even defeat that technology, a concern expressed by the

---

150. RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, & EXPLOSIVES, FEDERAL FIREARMS REGULATIONS: OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATIONS 6 (2017).

151. *Id.*

152. Williamson, *supra* note 139.

153. Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, ASSOCIATED PRESS (June 2, 2019), https://www.wwlp.com/news/top-stories/did-gunmans-silencer-make-a-difference-in-the-carnage/ [https://perma.cc/W8DA-27C2].

154. *Id.* A 2013 mass shooter, Christopher Dorner, employed silencers in a mass shooting in California that killed four and wounded three, including police officers. Claudia Koerner & Alejandra Molina, *Dorner Amassed Arsenal for Rampage*, ORANGE CTY. REG. (Feb. 28, 2013), https://www.ocregister.com/2013/02/28/dorner-amassed-arsenal-for-rampage/ [https://perma.cc/RV3L-GEGR].

155. *See* VIOLENCE POL'Y CTR., SILENCERS: A THREAT TO PUBLIC SAFETY 3–7 (2017), http://www.vpc.org/studies/silencers.pdf [https://perma.cc/FR6S-ZD36].

Minnesota Chiefs of Police Association when its State Legislature was considering a bill to make them available to state residents.[156] By one account, "if the sound of a gunshot is suppressed, it may not trigger gunshot alert systems."[157] And a rogue hunter who is hunting out of season, or on posted or private land, would have an obvious and powerful incentive to use a silencer in hopes of avoiding detection.

## E. Other Considerations

One additional reason explains the push to make silencer purchase easier and quicker, and it has nothing to do with safety or hearing. Like accessories for any commercial product, an explosion of silencer sales offers the prospect of enhanced revenues for manufacturers. According to Josh Waldron, founder and CEO of Utah-based SilencerCo, the silencer industry is "the highest-growth niche of the firearms industry right now."[158] Since 2013, when Waldron was quoted, silencer sales have increased significantly, even with current restrictions (silencer possession increased by 400,000 from 2015 to 2016).[159] From 2014 to 2017, SilencerCo's business increased 600 percent, according to the company's chief revenue officer. The company anticipates that with deregulation, the silencer market could expand ten-fold.[160]

## F. Hearing Protection Policy

It is important to remind ourselves of three pertinent facts. First, silencers today are perfectly legal to purchase, except for the eight states that otherwise prohibit them. Second, silencers are an accessory, not a gun. No firearm requires a silencer for its operation. The federal government determined decades ago that a system of background checks and registration was an appropriate step to discourage their use for criminal purposes. Third, the chief stated purpose behind the drive to make silencers easier to acquire—the protection of shooters' hearing—is best achieved not by using silencers, but by using proper hearing protection gear. The legislation in question would be truer to its stated purpose of protecting shooters' hearing if it subsidized the purchase and dissemination of high-quality hearing protective devices and promoted a public service campaign to remind shooters to wear proper protective hearing gear. As hearing experts recommend, hearing protection should be worn even for firearms fitted with silencers.

---

156. Abby Simons, *Minnesota House Panel Backs Legalizing Firearm 'Silencers'*, STAR TRIB. (Mar. 13, 2015), http://www.startribune.com/minnesota-house-panel-backs-legalizing-firearm-silencers /296160971/ [https://perma.cc/D29F-FNFM].

157. Robin L. Barton, *Why Silencers Aren't Golden*, CRIME REP. (June 20, 2017), https://thecrimereport.org/2017/06/20/why-silenced-guns-arent-golden/ [https://perma.cc/UJ53-NNPP].

158. Stephanie Mencimer, *Gunmakers and the NRA Bet Big on Silencers*, MOTHER JONES (Mar. 19, 2013), http://www.motherjones.com/politics/2013/03/guns-nra-national-rifle-association-wants-states-legalize-silencers-supressors/ [https://perma.cc/TJ88-WPYE].

