UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.   CASE NO. 8:20-cr-206-TPB-AEP

MUHAMMED MOMTAZ AL-AZHARI

**UNITED STATES' SENTENCING MEMORANDUM**

The Defendant committed himself to terrorism many years ago. In 2018, he was released from prison in Saudi Arabia following a conviction and sentence for supporting terrorism in Syria. He then came to the United States where he pledged allegiance to the Islamic State and began planning an attack in the Tampa Bay area. Thanks to the diligent efforts of law enforcement, the Defendant's plans were thwarted before anyone was harmed.

The parties have agreed that a sentence of 216 months' imprisonment is appropriate in this case. Additionally, the Defendant's demonstrated desire to kill Americans demands federal supervision for the rest of his life. Accordingly, the United States respectfully requests that the Court sentence the Defendant to 216 months' imprisonment and a lifetime term of supervised release.

I.   **FACTS**

The following facts are set forth in the Presentence Investigation Report (PSR)

and the Complaint (Doc. 5),[1] except where noted. The United States is prepared to have a witness testify at sentencing to these facts and others, as necessary.

The Defendant, Muhammad Momtaz Al-Azhari, is a 26-year-old U.S. citizen who has lived overseas for much of his life. PSR ¶ 19; Compl. ¶¶ 11. In 2015, when he was approximately 18 years old, the Defendant was imprisoned with his father in Saudi Arabia for supporting terrorist groups in Syria and Yemen, including by providing financial support. PSR ¶ 54. He thereafter was removed to the United States in December 2018, *id.*, and he has been living in Tampa, Florida since October 2019, *id.* ¶ 68.

Despite his time in Saudi Arabia—where the Defendant claims that he was tortured and now suffers from PTSD as a result, *id.* ¶ 75—the Defendant's commitment to violent extremist ideology did not waver. In fact, it deepened. The evidence showed that after returning to the United States, the Defendant began consuming Islamic State of Iraq and al-Sham ("ISIS") propaganda, including images of dead jihadis and content of ISIS leaders. *Id.* ¶¶ 20, 35. He accessed messaging application chat rooms to view ISIS media and to learn about explosives, suicide belts, and solvent traps, among other things. *Id.* ¶ 35.

---

[1] On May 27, 2020, the Defendant made his initial appearance and requested a preliminary hearing pursuant to Rule 5.1 of the Federal Rules of Criminal Procedure. After hearing testimony from FBI Special Agent Cynthia Hazel, Magistrate Judge Elizabeth J. Jenkins found that there was probable cause to believe that the Defendant had committed a violation of 18 U.S.C. § 2339B. *See* Doc. 13.

By May 2020, the Defendant had taken substantial steps to commit a terrorist attack in support of ISIS in the Tampa Bay area. He does not dispute that in late April 2020 he had acquired firearms and tactical gear, including a military anti-stab and bulletproof vest, solvent filters, a facemask, a .22-caliber Uzi submachine gun and a nine-millimeter pistol. *Id.* ¶¶ 22, 25. The Defendant also had purchased a Glock pistol with an extended magazine and a silencer from an FBI confidential source before he was apprehended by the FBI on May 24, 2020. *Id.* ¶ 34. Before his arrest, the Defendant had indicated to the confidential source that he wanted a fully automatic AK-47. *Id.*

The Defendant's thwarted attack was imminent. Attached hereto is a CD, marked as Exhibit 1, containing two recordings of the Defendant, which were produced to the defense in discovery. The first recording was created on April 30, 2020, approximately three weeks before his arrest in this case. It depicts the Defendant wearing a facemask, pointing what appears to be an Uzi submachine gun at the ground, and rehearsing in Arabic and English what he would say during an attack, including:

> Hey you! Get on the floor; get on the floor now. Don't you move, don't you move, I'm telling you, I will kill you. Get on the floor.
>
> . . .
>
> God willing, the Almighty. This is revenge for my monotheist brothers in Guantanamo in general . . . God willing this is a revenge for all my Muslim brothers in Iraq and Syria and everywhere whom they were

3

> killed at the hands of these filthy crusaders . . . God willing, the Almighty, the Islamic State remains, God willing.

