## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 8:20-cr-206-TPB-AEP**

**MUHAMMED MOMTAZ ALAZHARI**

_____/

### SENTENCING MEMORANDUM

The parties in this case have agreed upon a sentence of imprisonment: 18 years. The plea agreement is binding, so if the Court were to seek to impose a higher or lower sentence of imprisonment, either party could withdraw from the plea agreement, and the case would proceed to trial. At the same time, the parties disagree on the calculation of the Sentencing Guidelines. The Government seeks to prove certain enhancements that would elevate the advisory Guideline range *above the sentence of imprisonment the Government has agreed is appropriate*. Outstanding objections to the presentence report would require the Court to hold an evidentiary hearing to determine whether Mr. Alazhari's offense was "tantamount to attempted murder"; whether Mr. Alazhari obstructed an FBI investigation of which he was unaware; and whether Mr. Alazhari had the specific intent to influence or affect the conduct of government by coercion or intimidation, or the intent to retaliate against government conduct.

1

The Government can't make these showings, but the Court shouldn't waste the time and energy to let it try.  The Government has agreed that the Court should impose a sentence of imprisonment beneath the advisory range it advances.  And the parties' agreement is well-supported by the evidence and the 18 U.S.C. § 3553(a) factors.  Mr. Alazhari was tortured as a teenager in a Saudi prison following kangaroo-court proceedings, and suffered from severe and untreated mental illness at the time of the offense.  The interaction of the advisory Guidelines range with the statutory maximum penalty would deprive him of any benefit from his acceptance of responsibility – a well-recognized ground for a downward departure.  There is no reason for the Court to watch patiently as the Government attempts to drive the advisory Guidelines range above the parties' agreed-upon sentence and above the statutory maximum, only to thereafter watch the Government promptly advocate for a sentence below the Guidelines range in accordance with the plea agreement.  The Court need not and should not engage in such a pointless and purely academic endeavor.

The parties have no agreement as to another element of the sentence, however, the term of supervised release.  There is an outstanding objection to the presentence report on the advisory range for the term of supervised release, and the Court should entertain *that* objection, since it could actually make a difference to the sentence.  Because Mr. Alazhari's conduct never progressed anywhere near a point at which anyone was placed at risk of death or serious bodily injury, this Court should sustain his objection and impose a term of supervised release at the high end

2

of the resulting advisory range, three years.  In the alternative, even if the Court adopts the Government's proposed advisory range, the Court should sentence Mr. Alazhari to a term of supervised release in line with the sentences imposed on similar defendants around the country for the same crime, about 10 years.

***

Muhammed Alazhari is an American citizen, born here, though he spent most of his childhood in the Middle East, where his father took a series of engineering jobs.  His home life was abusive and unstable and he showed early signs of mental illness, though he was never evaluated because of cultural resistance to mental health treatment.  His mother, Jessica, is a severe schizophrenic and drug addict whose whereabouts are currently unknown to the family.  She was abusive toward Muhammed and his sisters, and Muhammed's parents were physically abusive toward one another.  Jessica would beat Muhammed with a metal pipe.  In one instance, Jessica drove Muhammed into the Middle Eastern desert and left him there.  She came back to get him after he was sufficiently terrified, laughing about the incident at home.  Muhammed suffered from learning disabilities and mental illness at school, making him the butt of other children's jokes.

As a young child, Muhammed was delayed in his speech and physical development, and exhibited many of the signs of autism.  His father began to call him stupid.  He would misinterpret social situations and became paranoid, thinking, for example, that if his sisters were laughing together, they were laughing at him.  Similarly, he would misinterpret benign statements as criticism.  He also showed a

weak grasp on reality, having difficulty understanding abstract expressions and fantasy in cartoons, and retelling occurrences in an exaggerated or fantastical way, so much so that it displayed immaturity for him to think anyone would believe him. He also experienced hallucinations, telling family members that he saw "jins" – spirits or angels.

***

Muhammed's father's last job overseas was in Saudi Arabia. As with many similar families, Muhammed's father, Momtaz, was the spiritual leader of the family. He brought Muhammed to the Mosque and introduced him to Islam. One of the five pillars of Islam is Zakat, charitable giving. The local imam and Momtaz discussed at the Mosque Zakat for the needy.

This imam, however, found himself on the wrong side of the rigid Saudi political establishment. That was enough for the authorities to throw the imam, Momtaz, and Muhammed into indefinite pretrial detention to await what passes for justice in Saudi Arabia's notorious secret terrorism court, the Specialized Criminal Court (SCC). The Saudi "counterterrorism law's definition of terrorism includes 'any conduct . . . intended to disturb public order . . . or destabilize the state or endanger its national unity'" and penalizes "'anyone who challenges, either directly or indirectly, the religion or justice of the king or crown prince . . .'" U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Saudi Arabia* (2021), at 24. "Authorities may approve detentions in excess of six months in 'exceptional circumstances,' effectively allowing individuals to be held in pretrial detention

indefinitely in cases involving terrorism or 'violations of state security . . . .' [Police] may order the detention of any person accused of a crime under the counterterrorism law for up to 30 days, renewable up to 12 months, and in state security cases up to 24 months with a judge's approval." *Id.* at 12.

> Human rights organizations, the United Nations, and independent third parties noted numerous reports of torture and mistreatment of detainees by law enforcement officers. ALQST[, a local human rights organization] alleged that authorities continued to use torture in prisons and interrogation rooms. Amnesty International assessed in a February statement that one of the most striking failings of the SCC in trials was "its unquestioning reliance on torture-tainted 'confessions.'" It alleged at least 20 Shia men tried by the SCC have been sentenced to death on the basis of confessions obtained by torture since 2016, with 17 of them already executed. Former detainees in facilities run by Mabahith[, the Saudi General Directorate of Investigation,] alleged that abuse included beatings, sleep deprivation, and long periods of solitary confinement for nonviolent detainees.

*Id.* at 8.

This pattern held true for Muhammed. At age 18, he was placed in indefinite pretrial detention with others alleged to have supported terrorist organizations. There, he met real terrorist supporters and financiers. He was subject to beatings, burnings, cutting, corrosive liquids on his skin, and electrocution. He was never provided counsel. He eventually "confessed" to lesser charges and was sentenced to three years' imprisonment. While in the Saudi prison, his mental illness worsened, and he saw and addressed imaginary "faces" that smiled at him.

Putting aside the procedures used to "convict" Muhammed, the substance of the charges inspires little confidence.  The group within the Syrian conflict he and his father were alleged to have supported was Jaysh al-Islam ("Army of Islam").  An expert report obtained by the Defense authored by Dr. Joshua Landis, an expert on the Syrian conflict, explains,

> The U.S. government should not consider Muhammed Alazhari guilty of supporting a terrorist organization during 2014-2015 due to the assistance he gave Jaysh al-Islam (the Army of Islam).  The reason for this is simple.  Saudi Arabia and the United States were close allies in a common policy of arming, funding, and training the Syrian opposition and Jaysh al-Islam.

The group Muhammed allegedly supported in the Syrian conflict is a group the United States and Saudi Arabia supported as well.

***

The FBI wasted no time focusing its attention on Muhammed, sending an agent to interview him while he was still in Saudi custody (in the presence of his Mabahith interrogator and torturer).  Then, after Muhammed was deported from Saudi Arabia, a group of agents met him at the airport and later at his home to interview him.  Muhammed explained about the torture he had suffered, and his dismay that the Department of State did so little to help him.  He disclaimed any terrorist sympathies and said he was open to further contact with the FBI.

Back in the United States for the first time in 15 years, Muhammed's mental health began to falter.  He would "sleep by the entrance door and get up in the middle of the night 'frantic' that the FBI or Saudi spies were coming to kill him."  He

6

would watch the front door for hours and accuse his sister of colluding with the FBI. He worked at Home Depot, but was referred by the company to a therapist after making concerning statements to fellow employees.  He came to believe the therapist was also colluding with the FBI, and so quit the sessions.  Eventually, he checked himself into Gracepoint mental health facility, where he stayed for four days. Gracepoint's notes indicate that Muhammed thought that if he told the staff anything "they" would come after him, and that he had bought a gun "because he was afraid of what may happen."  He was diagnosed with post-traumatic stress disorder and prescribed anti-psychotic medication.  When agents later searched Muhammed's home they found the medications unopened in the packaging.  He never returned to Gracepoint for a recommended follow up.  A Defense expert, Dr. Yamout, has diagnosed Muhammed with schizophrenia, like his mother.

While Muhammed's belief that the FBI (or sometimes the Mabahith – he was never very consistent about this) was out to get him was a delusion springing from his mental illness, it was not very far from the truth.  The FBI observed his web browsing; posed online as an eBay seller Muhammed was interacting with; surreptitiously searched his home, his phone, his computer, and his car; installed a camera outside his home; tailed him on foot and in cars; watched him from above in airplanes; installed microphones in his home; and, just as he had claimed, enlisted his sister as an informant.

The FBI's final tactic was to introduce Muhammed to an informant, and then put an illegal firearm silencer in his hands.  The informant expressed an interest in

Muhammed's prison sentence and Muslim beliefs. Muhammed eventually "converted" the informant to Islam, and educated him about his beliefs. The two talked in vague and general terms about support for ISIS and Muslims generally, and ideas that ranged from kidnapping a high-ranking military officer to sending the informant to be a spokesperson for ISIS. The most concrete plans they talked about had little to do with ISIS or Islam at all, involving robbing banks and tire shops. They discussed no specific targets or plan in the United States, and no specific effort to join ISIS overseas. Whatever Muhammed wanted to do, it never materialized further than this. The informant sold Muhammed a pistol with an unregistered silencer attached, and the FBI arrested him. That was more than three years ago.

ARGUMENT

This Court should sentence Mr. Alazhari to 18 years' imprisonment because that is the parties' agreement, and the parties' agreement is well-supported by the law and evidence. In so doing, the Court should forgo deciding several difficult outstanding objections to the presentence report involving the prison element of the sentence, because they have no effect on the ultimate outcome at sentencing. Lastly, the Court should sustain Mr. Alazhari's objection and sentence him to three years' supervised release, or, in the alternative, ten years' supervised release.

## I. The Court should sentence Mr. Alazhari to 18 years' imprisonment.

The parties' plea agreement provides that the sentence of imprisonment should be 18 years. Doc. 310 at 3. Under this provision, "such a recommendation binds the court once the court accepts the plea agreement." Fed. R. Crim. P. 11(c)(1)(C).

The presentence report applies several enhancements under the Sentencing Guidelines that are in dispute.  First, the presentence report applies a cross-reference to the attempted murder guideline by characterizing Mr. Alazhari's offense as "tantamount to attempted murder."  But Mr. Alazhari's guilty plea establishes only that he attempted to provide material support and resources to ISIS, knowing that the organization was a terrorist one.  *See* Doc. 310 at 2 (providing the elements of the offense).  To resolve this objection, the Court would have to decide whether Mr. Alazhari specifically intended to commit murder, and took a substantial step toward *that* crime.

Second, the presentence report applies the obstruction of justice enhancement, because "[w]hile in custody on an unrelated state offense, the defendant solicited his sister to hide or destroy evidence of the instant offense."  PSR ¶ 47.  But Mr. Alazhari indisputably was unaware of the FBI investigation at the time of this phone call, made while he was detained for carrying a concealed weapon.  To resolve this objection, the Court would have to determine whether Mr. Alazhari's communications to his sister constituted an attempt to obstruct the investigation in this case.

Third, the presentence report applies the terrorism enhancement under U.S.S.G. § 3A1.4.  To determine whether this enhancement applies, the Court may not simply look to the name of the offense of conviction, but must also find as a matter of fact that the defendant specifically intended to influence or affect the conduct of government by intimidation or coercion, or retaliate against government

9

conduct.  *See United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021).  That

is, the Court must determine whether Mr. Alazhari's vague statements of disdain for

America along with his vague plans for providing material support or resources to

ISIS mean that whatever it is he was going to do was going to be done with the

specific intent to affect or retaliate for some government conduct.

     A.  <u>The Court should decline to resolve the objections.</u>

At sentencing, the court "must – for any disputed portion of the presentence

report or other controverted matter – rule on the dispute *or determine that a ruling is*

*unnecessary either because the matter will not affect sentencing,* or because the court will not

consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B) (emphasis added).

Here, if the Government prevails on each objection, the offense level is 44 (though

no offense level can be higher than 43), the sentencing table calls for an advisory

sentence of life imprisonment (though the statutory maximum is 20 years), and the

resulting guideline sentence is 240 months' imprisonment (though the plea

agreement binds the Court to impose a sentence of 216 months' imprisonment).  In

most mixed-result scenarios, the guideline range would still exceed the statutory

maximum and the parties' plea agreement.  If Mr. Alazhari were to prevail on all of

these objections, his advisory range would be 57 to 71 months (though the plea

agreement requires a sentence of 216 months).

     For each of the disputed enhancements, the Court should determine that a

ruling is unnecessary because it will not affect sentencing under Rule 32(i)(3)(B).

This Court should not entertain the Government's effort to drive the sentencing

range well above the sentence that it itself has agreed would be appropriate.  Nor, for

that matter, should the Court entertain an effort by Mr. Alazhari to drive the range

well below the agreed-upon sentence, as would be the case if he were to prevail on

the objections.  There is simply no point to such an exercise, and Rule 32 allows the

Court to avoid pointless exercises like the one proposed by the Government.  The

plea agreement presents the Court with a binary choice:  accept the parties'

recommendation of 18 years' imprisonment or reject it.  And, for the reasons

explained below, the parties' recommendation is well supported even if the

Government is right about the guidelines.  Because of that, the Court should not

decide these difficult and meaningless disputes, and instead should simply accept the

plea agreement and sentence Mr. Alazhari accordingly.

    B.   <u>The parties' plea agreement is supported by Mr. Alazhari's acceptance of responsibility.</u>

The Sentencing Guidelines provide a downward adjustment of two levels for

defendants who "clearly demonstrate[] acceptance of responsibility for" the offense.

U.S.S.G. § 3E1.1(a).  An additional one-level reduction applies where a plea of guilty

allows the Government to avoid preparing for trial and allows the Court and the

Government to efficiently allocate resources.  *Id.* § 3E1.1(b).  "The reduction of

offense level provided by this section recognizes legitimate societal interests.  For

several reasons, a defendant who clearly demonstrates acceptance of responsibility

for his offense by taking, in a timely fashion, the actions listed [in the guideline] is

appropriately given a lower offense level than a defendant who has not accepted responsibility." *Id.* § 3E1.1 background.

As both the plea agreement and the presentence report indicate, Mr. Alazhari is entitled to a three-level reduction for acceptance of responsibility. However, without the plea agreement, Mr. Alazhari would be effectively deprived of this reduction, and the sentence would fail to recognize the "legitimate societal interests" it seeks to advance. The maximum statutory sentence of imprisonment for the offense of conviction is 20 years. 18 U.S.C. § 2339B(a)(1). Accepting for these purposes the Government's guidelines calculations as correct, his offense level after the reduction is applied is 44 and his criminal history category is VI, with the sentencing table calling for a sentence of 360 months' to life imprisonment. Because this range is higher than the statutory maximum, the guideline sentence is instead established as exactly the statutory maximum, 240 months' imprisonment. *See* U.S.S.G. § 5G1.1(a).

In *United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995), the court held that a district court may depart downward "when § 5G1.1(a) renders § 3E1.1 ineffectual in reducing the defendant's actual sentence." Here, § 5G1.1(a) establishes the statutory maximum as the guideline sentence, rendering the acceptance-of-responsibility reduction ineffectual. The parties' agreed-upon sentence, however, represents a two-year, 10% decrease from the statutory maximum sentence and the guideline sentence. *Rodriguez* provides a sound basis for the plea agreement, and the Court should therefore accept it.

12

C.  <u>The § 3553(a) factors support the plea agreement.</u>

Mr. Alazhari grew up overseas amid abuse at the hands of his psychotic

mother.  He spent much of his young adulthood enduring torture and indefinite

detention in a Saudi prison without due process and on trumped up charges.  His

serious and untreated mental illness contributed to his commission of the offense, as

his paranoia and bizarre thinking spiraled out of control in the lead up to his arrest.

We can never know with any certainty what Mr. Alazhari would have done if the

government had not intervened.  Some of his statements and actions are quite

concerning, while many of his statements to the informant suggest his plans were

fanciful, half-baked, and downright silly.  The FBI put an unregistered silencer in his

hand and arrested him before he could progress any further.

Under these circumstances, the substantial but measured sentence of 18 years'

imprisonment agreed upon by the parties is appropriate.  Such a sentence will send a

strong message of disapproval and deterrence to Mr. Alazhari and anyone

considering a similar path, and will protect the public from him for most of two

decades.  At the same time, such a sentence recognizes Mr. Alazhari's acceptance of

responsibility and potential for rehabilitation.  A sentence of supervised release will

ensure he is properly monitored and cared for upon completion of his sentence of

imprisonment.  Mr. Alazhari has never had his mental illness properly recognized or

cared for, and he would benefit from such treatment upon his release.  Neither the

offense nor the offender is the type that requires an exceptionally harsh sentence,

while the nature of the offense merits the substantial sentence called for by the plea

agreement.  This Court should therefore accept the plea agreement and sentence Mr. Alazhari to 216 months' imprisonment.

## II.  The Court should sentence Mr. Alazhari to three years' supervised release.

The Guidelines provide a recommended term of supervised release for this Class C felony of one to three years.  U.S.S.G. § 5D1.2(a)(2).  However, the period may be increased to life where the defendant is convicted of certain terrorism-related offenses and the offense "resulted in, or created a foreseeable risk of, death or serious bodily injury to another person."  *Id.* § 5D1.2(b)(1).  Mr. Alazhari objected to the presentence report's application of this exception, and the Government opposes his objection.  The parties' plea agreement does not address the term of supervised release.

The exception permitting a term of life is inapplicable because nothing Mr. Alazhari *in fact* did resulted in or created a foreseeable risk of death or serious bodily injury.  To be sure, the Government posits that Mr. Alazhari may have committed a broad range of dangerous and harmful crimes had he completed this offense.  But, unlike the law of attempt, the relevant sentencing guideline is concerned with harm or risk that the defendant actually caused.  It is one thing to say that Mr. Alazhari wished to, could have, or would have caused such harm or risk, but it borders on the absurd to say that he actually did so.  Mr. Alazhari collected a few guns he may never have fired, consumed some propaganda, and talked some tough talk with the informant about robbing banks, robbing tire shops, and abducting some unspecified high-ranking military officer.  But the FBI sent in the informant to hand Mr.

14

Alazhari the silencer and arrested him long before any of this could come to fruition. The record is devoid of any actual harm or actual risk Mr. Alazhari caused that could support this increase in his advisory term of supervised release. This Court should therefore sentence him at the high end of the standard range, a term of three years.