159. Wing & Carro, *supra* note 137.

160. *Id.*

IV

CONCLUSION

In a dissenting opinion written in response to the Supreme Court's denial of certiorari to a gun rights case in 2018, Justice Clarence Thomas opined that the courts had treated the Second Amendment "cavalierly," as "a disfavored right," and as a "constitutional orphan."[161] While it is clear that Justice Thomas is unhappy with the way in which Second Amendment rights have been defined compared to the rest of the Bill of Rights, he offers no particular reason to believe that the Amendment's interpretation since *Heller* warrants these cartoonish labels, which seem designed mostly to provide a rallying cry for Second Amendment absolutists.

If anything is true about the rights protected by the Bill of Rights, it is that they were not produced in some cookie-cutter-like fashion designed to treat each of them identically. They were, after all, the product of many state recommendations and much bargaining and haggling during the First Congress of 1789. If all the amendments warrant the same dignity and treatment, where is Justice Thomas' umbrage at the sad and ignored Third Amendment, protecting citizens against the quartering of troops in people's homes in times of peace? Or the Seventh Amendment's ignored protection of the right of jury trial for suits at common law where the value exceeds twenty dollars? Or the Ninth Amendment's largely slighted enumeration clause? Throughout the history of constitutional interpretation, it is clear that some rights really are more important than others, a principle reflected in the "preferred freedoms" doctrine. Is there any argument to be made that the First Amendment's protections of free speech and press are no more important than any other Bill of Rights protections? As one constitutional scholar has noted, the preferred freedoms doctrine "has been absorbed in the concepts of strict scrutiny, fundamental rights, and selective incorporation."[162]

Perhaps Justice Thomas and others believe that the Second Amendment does—or should—protect a right to own LCMs and silencers. After all, firearms that accept detachable magazines must have a magazine inserted in order for the firearm to function. Yet magazines can be easily modified to limit the number of rounds they hold; alternately, magazines for firearms like assault weapons can be modified to fix a magazine in place and then feed in new rounds when it is depleted.[163] In both instances, these simple technical modifications retain firearms' ability to function yet also comply with the public policy recommendations of many criminologists, health and medical professionals, political leaders, and others to limit the ability of guns to fire many rounds without rapid reloading through the use of removable magazines.

---

161. Sylvester v. Becerra, 138 S. Ct. 945, 945, 952 (2018) (Thomas, J., dissenting from denial of certiorari).

162. C. Herman Pritchett, *Preferred Freedoms Doctrine*, *in* THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 663, 664 (Kermit L. Hall et al. eds., 1992).

163. SPITZER, *supra* note 3, at 145.

In the minds of some, Second Amendment rights would exist whenever a human hand comes in contact with a firearm. The idea that this right should further extend to a gun accessory like a magazine or silencer would lead us to a constitutional theory that would apply a right to something because, well, some people really, really want it, and it has something to do with firearms.

One can easily make the argument that the Court's reinterpretation of the Second Amendment in *Heller* was deeply problematic, both as history and law.[164] Yet, problematic or not, it is the law, and courts have made a good faith effort to follow it. After all, in the years since *Heller*, the Supreme Court has to date declined to hear over 150 appeals of lower federal court rulings on the Second Amendment. Moreover, over 1,300 legal challenges to gun laws have resulted in a vast majority of the laws being upheld.[165] When taken together, this record surely suggests that the relationship between gun laws and gun rights has been reasonably balanced with the result that both remain intact. The Second Amendment is no "cavalierly disfavored orphan." While there continue to be areas where its legal application needs clarification, the *Heller* rubric made a more or less sensible effort to reconcile the newly established right to bear arms with the legitimate policy concerns of a nation plagued by persistent gun violence.

---

164. For such an argument, see generally SPITZER, *supra* note 31, at 54–61.

165. *Protecting Strong Gun Laws: The Supreme Court Leaves Lower Court Victories Untouched*, GIFFORDS LAW CTR. (May 31, 2019), https://lawcenter.giffords.org/protecting-strong-gun-laws-the-supreme-court-leaves-lower-court-victories-untouched/ [https://perma.cc/4B6A-XJ9T].