Ex. 2, Officially Reviewed FBI Translation. The next day, the FBI took possession of a .22-caliber Uzi submachine gun that was at the Defendant's residence. PSR ¶ 29.

The second recording is of the Defendant at his home on May 16, 2020—approximately two weeks after his arrest on state charges and one week before he was arrested in this case. Beginning at 1:39 of the recording, he is overheard saying:

> Know America. Today is your emergency. Today we kill from you guys like you killed from us. I pledge allegiance to Sheik Abu Ibrahim al-Hashimi . . . when you consider what I'm about to do.

Ex. 3, Transcript of Audio Recording; PSR ¶ 31. At the time of the recording, al-Hashimi was the second and then-current "Caliph" of ISIS and was considered its leader. Compl. ¶ 119 n.13. Al-Hashimi was killed in February 2022. *See Islamic State leader Abu Ibrahim al-Qurayshi killed in Syria, US says*, BBC, Feb. 4, 2022, available at https://www.bbc.com/news/world-middle-east-60246129.

The Defendant did not hide his allegiance to ISIS or his hatred of America. He was vocal about avenging the United States' military actions in the Middle East and the imprisonment of Muslims. PSR ¶ 21. The Defendant told an FBI confidential source that he wanted to join ISIS. *Id.* ¶ 33. He described the group as "real followers" and noted that he enjoyed his prior life in the Middle East. *Id.* The Defendant also is an admirer of Osama Bin Laden and Omar Mateen, the attacker responsible for the deaths of 49 people at Pulse nightclub in Orlando in June 2016.

*Id.* ¶¶ 21, 33. He spoke highly of Mateen to the confidential source, explaining that he was planning to kill as many Americans as he could with his Muslim brothers. *Id.* ¶ 33. At a minimum, the Defendant wanted to kill at least 50 "kuffar," or nonbelievers. *Id.*

To the Defendant, the United States was the "real" terrorist, and he was "going to show them terror." *Id.* ¶ 32. The Defendant was particularly interested in targeting people who were affiliated with the military or the government, even disclosing to the confidential source that he wanted to kidnap and kill a high-ranking American military officer on behalf of ISIS. *Id.* ¶ 33. He told the confidential source that they should "keep bombing these motherfuckers until we die, do it until we get to Allah." *Id.*

## II.   DEFENDANT'S UNRESOLVED OBJECTIONS TO THE PSR

**Base Offense Level.** The Defendant objects to the application of USSG §2M5.3(c)(2) and the subsequent cross reference to the Attempted Murder guideline. He argues that "none of the evidence establishes a substantial step to commit murder or the intent to do so." He is wrong.

The base offense level under the applicable guideline for providing material support to a foreign terrorist organization, section 2M5.3, is 26. The Guideline instructs that if "the offense was tantamount to attempted murder, apply §2A2.1 (Assault with Intent to Commit Murder; Attempted Murder), if the resulting offense

5

level is greater than that determined above." Section 2A2.1 provides for a base offense level of 33 "if the object of the offense would have constituted first degree murder," which in turn, covers conduct that would constitute first degree murder under 18 U.S.C. § 1111. *Id.* comment. (n.1); *see also* 18 U.S.C. § 1111 ("Murder is the unlawful killing of a human being with malice aforethought."). For the cross-reference to apply, the Court must make explicit findings based on a preponderance of the evidence. *See United States v. Mock*, 523 F.3d 1299, 1304 (11th Cir. 2008).

    The Court can easily make such findings here. As noted above, the Defendant repeatedly and in no uncertain terms expressed his desire to kill innocent Americans. For example, he told the confidential source that he wanted to kidnap and kill a high-ranking American military officer on behalf of ISIS and that he wanted to kill at least 50 "kuffar," or nonbelievers. PSR ¶ 33.