Even if the enhancement applies or the Court chooses to vary from the advisory range, the Court should not impose a lifetime term of supervision. Data available from the Sentencing Commission's Interactive Data Analyzer show that, from fiscal years 2015 to 2022, defendants sentenced under the material support guideline received a median term of supervised release of only 180 months:



**Average and Median Supervised Release**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022

The figure includes the 140 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
**FILTER:**
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2M5.3; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

Looked at slightly differently, from fiscal years 2015 to 2021, the data show clusters of sentences at 60 months, 120 months, and life in material-support cases, with lifetime supervision (or terms of years approaching a lifetime) closely associated with sentences of imprisonment well above the agreed upon sentence of imprisonment in this case:

| Sup. Rel. (Months) | No. of Sentences | Avg. Prison Sentence |
|---|---|---|
| 0 | 7 | 171.14 |
| 24 | 3 | 135.73 |
| 36 | 4 | 148.50 |
| 60 | 17 | 188.47 |
| 72 | 1 | 60.00 |
| 96 | 2 | 123.00 |
| 120 | 16 | 135.88 |
| 140 | 1 | 100.00 |
| 144 | 2 | 145.00 |
| 180 | 6 | 212.00 |
| 240 | 12 | 119.06 |
| 300 | 1 | 180.00 |
| 360 | 1 | 240.00 |
| 600 | 1 | 240.00 |
| LIFE | 35 | 234.86 |
| **Grand Total** | **109** | **182.15** |

This Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Several circumstances indicate that a lengthy term of supervision or supervision for life would create an "unwarranted" sentence disparity with these other cases. First, Mr. Alazhari's youth and lack of prior criminal history indicate he is not in need of formal supervision beyond the year

16

2045, when his supervision would expire if the Court accepts the plea agreement and imposes a term of supervised release of 10 years.  Second, Mr. Alazhari's crime was an attempt, rather than a completed offense.  And third, the FBI has shown a singular intrepidness in keeping a close eye on Mr. Alazhari, starting from its visiting him while still in Saudi prison and including its pervasive surveillance of him.  If there is a future need to supervise Mr. Alazhari's conduct, this Court need not redundantly task a probation officer to do what the FBI will do on its own accord. Thus, this Court should sentence Mr. Alazhari below the median of 180 months, and add to the cluster of sentences at the 120-month range.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:   (813) 228-2715
Email:  Samuel_Landes@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of July 2023, a true and correct

copy of the foregoing was filed with the Clerk of the Court using the CM/ECF

system, which will send notice of the electronic filing to:

AUSA Patrick Scruggs and Risha Asokan

<u>/s <b>Samuel E. Landes</b>          </u>
Samuel E. Landes, Esq.
Assistant Federal Defender

18



**CARTER**
**PSYCHOLOGY**
**CENTER**

**Forensic Psychological Evaluation**
**(Confidential)**

Mr. Samuel Landes, Esq.
Federal Public Defender's Office- Tampa, FL

Regarding: Muhammed Al-Azhari
Date of Birth: 2/18/1997
Dates of Evaluation: 1/22/2021
Date of Report: 4/30/2021
Age: 24
Case No.: 8:20-CR-00206-TPB-AEP-1
Location of Evaluation: Hernando County Jail (video conference)

Patricia A. Bach, Ph.D.

Christine M. Aust, Psy.D.

Debra K. Carter, Ph.D.

Stephanie F. Johnson, Ph.D.

Brendan J. McCollum, Psy.D.

Veronica P. Medina, Psy.D.

Christine A. Profito. Psy.D.

Michael B. Spellman, Ph.D.

Karim Z.Yamout, Psy.D.

Dear Mr. Landes,

Pursuant to the Request For Mental Health Evaluation, I conducted a psychological evaluation of Mr. Muhammed Al-Azhari.

**INFORMED CONSENT & LIMITS OF CONFIDENTIALITY:**

I explained to the defendant the purpose of today's evaluation and explained to him the relevant confidentiality factors. He articulated understanding and consented to the evaluation.

**SOURCES OF INFORMATION:**
- Interview with, Mental Status Examination of, and Behavioral Observations of defendant (total 2 hours)
- Telephone interviews with defendants sisters (2 sisters), father, and maternal grandmother.
- Statements made by Ms. Reem Faria during an interview with Task Force Officers dated 5/26/2020.
- Gracepoint mental health facility records.
- Hernando County Jail medical records.
- Court documents.
- Communications with defendant's legal team.

4835 27th Street West
Suite 125
Bradenton, Florida 34207

2970 University Parkway
Suite 203
Sarasota, FL 34243

t. 941.753.0064
f. 941.753.2977

www.CarterPsych.com

## RELEVANT BACKGROUND (based on interviews):

Mr. Al-Azhari's history is characterized several psychological relevant environmental and personal factors. The environmental factors include a mother who was afflicted with Schizophrenia and Bipolar disorder and drug abuse, torturous physical and mental abuse throughout his childhood, witnessing violent altercations between his parents, police involvement at the home, social embarrassment, and poor affiliation with his father. The personal factors include a history of idiosyncrasies in his behavior and his thinking, developmental learning deficits, as well as psychological torment.

Regarding his environment, Mr. Al-Azhari's childhood home was characterized by instability and violence. His grandmother and his two sisters described that Mr. Al-Azhari's parents were physically violent with each other and that his mother was abusive towards her children. The parents struck each other and even used knives or other household items against each other. His father has been arrested for domestic abuse. His mother has been arrested for unruly behavior under the influence of alcohol. Mr. Al-Azhari's mother once drove him into the dessert (they were living in Oman), made him get out of the car, told him that she was leaving him there, and drove off. Mr. Al-Azhari was terrified though his mother ultimately came back and picked him up. She later laughed about this at home. His mother has also struck him with a metal pipe, thrown objects at him, and violently beat him. The children were terrified of their mother, who was unpredictable and would sometimes arouse them from sleep and beat them. Mr. Al-Azhari was terrified of his mother and of his parents' altercations. He would sometimes wish his father not to come home so that his mother's anger would not get triggered. At school he was made fun of, so he did not found any safe haven. He described that he spent his childhood "mar'oub" (in terror). Mr. Al-Azhari reported that he suffered through depression, anxiety, and fear. There were times when he contemplated suicide as a teenager but never attempted it out of fear.

Regarding individual factors, Mr. Al-Azhari's grandmother and his two older sisters believed that Mr. Al-Azhari had Autism and reported that the family had spoken about it during his childhood. However, due to cultural factors, he was never evaluated for Autism or any other mental health condition. His grandmother described that when her daughter (Mr. Al-Azhari's mother) was pregnant with Mr. Al-Azhari, she and her husband engaged in violent physical altercations. When Mr. Al-Azhari was born, he was delayed in his physical development and in speech. She recalled that Mr. Al-Azhari's mother would say that she wanted to have him evaluated but never followed through with her plans. The mother and grandmother suspected that Mr. Al-Azhari had Autism. As a child Mr. Al-Azhari did not make eye contact, he was very literal and did not understand abstract expressions or fantasy in cartoons, he played with his toys in unusual ways, he was rigid in his expectations and in his routines, and he was easily startled. His grandmother recalled that Mr. Al-Azhari was "always behind" in his development and that his father referred to him as being "stupid." When I spoke with Mr. Al-Azhari's sisters, they individual provided similar accounts, such as Mr. Al-Azhari hitting his head against the wall when he was upset, he had exaggerated and immature emotional outbursts, he was sensitive to criticism and misinterpreted benign statements as criticisms, he would think that people on the street or in school were planning to hurt him, he accused his siblings of laughing at him if he saw them laughing together, he was socially awkward, and he perceived occurrences or otherwise retold them in an exaggerated and fantastical way.

Mr. Al-Azhari also exhibited a learning disorder. His grandmother described him as having been "slow" as a child. His sisters described that Mr. Al-Azhari had difficulty learning things in school. When they or his father tried to teach him things, they noticed that his reading was slow and his comprehension was inaccurate. This bothered Mr. Al-Azhari a lot growing up as his father referred to

him as a "ghabi" (Arabic word meaning stupid) while Mr. Al-Azhari was preoccupied with pleasing his father. The father's disappointment was apparent to family members as at the time, Mr. Al-Azhari was the only male child in the family. Mr. Al-Azhari's father recalled to me that he used to tutor his son and his son had a difficult time learning things and a difficult time concentrating. Mr. Al-Azhari's sisters each explained that instead of trying to get to the root of his son's behavior and learning problems, his father instead dismissed his son as being lazy or unintelligent.

As he became a teenager, Mr. Al-Azhari started to exhibit increasing suspiciousness. He frequently believed that people were criticizing him. His siblings dismissed this as a manifestation of his "sensitive" nature. His lavish, exaggerated, and fantastical stories became more frequent. He appeared to make up scenarios to compensate for feeling inferior (from social unacceptance, from father's unacceptance, from poor school achievement) but his scenarios were so implausible that it was immature of him to not realize how ridiculous they were. By the time of his arrest, it was already clear to his siblings that Mr. Al-Azhari suffered from mental health problems. They did not know the exact nature/diagnosis of the problems, but they at least recognized that he had difficulties with learning, he had impairments in social understandings and maturity, he was becoming increasingly paranoid, and he struggled with feeling inferior/insecure. During incarceration, Mr. Al-Azhari's father recalled that his son would stare into the void and smile or address imaginary people. His father and other inmates would look wonderingly at each other, and when they asked him what he was doing Mr. Al-Azhari would tell them that he saw faces and some of them were smiling at him. Mr. Al-Azhari's father also recalled that his son was given several medications at the jail but his father did not know what the medications were.

After his release from incarceration in Saudi Arabia, Mr. Al-Azhari came to the United States and lived with his father and his older sister (one of the collateral informants whom I interviewed) in Florida. His sister described that Mr. Al-Azhari would sleep by the entrance door and get up in the middle of the night "frantic" that the FBI or Saudi spies were coming to kill him. He would watch the front door for hours. There were times when he suspected that his sister was colluding with the FBI. He was referred to therapists by his employer at the time, but then stopped attending the sessions because he believed that his therapist was also colluding with the FBI. He would report to his sister that was "tired of this life" and wanted to end his life. At one point he also admitted himself to a psychiatric facility (*see Records Review below*). Mr. Al-Azhari left his father's home in Florida and went to live with his grandmother and his maternal uncle in California. His grandmother recalled that Mr. Al-Azhari was "so paranoid," consistently "scanning his environment" fearing that he was being followed to be killed. While in the US he interacted with the FBI and was under the impression that he was going to be employed by the FBI. However, he also feared that the FBI were hunting him down. On the other hand, and consistent with prior history, Mr. Al-Azhari also continued to tell boastful, fantastical stories about himself. These are perceived by his family as a compensatory mechanism for his sense of inferiority and his low self-esteem and insecurity.

In addition to Mr. Azhari's signs of Autism and his delusions, he also has a history of hallucination. His sister recalled that as children, their father used to tell them about "Jin," a Muslim concept of invisible beings (akin to spirit or angels) who exist among people. As a child Mr. Al-Azhari used to often tell his sister that he saw Jin. He believed that Jin did things to him or at the home. He would point to the air when upset and say he saw a Jin. His sister argued with him and he eventually stopped telling her about his "ruqyas" (visions). However, during his incarceration in Saudi Arabia, when his sister used to speak with him by phone, Mr. Al-Azhari used to report to her that he saw faces of people laughing at him. She learned that his father would hear him speaking to "the air" and Mr. Al-Azhari would report seeing people who were not there.

Regarding substance use, Mr. Al-Azhari denied use of alcohol or drugs, citing his religious beliefs as being contrary to consuming such agents.

## RECORDS REVIEW:

1.  <u>Gracepoint mental health facility:</u>

Initial Psychiatric Evaluation dated 5/5/2020 shows that Mr. Al-Azhari consulted Gracepoint psychiatric facility with Chief Complaint of "needs medications for anxiety." The psychiatric evaluated noted that Mr. Al-Azhari reported his history of incarceration and reported current trouble with sleep, anxiety, and flashbacks. Mr. Al-Azhari reported that he was "threatened if he disclosed anything they would come after him." He reported that he planned to write a book about his incarceration, he had spoken with some Arabs and, and he was afraid that the information leaked. He bought a gun "because he is afraid of what may happen." He had also reported that he threw away all of his belongings including his laptop in the trash "a couple days" prior because he was "so scared."

Mr. Al-Azhari reported attending Care solutions for counseling.

Mr. Al-Azhari also reported to the treating psychiatrist that while he was in the Saudi prison, he was prescribed Seroquel (antipsychotic).

His urinalysis also came back positive for methamphetamine and amphetamines. Yet, a second drug screen on 5/5/2020 was negative for all substances. When Mr. Al-Azhari's sister was contacted and informed of this, she was reportedly "very shocked" because Mr. Al-Azhari was "so against drugs" and his sister wondered if the drugs were slipped into his system involuntarily.

Mr. Al-Azhari was diagnosed with Post-Traumatic Stress Disorder, he was voluntarily admitted to the inpatient unit, and he was started on Paxil (antianxiety/antidepressant) and Vistaril (antihistamine that can help treat anxiety).

The next day, on 5/6/2020, Mr. Al-Azhari was noted to exhibit "paranoia" and was prescribed an antipsychotic medication (Risperdal) as well as a medication to treat side effects of the Risperdal (benztropine). His insight and judgment were noted to be poor and he was noted to be "in imminent danger of self neglect."

On 5/8/2020, Mr. Al-Azhari's mental state was noted to be improved and he was discharged. His discharge medications were Prolixin (antipsychotic) and Cogentin (treats side effects from antipsychotic medication).

He was scheduled for an outpatient follow-up appointment on 5/11/2020 but did not show up to it.

There is an outpatient Treatment Plan document dated 5/20/2020 whereby the encounter took place conducted via telephone due to COVID-19. Mr. Al-Azhari was again diagnosed with PTSD and noted to have symptoms of paranoia, flashbacks, aggressiveness, fear, depressed mood, auditory hallucinations, and history of suicidal and homicidal intent. The recommended treatment was to continue with his medications and have scheduled meetings with the psychiatric nurse practitioner for medication review.

2.  <u>Hernando County Jail:</u>

There are no pertinent mental health records.


## EVALUATION: MENTAL STATUS AND TESTING:

### Mental Status/Behavioral Observation:

I interviewed Mr. Al-Azhari via video conference while he was located at the jail.

Mr. Al-Azhari presented as alert and oriented in all spheres.

His speech was fluent and comprehensible.

Thought process was clear and coherent.

Memory recall appeared detailed.

Comprehension was intact.

Logical reasoning appeared somewhat concrete and simplistic.

His mood was depressed and anxious because of his circumstances.

Affect was appropriate.

Eye contact was intact.

He did not articulate any thoughts of wanting to harm himself or anyone else.

He occasionally provided somewhat lavish and almost fantastical stories. While he appeared out of touch with reality at times, his accounts as he articulated them to me were not bizarre or out of the realm of reality, and were not compellingly delusional.

He was also somewhat quizzical of the examiner and as the examination progressed, he became increasingly guarded. I later learned that Mr. Al-Azhari developed the delusional belief that I was in collusion with the FBI.

Demeanor was nevertheless polite.

His insight and judgment were impaired.


## DIAGNOSTIC IMPRESSIONS:
- Schizophrenia, Unspecified
- Autism Spectrum Disorder, Level I
- Adjustment Disorder with Anxiety and Depressed mood. Mr. Al-Azhari is experiencing depression and anxiety as a result of his current legal stressors.
- Rul out Post-Traumatic Stress Disorder. There are indications of nightmares, intrusive thoughts, and anxiety. However, I did not have sufficient opportunity (due to Mr. Al-Azhari becoming delusionally

paranoid about me) to further explore the presence of PTSD using more comprehensive additional steps such as testing and further interviewing.
- Rule out Specific Learning Disorder

## SUMMARY AND CONCLUSIONS REGARDING DEFENDANT:

Mr. Muhammed Al-Azhari is a 24-year-old male who grew up abused and tormented by his mother who herself was afflicted with mental illness. He also witnessed violence between his parents on a consistent basis, sometimes leading to involvement from law enforcement. As a youngster, he exhibited deficits in learning, deficits in social interaction, and was generally "slow" in his development. As a consequence, and as the only male among his siblings, he also felt shunned by his father who reportedly dismissed Mr. Al-Azhari's behavior to him being a "ghabi" (stupid) rather than to having a mental illness. There was talk about him having Autism as a child, but due to cultural factors his family never pursued any formal psychological evaluations.

Into his teen years, Mr. Al-Azhari started to additionally develop beliefs of paranoia and a tendency to tell lavishly exaggerated stories. His idiosyncrasies and learning deficits garnered the sympathy of his older sisters but the ire of his mother and the disappointment of his father. He nevertheless became preoccupied with pleasing his father.

In 2014, at the age of 17 years, Mr. Al-Azhari was arrested and incarcerated in prison in Saudi Arabia. He was then released in 2018. During that time, he experienced visual hallucinations and spoke to people who were not there. He reported to a psychiatrist in 2020 that he had been prescribed Seroquel (antipsychotic) while incarcerated. After his release, Mr. Al-Azhari moved to Florida to live with his father and his older sister.

Since his release from prison and return the United States in 2018, Mr. Al-Azhari has been exhibiting paranoid delusions that Saudi agents or the FBI were after him to kill him, he spent hours guarding doors, he woke up in the middle of the night frantic that he was being chased, he accused people in his life (his sister, his mental health counselor) of colluding with the FBI, and he eventually bought a gun for protection. At one point his employer referred him to mental health services through their Employee Assistance Program, but he quit counseling because he suspected his counselor was colluding with the FBI. In May 2020, he admitted himself for "anxiety" to Gracepoint and was diagnosed with Post-Traumatic Stress Disorder but also noted to be "paranoid" and prescribed antipsychotic medications at the hospital and upon discharge.

When I met with Mr. Al-Azhari, he presented as alert, oriented, calm, and respectful. However, he also exhibited a tendency to tell lavish stories and he also became increasingly guarded with me as our 2-hour interview progressed. I later learned that Mr. Al-Azhari developed the paranoid belief that I was colluding with the FBI.

Regarding diagnoses, Mr. Al-Azhari qualifies for diagnoses of Schizophrenia. His childhood history also reflects that he suffered from Autism. However, at this point, his symptoms of Autism are likely eclipsed by his symptoms of Schizophrenia (e.g., if he is socially awkward it can appear as a thought disorder). He may suffer from PTSD and from a Learning Disorder. However, I am unable to test Mr. Al-Azhari further for these conditions as he has incorporated me into his paranoid delusions and therefore his trust in me has eroded.

Regarding treatment recommendations, Mr. Al-Azhari will require a combination of medication and mental health counseling for his Schizophrenia. Further, his Autism Spectrum Disorder makes him

vulnerable to manipulation and to predators. If incarcerated, he will require placement in a facility that can accommodate his mental health needs.

I would note that Mr. Al-Azhari, as he presented to me, was too disconnected from reality, and his thought process was too altered by fantasy, to be able to perceive matters in a reality-based perspective or to provide reality-based facts. This raised a concern about his ability to discuss his case in a factual manner, have a rational understanding of case matters such as the available evidence or party affiliations, and generally possess sufficient rational capacity to consult with his attorney.

Thank you kindly for involving me in the present case. If there are any questions, please do not hesitate to contact me.

Sincerely,

Karim Z. Yamout, PsyD, ABPP-CN
Licensed Psychologist, Board Certified in Clinical Neuropsychology

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry        01/10/2019

Muhammed Momtaz Al-Azhari (Muhammed); DOB 2/18/1997; SSN 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; address 12724 N 57th Street, Tampa, FL 33617; cellular telephone 813-816-6525; was interviewed at his home address. Present at the interview were TFO Christopher Ragan, SA Mark Haines, and Al-Azhari's sister, Muna Al-Azhari (Muna), who assisted in a minor translation role. After being advised of the identities of the interviewing agents and the purpose of the interview, Al-Azhari provided the following information:

Muhammed stated he was born in California and has spent the last 15 years living in Syria and Saudi Arabia with his father, Momtaz Al-Azhari (Momtaz), and his siblings. Muhammed spent the last three years in prison in Saudi Arabia for charges related to association with the Free Syrian Army (FSA). Upon his release in December 2018, Muhammed was deported from Saudi Arabia and returned to the United States where he has been staying with Muna at this address.

Muhammed stated the reason for his incarceration involved his limited association with two Imams at the mosque he and his father attended in Saudi Arabia. Muhammed explained that in the Muslim faith, worshipers were required to pay a "zakat", or tithe, which equated to two and one half percent of one's income. This zakat is paid once annually. Muhammed and Momtaz went to the mosque with Momtaz's tithe in hand. They asked the Imam if he knew a reliable source who could ensure the zakat was distributed to Mecca in order to support the poor people there. The Imam told them he did not have the resources to ensure the money was received in Mecca, but referred them to his brother,          who was also an Imam and had a room at their mosque.

Upon visiting          in a small room at the mosque, Muhammed greeted and left the room, intending to pray. This left Momtaz and          as the only remaining room occupants. Muhammed stated he had no direct knowledge



| Investigation on | 01/03/2019 | at | Tampa, Florida, United States (In Person) |

| File # | | Date drafted | 01/08/2019 |

by    HAINES MARK ALLEN, Christopher J Ragan

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DISC-01648

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of          Interview of Muhammed Al-Azhari   , On   01/03/2019   , Page   2 of 4

of the contents of the ensuing conversation, but Momtaz later told
Muhammed of the conversation. Momtaz told Muhammed that he asked       if
he could ensure that the zakat reached the poor people of Mecca. Momtaz
also requested a receipt showing payment of his zakat. Momtaz told
Muhammed that       said he would not provide a receipt for payment, nor
did he have the resources to ensure the money would make it to Mecca.
Muhammed stated that Momtaz did not leave the money with       and
Muhammed saw the envelope in his father's possession after the meeting.