    The Defendant's explicit statements, coupled with his "objective acts," plainly show that he took a substantial step to commit murder and acted with malice aforethought in doing so. *See United States v. Yost*, 479 F.3d 815, 819 (11th Cir. 2007) ("A substantial step can be shown when the defendant's objective acts mark his conduct as criminal and, as a whole, 'strongly corroborate the required culpability.'") (quoting *United States v. Murrell*, 368 F.3d 1283, 1288 (11th Cir. 2004)). The Defendant acquired, among other things, solvent traps to make silencers, a bullet proof vest, and firearms in preparation for an attack in the Tampa Bay area, where

6

he had even scouted target locations. PSR ¶¶ 21, 22, 25. In fact, he had screwed the silencer onto a Glock 19 pistol minutes before he was arrested. Compl. ¶ 142. That he did not get a chance to open fire on victims, or that he did not plead guilty to attempted murder, is not relevant.

In *United States v. Sami Osmakac*, Case No. 8:12-cr-00045 (MDFL), the defendant, who was convicted by a jury for attempted use of weapons of mass destruction and possession of unregistered firearms, was subject to the Attempted Murder cross reference based on similar facts. There, Osmakac, like this Defendant, desired to commit a violent attack in the Tampa Bay area and had acquired firearms, including what he believed was a detonatable car-bomb, in furtherance of his plan. *United States v. Osmakac*, 868 F.3d 937, 943–47 (11th Cir. 2017). He similarly verbalized his motivations, stating that the attack would be "'payback'" for killing Osama Bin Laden. *Id.* at 947. And like the Defendant, he was apprehended shortly before he had intended to commence an attack. *Id.* Based on this conduct, District Judge Mary S. Scriven agreed with the government that the Attempted Murder cross reference applied. *See United States v. Osmakac*, Case No. 8:12-cr-00045, Sentencing Transcript, Doc. 384, at 33. The facts of this case counsel the same outcome.

The United States, therefore, urges the Court to enter specific factual findings that support the application of USSG §2M5.3(c)(2).

**Obstruction of Justice Enhancement.** The Defendant argues that the obstruction of justice enhancement is inapplicable here because at the time that he instructed his sister to dispose of his firearms, he was not aware that the FBI was investigating him for attempting to provide material support to ISIS. In his view, the Defendant had to have knowledge of the specific investigation that he was obstructing for the enhancement to apply. Not so.

United States Sentencing Guidelines Section 3C1.1 provides for a two-level increase to the Defendant's base offense level if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of his offense of conviction, and "(2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." The Application Notes to section 3C1.1 list examples of conduct warranting the enhancement, including "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." *Id.* §3C1.1, comment. (n.4(D)).

In this Circuit, the word "willfully," as used in section 3C1.1., requires that "the defendant consciously act with the purpose of obstructing justice." *United States v. Burton*, 933 F.2d 916, 918 (11th Cir. 1991) (citations omitted). Contrary to the Defendant's objection, "[t]he relevant question is whether the obstructive conduct

8

occurred during the course of the investigation, prosecution, or sentencing of the offense of conviction or a closely related offense." *United States v. Doe*, 661 F.3d 550, 566 (11th Cir. 2011) (citations omitted). "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *Id.* §3C1.1, comment. (n.1). To apply the enhancement, the district court must "note specifically what [the] defendant did, why that conduct warrants the enhancement, and, if applicable, how that conduct actually hindered the investigation or prosecution of the offense." *United States v. Alpert*, 28 F.3d 1104, 1108 (11th Cir. 1994).

    Here, the uncontroverted facts establish that the Defendant consciously acted with the purpose of obstructing justice, and the obstructive conduct occurred during the course of the federal investigation into his attempt to provide material support to ISIS and his possession of unregistered firearms. By late April 2020, the Defendant had acquired firearms, including an Uzi submachinegun, and other gear, including solvent filters and a bulletproof vest. PSR ¶¶ 22, 25. He also had discussed with an undercover obtaining an AK-47, extended magazines, and silencers. *Id.* ¶ 25. Then, on April 30, the Defendant created the video included in Exhibit 1 of him rehearsing an attack. The next day, the Defendant was arrested at Home Depot—where he worked at the time—for carrying a concealed weapon without a permit. *Id.* ¶ 57.