Approximately nine months later, Muhammed heard that both Imams at the
mosque had been arrested for suspicion of collecting money for extremist
groups. Muhammed said that       denied the allegations against him, and
provided the names of Muhammed and Momtaz to law enforcement as "character
references". Approximately 90 days later, Muhammed and Momtaz were
arrested as well.

Upon arriving in prison, Muhammed was presented with two documents
numbering approximately 45-50 pages each. Upon briefly looking at the
documents, Muhammed saw one had information relating to ISIS and one had
information relating to Al-Qaida. The interrogator questioning Muhammed
ordered him to sign one document or the other. Muhammed assumed these
documents were fabricated allegations put in writing with aim for him to
confess to crimes he did not commit, although Muhammed was uncertain of
the exact contents as he did not read through the documents in entirety.
Muhammed refused to sign either document.

Upon Muhammed's refusal to sign, the interrogator told him he wanted to be
promoted and began to repeatedly torture him. Muhammed claimed that it was
very prestigious for law enforcement in the Middle East to obtain
terrorism related confessions from United States citizens. Confessions
would often result in promotion and/or monetary awards.

The torture tactics included burning Muhammed with chemicals, burning his
fingers, cutting his toes, and disfiguring his penis. Muhammed stated on
multiple occasions he was raped with broom handles. Muhammed was tortured
repeatedly for days.

[Agent's Note: At this time, Muhammed showed the interviewing agents
multiple scars on the backs of his fingers on his right hand, scars on his
toes, and stated he had burn scars on the front of his right pelvic area.
Muhammed offered to show the scars in that area, but agents declined.]

Muhammed continued, stating that finally, an older officer approached him
playing the "good cop" role. This officer asked if Muhammed was familiar
with the FSA. Muhammed stated he knew of the FSA, but was not a member. He

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of        Interview of Muhammed Al-Azhari    , On   01/03/2019   , Page   3 of 4

was aware of the circumstances in Syria and did sympathize with the
suffering of the citizens there. The older officer questioned Muhammed on
his FSA affiliation and that of his family, told Muhammed that admitting
to being a member of the FSA was a local violation as opposed to a "world"
violation, and advised him the penalties were far less severe to confess
to being a FSA member as opposed to a true terrorist organization.

After suffering torture, Muhammed finally unwillingly signed the
confession stating he was a member of the FSA. Approximately two years
after his incarceration, Muhammed appeared in front of a judge. Muhammed
explained to the judge that his confession had been coerced, but the judge
maintained that the signed confession was evidence against him, and the
judge sentenced Muhammed to three years in prison. After three total years
in prison (December 2018) Muhammed was released.

Muhammed said that Momtaz was also convicted and still in prison in Saudi
Arabia, but was due to be released in two days. Muhammed was unaware of
Momtaz's intentions upon his release. Muhammed explained that his father
had become increasingly more mentally unstable the longer he spent in
prison. Momtaz was currently on multiple medications to stabilize his
mental status and has not spoken to Muhammed or his siblings much lately.

Muhammed stated he was dismayed with the lack of support from the US
Department of State (DoS). Muhammed felt the DoS failed to do anything to
resolve the issue of his unjust incarceration. Muhammed stated he was
worried about speaking to the DoS representatives freely due to the Saudis
spying on their conversations. Muhammed said that most Saudi government
officials are corrupt. They were known to take bribes from affluent
business men and would routinely unjustly imprison the rivals of those
business men, ultimately bringing ruin to their businesses.

Despite his dismay with the DoS, Muhammed stated he was, "full of hate"
toward the Saudi Arabian government. Muhammed said he wished the US
government would enter Saudi Arabia and destroy the government and
jihadists there. Muhammed spoke of filing a lawsuit against the Saudi
government over the suffering to which he was subjected. Muhammed stated
he also intended to write a book regarding his experiences. Muhammed said
he partially blamed religious extremists for his suffering, as he would
not have been put in this position without the existence of groups like Al-
Qaida and ISIS.

Muhammed said he intended on flying to Los Angeles this coming Friday to
visit family members in the area. Muhammed advised his mother, Jessica Al-
Azhari, his grandmother, and his uncle all lived at 5038 Peacock Lane,
Riverside, CA, which is where he intended to stay while visiting. Muhammed

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of _____ Interview of Muhammed Al-Azhari ___ , On  01/03/2019  , Page  4 of 4

said the purpose of the trip was to evaluate the resources he would have
there and he had already mostly decided to remain in Los Angeles. Muhammed
also said his siblings who currently lived in Saudi Arabia were due to
relocate to the United States next week. They would be temporarily staying
at Muna's house until they were able to establish themselves.

Muhammed said he was open to further future contact.

[Agent's Note: Interview notes have been digitally attached. Original
interview notes have been submitted as a physical 1A.]

STORY STARTED @ 18 YOA

MOVING TO LA TOMORROW W/MOM IN RIVERSIDE

JESSICA ALAZHARI

GRANDMA, UNCLE

SIBLINGS MOVING HERE (TAMPA) STAYING W/MUNA

MUNA ALAZHARI

ZAKAT - 2½% ONCE PER YEAR

HE + BROTHERS WENT TO MOSQUE

DAD ASKED IMAM FOR TRUSTWORTHY PLACE TO PUT ZAKAT

IMAM REFERRED HIM TO IMAM'S BROTHER ALSO IMAM
     ELIAS                                      AN

2ND IMAM HAS PRIVATE ROOM @ BACK OF MOSQUE
    YASIR

MU + DAD WENT TO HIM - MU WENT TO PRAY

MU SAID HELLO THEN LEFT THE ROOM LEAVING DAD W/ YASIR

DAD SAID HE REQUESTED RECEIPT FOR ZAKAT - YASIR SAID NO
                                                     NO

DAD INTENDED THE MONEY TO GO TO POOR IN MECCA

DAD DIDN'T LEAVE MONEY W/ YASIR

- 9 MO LATER YASIR WAS ARRESTED (UNK WHY) ACCUSED OF

  COLLECTING FOR TERRORISM

- REFERRED MOMCAT + MU AS CHARACTER REFERENCES

  90 DAYS LATER THEY ARRESTED MU + DAD
   FBI
  CREATES STORIES ABOUT ISIS + AQ

  TWO DOCS PRESENTED TO + MAKE HIM SIGN

  - REFUSES

DISC-01652

UNSURE OF EXACT CONTENT

TOLD HIM TO CHOOSE ONE TO SIGN

TORTURED HIM - BURNED W/ CHEMS, BURNED FINGERS, CUT

TOES, DISFIGURED PENIS          (LIKE ARRESTING US CITS)

TOLD HIM INTERROGATOR WAS GOING TO GET PROMOTED

TORTURED EVERY DAY

              FSA

FREE SYRIAN ARMY - NOT A MEMBER - FEEL BAD BE SYRIA

                         LOCAL

GOV COP - OLD GUY - OFFERED CHARGES - NOT WORLDWIDE

      ASKED FOR FSA INFO + FAMILY INFO

AFTER 2 YRS - COURT - 3 YR SENTENCE

JUDGE UPHELD CONFESSION AS EVIDENCE DESPITE COERCION

DAD RELEASED IN 2 DAYS

THINK DAD IS BECOMING MENTALLY DISTURBED - ON MULTIPLE

      MEDS

DEPT OF STATE DON'T DO ANYTHING - COULDN'T TELL THEM

      DUE TO SPYING

- GOVT CORRUPTION - SET BUSINESSMEN AGAINST ONE ANOTHER

DISC-01653

213-816-6525   Px

"I'm FULL OF HATE" N15d AM GOP WOULD DESTROY RCA
+ JIHADISTS

GMA

# SAUDI ARABIA 2020 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud, who is both head of state and head of government.  The 1992 Basic Law sets out the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution.  It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud).  In 2015 the country held its most recent municipal elections on a nonparty basis for two-thirds of the 3,159 seats in the 284 municipal councils around the country.  Independent polling station observers did not identify significant irregularities with the elections.

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all of which report to the king, are responsible for law enforcement and maintenance of order.  The State Security Presidency includes the General Directorate of Investigation (Mabahith), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior.  Civilian authorities generally maintained effective control over the security forces.  Members of the security forces committed some abuses.

Saudi Arabia continued air operations in Yemen throughout the year as leader of a coalition formed to counter the 2014 Houthi takeover of Yemeni government institutions and facilities.  Houthi militants conducted missile, rocket, drone, and artillery attacks aimed at Saudi territory on an almost weekly basis.  Saudi-led coalition airstrikes in Yemen reportedly resulted in civilian casualties and damage to infrastructure on multiple occasions.  In June the UN secretary-general noted a "sustained, significant decrease in killing and maiming due to air strikes" and delisted the Saudi-led coalition from the list of parties responsible for grave violations against children in armed conflict.  The Joint Incident Assessment Team, an independent investigative body, reviewed allegations of civilian casualties against the Saudi-led coalition in Yemen and referred incidents for potential action.

## SAUDI ARABIA

(See the Department of State's *Country Reports on Human Rights Practices* for Yemen).

During the year a royal decree abolished discretionary (*ta'zir*) death penalty sentences for crimes committed by minors, although the death penalty can still be applied to minors in instances specified by Islamic law (including for murder when the victim's family seeks the death penalty).  The decree also capped prison sentences for minors at 10 years.  The Supreme Court instructed courts to end flogging as a discretionary sentence and replace it with prison sentences or fines, which could eliminate flogging in most cases.  Authorities continued to expand women's rights, including a court ruling that a woman living independently did not constitute a criminal act and the Ministry of Education's decision to drop the requirement that women studying abroad on a government scholarship be accompanied by a male guardian.

Significant human rights issues included:  unlawful killings; executions for nonviolent offenses; forced disappearances; torture and cases of cruel, inhuman, or degrading treatment of prisoners and detainees by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; political prisoners or detainees; serious restrictions on free expression, the press, and the internet, including threats of violence or unjustified arrests or prosecutions against journalists, censorship, site blocking, and engaging in harassment and intimidation against Saudi dissidents living abroad; substantial interference with the freedom of peaceful assembly and freedom of association; severe restrictions of religious freedom; restrictions on freedom of movement; inability of citizens to choose their government peacefully through free and fair elections; violence and discrimination against women, although new women's rights initiatives were implemented; trafficking in persons; criminalization of consensual same-sex sexual activity; and restrictions on workers' freedom of association, including prohibition of trade unions and collective bargaining.

In several cases the government did not punish officials accused of committing human rights abuses, contributing to an environment of impunity.  In September the Public Prosecutor's Office announced a final verdict in the murder trial of journalist Jamal Khashoggi, killed at the Saudi Consulate in Istanbul, Turkey, in 2018.  All five defendants previously sentenced to death for their roles had their

SAUDI ARABIA

sentences commuted to a maximum of 20 years in prison, following a pardon from the Khashoggi family.  Three others had their prison sentences upheld.  The UN special rapporteur on extrajudicial, summary, or arbitrary executions called the verdicts a "parody of justice" and stated high-level officials "who organized and embraced the execution of Jamal Khashoggi have walked free from the start."

# Section 1. Respect for the Integrity of the Person, Including Freedom from

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that the government or its agents committed arbitrary or unlawful killings.  The Public Prosecutor's Office (PPO), which reports to the King, is responsible for investigating whether security force actions were justifiable and pursuing prosecutions.

On April 13, media reported that security forces shot and killed tribal activist Abdulrahim al-Huwaiti in the northwestern town of al-Khuraybah, Tabuk region.  Al-Huwaiti reportedly refused to leave his home, which was slated for demolition in preparation for the construction of a new high-tech city to attract foreign investors.  He was killed following a clash with authorities at his home.  Hours before his death, al-Huwaiti posted YouTube videos in which he criticized the project and claimed his neighbors had been forcibly removed after facing pressure from the government and rejecting financial compensation to move.

An August 13 report by Human Rights Watch (HRW) accused Saudi border guards of killing several dozen Ethiopian migrants in April as they crossed over the border from Yemen illegally, fleeing Houthi forces who were forcibly expelling migrant workers.

Under the country's interpretation and practice of sharia (Islamic law), capital punishment may be imposed for a range of nonviolent offenses, including apostasy, sorcery, and adultery, although in practice death sentences for such offenses were rare and usually reduced on appeal.  As of December 31, five of the 25 executions during the year were for crimes not considered "most serious" (drug

## SAUDI ARABIA

related).  The total number of executions during the year was considerably less than the 185 executions carried out in 2019.

Since the country lacks a comprehensive written penal code listing criminal offenses and the associated penalties for them (see section 1.e.), punishment--including the imposition of capital punishment--is subject to considerable judicial discretion.

On September 7, the Riyadh Criminal Court issued a final verdict in the murder trial of journalist Jamal Khashoggi, killed in Istanbul in 2018.  All five government agents who were previously sentenced to death for their roles had their sentences commuted to a maximum of 20 years in prison.  Three other defendants had their sentences of seven to 10 years' imprisonment upheld.  The court's ruling came after Khashoggi's sons announced in May they would exercise their right to pardon the five individuals who had been sentenced to death.  On September 7, the UN special rapporteur for extrajudicial, summary, or arbitrary executions, Agnes Callamard, called the final verdict a "parody of justice" and asserted that the high-level officials "who organized and embraced the execution of Jamal Khashoggi have walked free from the start."

In April a royal decree abolished discretionary (*ta'zir*) death penalty sentences for those who committed crimes as minors.  (The 2018 Juvenile Law sets the legal age of adulthood at 18 based on the Hijri calendar.)  Minor offenders, however, who are convicted in *qisas*, a category of crimes that includes various types of murder, or *hudud*, crimes that carry specific penalties under the country's interpretation of Islamic law, could still face the death penalty, according to HRW.  The royal decree also capped prison sentences for minors at 10 years.

On April 8, government authorities in al-Bahah region carried out a qisas death sentence against Abdulmohsen al-Ghamdi, who had been charged with intentional homicide when he was a child, according to the European-Saudi Organization for Human Rights (ESOHR).  Al-Ghamdi was reportedly arrested in 2012, at the age of 15, after he had shot and killed a classmate at a high school.

On August 26, the governmental Human Rights Commission (HRC) announced the Public Prosecutor's Office (PPO) ordered a review of the death sentences of

## SAUDI ARABIA

three Shia activists, Abdullah al-Zaher, Dawood al-Marhoon, and Ali al-Nimr, who were minors at the time of arrest. The statement indicated that the review order was an implementation of the April royal decree and applied retroactively.

In November a judge in the Specialized Criminal Court (SCC) ruled to overturn al-Marhoon and al-Zaher's death sentences, and resentenced them to 10 years. Al-Zaher and al-Marhoon were 16 and 17, respectively, at the time of their arrests in 2012. Both were charged in connection with their involvement in antigovernment protests.

As of December, al-Nimr's case remained under review. Al-Nimr was arrested in 2012 and sentenced to death in 2014 for crimes allegedly committed when he was 17. He was charged with protesting, aiding and abetting fugitives, attacking security vehicles, and various violent crimes. Human rights organizations reported due process concerns relating to minimum fair-trial standards for his case. Al-Nimr is the nephew of Shia cleric Nimr al-Nimr, executed in 2016.

There was also no update by year's end as to whether the April royal decree would be applied retroactively in the case of the death sentence against Mustafa al-Darwish for his involvement as a minor in antigovernment protests in 2012. On February 26, Nashet Qatifi, a Shia activist group, claimed the Supreme Court had upheld al-Darwish's death penalty.

In November the rights group Reprieve expressed concern for 10 minors who remained on death row, including Muhammad al-Faraj. The group reported that prosecutors continued to seek the death penalty in a trial against al-Faraj, who was arrested in 2017 for protest-related crimes when he was 15.

In February a court issued a final verdict reducing Murtaja Qureiris' sentence from a 12-year prison term handed to him in June 2019 to eight years, followed by a travel ban for a similar period, according to the human rights organization al-Qst (ALQST). According to rights groups including Amnesty International, Qureiris was detained in 2014 for a series of offenses committed when he was between 10 and 13 years old, and the public prosecution had sought the death penalty in his case.

## SAUDI ARABIA

There were terrorist attacks in the country during the year.  Iranian-backed Houthis continued to target Saudi civilians and infrastructure with missiles and unmanned aircraft systems launched from Yemen.  There were no civilian casualties during the year.

The United Nations, nongovernmental organizations (NGOs), media, and humanitarian and other international organizations reported what they characterized as disproportionate use of force by all parties to the conflict in Yemen, including the Saudi-led coalition, Houthi militants, and other combatants. The Group of Experts concluded that four airstrikes conducted by the Saudi-led coalition (SLC) between June 2019 and June 2020 were undertaken without proper regard to the principles of distinction, proportionality, and precaution to protect civilians and civilian objects.  A UN report released in June documented 395 instances of killing and 1,052 instances of maiming of children in Yemen between January and December 2019, of which 222 casualties were attributed to the SLC. The UN secretary-general noted this was a "sustained significant decrease in killing and maiming due to air strikes" and delisted the SLC from the list of parties responsible for grave violations against children in armed conflict.  (See the *Country Reports on Human Rights Practices* for Yemen.)

## b. Disappearance

There were reports of disappearances carried out by or on behalf of government authorities.

In early March authorities reportedly detained four senior princes:  Prince Ahmed bin Abdulaziz, King Salman's full brother; his son, Prince Nayef bin Ahmed, a former head of army intelligence; Prince Mohammed bin Nayef, former crown prince and interior minister; and his younger brother, Prince Nawaf bin Nayef. The detentions were not announced by the government, but Reuters reported that the princes were accused of "conducting contacts with foreign powers to carry out a coup d'etat."  The *Wall Street Journal* reported that at the same time, security forces detained dozens of Interior Ministry officials, senior army officers, and others suspected of supporting the alleged coup attempt.  In August lawyers representing Prince Mohammed bin Nayef said they were increasingly concerned about his well-being, alleging that his whereabouts remained unknown five months

## SAUDI ARABIA

after he was detained and stating that he had not been allowed visits by his personal doctor.  Prince Nawaf's lawyers stated he was released in August, but there were no updates on the other three as of year's end.

On March 16, authorities arrested Omar al-Jabri, 21, and Sarah al-Jabri, 20, in Riyadh and held them in incommunicado detention, according to HRW.  They are the children of former intelligence official Saad al-Jabri, who has lived in exile in Canada since 2017.  Prisoners of Conscience reported that the first trial hearing against Omar and Sarah occurred on September 10.  They remained in detention at year's end.

On March 27, authorities reportedly detained Prince Faisal bin Abdullah Al Saud, son of the late king Abdullah and former head of the Saudi Red Crescent Society, and have since held him incommunicado and refused to reveal his whereabouts, according to HRW.  The authorities previously detained Prince Faisal during a November 2017 anticorruption campaign.

On March 5, the UN Working Group on Arbitrary Detentions contacted the Foreign Ministry to urge the release of Princess Basmah bint Saud, 56, a daughter of the late king Saud.  On April 15, a verified Twitter account owned by Princess Basmah issued a series of tweets stating that she and her daughter Suhoud al-Sharif were being held without charge in al-Ha'ir Prison in Riyadh and that her health was deteriorating, according to HRW.  The tweets apparently disappeared after several hours.  On May 5, Agence France-Presse (AFP) reported that family members had received no further information about her well-being or status.  On April 6, the Special Procedures of the UN Human Rights Council reported it sent a communication to the government alleging that authorities prevented Princess Basmah and her daughter from traveling to seek medical attention for her daughter's health condition, that they were subsequently detained and held incommunicado for a period of approximately one month, and that they were being held at the al-Ha'ir Prison in Riyadh without charge, according to the ESOHR.

On May 17, State Security Presidency (SSP) officers arrested internet activist Amani al-Zain in Jeddah; her whereabouts remained unknown, according to the Gulf Center for Human Rights (GCHR) and Prisoners of Conscience.  They added that al-Zain was arrested after she apparently referred to Crown Prince Mohammed

bin Salman as "Abu Munshar," meaning "father of the saw," while on a live video chat with Egyptian activist Wael Ghonim in October 2019.