9

While the Defendant was in state custody for carrying a concealed weapon (i.e., a closely related offense), he called his sister and instructed her to, among other things, hide or dispose of his "toys." *Id.* ¶ 28. He mentioned that he had "a toy at home, and a toy in the car." *Id.* The Defendant was afraid that "'they will take the toy to the police.'" *Id.* His sister stated that she was going to "'trash the guns,'" to which the Defendant responded, "'Ok, throw them away.'" *Id.* Later that day, the FBI obtained a .22 caliber Uzi submachinegun, which was in the Defendant's house, and a nine-millimeter pistol, which was in his car. *Id.* ¶ 29.

The Defendant argues that he did not consciously act with the purpose of obstructing justice because he had no idea at the time that he was under federal investigation. The sequence of events described above, however, shows that the Defendant was planning an attack before his state arrest, and that he was trying to cover his tracks. The only plausible explanation for why the Defendant instructed his sister to hide or remove his weapons was to impede the investigation into his concealed carry charge, which was closely related to the ongoing federal investigation into his material support of ISIS or, at a minimum, his possession of unregistered firearms. The obstruction enhancement, therefore, applies.

**Terrorism Enhancement.** The Defendant contends that the terrorism enhancement under USSG §3A1.4 is inapplicable because the government cannot prove his specific intent to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct. In his view, his anti-American government speech "has been disconnected from his actual acts of attempting to provide material support to ISIS." The Defendant misapprehends what is required for this enhancement to apply.

Section 3A1.4(a) provides that the terrorism enhancement applies if the Defendant's "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." USSG §3A1.4(a). The definition of "federal crime of terrorism" is found in 18 U.S.C. § 2332b(g)(5), which is "an offense that: (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of" one of the criminal statutes listed in section 2332b(g)(5)(B). To satisfy the first prong, "the government must show that the defendant's offense was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive." *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021).

It is true that for the enhancement to apply, the government must satisfy both prongs. The second is not in dispute. *See* 18 U.S.C. § 2332b(g)(5)(B) (listing 2339B "relating to providing material support to terrorist organizations"). The first ought not to be either, as it is plainly borne out by the evidence. There is no question that the Defendant's attempt at providing material support to ISIS was "planned to

11

influence, affect, or retaliate against government conduct." *Arcila Ramirez*, 16 F.4th at 854. And for what it is worth, it was his personal motive, too.

As described above, the Defendant repeatedly voiced that he sought to carry out an attack to seek revenge for the United States' military operations in the Middle East, including by specifically targeting U.S. military personnel. *See supra* page 5. Additionally, the FBI obtained recordings of the Defendant in which he expressly stated that he sought revenge against the United States for perceived wrongs against his "Muslim brothers." For example, in the first recording in Exhibit 1, the Defendant says in Arabic, while rehearsing an attack, "This is revenge for my monotheist brothers in Guantanamo in general . . . God willing, this is a revenge for all my Muslim brothers in Iraq and Syria and everywhere." Ex. 2. In the second recording, the Defendant says, "Today we kill from you guys like you killed from us." Ex. 3. These are just a few examples of the Defendant's explicit desire to retaliate against the United States Government. *See United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011) (affirming terrorism enhancement where defendants "spoke expressly about their desire to impose Sharia, toppling existing governments in the process"). For the Defendant to argue otherwise only adds insult to injury.

In the *Osmakac* case, Judge Scriven agreed with the government that the terrorism enhancement applied based on similar facts. *See United States v. Osmakac*, Case No. 8:12-cr-00045 (MDFL), Sentencing Transcript, Doc. 384, at 33. In that

12

case, Osmakac had voiced his desire to commit a "payback" attack for the United States' killing of Osama Bin Laden. *Osmakac*, 868 F.3d at 942. He told a confidential source that he wanted to target a "gay night club" and would "shoot a hostage every 30 minutes until his Muslim 'sisters and . . . brother[s]' were released from Guantanamo and elsewhere." *Id.* at 944.