On June 28, the Geneva-based Organization for Rights and Liberties (SAM) called on the government to disclose the fate of five Yemenis it said were being held in its prisons.  On June 10, Prisoners of Conscience confirmed Sheikh Abdulaziz al-Zubayri, a member of the Yemeni Congregation for Reform or al-Islah Party had been in Saudi detention since May 20 for participating in an online meeting hosted by Yemeni students in Turkey.

In February disappeared humanitarian aid worker Abdulrahman al-Sadhan was permitted to call his family briefly, at which time he stated he was being held in al-Ha'ir Prison.  His family has not heard from him since.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits torture and makes officers, who are responsible for criminal investigations, liable for any abuse of authority.  Sharia, as interpreted in the country, prohibits judges from accepting confessions obtained under duress.  Statutory law provides that public investigators shall not subject accused persons to coercive measures to influence their testimony.

Human rights organizations, the United Nations, and independent third parties noted numerous reports of torture and mistreatment of detainees by law enforcement officers.  ALQST alleged that authorities continued to use torture in prisons and interrogation rooms.  Amnesty International assessed in a February statement that one of the most striking failings of the SCC in trials was "its unquestioning reliance on torture-tainted 'confessions.'"  It alleged at least 20 Shia men tried by the SCC have been sentenced to death on the basis of confessions obtained by torture since 2016, with 17 of them already executed.  Former detainees in facilities run by the Mabahith alleged that abuse included beatings, sleep deprivation, and long periods of solitary confinement for nonviolent detainees.

# SAUDI ARABIA

On May 11, seven UN special rapporteurs sent a letter to the government regarding Shia cleric Sheikh Mohammed Hassan al-Habib and Shia teenager Murtaja Qureiris (see section 1.a.), expressing concern at the use of torture and mistreatment to extract confessions and possible incriminating evidence.

On July 11, the ESOHR stated the government continued to hold 49 women activists in detention, including several human rights advocates, and claimed they were subjected to torture and mistreatment.

On August 13, SAM alleged in *Middle East Monitor* that Jizan Prison authorities subjected hundreds of Yemeni detainees to torture and mistreatment.  It said former Yemeni detainees claimed that prison officials subjected them to severe torture including electrocutions, crucifixions, being held in solitary confinement for prolonged periods, denial of health care, and being denied outside contacts, including with lawyers and family.  According to the group, at least one detainee died.

Officials from the Ministry of Interior, the PPO, and the HRC, which is responsible for coordinating with other government entities to investigate and respond to alleged human rights violations (see section 5), claimed that rules prohibiting torture prevented such practices from occurring in the penal system.  The Ministry of Interior stated it installed surveillance cameras to record interrogations of suspects in some criminal investigation offices, police stations, and prisons where such interrogations allegedly occurred.

Courts continued to sentence individuals to corporal punishment, but in April the Supreme Court instructed all courts to end flogging as a discretionary (ta'zir) criminal sentence and replace it with prison sentences, fines, or a mixture of both. Flogging still could be included in sentences for three hudud crimes:  drunkenness, sexual conduct between unmarried persons, and false accusations of adultery.  The Supreme Court stated the reform was intended to "bring the Kingdom in line with international human rights norms against corporal punishment."

Impunity was a problem in the security forces.  The ongoing crackdown on corruption, including the investigation of security services personnel, and the announced reform of the legal code indicate efforts to address impunity.

# SAUDI ARABIA

## Prison and Detention Center Conditions

Prison and detention center conditions varied, and some did not meet international standards; reported problems included overcrowding and inadequate conditions.

**Physical Conditions:**  Juveniles constituted less than 1 percent of detainees and were held in separate facilities from adults, according to available information.

Authorities held pretrial detainees together with convicted prisoners.  They separated persons suspected or convicted of terrorism offenses from the general population but held them in similar facilities.  Activists alleged that authorities sometimes detained individuals in the same cells as individuals with mental disabilities as a form of punishment and indicated that authorities mistreated persons with disabilities.

Authorities differentiated between violent and nonviolent prisoners, sometimes pardoning nonviolent prisoners to reduce the prison population.  Shia inmates were in some cases held in separate wings of prisons and reportedly faced worse conditions than Sunnis.

Certain prisoners convicted on terrorism-related charges were required to participate in government-sponsored rehabilitation programs before consideration of their release.

In a June 7 report, the *Guardian* newspaper quoted rights groups as saying that al-Ha'ir Prison in Riyadh has long been associated with physical abuse.  An ALQST representative alleged the general criminal area of al-Ha'ir was overcrowded and had poor sanitation and that denial of medical treatment and temporary transfer of political prisoners into the overcrowded general criminal prison were used as punishment.

On March 26, the HRC announced that authorities released 250 foreign detainees held on nonviolent immigration and residency offenses as part of efforts to contain the spread of COVID-19.

On April 24, human rights defender Abdullah al-Hamid, 69, died in detention. Prisoners of Conscience, which tracks human rights-related cases in the country,

## SAUDI ARABIA

asserted his death was due to "intentional health neglect" by prison authorities. According to ALQST and HRW, al-Hamid's health deteriorated after authorities delayed a necessary heart operation. ALQST and HRW also reported that authorities took steps to prevent him from discussing his health condition with his family. Al-Hamid, cofounder of the Saudi Civil and Political Rights Association (known as ACPRA), was serving an 11-year prison sentence following his conviction in 2013 on charges related to his peaceful political and human rights activism. On June 2, UN experts sent the government a letter expressing deep concern over al-Hamid's death in detention.

**Administration:** There were multiple legal authorities for prisons and detention centers. The General Directorate of Prisons administered approximately 91 detention centers, prisons, and jails, while the Mabahith administered approximately 20 regional prisons and detention centers for security prisoners. The law of criminal procedure gives the PPO the authority to conduct official visits of prisons and detention facilities "within their jurisdictional areas to ensure that no person is unlawfully imprisoned or detained."

No ombudsmen were available to register or investigate complaints made by prisoners, although prisoners could and did submit complaints to the HRC, which has offices in a number of prisons, and the quasi-governmental National Society for Human Rights (NSHR) for follow up. The law of criminal procedure provides that "any prisoner or detainee shall have the right to submit, at any time, a written or verbal complaint to the prison or detention center officer and request that he communicate it to a member of the [former] Bureau of Investigations and Public Prosecution [renamed the PPO]." Inmates, however, required approval from prison authorities to submit complaints to an HRC office. Under the law there is no right to submit complaints directly to judicial authorities. There was no information available on whether prisoners were able to submit complaints to prison or prosecutorial authorities without censorship or whether authorities responded or acted upon complaints.

On January 13, the PPO launched *Ma'akom*, an electronic service that allows citizens and residents to submit complaints in case of any violation of the rights of detainees. Sheikh Abdullah bin Nasser al-Muqbel, the PPO's assistant undersecretary for prison supervision and enforcement of sentences, declared, "The

**SAUDI ARABIA**

PPO will follow up on the case, go to where the detainee is held, conduct the necessary investigations, order the detainee's release if there are irregularities in his arrest, and take necessary measures against perpetrators of the illegal arrest." There were no updates on implementation of the system by year's end.

Record keeping on prisoners was inadequate; there were reports authorities held prisoners after they had completed their sentences.

A Ministry of Interior-run website (*Nafetha*) provided detainees and their relatives access to a database containing information about the legal status of the detainee, including any scheduled trial dates. Activists said the website did not provide information about all detainees.

Authorities generally permitted relatives and friends to visit prisoners twice a week, although certain prisons limited visitation to once or twice a month. Prisoners were typically granted at least one telephone call per week. There were reports that prison, security, or law enforcement officials denied this privilege in some instances, often during investigations. The families of detainees could access the Nafetha website for applications for prison visits, temporary leave from prison (generally approved around post-Ramadan Eid holidays), and release on bail (for pretrial detainees). Some family members of detained persons under investigation said family visits were typically not allowed, while others said allowed visits or calls were extremely brief (less than five minutes). Authorities at times reportedly denied some detainees weekly telephone calls for several months. Some family members of prisoners complained authorities canceled scheduled visits with relatives without reason. Since March human rights groups reported that in-person visitation in prisons was suspended due to COVID-19 restrictions.

Authorities generally permitted Muslim detainees and prisoners to perform religious observances such as prayers.

**Independent Monitoring:** Independent institutions were not permitted to conduct regular, unannounced visits to places of detention, according to the UN Committee against Torture. During the year the government permitted some foreign diplomats restricted access to some prison facilities in nonconsular cases. In a limited number of cases, foreign diplomats were granted consular visits to individuals in

## SAUDI ARABIA

detention, but the visits took place in a separate visitors' center where conditions may differ from those in the detention facilities holding the prisoners.

The government permitted the HRC and quasi-governmental NSHR to monitor prison conditions. The organizations stated they visited prisons throughout the country and reported on prison conditions. On July 9, local media reported the HRC conducted 2,094 prison visits during the fiscal year 2019-20, including visits to public prisons, security prisons, and various detention centers, as well as "social observation centers" and girls' welfare institutions.

**Improvements:** On April 7, King Salman ordered the temporary suspension of execution of final verdicts and judicial orders related to the imprisonment of debtors involved in private rights-related cases in an effort to reduce the prison population and limit the spread of COVID-19. He also ordered the immediate, temporary release of prisoners already serving time for debt-related convictions.

## d. Arbitrary Arrest or Detention

The law provides that no entity may restrict a person's actions or imprison a person, except under the provisions of the law. The law of criminal procedure provides that authorities may not detain a person for more than 24 hours, but the Ministry of Interior and the SSP, to which the majority of forces with arrest powers reported, maintained broad authority to arrest and detain persons indefinitely without judicial oversight, notification of charges, or effective access to legal counsel or family.

**Arrest Procedures and Treatment of Detainees**

On May 11, the Council of Ministers established a new system for the PPO and amended Article 112 of the law of criminal procedure, giving the PPO "complete and independent powers" to identify major crimes that require detention, according to local media. On August 21, Public Prosecutor Saud al-Mu'jab issued a list of 25 major crimes that mandate arrest and pretrial detention, including types of border crimes, corruption, homicide, and offenses against national security, among others.

According to the law of criminal procedure, "no person shall be arrested, searched, detained, or imprisoned except in cases provided by law, and any accused person

## SAUDI ARABIA

shall have the right to seek the assistance of a lawyer or a representative to defend him during the investigation and trial stages." By law authorities may summon any person for investigation and may issue an arrest warrant based on evidence. In practice authorities frequently did not use warrants, and warrants were not required under the law in all cases.

The law requires authorities to file charges within 72 hours of arrest and hold a trial within six months, subject to exceptions specified by amendments to the law of criminal procedure and the counterterrorism law (see section 2.a.). Authorities may not legally detain a person under arrest for more than 24 hours, except pursuant to a written order from a public investigator. Authorities reportedly often failed to observe these legal protections, and there was no requirement to advise suspects of their rights.

The law specifies procedures required for extending the detention period of an accused person beyond the initial five days. Authorities may approve detentions in excess of six months in "exceptional circumstances," effectively allowing individuals to be held in pretrial detention indefinitely in cases involving terrorism or "violations of state security." There is a functioning bail system for less serious criminal charges. The PPO may order the detention of any person accused of a crime under the counterterrorism law for up to 30 days, renewable up to 12 months, and in state security cases up to 24 months with a judge's approval.

By law defendants accused of any crime cited in the law are entitled to hire a lawyer to defend themselves before the court "within an adequate period of time to be decided by the investigatory body." In cases involving terrorism or state security charges, detainees generally did not have the right to obtain a lawyer of their choice. The government provided lawyers to defendants who made a formal application to the Ministry of Justice to receive a court-appointed lawyer and proved their inability to pay for their legal representation.

There were reports authorities did not always allow legal counsel access to detainees who were under investigation in pretrial detention. Authorities indicated a suspect could be held up to 12 months in investigative detention without access to legal counsel if authorized by prosecutors. Judicial proceedings begin after authorities complete a full investigation.

## SAUDI ARABIA

The king continued the tradition of commuting some judicial punishments.  Royal pardons sometimes set aside a conviction and sometimes reduced or eliminated corporal punishment.  The remaining sentence could be added to a new sentence if the pardoned prisoner committed a crime subsequent to release.

Authorities commuted the sentences of some who had received prison terms.  The counterterrorism law allows the PPO to stop proceedings against an individual who cooperates with investigations or helps thwart a planned terrorist attack.  The law authorizes the SSP to release individuals already convicted in such cases.

**Arbitrary Arrest:**  Rights groups received reports from families claiming authorities held their relatives arbitrarily or without notification of charges.  During the year authorities detained without charge security suspects, persons who publicly criticized the government, Shia religious leaders, individuals with links to rights activists, and persons accused of violating religious standards.

On September 4, Prisoners of Conscience reported that the SCC sentenced six academics and journalists detained in 2017, including Abdullah al-Maliki, Fahd al-Sunaidi, Khalid al-Ajeemi, Ahmed al-Suwayan, Ibrahim al-Harthi, and Yousef al-Qassem, to prison sentences of three to seven years.  Saudi rights activist Yahya al-Assiri stated the men were arbitrarily detained and that their convictions were based on solely on tweets.

**Pretrial Detention:**  In August, ALQST and the Geneva-based MENA Rights Group lodged a complaint to the UN Working Group on Arbitrary Detention and the Special Procedures of the UN Human Rights Council in Geneva over the "arbitrary" detention of Prince Salman bin Abdulaziz bin Salman and his father.  In 2018 Prince Salman was detained along with 11 other princes after they staged what the PPO called a "sit-in" at a royal palace in Riyadh to demand the state continue to pay their electricity and water bills.  Sources told AFP that the prince and his father have never been interrogated or charged since their detention began more than two and a half years ago.

Incommunicado detention was also a problem (see section 1.b.).  Authorities reportedly did not always respect a detainees' right to contact family members following detention, and the counterterrorism law allows the investigatory body to

SAUDI ARABIA

hold a defendant for up to 90 days in detention without access to family members or legal counsel (and the SCC may extend such restrictions beyond this period). Security and some other types of prisoners sometimes remained in prolonged solitary detention before family members or associates received information of their whereabouts, particularly for detainees in Mabahith-run facilities.

On September 6, HRW stated authorities denied some prominent detainees, including former crown prince Mohammed bin Nayef and Muslim scholar Salman al-Odah, contact with their family members and lawyers for months. After almost three months in incommunicado detention, according to HRW, family members of women's rights activist Loujain al-Hathloul said authorities allowed her parents to visit on August 31, following her six-day hunger strike; she started another hunger strike October 26 in protest of prison conditions (see section 1.e., Political Prisoners and Detainees).

**Detainee's Ability to Challenge Lawfulness of Detention before a Court:**
Under the law detainees are not entitled to challenge the lawfulness of their detention before a court. In the case of wrongful detention, the law of criminal procedure, as well as provisions of the counterterrorism law, provide for the right to compensation if detainees are found to have been held unlawfully.

# e. Denial of Fair Public Trial

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force. Nevertheless, the judiciary, the PPO, and the SSP were not independent entities, as they were required to coordinate their decisions with executive authorities, with the king and crown prince as arbiters. Although public allegations of interference with judicial independence were rare, the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies, such as the SCC, which rarely acquitted suspects. Human rights activists reported that SCC judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities. Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients

## SAUDI ARABIA

at critical stages of the judicial process, particularly during the pretrial investigation phase.

Women's ability to practice law was limited; there were no women on the High Court or Supreme Judicial Council and no female judges or public prosecutors.  On June 17, the Shoura rejected a proposal to study appointing women as judges in personal status courts.  In August 2019, however, the PPO announced the appointment of 50 women as public prosecution investigators, marking the first time that women had held this position.  On June 4, the PPO appointed an additional 53 women as public prosecution investigators.

Defendants are able to appeal their sentences.  The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must unanimously affirm.  Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted.

Defendants possess the right under the law to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.).  In some prescribed cases (*qisas*), the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On February 6, Amnesty International reported that authorities were using the SCC "to systematically silence dissent."  Amnesty accused the SCC of using overly broad counterterror and anticybercrime laws in unfair trials to hand down prison sentences of up to 30 years as well as the death penalty to human rights defenders, writers, economists, journalists, religious clerics, reformists, and political activists, particularly from the Shia minority.  Amnesty asserted that "every stage of the SCC's judicial process is tainted with human rights abuses, from the denial of access to a lawyer, to incommunicado detention, to convictions based solely on so-called 'confessions' extracted through torture."

On April 17, HRW reported 68 Palestinians and Jordanians on trial before the SCC on the charge of links with an unnamed "terrorist organization" were subjected to a

## SAUDI ARABIA

range of abuses, including forced disappearances, long-term solitary confinement, and torture, according to their family members, and that their trial raised serious due process concerns.

### Trial Procedures

In the judicial system, there traditionally was no published case law on criminal matters, no uniform criminal code, no presumption of innocence, and no doctrine of stare decisis that binds judges to follow legal precedent.  The Justice Ministry continued to expand a project started in 2007 to distribute model judicial decisions to ensure more uniformity of legal application, and as recently as August 2019, the ministry published judicial decisions on its website.  The law states that defendants should be treated equally in accordance with sharia.  The Council of Senior Scholars, or the *ulema*, an autonomous advisory body, issues religious opinions (*fatwas*) that guide how judges interpret sharia.

In the absence of a formalized penal code that details all criminal offenses and punishments, judges in the courts determine many of these penalties through their interpretations of sharia, which varied according to the judge and the circumstances of the case.  Because judges have considerable discretion in decision making, rulings and sentences diverged widely from case to case.

Several laws, however, provide sentencing requirements for crimes including terrorism, cybercrimes, trafficking in persons, and domestic abuse.  In 2016 the Ministry of Justice issued a compilation of previous decisions that judges could refer to as a point of reference in making rulings and assigning sentences.

Appeals courts cannot independently reverse lower-court judgments; they are limited to affirming judgments or returning them to a lower court for modification.  Even when judges did not affirm judgments, appeals judges in some cases remanded the judgment to the judge who originally authored the opinion.  This procedure sometimes made it difficult for parties to receive a ruling that differed from the original judgment in cases where judges hesitated to admit error.  While judges may base their decisions on any of the four Sunni schools of jurisprudence, all of which are represented in the Council of Senior Scholars, the Hanbali School predominates and forms the basis for the country's law and legal interpretations of

## SAUDI ARABIA

sharia.  Shia citizens use their legal traditions to adjudicate family law cases between Shia parties, although either party can decide to adjudicate a case in state courts, which apply Sunni legal traditions.

While the law states that court hearings shall be public, courts may be closed at the judge's discretion.  As a result, many trials during the year were closed.  Since 2018 the Ministry of Foreign Affairs barred foreign diplomatic missions from attending court proceedings at the SCC as well as trials related to security and human rights issues.  Diplomatic personnel were generally allowed to attend consular proceedings of their own citizens.  Some family members of prisoners complained that neither they nor the legal representatives of the accused were permitted access to trials or notified about the status of trial proceedings.  In a number of cases, family members were given only 24 hours' notice before an SCC trial hearing.

According to the Ministry of Justice, authorities may close a trial depending on the sensitivity of the case to national security, the reputation of the defendant, or the safety of witnesses.  Representatives of the HRC sometimes attended trials at the SCC.

According to the law, authorities must offer defendants a lawyer at government expense.  In 2017 the Ministry of Justice stated that defendants "enjoy all judicial guarantees they are entitled to, including the right to seek the assistance of lawyers of their choosing to defend them, while the ministry pays the lawyer's fees when the accused is not able to settle them."  Activists alleged that many political prisoners were not able or allowed to retain an attorney or consult with their attorneys during critical stages of the investigatory and trial proceedings.  Detained human rights activists often did not trust the courts to appoint lawyers for them due to concerns of lawyer bias.