Here, the record reflects statements by the Defendant that even more clearly demonstrate a calculation to influence and retaliate against our government. The Court, accordingly, should overrule the Defendant's specious objection.

**Supervised Release Guidelines.** The Defendant disagrees that the commission of his offense resulted in or created a foreseeable risk of death or serious bodily injury. For the same reasons articulated above in support of the application of USSG §2M5.3(c)(2), this objection should be overruled.

### III.   APPLICATION OF 3553(a) FACTORS

The United States respectfully submits that a sentence of 216 months in prison, to be followed by a lifetime term of supervised release, is "sufficient, but not greater than necessary," to serve the purposes set forth in 18 U.S.C. § 3553(a). *See also* 18 U.S.C. § 3583(c) (factors to be considered in including a term of supervised release found in section 3553(a)).

The Defendant's advisory guidelines call for a custodial sentence of life. The statutory maximum sentence under 18 U.S.C. § 2339B is 20 years—or 240 months—

13

which, in turn, caps the Defendant's guidelines. The parties have agreed, however, that a sentence of 216 months' imprisonment is appropriate based on the 3553(a) factors. The need for a lengthy sentence is self-evident in looking at the nature and circumstances of the offense. The Defendant acquired firearms and tactical gear in preparation for a mass casualty attack in the Tampa Bay area. He fell short of his goal because law enforcement stopped him. It follows, then, that an 18-year sentence—two years short of the statutory maximum—is not greater than necessary.

Second, the history and characteristics of the Defendant support the parties' agreed upon sentence. To be sure, the Probation Office did not allocate any points to the Defendant's criminal history. But the Chapter Three Terrorism enhancement automatically (and justifiably) bumped the Defendant from Category I to Category VI. The Defendant is a devout follower of ISIS, and despite his protests, he has a history of terrorist associations. Although he has accepted responsibility by pleading guilty, it is unlikely that his radical and violent beliefs have changed overnight.

Relatedly, a term of imprisonment of 216 months will "reflect the seriousness of the offense . . . promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The Defendant's disdain for the laws of the United States—his home country—and his desire to harm the American public is alarming. It bears repeating that the only reason why this case is not another mass

shooting data point is because the Defendant was apprehended before he could act. He should be punished accordingly.

Finally, the requested sentence will afford adequate deterrence and protect the public from future crimes of the Defendant. *Id.* § 3553(a)(2)(B), (C). The Defendant was armed and ready to go forward with an attack. He did not have a change of heart. He did not disavow his allegiance to ISIS. He got caught. Therefore, the Court must send a message to offenders like him that even those whose efforts are thwarted will face stiff penalties.

Although the parties agree on the Defendant's sentence, the appropriate length of supervised release is in dispute. The statutorily authorized term of supervised release for a terrorism offense in section 2332b(g)(5)(B) is any term of years or life. 18 U.S.C. § 3583(j). Because the Defendant's offense "created a foreseeable risk of death or bodily injury to another person," the advisory guidelines prescribe a term of not less than one year up to life. USSG §5D1.2(b)(1). Based on the nature of the offense conduct, the history and characteristics of the Defendant, and most importantly, the need to protect the public, the Defendant must be supervised for the rest of his life.

To be sure, it is generally rare for courts to impose a term of supervised release of life. But it is not unique in terrorism cases. As the Eleventh Circuit has held, "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for

15

incapacitation." *Jayyousi*, 657 F.3d at 1117 (internal quotation marks omitted). Indeed, district courts routinely impose lifetime supervision in cases where the defendant was convicted of a terrorism offense. *See, e.g.*, *United States v. Osmakac*, 12-cr-00045-MSS-AEP (MDFL), Doc. 354 (attempt to use weapons of mass destruction); *United States v. Abdulkader*, 16-cr-019 (SDOH), Doc. 67 (attempt to provide material support to a designated foreign terrorist organization); *United States v. Cornell*, 15-cr-012 (SDOH), Doc. 123 (same); *United States v. Amin*, 15-cr-00164 (EDVA), Doc. 20 (conspiracy to provide material support to a designated foreign terrorist organization).