The law provides defendants the right to be present at trial and to consult with an attorney during the trial.  The counterterrorism law, however, authorizes the attorney general to limit the right of defendants accused of terrorism to access legal representation while under investigation "whenever the interests of the investigation so require."  There is no right to discovery, nor can defendants view their own file or the minutes from their interrogation.  Defendants have the right to

## SAUDI ARABIA

call and cross-examine witnesses under the law.  Activists reported, however, that SCC judges could decide to restrict this right in "the interests of the case."  The law provides that a PPO-appointed investigator question the witnesses called by the defendant during the investigation phase before the initiation of a trial.  The investigator may also hear testimony of additional witnesses he deems necessary to determine the facts.  Authorities may not subject a defendant to any coercive measures or compel the taking of an oath.  The court must inform convicted persons of their right to appeal rulings.

The law does not provide for a right against self-incrimination.

The law does not provide free interpretation services, although services were often provided in practice.  The law of criminal procedure provides that "the court should seek the assistance of interpreters," but it does not obligate the court to do so from the moment the defendant is charged, nor does the law specify that the state will bear the costs of such services.

While sharia as interpreted by the government applies to all citizens and noncitizens, the law in practice discriminates against women, noncitizens, nonpracticing Sunni Muslims, Shia Muslims, and persons of other religions.  In some cases the testimony of a woman equals half that of a man.  Judges have discretion to discount the testimony of nonpracticing Sunni Muslims, Shia Muslims, or persons of other religions; sources reported judges sometimes completely disregarded or refused to hear testimony by Shia Muslims.

**Political Prisoners and Detainees**

The government maintained there were no political prisoners, including detainees who reportedly remained in prolonged detention without charge, while local activists and human rights organizations claimed there were "hundreds" or "thousands."  Credible reporting by advocacy groups and press suggested authorities detained persons for peaceful activism or political opposition, including nonviolent religious figures, women's rights defenders, and human rights activists, and those who the government claimed posted offensive or antigovernment comments on social media sites.

**SAUDI ARABIA**

In many cases it was impossible to determine the legal basis for incarceration and whether the detention complied with international norms and standards.  During the year the SCC tried political and human rights activists for nonviolent actions unrelated to terrorism, violence, or espionage against the state.  Authorities restricted attorneys' access to detainees on trial at the SCC.

International NGOs, the United Nations, and others criticized the government for abusing its antiterrorism legal authorities to detain or arrest some dissidents or critics of the government or royal family on security-related grounds, who had not espoused or committed violence.  At least 192 persons remained in detention for activism, criticism of government leaders or policies, impugning Islam or religious leaders, or "offensive" internet postings, including prominent activists such as Raif Badawi, Mohammed al-Qahtani, Naimah Abdullah al-Matrod, Maha al-Rafidi, Eman al-Nafjan, Waleed Abu al-Khair, and Nassima al-Sadah; clerics including former grand mosque imam Salih al-Talib; and Sahwa movement figures Safar al-Hawali, Nasser al-Omar, and others.

Between January and March, the Riyadh Criminal Court resumed trials against 11 women activists, including several arrested in 2018.  Among them were Nassima al-Sadah, Samar Badawi, Mayaa al-Zahrani, Nouf Abdelaziz al-Jerawi, and Loujain al-Hathloul--all of whom remained detained and faced charges related to their human rights work and contact with international organizations, foreign media, and other activists.  The women were accused of violating the cybercrimes law, which prohibits production of materials that harm public order, religious values, or public morals, and carries penalties of up to five years in prison and a fine of up to three million riyals ($800,000).  On November 25, all five appeared in criminal court, where the judge referred al-Hathloul's case to the SCC.  There was no information about the outcome of the hearing for al-Sadah, Badawi, al-Zahrani and al-Jerawi.

On August 26, media reported authorities severed contact between some detainees and their families, including Loujain al-Hathloul (see section 1.d.), Princess Basmah bint Saud, and Salman al-Odah.

On December 22, the Riyadh Criminal Court dismissed al-Hathloul's complaint that she had been tortured during the first months of her detention.  On December

SAUDI ARABIA

28, the SCC found al-Hathloul guilty of violating the antiterrorism law, specifically by "seeking to implement a foreign agenda and change the Basic Law of Governance," through online activity. She was sentenced to five years and eight months in prison with two years and 10 months of that suspended and credit for time served since her May 2018 arrest.

**Politically Motivated Reprisal against Individuals Located Outside the Country**

In August, Saad al-Jabri, a former high-ranking Saudi intelligence official who fled the country in 2016, filed a suit in Canada alleging that a hit squad (Tiger Squad) had been sent to track and kill him in 2018. The team was reportedly stopped by Canadian border services and refused entry, around the same time that Saudi officials killed Jamal Khashoggi in Istanbul. The suit also alleged al-Jabri's family members were held hostage in Saudi Arabia and that spyware was implanted on his smartphone. According to media reports, INTERPOL lifted a Red Notice that Saudi Arabia filed against him in 2017 on the basis that it was politically motivated.

**Civil Judicial Procedures and Remedies**

Complainants claiming human rights violations generally sought assistance from the HRC or the NSHR, which either advocated on their behalf or provided courts with opinions on their cases. The HRC generally responded to complaints and could refer cases to the PPO; domestic violence cases were the most common. Individuals or organizations may petition directly for damages or government action to end human rights violations before the Board of Grievances, except in compensation cases related to state security, where the SCC handles remediation. The counterterrorism law contains a provision allowing detainees in Mabahith-run prisons to request financial compensation from the Ministry of Interior/SSP for wrongful detention beyond their prison terms. In some cases the government did not carry out judicially ordered compensation for unlawful detentions in a timely manner.

# f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

## SAUDI ARABIA

The law prohibits unlawful intrusions into the privacy of persons, their homes, places of work, and vehicles. Criminal investigation officers are required to maintain records of all searches conducted; these records should contain the name of the officer conducting the search, the text of the search warrant (or an explanation of the urgency that necessitated the search without a warrant), and the names and signatures of the persons who were present at the time of search. While the law also provides for the privacy of all mail, telegrams, telephone conversations, and other means of communication, the government did not respect the privacy of correspondence or communications and used the considerable latitude provided by the law to monitor activities legally and intervene where it deemed necessary.

Authorities targeted family members of activists and critics of the government. On May 12, security officers raided the home of Saad al-Jabri's brother, Abdulrahman, a professor at King Saud University, and detained him without explanation, according to HRW. On August 24, authorities arrested Saad al-Jabri's son-in-law, Salem Almuzaini. His family said he was arrested without charge or justifiable cause, alleging the detention was in retaliation against and aiming to intimidate Saad al-Jabri for filing a lawsuit against Saudi government officials in a foreign court.

There were reports from human rights activists of governmental monitoring or blocking of mobile telephone or internet usage. The government strictly monitored politically related activities and took punitive actions, including arrest and detention, against persons engaged in certain political activities, such as calling for a constitutional monarchy, publicly criticizing senior members of the royal family by name, forming a political party, or organizing a demonstration (see section 2.a.). Customs officials reportedly routinely opened mail and shipments to search for contraband. In some areas, Ministry of Interior/SSP informants allegedly reported "seditious ideas," "antigovernment activity," or "behavior contrary to Islam" in their neighborhoods.

Encrypted communications were banned, and authorities frequently attempted to identify and detain anonymous or pseudonymous users and writers who made critical or controversial remarks. Government authorities regularly surveilled websites, blogs, chat rooms, social media sites, emails, and text messages. Media

## SAUDI ARABIA

outlets reported that authorities gained access to dissidents' Twitter and social media accounts and in some cases questioned, detained, or prosecuted individuals for comments made online.  The counterterrorism law allows the Ministry of Interior/SSP to access a terrorism suspect's private communications and banking information in a manner inconsistent with the legal protections provided by the law of criminal procedure.

The Committee for the Promotion of Virtue and the Prevention of Vice (CPVPV) is charged with monitoring and regulating public interaction between members of the opposite sex, although in practice CPVPV authorities were greatly curtailed compared with past years.

## g. Abuses in Internal Conflict

For information on Saudi Arabia's conflict in Yemen previously found in this section, please see the executive summary and section 1.a. of this report and the Department of State's *Country Reports on Human Rights Practices* for Yemen.

# Section 2. Respect for Civil Liberties, Including

## a. Freedom of Expression, Including for the Press

The law does not provide for freedom of expression, including for the press.  The Basic Law specifies, "Mass media and all other vehicles of expression shall employ civil and polite language, contribute towards the education of the nation, and strengthen unity.  Media are prohibited from committing acts that lead to disorder and division, affect the security of the state or its public relations, or undermine human dignity and rights."  Authorities are responsible for regulating and determining which speech or expression undermines internal security.  The government can ban or suspend media outlets if it concludes they violated the press and publications law, and it monitored and blocked hundreds of thousands of internet sites.  There were frequent reports of restrictions on free speech.

The counterterrorism law's definition of terrorism includes "any conduct…intended to disturb public order…or destabilize the state or endanger its national unity."  The law also penalizes "anyone who challenges, either directly or indirectly, the religion or justice of the king or crown prince…or anyone who

## SAUDI ARABIA

establishes or uses a website or computer program…to commit any of the offenses set out in the law."  Local human rights activists, international human rights organizations, and the UN special rapporteur on human rights and counterterrorism criticized the law for its overly broad and vague definitions of terrorism and complained the government used it to prosecute peaceful expression and dissent.

**Freedom of Speech:**  The government monitored public expressions of opinion and took advantage of legal controls to impede the free expression of opinion and restrict individuals from engaging in public criticism of the political sphere.  The law forbids apostasy and blasphemy, which can carry the death penalty, although there were no recent instances of death sentences being carried out for these crimes (see section 1.a.).  Statements that authorities construed as constituting defamation of the king, monarchy, governing system, or Al Saud family resulted in criminal charges for citizens advocating government reform.  The government prohibits public employees from directly or indirectly engaging in dialogue with local or foreign media or participating in any meetings intended to oppose state policies.

The government detained a number of individuals for crimes related to their exercise of free speech during the year.  On February 27, the UN high commissioner for human rights, Michelle Bachelet, urged the government to uphold the freedoms of expression and peaceful assembly and review convictions of activists, religious leaders, and journalists.

ALQST reported that authorities arrested Hezam al-Ahmari on February 10 for filming and publishing a video complaining about the opening of a nightclub in his neighborhood in Jeddah.  It said he was charged with "inciting public opinion," under Article 6 of the cybercrimes law.

In March the PPO stated it ordered the arrest of "three people who exploited social media to interpret God's will amid the coronavirus."  The arrestees, including Quran reciter Khaled al-Shahri, preacher Ibrahim al-Duwaish, and health worker Khaled Abdullah, tweeted or appeared in a video claiming the spread of novel coronavirus was a "punishment from Allah (God)," according to Prisoners of Conscience.

## SAUDI ARABIA

On April 8, the PPO announced that the dissemination of misinformation related to COVID-19 would be punishable under the cybercrimes law, adding that the PPO's Social Media Monitoring Unit would track offensive and illegal social media content and report violations to authorities.  Several persons were reportedly arrested and charged for "rumor mongering" and "disrupting order" for comments related to COVID-19.  The PPO stated it ordered "the arrest of a person who appeared in a video mocking the COVID-19 crisis and giving misleading information about the current situation."

On April 1, Prisoners of Conscience reported that authorities arrested a number of social media personalities, including Rakan al-Assiri, Mohammed al-Fawzan, Majed al-Ghamdi, and Mohammed al-Jedaie, over old tweets and videos expressing personal views, while Ministry of Interior spokesperson Lieutenant Colonel Talal al-Shalhoub stated they were arrested for breaking COVID-19 curfew restrictions.

**Freedom of Press and Media, Including Online Media:**  The Press and Publications Law governs printed materials; printing presses; bookstores; the import, rental, and sale of films; television and radio; foreign media offices and their correspondents; and online newspapers and journals.  Media fall under the jurisdiction of the Ministry of Media.  The ministry may permanently close "whenever necessary" any means of communication--defined as any means of expressing a viewpoint that is meant for circulation--that it deems is engaged in a prohibited activity, as set forth in the law.

Media policy statements urged journalists to uphold Islam, oppose atheism, promote Arab interests, and preserve cultural heritage.  A 2011 royal decree amended the press law to strengthen penalties, create a special commission to judge violations, and require all online newspapers and bloggers to obtain a license from the ministry.  The decree bans publishing anything "contradicting sharia, inciting disruption, serving foreign interests that contradict national interests, and damaging the reputation of the grand mufti, members of the Council of Senior Religious Scholars, or senior government officials."

The law states that violators can face substantial fines for each violation of the law, which doubles if the violation is repeated.  Other penalties include banning

## SAUDI ARABIA

individuals from writing.  While the Violations Considerations Committee in the Ministry of Media has formal responsibility for implementing the law, the Ministry of Interior, the CPVPV, and judges considered these issues regularly and exercised wide discretion in interpreting the law.  It was unclear which of these institutional processes accords with the law.

Although unlicensed satellite dishes were illegal, the government did not enforce restrictions on them, and their use was widespread.  Many foreign satellite stations broadcast a wide range of programs into the country in Arabic and other languages, including foreign news channels.  Access to foreign sources of information, including via satellite dishes and the internet, was common.  Foreign media were subject to licensing requirements from the Ministry of Media and could not operate freely.  Some privately owned satellite television networks, headquartered outside the country, maintained local offices and operated under a system of self-censorship.

**Violence and Harassment:**  Authorities subjected journalists, writers, and bloggers to arrest, imprisonment, and harassment during the year (see sections 1.c., Prison and Detention Center Conditions and 1.e., Political Prisoners and Detainees).  NGOs, academics, and the press claimed the government targeted dissidents using automated social media accounts to ensure that progovernment messages dominated social media trend lists and effectively silenced dissenting voices.  Automated account activity was reportedly accompanied by online harassment by progovernment accounts in some instances.

On July 19, writer and journalist Saleh al-Shehi died in the hospital two months after his early release from prison due to poor health.  Al-Shehi had served more than two years of a five-year sentence for insulting, defaming, and offending the royal court and its staff after accusing the royal court of corruption.  Local media reported COVID-19 as the cause of death.  According to the GCHR, his health deteriorated while in prison.  Reporters without Borders, the GCHR, and ALQST called for an independent international inquiry into al-Shehi's death.

On July 21, ALQST reported that in late April authorities arrested journalist Aql al-Bahili, writer Abdulaziz al-Dukhail, and activist Sultan al-Ajmi, among other

## SAUDI ARABIA

journalists and intellectuals, for tweeting condolences following the death of reformer and rights activist Abdullah al-Hamid (see section 1.a.).

**Censorship or Content Restrictions:**  The government reportedly penalized those who published items counter to government guidelines and directly or indirectly censored media by licensing domestic media and by controlling importation of foreign printed material.

All newspapers, blogs, and websites in the country must be government licensed. The Ministry of Media must approve the appointment of all senior editors and has authority to remove them.  The government provided guidelines to newspapers regarding controversial issues.  The Saudi Press Agency reported official government news.  The government owned most print and broadcast media and book publication facilities in the country, and members of the royal family owned or influenced privately owned and nominally independent operations, including various media outlets and widely circulated pan-Arab newspapers published outside the country.  Authorities prevented or delayed the distribution of foreign print media covering issues considered sensitive, effectively censoring these publications.

The government censored published online and print material it considered blasphemous, extremist, racist, offensive, or inciting chaos, violence, sectarianism, or harm to the public order, as well as criticism of the royal family or its allies among the Gulf Arab states.

On April 6, local media reported that the governor of Asir Province, Prince Turki bin Talal bin Abdulaziz Al Saud, ordered the suspension of two episodes of a drama series deemed offensive to the population of Asir.

Online self-censorship was pervasive, as social media users were extremely cautious about what they post, share, or "like" due to the threat of harassment or prosecution under broadly worded antiterrorism and other laws.  The government closely monitored and often targeted users who expressed support for liberal ideals, minority rights, or political reform, in addition to those who exposed human rights violations.  Questioning religious doctrine was strictly taboo, particularly content related to the Prophet Muhammed.  Twitter users were fearful of

## SAUDI ARABIA

expressing support for outspoken activists who were detained or received prison sentences. Such pressures reportedly led many users to join social media networks that offer more privacy, such as Snapchat and Path.

In some cases, however, individuals criticized specific government bodies or actions publicly without repercussions.

**Libel/Slander Laws:** The cybercrimes law provides for a maximum penalty of one year's imprisonment for "defamation and infliction of damage upon others through the use of various information technology devices," including social media and social networks.

**National Security:** Authorities used the cybercrimes law and the counterterrorism law to restrict freedom of expression, including by prosecuting numerous individuals under these laws on charges related to statements made on social media.

### Internet Freedom

The Ministry of Media or its agencies must authorize all websites registered and hosted in the country. The General Commission for Audiovisual Media has responsibility for regulating all audio and video content in the country, including satellite channels, film, music, internet, and mobile applications, independent from the Ministry of Commerce and Industry. Internet access was widely available.

The press and publications law implicitly covers electronic media, since it extends to any means of expression of a viewpoint meant for circulation, ranging from words to cartoons, photographs, and sounds. Laws, including the cybercrimes law, criminalize a number of internet-related activities, including defamation, hacking, unauthorized access to government websites, and stealing information related to national security as well as the creation or dissemination of a website for a terrorist organization. Security authorities actively monitored internet activity, both to enforce laws, regulations, and societal norms and to monitor recruitment efforts by extremist organizations such as ISIS.

The government reportedly collected information concerning the identity of persons peacefully expressing political, religious, or ideological opinions or beliefs

## SAUDI ARABIA

online.  According to Freedom House, authorities regularly monitored nonviolent political, social, and religious activists and journalists in the name of national security and maintaining social order.

Multiple rights groups reported that at least six individuals who had anonymous Twitter accounts critical of the government were arrested subsequent to a breach of Twitter user data.

Access to the internet is legally available only through government-authorized internet service providers (ISPs).  The government required ISPs to monitor customers and required internet cafes to install hidden cameras and provide identity records of customers.  Although authorities blocked websites offering proxies, persistent internet users accessed the unfiltered internet via other means.

On a number of occasions, government officials and senior clerics publicly warned against inaccurate reports on the internet and reminded the public that criticism of the government and its officials should be done through private channels, including official complaint processes.

The government charged those using the internet to express dissent against officials or religious authorities with terrorism, blasphemy, and apostasy.

The press and publications law criminalizes the publication or downloading of offensive sites, and authorities routinely blocked sites containing material perceived as harmful, illegal, offensive, or anti-Islamic.  The governmental Communications and Information Technology Commission (CITC) filtered and blocked access to websites it deemed offensive, including sexual content, as well as pages calling for domestic political, social, or economic reforms or supporting human rights, including websites of expatriate Saudi dissidents.

The CITC coordinated decisions with the Saudi Arabian Monetary Agency on blocking phishing sites seeking to obtain confidential personal or financial information.  Authorities submitted all other requests to block sites to an interagency committee, chaired by the Ministry of Interior, for decision.  Under the Telecommunication Act, failure by ISPs to block banned sites can result in a substantial fine.

# SAUDI ARABIA

Several voice-over-internet-protocol call services, including WhatsApp, remained blocked and only accessible using a virtual private network.

Authorities blocked websites of some news and advocacy groups deemed critical of the government, including London-based al-Araby al-Jadeed, the Arab Network for Human Rights Information, and the global advocacy organization Avaaz. Authorities also blocked the website of the Islamic Umma Party, which operated underground because political parties are illegal (see section 3).

The government blocked Qatari websites, such as al-Jazeera, since 2017, due to a dispute between Qatar and a group of countries that included Saudi Arabia.  In April the government blocked access to the websites of the Turkish official news agency, Anadolu Agency and the Turkish public broadcaster TRT's Arabic edition. Writing for blocked websites, providing them with materials to publish, or promoting alternative addresses to access them is a crime under the cybercrimes law.

## Academic Freedom and Cultural Events

The government restricted some public artistic expression but opened up cultural expression in a number of areas.  Academics reportedly practiced self-censorship, and authorities prohibited professors and administrators at public universities from hosting meetings at their universities with foreign academics or diplomats without prior government permission (see section 2.b., Freedom of Association).

On April 14, local media reported that Umm al-Qura University suspended a staff member and a student following their circulation of "deviant ideologies" on Twitter.