Here, the need for lifetime supervision is self-evident. The Defendant has dedicated his adult life to committing a terrorist attack against the United States—he has no other aspirations. Even now, despite accepting responsibility for his conduct, the Defendant has not disavowed his allegiance to ISIS. *See* PSR ¶ 39. It follows, then, that the risk to public safety will endure even after the Defendant serves his term of imprisonment. Simply put, a lifelong terrorist like the Defendant is the ideal candidate for lifetime supervision.

In addition, the United States requests that the Court make the necessary factual findings and impose a computer-monitoring provision during the Defendant's term of supervised release. Although it is difficult to pinpoint the source of the Defendant's radicalization, the evidence showed that he consumed ISIS-related

16

content on the Internet over several months; he also used the Internet to acquire firearm components and other gear. PSR ¶¶ 22-25. Under similar circumstances, courts have imposed computer-monitoring provisions as a special condition of supervised release. *See, e.g.*, *United States v. Musaibli*, 18-cr-20495 (EDMI), Doc. 291; *United States v. Cornell*, 15-cr-012 (SDOH), Doc. 123; *United States v. Amin*, 15-cr-00164 (EDVA), Doc. 20.

Here, based on the central role that internet usage played in the Defendant's radicalization and plotting, the United States respectfully requests that, in addition to those proposed by Probation, the Court enter the following special conditions, which were recently adopted in the *Musaibli* case cited above:

1. The defendant is prohibited from utilizing a computer during the term of supervised release with the exception of and solely for legal research, outside employment, as a specific class assignment in an accredited educational institution or to send or receive typed email messages without attached electronic files or images embedded in the body for a message, or for other uses, as approved in advance by the probation officer.

2. The defendant shall only access the internet through one internet capable device. All other internet capable devices, such as cellular phones and gaming consoles shall not have the internet connected. The defendant is prohibited from accessing any online computer service at any location including, but not limited to public libraries, internet cafes, and places of employment or education without the permission of the probation officer.

3. The defendant shall provide the probation officer with accurate information about all computer systems (hardware/software), all passwords and Internet Service Provider(s), that the defendant has potential access to and abide by all rules of the United States

17

   Probation Department's Computer Monitoring Program. The defendant shall only access a computer approved by the probation officer. The defendant shall consent to the probation officer conducting periodic, unannounced examinations of all computer systems, which may include computer monitoring software at the defendant's expense.

4. To ensure compliance with these provisions, the defendant shall submit his/her person, residence, computer and/or vehicle to searches conducted by the United States Probation Department at a reasonable time and manner. You shall inform any other residents that the premises and your computer may be subject to a search pursuant to this condition. The defendant shall provide the probation officer with access to any requested financial information including billing records (telephone, cable, internet, satellite, etc.).

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence the Defendant to a term of imprisonment of 216 months and to lifetime supervision after he is released.

    Respectfully submitted,

    ROGER B. HANDBERG
    United States Attorney

By:    */s/ Risha Asokan*
    Risha Asokan
    Assistant United States Attorney
    Florida Bar No. 1003398
    400 North Tampa Street, Suite 3200
    Tampa, Florida 33602
    Telephone: (813) 274-6000
    E-mail: risha.asokan2@usdoj.gov

U.S. v. Muhammed Al-Azhari        Case No. 8:20-cr-206-TPB-AEP

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice electronic filing to the following:

Samuel Landes, Esq.

Adam Allen, Esq.

*/s/ Risha Asokan*
Risha Asokan
Assistant United States Attorney
Florida Bar No. 1003398
400 North Tampa Street, Ste. 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Email: risha.asokan2@usdoj.gov