In 2016 King Salman issued royal decrees creating the General Entertainment Authority and the General Authority for Culture with a mandate to expand the country's entertainment and cultural offerings in line with its social and economic reform plan, known as Vision 2030.  During the year the General Entertainment Authority sponsored events dedicated to film, comics, music, and dance; however, programs were scaled down due to COVID-19 restrictions.

## SAUDI ARABIA

On February 20, Mecca regional authorities tweeted that the governor had ordered the arrest of female rapper Ayasel al-Bishi, calling the music video of her song "Bint Mecca" (Girl from Mecca) offensive to the customs and traditions of the holy city.  Al-Bishi's Twitter account was suspended, and the video was removed from YouTube.  Local media reported that the PPO questioned al-Bishi over filming without a permit and then released her.

## b. Freedoms of Peaceful Assembly and Association

The law does not provide for freedom of assembly and association, which the government severely limited.

### Freedom of Peaceful Assembly

The law requires a government permit for an organized public assembly of any type.  The government categorically forbids participation in political protests or unauthorized public assemblies, and security forces reportedly arrested demonstrators and detained them for brief periods.  Security forces at times allowed a small number of unauthorized demonstrations throughout the country.

In May security authorities arrested Egyptian national Hossam Magdy after he allegedly threatened to protest in front of his country's embassy to demand a seat on a repatriation flight.

### Freedom of Association

The law provided for limited freedom of association, but the government strictly restricted this right.  The law provides a comprehensive legal framework to govern the establishment, operation, and supervision of associations and foundations.  The government prohibited the establishment of political parties.  All associations must be licensed by the Ministry of Human Resources and Social Development and comply with its regulations.  Some groups that advocated changing elements of the social or political order reported their licensing requests went unanswered for years, despite repeated inquiries.  The ministry reportedly used arbitrary means, such as requiring unreasonable types and quantities of information, to delay and effectively deny licenses to associations.  The government also harassed and detained Saudi-based family members and associates of Saudi citizens living

## SAUDI ARABIA

abroad who were outspoken critics of the government (see sections 1.b., Disappearances and 1.f., Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence, for more details).

In September, Abdullah al-Maliki, an Islamic intellectual who defended the banned association ACPRA, was sentenced to seven years in prison.

Government-chartered associations limited membership only to citizens.

## c. Freedom of Religion

See the Department of State's International Religious Freedom Report at https://www.state.gov/international-religious-freedom-reports/.

## d. Freedom of Movement

The law does not contain provisions for freedom of internal movement, foreign travel, emigration, and repatriation.

**In-country Movement:**  The government generally did not restrict the free movement of male citizens within the country.  The guardianship system no longer requires a woman to have the permission of her male guardian (normally a father, husband, son, brother, grandfather, uncle, or other male relative) to move freely within the country (see section 6, Women).  On July 14, a court ruled in favor of a woman, whose trial lasted three years, after being charged with absenteeism, or *taghayyub*, under a law that allows guardians to report the unapproved absence of anyone under their guardianship.  The court ruled that living independently did not constitute a criminal act subject to "discretionary" punishment (see section 6, Women).

Authorities respected the right of citizens to change residence or workplace, provided they held a national identification card.

**Foreign Travel:**  There are restrictions on foreign travel.  Many foreign workers require an exit visa and a valid passport to depart the country.  Saudi citizens of both genders younger than 21, other dependents, or foreign citizen workers under sponsorship require a guardian's consent to travel abroad.  Royal Decree 134/M of

August 2019 stipulates that citizens of either gender older than 21 can obtain and renew a passport and travel abroad without guardian permission.

The government reportedly confiscated passports for political reasons and revoked the rights of some citizens to travel, often without providing them notification or opportunity to contest the restriction.  Most travel bans reportedly involved individuals in court cases relating to corruption, state security concerns, or labor, financial, and real estate disputes.

The *Washington Post* alleged the government increased the use of travel bans as part of a broader effort to suppress dissent within the royal family and business elite.  Media estimated that thousands of Saudis were placed under travel restrictions, including relatives of citizens detained in the government's anticorruption campaign as well as relatives of detained clerics and human rights activists.  The government seized the U.S. passports of the wife and children of dual U.S.-Saudi citizen Walid Fitaihi, barring them from leaving the kingdom and freezing their assets following Fitaihi's detention in 2017.  While the international travel ban for family members had been lifted at times during Fitaihi's detention, it was reinstated following Fitaihi's release on bond and subsequent charging.  Fitaihi was sentenced December 8 to six years in prison; as of year's end he was out of prison pending appeal.

## e. Status and Treatment of Internally Displaced Persons

Not applicable.

## f. Protection of Refugees

**Access to Asylum:**  The law provides that the "state will grant political asylum if public interest so dictates."  There are no regulations implementing this provision.  Generally, there is not a codified asylum system for those fleeing persecution, and the country is not a party to the 1951 Refugee Convention.  The government permitted refugees recognized by the Office of the UN High Commissioner for Refugees (UNHCR) to stay in the country temporarily, pending identification of a durable solution, including third-country resettlement or voluntary repatriation.  The government generally did not grant asylum or accept refugees for resettlement

## SAUDI ARABIA

from third countries.  Government policy is to refuse refugee status to persons in the country illegally, including those who have overstayed a pilgrimage visa.  The government strongly encouraged persons without residency to leave, and it threatened or imposed deportation.  Access to naturalization was difficult for refugees.

On April 4 and July 5, the government announced free three-month extensions of residency permits of all expatriates inside the country as well as the visas of visitors whose visa validity expired during the period of COVID-19-related suspension of flights.  On April 6, the General Directorate of Passports announced electronic renewal of visitor identification cards for Yemeni citizens until May 14 in accordance with royal directives.

In an August report, HRW alleged that "thousands of Ethiopian migrants are now languishing in squalid detention centers in Saudi Arabia or remain stranded at the border" after being pushed out of Yemen by Houthi forces and COVID-19 travel restrictions with their home countries.  Multiple media sources claimed the detainees faced overcrowding, abuse, and poor sanitation at immigration detention facilities in Jizan Province, without the ability to legally challenge their detention, according to HRW.  On September 15, the International Organization for Migration expressed alarm at reports of the deteriorating situation and called for urgent action.

Media published purported mobile cell phone images received from migrants held inside immigration detention centers in Jizan, showing dozens of emaciated men lying in rows inside small rooms with barred windows.  There were claims that one migrant died of heatstroke, a 16-year-old killed himself, and others lacked adequate food and water.

On November 20, HRW reported that two Uyghur men--Hemdullah Abduweli (or Aimidoula Waili on his Chinese passport) and Nurmemet Rozi (or Nuermaimaiti on his Chinese passport)--were arrested and potentially faced deportation to China.  Both were residents in Turkey.  Abduweli had been in hiding since February.  In a November interview with Middle East Eye, Abduweli claimed that the Chinese government wanted him deported back to China.

### SAUDI ARABIA

The government did not recognize the right of Saudi citizens to petition for access to asylum or refugee status in foreign countries.  In several cases the government prosecuted and penalized Saudi citizens who sought asylum in foreign countries, according to multiple sources.

**Employment:**  Refugees and asylum seekers were generally unable to work legally, although Syrian and Yemeni citizens who possessed a temporary visa could obtain a visitor card from the Ministry of Interior, which reportedly allows these persons to work.  The renewable permits are valid for up to six months and tied to the validity period of their temporary visas; men between the ages of 18 and 60 were eligible to apply.  In 2017 the General Directorate of Passports allowed Yemeni men to convert their visitor identification card to a residency permit if their Yemeni passport and visitor identification card were valid.

**Access to Basic Services:**  The government provides preferential access to education, health care, public housing, and other social services to citizens and certain legal residents.  The UNHCR office in Riyadh provided a subsistence allowance covering basic services to a limited number of vulnerable families, based on a needs assessment.  Authorities worked with UNHCR to provide medical treatment, also following a needs assessment.  On March 30, King Salman ordered free coronavirus treatment for all citizens and residents, regardless of residency status, in all government and private health facilities.  In November the government announced all citizens and residents would be provided the COVID-19 vaccine at no cost.

## g. Stateless Persons

The country had a number of habitual residents who were legally stateless, but data on the stateless population were incomplete and scarce.

Citizenship is legally derived only from the father.  Children born to an unmarried citizen mother who is not legally affiliated with the citizen father may be considered stateless, even if the father recognized the child as his.  If the government did not authorize the marriage of a citizen father and a noncitizen mother prior to birth of the children, they may also be considered stateless.  The nationality laws do not allow Saudi women married to foreign citizens to pass their

## SAUDI ARABIA

nationality to their children, except in certain circumstances, such as fathers who are unknown, stateless, of unknown nationality, or do not establish filiation. Sons of citizen mothers and noncitizen fathers may apply for citizenship once they turn 18 (if not already granted citizenship at birth under certain circumstances); daughters in such cases can obtain citizenship only through marriage to a Saudi man. A child may lose legal identification and accompanying rights if authorities withdraw identification documents from a parent (possible when a naturalized parent denaturalizes voluntarily or loses citizenship through other acts). Since there is no codified personal status law, judges make decisions regarding family matters based on their own interpretations of Islamic law.

Foreign male spouses of female citizens can obtain permanent residency in the country without needing a sponsor, and they can receive free government education and medical benefits, although in general they cannot apply for citizenship on the basis of their marriage and residence. These spouses are also included in the quota of Saudis employed in private companies under the labor quota system, which improves their employment prospects. Female citizens must be between the ages of 30 and 50 to marry a non-Saudi man. Non-Saudi wives of Saudi men receive more rights if they have children resulting from their marriage with a Saudi man. Male citizens must be between the ages of 40 and 65 to marry a non-Saudi woman. The extent to which those strictures were enforced was unclear; there was anecdotal evidence they were not uniformly enforced. Children of Saudi women married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother.

In past years, UNHCR unofficially estimated there were 70,000 stateless persons in the country, almost all of whom were native-born residents known locally as *Bidoon* (an Arabic word that means "without" [citizenship]). Updated information on stateless persons was not available. Bidoon are persons whose ancestors failed to obtain nationality, such as descendants of nomadic tribes not counted among the native tribes during the reign of the country's founder, King Abdulaziz; descendants of foreign-born fathers who arrived before there were laws regulating citizenship; and rural migrants whose parents failed to register their births. As noncitizens, Bidoon are unable to obtain passports. The government sometimes denied them employment and educational opportunities, and their marginalized

## SAUDI ARABIA

status made them among the poorest residents of the country.  In recent years the Ministry of Education encouraged them to attend school.  The government issues Bidoon five-year residency permits to facilitate their social integration in government-provided health care and other services, putting them on similar footing with sponsored foreign workers.  The General Directorate of Passports issued special identification cards to Bidoon similar to residency permits issued to foreigners in the country, but with features entitling their holders to additional government services similar to those available to citizens.

Baloch, West African, and Rohingya Muslims from Burma resident in Saudi Arabia were stateless.  Some Rohingya had expired passports that their home government refused to renew; others had entered the country with fraudulent travel documents.  Many of them had been held in detention for years following their entry into the country under fake passports.  UNHCR estimated there were 280,000 Rohingya in the country.  Some of these individuals benefited from a prior program to correct their residency status; in 2014 the government issued nearly 200,000 four-year residency permits to Rohingya who entered the country prior to 2008.  Rohingya who arrived in the country after 2008 were not eligible for residency permits, although NGOs reported that Rohingya, including those without legal residency, were generally not subject to deportation prior to 2018.  In January the government granted more than 190,000 free, four-year residency permits to Rohingya who were sponsored by companies, institutions, and members of their community.

There were reports of growing anti-Rohingya sentiment related to the perception that the Burmese community in Mecca was spreading COVID-19.  On May 4, the government began demolitions of 114 buildings in al-Nakasah, in the municipality of Mecca--an impoverished area inhabited primarily by Rohingya residents.  The decision garnered praise on social media, with some social media users referring to Rohingya as "garbage" and accusing them of spreading COVID-19.

There also were between 300,000 and 400,000 Palestinian residents not registered as refugees.

# Section 3. Freedom to Participate in the Political Process

## SAUDI ARABIA

The law does not provide citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage; it establishes an absolute monarchy led by the Al Saud family as the political system.  The Allegiance Council, composed of up to 34 senior princes appointed by the king, is formally responsible for selecting a king and crown prince upon the death or incapacitation of either.  Only select members of the ruling family have a voice in the choice of leaders, the composition of the government, or changes to the political system.

The law provides citizens the right to communicate with public authorities on any matter and establishes the government on the principle of consultation (*Shoura*).  The king and senior officials, including ministers and regional governors, are required to be available through *majlis*, open-door meetings where in theory any male citizen or noncitizen may express an opinion or a grievance without an appointment.

Most government ministries and agencies had women's sections to interact with female citizens and noncitizens, and at least two regional governorates hired female employees to receive women's petitions and arrange meetings for women with complaints for, or requests of, the governor.

## Elections and Political Participation

**Recent Elections:**  In 2015 elections were held for two-thirds of the 3,159 seats on 284 municipal councils; the government appointed the remaining third.  Council members serve until an intervening election--nominally for four-year terms--but there was no active discussion of holding municipal elections during the year.  Women were allowed to vote and run as candidates for the first time in 2015.  The voting age was also lowered universally to 18.  The Ministry of Municipal and Rural Affairs actively encouraged women's participation in the municipal elections.  Election regulations prohibited candidates from contesting under party affiliation.  Twenty-one women won seats and 17 were appointed to seats, totaling approximately 1 percent of all available seats.

The NSHR observed the elections, and select international journalists were also permitted to observe.  Independent polling station observers identified no

## SAUDI ARABIA

irregularities with the election.  Prior to the election, several candidates reported they were disqualified for "violating the rules and regulations" without further explanation.  They had the right to appeal, and some were reinstated in time for the elections.  Uniformed members of the security forces, including the military and police, were ineligible to vote.

**Political Parties and Political Participation:**  There were no political parties or similar associations.  The law does not protect the right of individuals to organize politically and specifically bans a number of organizations with political wings, including the Muslim Brotherhood, as regional and local terrorist groups.  The government continued to regard human rights organizations, such as ACPRA, as illegal political movements and treated them accordingly.

**Participation of Women and Members of Minority Groups:**  The government changed laws and regulations to open new social and economic opportunities for women, but societal and institutional gender discrimination continued to exclude women from some aspects of public life.  Political participation remained restricted, and authorities arrested and abused women's rights activists perceived as critical or independent of the government.  Nevertheless, women served in senior advisory positions within government ministries.

In October a royal decree appointed academic Hanan al-Ahmadi to serve as deputy speaker of the Shoura Council, making her the third-ranking official in the Shoura Council and the first woman in that leadership role.  Thirty women were members of the Shoura, or Consultative Council, the 150-person royally appointed body that advises the king and may propose but not pass laws.

On January 28, Shorooq bint Mohammed al-Jadaan was appointed as the first woman to assume a leadership position at the country's Alimony Fund.  On February 24, the Saudi Sports for All Federation announced the creation of a female soccer league.  On June 7, HRC president Awad Alawad appointed Norah bint Mohammed al-Haqbani as the first spokeswoman for the HRC.  On July 3, King Salman issued a royal decree appointing 13 women as members of the HRC's council, giving them half of the 26 seats.

## SAUDI ARABIA

On August 10, the governor of Tabuk Region, Prince Fahd bin Sultan bin Abdulaziz, appointed Khulood Mohammed al-Khamis as the secretary general of Tabuk's regional council, making her the first woman to hold the role in the kingdom.  On August 15, the Presidency of the Two Holy Mosques appointed 10 female officials to leadership positions for the first time, naming Munira bint Awad al-Jamihi to head the General Directorate for Women's Affairs.

No laws prevent male citizens from minority groups from participating in political life on the same basis as other male citizens.  Societal discrimination, however, marginalized the Shia Saudi population, and tribal factors and longstanding traditions continued to dictate many individual appointments to positions.  Unofficially, government authorities will not appoint a Bedouin tribesman to a high-ranking ministerial-level position, and Bedouins can reach only the rank of major general in the armed forces.  All Council of Ministers members from tribal communities were members of urbanized "Hamael" tribes, rather than Bedouin tribes.  While the religious affiliation of Shoura Council members was not known publicly, the council included an estimated seven or eight Shia members.  The Council of Ministers contained one religious minority member, Mohammad bin Faisal Abu Saq, a Shia Ismaili, who had held the position of minister of state for Shoura affairs since 2014.  Multiple municipal councils in the Eastern Province, where most Shia Saudis resided, had large proportions of Shia Saudis as members to reflect the local population, including a majority in Qatif and 50 percent in al-Ahsa.  Eastern Province Shia judges dealing with intra-Shia personal status and family laws operated specialized courts.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption.  Some officials engaged in corrupt practices, and perceptions of corruption persisted in some sectors.  Government employees who accepted bribes faced 10 years in prison or substantial fines.

The Supreme Anticorruption Committee, the National Anticorruption Commission (*Nazaha*), the PPO, and the Control and Investigation Board are units of the

## SAUDI ARABIA

government with authority to investigate reports of criminal activity, corruption, and "disciplinary cases" involving government employees. These bodies are responsible for investigating potential cases and referring them to the administrative courts. Nazaha's ministerial-level director reported directly to the king.

Legal authorities for investigation and public prosecution of criminal offenses are consolidated within the PPO; the Control and Investigation Board is responsible for investigation and prosecution of noncriminal cases. Financial audit and control functions are vested in the General Auditing Board. The HRC also responded to and researched complaints of corruption.

In December 2019 King Salman issued three royal decrees consolidating anticorruption responsibilities under a single entity, the new Control and Anticorruption Commission. The decrees consolidate the Control and Investigation Board, Mabahith's Administrative Investigations Directorate (within the General Investigation Directorate) and Nazaha into the new commission, led by Mazen bin Ibrahim al-Khamous. The consolidated agency is intended to have criminal investigation and prosecutorial authorities that its predecessors lacked. As with Nazaha, the new Control and Anticorruption Commission reports directly to the king. Local press reported in November that the new Control and Anticorruption Commission had launched more than 150 criminal investigations. On July 27, a royal decree approved a Council of Ministers decision that brought the General Auditing Bureau, the country's oldest audit institution, under the authority of the king.

Provincial governors and other members of the royal family paid compensation to victims of corruption during weekly majlis meetings where citizens raised complaints.

**Corruption:** Nazaha continued operations and referred cases of possible public corruption to the PPO. On February 12, Nazaha announced it would refer to court the cases of 386 persons accused of financial and administrative corruption. On March 15, Nazaha announced it had criminally investigated 674 state employees and ordered the detention of 298, including eight military officers and two judges, for "financial and administrative corruption, consisting of bribery crimes,

## SAUDI ARABIA

embezzlement and waste of public money, misuse of employment powers, and administrative misuse" involving a total of 379 million riyals ($101 million). On May 4, Nazaha stated a court sentenced 14 individuals, including several court employees, to 22 years and 10 months in prison and substantial fines for abuse of power and bribery.

On July 6, Nazaha announced it initiated 105 cases in crimes such as bribery and abuse of power. On August 11, Nazaha stated it had initiated 218 corruption cases involving a current Shoura member, a judge, and a number of security officers, among others, for fraud, bribery, and financial and professional corruption. On August 21, a royal decree fired a number of officials on suspicion of corruption. On August 31, King Salman dismissed high-ranking officials, including the commander of the Joint Forces, Prince Fahd Bin Turki Bin Abdulaziz Al Saud, and deputy emir of al-Jouf region, Prince Abdulaziz Bin Fahd Bin Turki Bin Abdulaziz Al Saud, over corruption charges.

In February 2019, Public Prosecutor Saud al-Mu'jab announced the launch of the Financial Reports Office, part of the General Auditing Bureau. Al-Mu'jab noted the office would monitor state spending and help sustain the fight against corruption after the end of the anticorruption campaign in January 2019.

Human rights organizations criticized the government for using anticorruption campaigns as a pretext to target perceived political opponents and for arbitrarily detaining and abusing individuals targeted in the crackdown (see sections 1.c. and 1.d., Pretrial Detention). On March 17, HRW voiced concern over the arrest of 298 government employees on suspicion of corruption, warning of possible "unfair legal proceedings" in the judicial system.

**Financial Disclosure:** The government had a uniform schedule of financial disclosure requirements for public officials. These disclosures were not made public.

# Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

**SAUDI ARABIA**

The law provides that "the State shall protect human rights in accordance with Islamic sharia." The government restricted the activities of domestic and international human rights organizations. The government did not allow international human rights NGOs to be based in the country and restricted their access to the country for visits. International human rights and humanitarian NGOs reported the government was at times unresponsive to requests for information and did not establish a clear mechanism for communication with NGOs on both domestic human rights issues and issues relating to the conflict in Yemen. There were no transparent standards governing visits by international NGO representatives.

The government often cooperated with and sometimes accepted the recommendations of the NSHR, the sole government-licensed domestic human rights organization. The NSHR accepted requests for assistance and complaints about government actions affecting human rights.

The government blocked websites of unlicensed local human rights groups and charged their founders with founding and operating unlicensed organizations.

**Government Human Rights Bodies:** The government had mechanisms to investigate and punish abuse. The HRC is part of the government and requires the permission of the Ministry of Foreign Affairs before meeting with diplomats, academics, or researchers with international human rights organizations. The HRC president has ministerial status and reports to the king. The HRC worked directly with the Royal Court and the Council of Ministers, with a committee composed of representatives of the Shoura Council and the Ministries of Labor and Social Development and Interior, and with the Shoura Council committees for the judiciary, Islamic affairs, and human rights.

During the year the HRC and NSHR were more outspoken in areas deemed less politically sensitive, including child abuse, child marriage, and trafficking in persons. While they avoided topics such as protests or cases of political activists that would require directly confronting government authorities, they did inquire into complaints of mistreatment by some high-profile political prisoners, including Loujain al-Hathloul and Raif Badawi. The HRC board's 18 full-time members included nine women, making up half of the board members for the first time, and

## SAUDI ARABIA

at least three Shia members; they received and responded to complaints submitted by their constituencies, including problems related to persons with disabilities, religious freedom, and women's rights.  The Shoura Council's Human Rights Committee also actively followed cases and included women and Shia among its members; a woman served as chairperson of the committee.

The HRC and NSHR maintained records of complaints and outcomes, but privacy laws protect information about individual cases, and information was not publicly available.  On August 12, the HRC said it monitored 243 human rights-related cases in 2019.  On September 8, local media reported the HRC received 4,211 complaints in 2019.  The NSHR stated it received 3,739 complaints in 2019.  Topics of complaints included labor, abuse, citizenship, social welfare, health, and education.

The Board of Grievances, a high-level administrative judicial body that hears cases against government entities and reports directly to the king, is the primary mechanism to seek redress for claims of abuse.  During the year the Board of Grievances held hearings and adjudicated claims of wrongdoing, but there were no reported prosecutions of security force members for human rights violations.  Military and security courts investigated an unknown number of abuses of authority and security force killings.  Citizens may report abuses by security forces at any police station or to the HRC or NSHR.  The HRC, in cooperation with the Ministry of Education, provided materials and training to police, other security forces, the Ministry of Defense, and the CPVPV on protecting human rights.

# Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

## Women

**Rape and Domestic Violence:**  Rape is a criminal offense under sharia law with a wide range of penalties, from flogging to execution.  The law does not recognize spousal rape as a crime.  The government enforced the law based on its interpretation of sharia, and, in some cases, courts punished victims as well as perpetrators for illegal "mixing of genders," even when there was no conviction for

## SAUDI ARABIA

rape.  Victims also had to prove that the rape was committed, and a woman's testimony in court was not always accepted.

Due to these legal and social obstacles, authorities brought few cases to trial. Statistics on incidents of, and prosecutions, convictions, or punishments for rape were not available.  Most rape cases were likely unreported because victims faced societal and familial reprisal, including diminished marriage opportunities, criminal sanctions up to imprisonment, or accusations of adultery or sexual relations outside of marriage, which are punishable under sharia.

The law against domestic violence defines domestic abuse broadly and criminalizes domestic abuse with penalties of one month to one year of imprisonment or a fine, unless a court provides a harsher sentence.

Researchers stated it was difficult to gauge the magnitude of domestic abuse, which they believed to be widespread.  Recent studies varied widely, finding the rate of domestic abuse to be anywhere between 15 to 60 percent.  The National Family Safety Program, a quasi-governmental organization under the Ministry of National Guard, is charged with spreading awareness of and combatting domestic violence, including child abuse, and continued to report abuse cases.

Officials stated the government did not clearly define domestic violence and procedures concerning cases, including thresholds for investigation or prosecution, and thus enforcement varied from one government body to another.  Some women's rights advocates were critical of investigations of domestic violence, claiming investigators were hesitant to enter a home without permission from the male head of household, who may also be the perpetrator of violence.  Activists reported the situation had improved in recent years, with greater awareness of resources for domestic violence victims, such as the domestic violence hotline managed by the Ministry of Human Resources and Social Development.  They also noted, in the previous two years, increased willingness from authorities to investigate and prosecute domestic violence perpetrators, but they expressed concern that some police departments continued to neglect domestic violence cases.

**SAUDI ARABIA**

On May 4, a Riyadh police spokesperson stated security authorities arrested and referred to the PPO a man for allegedly abusing his two sisters, adding that all legal measures were taken against him.

On June 19, Public Prosecutor Saud al-Mu'jab ordered the arrest of a man for physically abusing his wife and locking her up along with their three children in al-Baha Province.

The government made efforts to combat domestic violence. On March 14, the HRC branch in the Northern Borders Province held a workshop on domestic violence that included participants from government ministries as well as from civil society organizations. The Ministry of Human Resources and Social Development administered government-supported family-protection shelters. Women reported that remaining in the shelters was not always voluntary.

Women reported that domestic abuse in the form of incest was common but seldom reported to authorities due to fears over societal repercussions, according to local sources.

**Female Genital Mutilation/Cutting (FGM/C):** The official government interpretation of sharia prohibits the practice; however, some studies indicated up to 18 percent of women reported having undergone some type of FGM/C.

**Sexual Harassment:** The extent of sexual harassment was difficult to measure, with little media reporting and no official government data. No statistics were available on the incidence of sexual harassment due to past reluctance to report violations.

The 2018 sexual harassment law, passed by the Council of Ministers, carries a maximum penalty of up to five years in prison and a substantial fine. On August 30, the HRC explained that a legal punishment against sexual harassment is irreversible, even if the victim renounced his or her own rights or did not file a legal complaint.

In May 2019 the PPO issued a statement on its Twitter page explaining the legal definition of harassment, noting that the law provides for penalties of up to two years in prison and substantial fines. Local media reported a number of incidents

## SAUDI ARABIA

of harassment during the year.  On February 29, the PPO ordered the arrest of a number of individuals who appeared in a video harassing girls outside a mall in Jeddah and filed a criminal lawsuit against the individuals.

**Reproductive Rights:**  Married couples and individuals have the right to decide the number, spacing, and timing of their children and to manage their reproductive health, and to have access to the information and means to do so is generally free from discrimination, coercion, or violence.  Premarital sex is illegal under Sharia law, however, and hospitals and health centers may report extramarital pregnancies to police.  Sterilization for health reasons was allowed and required spousal consent and a hospital committee's approval.  Sterilization is not a common procedure in the country, and young, healthy women reportedly had a harder time receiving approval for the procedure than older women with health problems.

Although no legal barriers prevent access to contraception, lack of awareness, cultural and religious beliefs, and social pressure for large families likely affected many women, especially those in rural areas.

Almost all women had access to skilled health attendance during pregnancy and childbirth; however, some women in rural areas had to travel to the closest medical facility to receive treatment, while others in rural communities received health services from Ministry of Health-sponsored mobile health clinics.

Government and quasi-government agencies provided social, medical, and psychological care to survivors of sexual violence.

**Coercion in Population Control:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

**Discrimination:**  Women continued to face discrimination under law and custom. Regulations issued in 2019 and during the year, however, granted women many of the same rights enjoyed by men pertaining to travel abroad, civil status, and employment.

In August 2019 most restrictions under the guardianship system, which had required women to have permission from close male relatives to conduct certain actions, were eliminated.  There were reports, however, that government and

## SAUDI ARABIA

nongovernment entities, primarily in rural areas, continued to require women to obtain guardian permission prior to providing services.

Amendments to the Civil Status Regulation, which entered into effect in September 2019, grant women older than 18 the right to perform several actions pertaining to civil status that were previously limited to men. These include registering the birth of a child; registering the death of a spouse or close relative; registering a marriage or divorce (whether initiated by the husband or wife); and being designated "head of household," thereby allowing women to serve as the guardian of their minor children. Women can also obtain from the Civil Status Administration a "family registry," which is official documentation of a family's vital records that verifies the relationship between parents and children. This reform allows mothers to perform administrative transactions for their children, such as registering them for school or obtaining services at a hospital.

On July 14, a court ruled in favor of Maryam al-Otaibi after her family filed a complaint that she was living and traveling in Riyadh. She was charged with absenteeism, or taghayyub, under a law that allows guardians to report unauthorized absence of anyone under their guardianship, which could lead to the arrest, detention, or forcible return of the individual. The court ruled that living independently did not constitute a criminal act subject to discretionary punishment, adding that al-Otaibi was "a sane adult who has the right to decide where she wants to live," according to court documents.

Women may legally own property and are entitled to financial support from their guardian. They can make their own determinations concerning hospital care. In 2018 the Ministry of Commerce and Investment announced women no longer need their male guardian's permission to start a business. Women still require a guardian's permission to exit prisons after completing their terms.

The law prohibits women from directly transmitting citizenship to their children, particularly if the children's father is a noncitizen (see section 2.d. and section 6, Children). The country's interpretation of sharia prohibits Muslim women from marrying non-Muslims, but Muslim men may marry non-Muslim women. Women require government permission to marry noncitizens; men must obtain government permission if they intend to marry citizens from countries other than Gulf

## SAUDI ARABIA

Cooperation Council-member states (Saudi Arabia, Bahrain, Kuwait, Oman, Qatar, and the United Arab Emirates).  Regulations prohibit men from marrying women from Bangladesh, Burma, Chad, and Pakistan.  The government additionally requires Saudi men wishing to marry a second wife who is a foreigner to submit documentation attesting to the fact that his first wife was disabled, had a chronic disease, or was sterile.

Societal pressures restricted women from using some public facilities.  Some but not all businesses still required or pressured women to sit in separate, specially designated family sections in public places.

Cultural norms selectively enforced by state institutions require women to wear an *abaya* (a loose-fitting, full-length cloak) in public.  Female foreigners were only required to dress modestly.

In July a Saudi woman was barred from entering a private park in Hail because park employees believed she was not dressed modestly.  In a video posted to social media, the woman said she called police who came to the scene and told her the park owner could decide whether to allow her to enter.

Women also faced discrimination in courts, where in some cases the testimony of a woman equals half that of a man.  All judges are male, and women faced restrictions on their practice of law (see section 1.e., Denial of Fair Public Trial). In divorce proceedings women must demonstrate legally specified grounds for divorce, but men may divorce without giving cause, citing "irreconcilable differences."  In doing so, men must pay immediately an amount of money agreed at the time of the marriage that serves as a one-time alimony payment.  Men may be forced, however, to make subsequent alimony payments by court order.  The Ministry of Justice reported it compelled 7,883 fathers to pay alimony in 2018. The government began implementing an identification system based on fingerprints, designed to provide women more access to courts, even if they chose to cover their faces with the *niqab* covering.

In February, Justice Minister Sheikh Walid al-Samaani issued a decision binding both spouses to appear in court to complete their divorce, ending the so-called secret divorce, whereby men could divorce their wives without the woman's

## SAUDI ARABIA

consent or knowledge.  In February the Ministry of Justice also canceled an article in the marriage law that gave a husband the right to force his wife to return to her home against her will.

Women faced discrimination under family law.  For example, a woman needs a guardian's permission to marry or must seek a court order in the case of *adhl* (male guardians refusing to approve the marriage of women under their charge).  In such adhl cases, the judge assumes the role of the guardian and may approve the marriage.  During the year courts executed marriage contracts for women whose male guardians refused to approve their marriage, according to informed judicial sources quoted by local media.  On February 7, local media reported that courts considered an average of 750 cases annually.

In February local media reported that a male guardian can be imprisoned for up to one year and fined for forcing a woman under his charge to marry against her will. In January media reported that the Personal Status Court in Dammam issued an unprecedented ruling granting a woman in her fifties the right to marry without her guardian's approval after her son, who was her male guardian, refused to approve her marriage.  On May 30, however, the Judicial Committee at the Shoura Council rejected a proposal to allow women to contract their marriage without requiring the permission of a male guardian.

Courts routinely award custody of children when they attain a specified age (seven years for boys and nine years for girls) to the divorced husband or the deceased husband's family.  In numerous cases, former husbands prevented divorced noncitizen women from visiting their children.  In 2018 Justice Minister Sheikh Walid al-Samaani directed all courts to drop the requirement for divorced women to file a lawsuit to gain custody of their children.  Provided there were no disputes between the parents, mothers may simply submit a request to the relevant court, without the need for legal action.

On February 16, the Ministry of Justice added an article to the regulations of legal proceedings ordering that resolution of custody, alimony and visitation issues in divorce cases be resolved prior to the finalization of a divorce and within 30 days of the initial hearing.

**SAUDI ARABIA**

Sharia-based inheritance laws discriminate against women, giving daughters half the inheritance awarded to their brothers.

According to recent surveys, women constituted 52 percent of public education and higher education students.  Segregated education through university level was standard.  The only exceptions to segregation in higher education were medical schools at the undergraduate level and the King Abdullah University of Science and Technology, a graduate-level research university, where women worked jointly with men, were not required to wear an abaya, and have long driven cars on campus.  Other universities, such as al-Faisal University in Riyadh, offered partially segregated classes with students receiving instruction from the same teacher and able to participate together in class discussion, but with the women and men physically separated by dividers.

## Children

**Birth Registration:**  Citizenship derives from the father, and both the father and mother may register a birth.  There were cases of authorities denying public services to children of citizen parents, including education and health care, because the government failed to register the birth entirely or had not registered it immediately, sometimes because the father failed to report the birth or did not receive authorization to marry a foreigner.  Children of women who were married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother (see section 2.d., Stateless Persons).

**Child Abuse:**  Abuse of children occurred.  The National Family Safety Program operated a child helpline dedicated to assisting children in matters ranging from bullying to abuse, providing counseling, tracking, and referrals to social services.  The Ministry of Human Resources and Social Development had 17 social protection units across the country providing social protection to children younger than 18 as well as other vulnerable populations suffering domestic violence and abuse.

In April the spokesperson of Asir Province police said a man was arrested for abusing his 15-year-old daughter, which reportedly led her to take her own life.

**SAUDI ARABIA**

In September the ministry's Domestic Violence Center announced that authorities opened an investigation based on a video, which went viral on social media, showing a father beating his two-year-old son.  The Family Protection Unit managed to locate the toddler, and the father was referred to authorities to take legal action against him in line with the child protection law.

**Child, Early, and Forced Marriage:**  In March the Ministry of Justice set the minimum age for marriage at 18 and stipulated that girls and boys younger than 18 can only marry with court approval.  According to local media, the court would ensure several conditions are met before approving a marriage contract for a bride or groom younger than 18, including assessing their psychosocial development and hearing statements from the potential bride, groom, and guardians to determine consent.  Previously, marriage officials had the authority to endorse marriage contracts; this reform ended their authority in cases where the potential bride and groom are younger than 18.  The HRC and NSHR monitored cases of child marriages, which they reported were rare or at least rarely reported, and took steps to prevent consummation of the marriage.  The application for a marriage license must record the bride's age, and registration of the marriage is a legal prerequisite for consummation.

**Sexual Exploitation of Children:**  The cybercrimes law stipulates that punishment for such crimes, including the preparation, publication, and promotion of material for pornographic sites, may be no less than two-and-one-half years' imprisonment or a substantial fine if the crime includes the exploitation of minors.  The law does not define a minimum age for consensual sex.  On January 14, the Riyadh Criminal Court sentenced a man to 40 days in prison and 70 lashes, to be administered in two rounds, for sexually harassing a 12-year-old boy online.

**International Child Abductions:**  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

# Anti-Semitism

# SAUDI ARABIA

There were no known data on Jewish citizens and no statistics available concerning the religious denominations of foreigners.

Cases of government-employed imams using anti-Jewish language in their sermons were rare and occurred without authorization by government authorities.  The law requires government-employed imams to deliver all sermons in mosques in the country.  Sermons are vetted and cleared by the Ministry of Islamic Affairs.  During the year the ministry issued periodic circulars to clerics and imams in mosques directing them to include messages on the principles of justice, equality, and tolerance and to encourage rejection of bigotry and all forms of racial discrimination in their sermons.

Some NGOs reported that anti-Semitic material remained in school textbooks and online in private web postings and that some journalists, academics, and clerics made anti-Israel comments that sometimes strayed into anti-Semitism, including at the Grand Mosque in Mecca.  Speaking on the sidelines of the November G20 Summit, Education Minister Hamad Al al-Sheikh claimed the ministry revised school curricula to remove extremist ideas and promote the concept of moderation and tolerance.

Saudi Council of Senior Scholars member and Muslim World League secretary general Mohammed al-Issa condemned anti-Semitism and intolerant speech.  On January 23, al-Issa led a delegation of Muslim leaders to visit the Auschwitz death camp to mark the 75th anniversary of its liberation.  The visit was part of a joint enterprise between the Muslim World League and the American Jewish Committee.  On February 20, King Salman received a delegation from the King Abdullah bin Abdulaziz International Center for Interreligious and Intercultural Dialogue that included Israeli rabbi David Rosen, becoming the first Israeli rabbi to meet with a Saudi king in recent history.

On September 5, shortly after the United Arab Emirates and Bahrain agreed to normalize ties with Israel, the imam of the Grand Mosque in Mecca, Abdulrahman al-Sudais, said in a televised sermon that Muslims should avoid "passionate emotions and fiery enthusiasm" towards Jews and emphasized that the Prophet Muhammad was good to his Jewish neighbors.

**SAUDI ARABIA**

In April, *Umm Haroun*, a Ramadan television series that aired on the state-controlled MBC network, centered around the story of a Jewish midwife in an unspecified multireligious Gulf state.  Experts said the series was a sign of shifting discourse on Jews and Israel.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

The law does not prohibit discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, air travel and other transportation, access to health care, the judicial system, or the provision of other state services or other areas.  The law does not require public accessibility to buildings, information, and communications.  Newer commercial buildings often included such access, as did some newer government buildings.  On July 19, the Ministry of Municipal and Rural Affairs ordered all stores and shopping malls to install ramps for persons with disabilities.

The Ministry of Human Resources and Social Development is responsible for protecting the rights of persons with disabilities.  Vocational rehabilitation projects and social care programs increasingly brought persons with disabilities into the mainstream.  Children with disabilities could attend government-supported schools.  In June 2019 the Ministry of Education stated it had taken measures to integrate disabled students, including special education programs in regular schools, training faculty members who work with students with disabilities, and providing technological instruments for students with disabilities free of charge.

Persons with disabilities could generally participate in civic affairs, and there were no legal restrictions preventing persons with disabilities from voting in municipal council elections.  Persons with disabilities were elected and appointed to municipal councils in 2015, and two individuals with disabilities served on the consultative Shoura Council, which was reconstituted in 2016.

## Members of National/Racial/Ethnic Minority Groups

## SAUDI ARABIA

Although racial discrimination is illegal, societal discrimination against members of national, racial, and ethnic minorities was a problem.  Descendants of former slaves in the country, who have African lineage, faced discrimination in both employment and society.  There was formal and informal discrimination, especially racial discrimination, against foreign workers from Africa and Asia.  There was also discrimination based on tribal or nontribal lineage.  A tolerance campaign by the King Abdulaziz Center for National Dialogue sought to address discrimination, and it provided training during the year to combat discrimination against national, racial, or ethnic groups.

On September 3, a video widely circulated on social media showed black Saudi model Ziad al-Mesfer being assaulted by a group of young men on a street in Riyadh, with some hurling racial slurs during the attack.  The video sparked an online debate, with many defending al-Mesfer's right to dress as he chooses and calling on authorities to hold the attackers accountable.  Others said his choice of dress and modeling activities went against customs and traditions.

The government continued its multiyear Tatweer project to revise textbooks, curricula, and teaching methods to promote tolerance and remove content disparaging religions other than Islam.

Local sources claimed that Saudi citizens received preferential access to COVID-19 testing and treatment, with some foreign residents reportedly being refused admittance to hospitals during periods of high rates of infection.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

Under sharia, as interpreted in the country, consensual same-sex sexual conduct is punishable by death or flogging, depending on the perceived seriousness of the case.  It is illegal for men "to behave like women" or to wear women's clothes, and vice versa.  Due to social conventions and potential persecution, lesbian, gay, bisexual, transgender, and intersex (LGBTI) organizations did not operate openly, nor were there LGBTI rights advocacy events of any kind.  There were reports of official and societal discrimination, physical violence, and harassment based on sexual orientation or gender identity in employment, housing, access to education,

## SAUDI ARABIA

and health care.  Stigma or intimidation limited reports of incidents of abuse.  Saudi clerics condemned homosexuality during government-approved Friday sermons at some mosques, most notably at the Grand Mosque in Mecca on August 14.

There were no government efforts to address discrimination.  In 2016 newspapers quoted PPO officials as stating the bureau would seek death sentences for anyone using social media to solicit homosexual acts.  There were no reports, however, that the PPO sought death sentences in LGBTI cases during the year (see section 1.a.).

During the year local newspapers featured opinion pieces condemning homosexuality and calling on authorities to punish harshly individuals engaging in same-sex relations.

A conversation about homosexuality in a comedy series broadcast on MBC during the Muslim holy month of Ramadan sparked controversy.  In a scene from the series, *Exit 7*, a man and his teenage daughter discussed the topic of homosexuality, with the daughter defending the rights of the LGBTI community.

On April 8, authorities arrested Mohamad al-Bokari, a Yemeni blogger living in Riyadh, for posting a video on social media calling for equal rights, including for gay men.  On July 20, a court sentenced him to 10 months in prison and a fine, followed by deportation to Yemen, according to HRW.  HRW reported that al-Bokari was charged with violating public morality by promoting homosexuality online and "imitating women."  A source in contact with al-Bokari told HRW that before his trial he was held in solitary confinement for six weeks in al-Malaz Prison in Riyadh, where he was subjected to torture, including beatings and a forced anal exam, an internationally discredited practice used to seek "proof" of homosexual conduct.

## HIV and AIDS Social Stigma

There were no reports of societal violence or discrimination against persons with HIV/AIDS.  By law the government deported foreign workers who tested positive for HIV/AIDS upon arrival or who tested positive when hospitalized for other reasons.  There was no indication that HIV-positive foreigners failed to receive

SAUDI ARABIA

antiretroviral treatment or that authorities isolated them during the year.  The Ministry of Health's HIV/AIDS program worked to counter stigma and discrimination against persons with HIV/AIDS.

## Other Societal Violence or Discrimination

Social, legal, economic, and political discrimination against the country's Shia minority continued.  HRW claimed that some state clerics and institutions "incited hatred and discrimination against religious minorities, including the country's Shia Muslim minority."

To address the problem, the Ministries of Defense and Interior and the National Guard included antidiscrimination training in courses offered by the King Abdulaziz Center for National Dialogue for police and other law enforcement officers.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law does not provide for the right of workers to form and join independent unions.  The law does not provide for the right to collective bargaining or the right to conduct legal strikes.  The law does not prohibit antiunion discrimination or require reinstatement of workers fired for union activity.  There was little information on government efforts to enforce applicable laws and whether penalties were commensurate with those under other laws involving denials of civil rights, such as discrimination.

The government did not respect freedom of association and the right to collective bargaining.  There were no labor unions in the country, and workers faced potential dismissal, imprisonment, or, in the case of migrant workers, deportation for union activities.

The government allowed citizen-only labor committees in workplaces with more than 100 employees, but it placed undue limitations on freedom of association and was heavily involved in the formation and activities of these committees.  For example, the ministry approves the committee members and authorizes ministry

## SAUDI ARABIA

and employer representatives to attend committee meetings.  Committee members must submit the minutes of meetings to management and then transmit them to the minister; the ministry can dissolve committees if they violate regulations or are deemed to threaten public security.  Regulations limit committees to making recommendations to company management that are limited to improvements to working conditions, health and safety, productivity, and training programs.

The Saudi National Committee of Workers Committees, an umbrella organization that supports dozens of workers committees and advocates for workers' rights, chaired the Labor20 engagement group, as the country hosted the year's G20 meeting.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor, but the government did not effectively enforce the law, and penalties were not commensurate with those for other analogous serious crimes, such as kidnapping, which can receive up to the death penalty.  The fine for trafficking in persons is 15 years in prison and fines up to one million riyals (approximately $267,000).  Forced labor occurred, especially among migrant workers--notably domestic servants.  Conditions indicative of forced labor experienced by foreign workers reportedly included withholding of passports; nonpayment of wages; restrictions on movement; and verbal, physical, and sexual abuse.  Labor law prohibits the confiscation of passports and nonpayment of wages.  Violations of labor laws could result in penalties, but these did not sufficiently deter violations.  Many migrant workers, particularly domestic employees not covered under the labor law, were unable to exercise their right to end their contractual work.  An employer may require a trainee to work for him or her upon completion of training for a period not to exceed twice the duration of the training or one year, whichever is longer.

Restrictive sponsorship laws increased workers' vulnerability to forced labor conditions and made many foreign workers reluctant to report abuse.  The contract system does not allow workers to change employers or leave the country without the written consent of the employer under normal circumstances.  Employers or sponsors were responsible for processing residence permits and exit visas on their behalf.

## SAUDI ARABIA

If wages are withheld for 90 days, a ministerial decree permits an employee to transfer his or her sponsorship to a new employer without obtaining prior approval from the previous employer.  There were reports, however, that the Ministry of Human Resources and Social Development did not always approve petitions to transfer sponsorship due to withheld wages, including some cases in which wages had been withheld for more than three months.

Due to the economic disruptions caused by the COVID-19 pandemic, thousands of expatriate workers lost their jobs.  Many who could not or chose not to repatriate were left without legal status, putting them at greater risk of exploitation and trafficking.  The government encouraged companies to place employees on reduced hours, vacation leave, or unpaid leave, rather than terminating contracts.  In April, Article 41 was inserted in the Implementation Regulation of the Labor Law, which enabled the employer and employee, between April and October 2020, to agree to any of the following:  a reduction in salary provided that there is a corresponding reduction in working hours; placing the employee on paid annual leave (as part of their holiday entitlement); or implementing a period of unpaid leave.  Officials confirmed that Article 74 of the labor law still applied during the pandemic, which only recognized termination when either the business or the business unit within which the employee worked was closing permanently.

The Ministry of Human Resources and Social Development, Ministry of Interior, and Ministry of Foreign Affairs developed an electronic platform and integrated system in 2014 to facilitate recruitment of domestic workers and regularize contractual relationships.  The platform was also designed to lower recruitment costs and address worker shortages due to source country deployment bans.  The system failed to prevent completely exploitative practices by middlemen, brokers, and other stakeholders that both workers and employers encounter before they reach registered agencies.  Some domestic workers lacked access to the platform, and source country agencies lacked influence on the platform's procedures.

A few countries that previously allowed their citizens to migrate to the country for work prohibited their citizens from seeking work in Saudi Arabia after widespread reports of worker abuse.

## SAUDI ARABIA

The government continued implementation of the Wage Protection System (WPS), which requires employers to pay foreign workers through bank transfers, thereby allowing the ministry to track whether workers were paid appropriately.  On August 1, the Ministry of Human Resources and Social Development started implementing stage 16 of the WPS, requiring all employers with more than five employees to comply with WPS regulations.  The ministry fined companies for delaying payment for employees' salaries on the first occurrence and blocked companies from accessing government services if a company delayed salaries for two or more months.  In November the ministry announced that 200,000 establishments were already using the WPS application and stated that by the end of the year, all private-sector companies with one or more employees would be required to utilize the WPS.

In November the government announced the Labor Reform Initiative, scheduled to come into effect on March 14, 2021, which will allow workers to change employers upon the conclusion of an employment contract without the original employer's approval.  The reform will also enable workers to obtain exit-reentry visas and depart the country upon the contract's conclusion without employer approval.  The changes will benefit roughly seven million private-sector expatriate workers but will not initially apply to domestic workers.

Undocumented workers were not protected by labor laws and were particularly susceptible to forced labor, substandard wages, and deportation by authorities.

Also see the Department of State's Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the worst forms of child labor.  The law provides that no person younger than 15 may legally work unless that person is the sole source of support for the family.  Children between the ages of 13 and 15 may work if the job is not harmful to health or growth and does not interfere with schooling.  Ministerial Decree No. 1/2834, Article 1, provides that hazardous operations, such as power-operated machinery, or harmful industries, such as mines and quarries, may not employ legal minors.  Children younger than 18 may not be employed for shifts

## SAUDI ARABIA

exceeding six hours a day.  There is no minimum age for workers employed in family-owned businesses or other areas considered extensions of the household, such as farming, herding, and domestic service.

The HRC and NSHR are responsible for monitoring enforcement of child labor laws.  There was little information on government efforts to enforce applicable laws and whether penalties were commensurate with those for other analogous serious crimes, such as kidnapping.  Authorities most commonly enforced the law in response to complaints about children begging on the streets.

Most child labor involved children from other countries, including Yemen and Ethiopia, forced into begging rings, street vending, and working in family businesses.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

No regulations prohibit discrimination on the basis of religion, political opinion, national origin or citizenship, sexual orientation or gender identity, language, or HIV-positive status.  Gender-based violence and harassment occurred in the world of work (see section 6).  Discrimination with respect to employment and occupation occurred in all these categories.  There are no effective complaint resolution mechanisms present to deter these discriminatory regulations and practices.

A 2019 amendment to the labor law enacted a general prohibition on discrimination during employment as well as in the terms of recruitment.  The amendment mandated that employers treat all workers equally and barred discrimination on the basis of gender, disability, age, or any other forms of discrimination, whether in work, employment, or advertising a vacancy.  Women may work without their guardian's permission, but some employers required women to have such permission, even though the law prohibits the practice.  The decree expands previous regulations barring employers from firing female workers on maternity leave and includes protection from dismissal for pregnancy-related illness if the absence is less than 180 days per year.  Employers who violate the

## SAUDI ARABIA

antidiscrimination law can be fined.  The antidiscrimination law only applies to citizens and does not protect the rights of expatriates.  There is widespread societal discrimination against African and Asian expatriate workers.  The government did not effectively enforce the law, and penalties were not commensurate with those under laws related to civil rights, such as election interference.

In recent years the government decreased the number of restrictions on women's employment in various sectors (see section 6, Women).  On August 26, the Council of Ministers approved two amendments in the labor law removing Articles 149 and 150, which had prohibited employment of women in some hazardous jobs and night shifts.  The Ministry of Human Resources and Social Development explicitly approved and encouraged the employment of women in specific sectors, particularly in government and retail, but women continued to face societal discrimination, and in practice gender segregation continued in the workplace.  In medical settings and the energy industry, women and men worked together, and in some instances women supervised male employees.  Bureaucratic procedures largely restricted women working in the security services to employment in women's prisons, at women's universities, and in clerical positions in police stations.  There were no women working as judges or as members of the Council of Senior Religious Scholars.

The first-quarter Labor Market Report by the General Authority for Statistics found that Saudi girls and women (15 years of age and older) constituted 8.3 percent of the country's total labor force (Saudi and non-Saudi, 15 years of age and older).  The same report estimated that women and girls, both Saudi and foreign, represented 25.4 percent of all employed persons (15 years of age and older) in the country.  Most non-Saudi women were employed as domestic workers.

No regulation requires equal pay for equal work.  In the private sector, the average monthly wage of Saudi women workers was 58 percent of the average monthly wage of Saudi men.  Labor dispute settlement bodies did not register any cases of discrimination against women.

The law grants women the right to obtain business licenses without the approval of their guardians, and women frequently obtained licenses in fields that might require them to supervise foreign workers, interact with male clients, or deal with

## SAUDI ARABIA

government officials.  Although it is illegal for a potential employer to ask a female applicant for her guardian's permission when she applies for a job, some employers required them to prove such permission.  Women who work in establishments with 50 or more female employees have the right to maternity leave and childcare.

The country had an increasing number of female diplomats; in March local media reported the number reached 151 in 2019.  On August 2, the minister of education appointed the country's first three women overseas cultural attaches.  On August 25, the Ministry of Foreign Affairs appointed Ahlam bint Abdulrahman Yankasar as the director-general of the general department of cultural affairs, the first woman to serve as a director general in the ministry.  In February 2019 a royal decree appointed the first female Saudi ambassador.

Bureaucratic procedures largely restricted women working in the security services to employment in women's prisons, at women's universities, and in clerical positions in police stations, where they were responsible for visually identifying other women, for example wearing niqabs, for law enforcement purposes.  On January 19, the military chief of general staff inaugurated the first women's wing in the Armed Forces.  In October 2019 officials announced that women would be able to join the armed forces in a wide range of positions, including corporals and sergeants.  In June, Director of Government Affairs Moaid Mahjoub tweeted a photograph of one of the first female members of a Saudi Royal Guard regiment.

Discrimination with respect to religious beliefs occurred in the workplace. Members of the Shia community complained of discrimination based on their religion and had difficulty securing or being promoted in government positions. They were significantly underrepresented in national security-related positions, including the Ministries of Defense and Interior and the National Guard.  In predominantly Shia areas, Shia representation was higher in the ranks of traffic police and employees of municipalities and public schools.  A very small number of Shia occupied high-level positions in government-owned companies and government agencies.  Shia were also underrepresented in employment in primary, secondary, and higher education.

## e. Acceptable Conditions of Work

**SAUDI ARABIA**

The monthly minimum wage for public-sector employees was above the estimated poverty-income level.  In November the minister of human resources announced the minimum wage for Saudis in the private sector would be set at 4,000 riyals (approximately $1,066) per month.  There was no private-sector minimum wage for foreign workers.

By law a standard workday is eight hours.  A standard workweek is 48 hours but can extend to 60 hours, subject to payment of overtime, which is 50 percent more than the basic wage.  Labor law requires employers to provide paid holidays on Eid al-Fitr, Eid al-Adha, and Saudi National Day but does not apply to domestic workers--those sponsored by individuals rather than companies.

An estimated 10.4 million foreign workers, including approximately 1.3 million women, made up approximately 76.5 percent of the labor force, according to the General Authority for Statistics' labor market survey for the first quarter.  Legal workers generally negotiated and agreed to work conditions prior to their arrival in the country, in accordance with the contract requirements contained in the labor law.

The law provides penalties for bringing foreigners into the country to work in any service, including domestic service, without following the required procedures and obtaining a permit.  The penalties were not commensurate with those for similar crimes, such as fraud.

Occupational safety and health (OSH) standards are appropriate for main industries.  The labor law provides for regular safety inspections and enables ministry-appointed inspectors to make unannounced inspections, initiate sanctions, examine materials used or handled in industrial and other operations, and submit samples of suspected hazardous materials or substances to government laboratories.  The government effectively enforced the law.  The Ministry of Health's Occupational Health Service Directorate worked with the Ministry of Human Resources and Social Development on health and safety matters.  In accordance with Articles 121 and 122 of the labor law, employers are obligated to safeguard safety and health requirements in the workplace to protect employees from harm and disease.  Regulations require employers to protect some workers from job-related hazards and disease, although some violations occurred.  Penalties

## SAUDI ARABIA

for violations of OSH laws were not commensurate with those for crimes of negligence.  Under Article 121, punishment for labor violations can range up to 100,000 riyals (approximately $26,700) and possibly temporary or permanent closure of a business (commensurate with the punishment for vandalizing cultural or historical sites).  These regulations did not cover farmers, herdsmen, domestic servants, or workers in family-operated businesses.  Although the ministry employed nearly 1,000 labor inspectors, foreign workers privately reported frequent failures to enforce health and safety standards.  Although statistics were unavailable, examples of major industrial accidents during the year that caused the death or serious injury to workers include local media reports from June 11 that six workers died in a water pipeline construction accident in al-Aziziah district in Riyadh and from December 16 that one worker died and three others were injured due to gas leakage in an air-conditioner shop in Riyadh.

On April 25, local media reported that the Ministry of Municipal and Rural Affairs began preparing residences belonging to the Saudi Authority for Industrial Cities and Technology Zones to be used as temporary housing for up to 29,000 workers. According to the ministry, the residences were established in response to the rapid rise in number of confirmed COVID-19 cases among expatriate workers in densely populated labor camps and neighborhoods.

The law requires that a citizen or business must sponsor foreign workers in order for them to obtain legal work and residency status, although the requirement exempts Syrian and Yemeni citizens who overstayed their visas.  The Ministry of Human Resources and Social Development implemented measures allowing noncitizen workers to switch their employer to a new employer or company that employed a sufficient quota of Saudi citizens.  Some workers were unaware of the new regulations and were forced to remain with their sponsor until completion of their contract or seek the assistance of their embassy to return home.  There were also instances in which sponsors bringing foreign workers into the country failed to provide them with a residency permit, which undermined the workers' ability to access government services or navigate the court system in the event of grievances. Sponsors with commercial or labor disputes with foreign employees also could ask authorities to prohibit employees from departing the country until the dispute was resolved.  Authorities, however, would not jail or forcibly return fleeing workers

## SAUDI ARABIA

who sought to exit the country within a 72-hour period or coordinate with their embassy for repatriation as long as the employees did not have criminal charges or outstanding fines pending against them.

Bilateral labor agreements set conditions on foreign workers' minimum wage, housing, benefits including leave and medical care, and other topics. Those provisions were not drafted in line with international standards and varied depending on the bargaining power of the foreign workers' country. The labor law and the law against trafficking in persons do not provide penalties commensurate with those for other analogous serious crimes, such as kidnapping.

In July the HRC, in coordination with other government bodies, conducted a large-scale awareness campaign, *Together to Combat Trafficking in Persons*, which included educational messages coordinated across social media platforms, print media, and television.

There were reports that some migrant workers were employed on terms to which they had not agreed and experienced problems, such as delays in the payment of wages, changes in employer, or changed working hours and conditions. Migrant workers, especially domestic workers, were vulnerable to abuse, exploitation, and conditions contravening labor laws, including nonpayment of wages, working for periods in excess of the 48-hour workweek, working for periods longer than the prescribed eight-hour workday without due compensation, and restrictions on movement due to passport confiscation. There were also reports of physical, psychological, sexual, and verbal abuse.

There were reports that some migrant workers, particularly domestic employees, were unable to exercise their right to remove themselves from dangerous situations. Some employers physically prevented workers from leaving or threatened them with nonpayment of wages if they left. Sponsoring employers, who controlled foreign workers' ability to remain employed in the country, usually held foreign workers' passports, a practice prohibited by law. In some contract disputes, sponsors asked authorities to prevent the employee from leaving the country until resolution of the dispute to coerce the employee into accepting a disadvantageous settlement or risking deportation without any settlement.

## SAUDI ARABIA

While some foreign workers were able to contact the labor offices of their embassies for assistance, domestic workers in particular faced challenges when attempting to gain access to their embassies, including restrictions on their freedom of movement and telephone access, confiscation of their passports, and being subjected to threats and verbal and physical abuse.  During the year hundreds of primarily female domestic workers sought shelter at their embassies' safehouses to escape physical and sexual abuse by their employers.  Those workers usually sought legal assistance from their embassies and government agencies to obtain end-of-service benefits and exit visas.  In addition to their embassies, some domestic servants could contact the NSHR, the HRC, the governmental Interministerial General Secretariat to Combat Human Trafficking, and the Migrant Workers' Welfare Department, which provided services to safeguard migrant workers' rights and protect them from abuse.  Some were able to apply to the offices of regional governors and lodge an appeal with the Board of Grievances against decisions by those authorities.

In June media outlets reported that Nigeria's National Agency for the Prohibition of Trafficking in Persons had received distress calls and evidence that Nigerian women in Saudi Arabia were subjected to cruel working conditions, unpaid salaries and other entitlements, 18-hour workdays, and hazardous duties.